UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-

EDWARD GENE SMITH,

Defendant.

---

25 Cr. 4 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion to suppress statements made by defendant Edward Gene Smith, who is charged with child pornography offenses. On June 26, 2024, Smith was twice interviewed by federal agents during the execution of a search warrant at his home. Smith now moves under the Fifth Amendment to suppress statements he made during those interviews, claiming that the agents did not give him the warnings that *Miranda v. Arizona*, 384 U.S. 436 (1966), requires for a custodial interrogation. On April 7, 2025, the Court held an evidentiary hearing on the motion. For the reasons that follow, the Court finds that Smith was not in custody within the meaning of the Fifth Amendment during either interview, and thus denies the motion.

I.   **Overview**

On June 26, 2024, at approximately 6 a.m., federal agents and local police executed a court-authorized search warrant at Smith's apartment on Central Park South in Manhattan. The statements Smith made during two interviews conducted during the search are the subject of this motion.

On September 10, 2024, Smith was arrested on a complaint. Dkts. 2, 4.

1

On January 6, 2025, a grand jury returned Indictment 25 Cr. 4 (PAE). It charges Smith in three counts. *See* Dkt. 22 ("Indictment"). Count One charges receipt and distribution of child pornography, on or about June 3 to June 6, 2023, in violation of 18 U.S.C. § 2252A(a)(2)(B)(b)(l)–(2). Count Two charges possession of child pornography, on or about June 3, 2023 to June 26, 2024, in violation of 18 U.S.C. § 2252A(a)(5)(B), (b)(2). Count Three charges, on or about April 23, 2023, the knowing and intentional distribution and possession with intent to distribute of a controlled substance, clonazepam, in violation of 21 U.S.C. §§ 812, 841(a)(l), (b)(2).

At a February 13, 2025 pretrial conference, the Court set a schedule for Smith's motion to suppress the statements he made during the June 26, 2024 interviews. Dkt. 39. On March 6, 2025, Smith filed a motion to suppress those statements, along with a memorandum of law and exhibits. Dkts. 47–48. On March 20, 2025, the Government filed an opposition. Dkt. 51 ("Gov't Br."). On April 7, 2025, the Court held an evidentiary hearing and heard argument. *See* Dkt. 63 ("Transcript" or "Tr."). The Government called one witness, Special Agent Audra Hampsch of the Federal Bureau of Investigation ("FBI"), one of the agents who conducted the interviews. The Government also offered as evidence body camera footage, audio recordings, and transcripts from each interview. The defense cross-examined Special Agent Hampsch but did not offer live testimony. On April 9, 2025, the defense filed a post-hearing letter. Dkt. 62. On April 10, 2025, the Government filed a response. Dkt. 65.

## II. Factual Findings

### A. Evidence Considered

The Court draws the factual findings below from the testimony of Special Agent Hampsch, Smith's pre-hearing affidavit, Dkt. 48-2 ("Smith Aff."), and exhibits received at the

2

hearing. These included (1) video and audio recordings from a body camera worn by Special Agent Hampsch during the execution of the search warrant on June 26, 2024, GX 1; (2) video and audio recordings from body cameras worn by FBI Special Agents Matthew Deragon, GX 2, and Michael Buscemi, GX 4, during the execution of the search warrant; (3) audio recording of the first interview of Smith by Special Agents Hampsch and Buscemi, which lasted from approximately 6:09 a.m. to 6:54 a.m., GX 6T (transcript); (4) audio recording of a second, brief interview of Smith by Special Agents Hampsch and Buscemi, which lasted from approximately 6:59 a.m. to 7:06 a.m., GX 7T (transcript); (5) a photograph taken by FBI Special Agent Alexandra Chacon during the execution of the search warrant, at approximately 6:13 a.m., GX 8; and (6) a copy of the FBI's crime scene sign-in log at Smith's residence the day of the search, DX U.

### B. Facts Established

On a suppression motion, the Government bears the burden of proof by a preponderance of the evidence. *See United States v. Vado*, 87 F. Supp. 3d 472, 474 n.1 (S.D.N.Y. 2015). The Court finds the facts below established by a preponderance. Most of these facts are undisputed, centrally including those based on the events and statements captured on the video footage of the agents' entry into the apartment and the audio recording of the interviews of Smith.

Where the Court cites to testimony, it has credited it, unless otherwise indicated. The Court found the testimony of Special Agent Hampsch, the sole live witness, broadly credible. The Court bases this finding on its assessment of her experience, knowledge, demeanor, and the consistency of her testimony with other evidence. The Court found significant aspects of Smith's affidavit consistent with Special Agent Hampsch's live testimony, and to that extent credits it. But other aspects of Smith's affidavit were not credible or compatible with the other

3

evidence, including his statements or implications that he wore only underwear during the interviews, *see* Smith Aff. ¶ 8 ("I asked if I could at least put on underwear. . . . I had to verbally direct the agent to my dresser where I kept my boxers."), or to the effect that he did not feel free to leave or to decline to answer questions, *see id.* ¶ 9 ("I never felt that I was free to leave or could end their questioning."); *id.* ¶ 10 ("I never had the sense or impression that I could refuse to answer any questions"); *id.* ¶ 11 (circumstances "led me at some point to believe I was being arrested"); *id.* (claiming he was "corner[ed]" by the agents during the interview). The Court evaluated Smith's affidavit under the same standards applicable to Special Agent Hampsch's testimony, save that, because Smith did not testify, the Court was unable to evaluate his demeanor.[1]

### 1.  **Execution of the Search Warrant**

On June 26, 2024, at approximately 6 a.m., nine law enforcement officers arrived at Smith's apartment building to execute the search warrant. Tr. at 7, 46–48. The officers included seven agents from the Federal Bureau of Investigation ("FBI"), one FBI intern, and one officer from the New York Police Department. *See* DX U. The use of eight or nine officers is standard for the execution of a search warrant. *Id.* at 15. The warrant authorized the agents to search for evidence of Smith's receipt or possession of "child sexual abuse material" ("CSAM"). Tr. at 124. The agents did not have an arrest warrant for Smith. *Id.* at 13.

---

[1] Relatedly, because Smith did not testify and his account was not subject to cross-examination, the Court affords his account less weight. *See, e.g., United States v. Calix*, No. 13 Cr. 582, 2014 WL 2084098, at *1 n.1 (S.D.N.Y. May 13, 2014) (citing, *inter alia, United States v. Rodriguez*, 368 F. App'x 178, 180 (2d Cir. 2010)); *United States v. Medina*, 19 F. Supp. 3d 518, 535 n.13 (S.D.N.Y. 2014) (collecting cases).

4

As reflected in body camera footage, the agents, who wore bulletproof vests and were armed, knocked repeatedly on Smith's door, announced their presence, stated that they had a search warrant, and asked Smith to come to the door. GX 1 at 1:35–2:30. Approximately one minute passed without a response. *See id.* The agents then opened the door with a key they had obtained from building management. GX 2 at 2:27–2:33; *see also* Tr. at 14. Smith appeared to be walking towards that door when the agents opened it. GX 2 at 2:38–2:43. He had apparently just emerged from a shower and was wet and unclothed. *See id.*; *see also* Tr. at 64. The agents' weapons, which had been drawn upon entering, remained drawn, although these were not pointed at Smith, but instead appear largely to have been pointed downwards. GX 1 at 2:30–2:50.[2]

The agents stood in the hallway as Smith walked to the door. GX 2 at 2:38–2:43. One agent, holding Smith's upper arm, appears to have briefly pulled or guided him into the hallway alongside the front door. *Id.* at 2:40–2:47. Special Agent Hampsch did not regard that action as a use of force. Tr. at 17. As she testified, Smith was "moved to the left of the door so the team could safely effectuate a security sweep." *Id.* An agent briefly restrained Smith in the hallway, holding his hands behind his back for several seconds, *see* GX 1 at 2:50–2:57, while other officers entered and secured the premises, *id.*; Tr. at 20–21. Smith was asked "if there were any weapons inside the apartment or if there was anything inside the apartment that would harm [the agents]"; he responded that there were not, *id.* at 19–20; GX 1 at 2:55–3:03, a denial that later proved untrue, Tr. at 20. Smith was not handcuffed. Smith Aff. ¶ 11; Tr. at 30. Less than a minute after Smith entered the hallway, an agent obtained a towel from Smith's bathroom and

---

[2] Special Agent Hampsch testified that drawing weapons is customary during a security sweep. Tr. at 54. It is also customary for the agents, absent provocation, to point the guns in a "sul" position, meaning "a safe position facing down." *Id.*

gave it to him to wrap around his waist. GX 1 at 3:33–3:38. A few seconds later, with the security sweep concluded, Smith, without the agents touching him, was escorted back into his apartment. *See id.* at 3:45–4:01. The agents holstered their guns at the conclusion of the security sweep. *See id.* 3:45–4:04; Tr. at 123.

The above events were captured on body camera footage. The body cameras, however, were switched off shortly after Smith's reentry into the apartment. *See* GX 1 at 3:50–4:04. Little time—about two to four minutes—elapsed between when the body cameras were switched off and when the interview of Smith in the apartment kitchen began. Tr. at 80. Special Agent Hampsch did not recall any communications with Smith during that window, save that it was "a priority" to "get Mr. Smith clothes." *Id.* at 108. Contrary to the implication in Smith's affidavit that he was given and wore only underwear during that interview, Smith Aff. ¶ 8, the Court credits Special Agent Hampsh's testimony that Smith was provided clothing before the interview began, and that he wore a shirt and pants throughout the interview. Tr. at 105–07. Indeed, a photograph of the premises taken by Special Agent Chacon at 6:13 a.m., *see* GX 9 ¶ 8, taken to capture the pre-search state of the apartment, depicts Smith, in the distance, seated at his kitchen table wearing a gray shirt. GX 8. The bottom half of Smith's body was not in view of the camera. *See id.* At the hearing, defense counsel abandoned the claim that Smith had worn only underwear during the interview.[3]

---

[3] Special Agent Hampsch testified that she is "very confident" that Smith was wearing a shirt during the entirety of the interview. Tr. at 105. She initially testified that she is "somewhat confident" that he was wearing long pants during the interview. *See id.* But when probed by the Court about whether—insofar as she sat facing Smith several feet away during parts of the interview with no table or other objects in between them—she would have remembered had he not been wearing pants, she was more emphatic. She testified, "Absolutely. . . . I would have been personally uncomfortable if he had been wearing just underwear. . . . If he was wearing underwear only, I would have remembered that." *Id.* at 106–07. The Court credits that testimony. And Smith's affidavit is not directly contrary. It states that, when he asked if he could

6

### 2.     The First Interview

The first interview lasted 45 minutes, from 6:09 a.m. to 6:54 a.m. GX 9 ¶ 6. It took place in Smith's kitchen and is captured on an audio recording. Tr. at 124; GX 6T. Special Agents Hampsch and Buscemi conducted the interview. Tr. at 21. Special Agent Hampsch described the narrow kitchen space as "cramped," and "not a conducive area" for conducting an interview. *Id.* at 103. The agents selected the kitchen area for the interview, however, because Smith's apartment was a studio, and the agents preferred to interview him away from where the search was occurring. *See id.* at 22.

During the interview, Smith was seated in a chair facing the two agents. There was one chair that Special Agents Hampsch and Buscemi alternated using; the other stood alongside the seated agent. *See id.* at 124. The agents situated Smith's chair in the center of the kitchen, to position him away from an open door frame that opened into the living area, as otherwise Smith, during the interview, would have been able to observe the search. *See id.* at 103. During the interview, the agents seated or standing across from Smith were "several feet away" and never sat next to or physically touched him, save for a brief point during the interview where Agent Hampsch "crouched" beside him to show him documents. *Id.* at 75, 124.

Salient to the suppression motion, approximately two minutes into the interview, Special Agent Hampsch stated, "Just to be clear, . . . you're not under arrest." GX 6T at 2:09–2:14.[4] Special Agent Buscemi added:

---

"put on underwear, . . . Agent Buscemi instructed another agent to retrieve underwear for [him]," Smith Aff. ¶ 8, thus implying, but never directly asserting, that he was not given a shirt and pants.

[4] In the short period before that statement by Special Agent Hampsch, Smith had been asked only limited questions, essentially about his employment and residence. The Government has agreed

7

> No one's under arrest. You're free to talk to us. You're free to, you're free to leave. You don't like the question I ask you? "Mike, I don't like that question." On to the next one. Alright? You're not under arrest. No handcuffs. Like, totally. Alright. No one's under arrest here today.

*Id.* at 2:14–2:35. Approximately halfway through the interview, Special Agent Hampsch repeated the point:

> I hope you understand. You know, this is just our job. We've got to check every box and vet everything. Just to reiterate, you are not in custody. You're not under arrest. We're just here for a search warrant to make sure we can get some of that content.

*Id.* at 26:26–26:49.

During the interview, the agents probed Smith about areas relating to child pornography. These included, *inter alia*, (1) whether he had made any online purchases using Bitcoin, *id.* at 2:13–2:37; (2) whether he had purchased content advertised as child pornography, *id.* at 5:00–5:41; (3) whether he knew that the girls appearing in the videos he purchased were minors, *id.* at 15:19–15:43; (4) how much money he had spent on such purchases, *id.* at 6:51–6:55; (5) whether the agents would find child pornography if they searched the contents of his devices, *id.* at 10:56–11:23; and (6) whether he had ever inappropriately touched or taken photographs of his stepdaughters, *id.* at 21:45–22:30.

Smith's answers, in substance, included the following: (1) he made "some" purchases of "adult material" using Bitcoin on an "adult site," *id.* at 2:13–3:00; (2) he purchased material from a pornography producer known as Snapgod, *id.* at 11:40–13:20; (3) before he purchased the material, he "figured" the girls in the videos "were teens," who "certainly could have been under 18, like 16 or 17," *id.* at 19:55–20:20, (4) his sexual preference is girls who are "teens," *id.* at

---

not to seek to offer in evidence Smith's statements before Special Agent Hampsch's statement quoted above. *See* Tr. at 157.

8

24:19–24:27, 34:42–34:49; (5) he spent "max 500" dollars on such content, *id.* at 6:44–7:04; (6) he "do[esn't] do anything with children" physically, *id.* at 6:38–6:51; and (7) he did not inappropriately touch or take photos of his stepdaughters, *id.* at 21:55–22:32.

Special Agent Hampsch testified—and the audiotape is in accord—that she does not recall Smith at any point asking to leave or terminate the interview, save that at one point he stated that he "needed to send an email to . . . one of his colleagues at work." Tr. at 95, 111–12; GX 6T at 27:01–27:05. The agents permitted Smith to send such an email, but under their supervision, because the phone was a subject of the search warrant. *Id.* at 27:05–28:28.

### 2.    The Second Interview

The second interview lasted seven minutes, from 6:59 a.m. to 7:06 a.m. and also took place in the kitchen and was captured on audio. GX 9 ¶ 7. The audio recording was turned off in between the two interviews. The second interview came about, Special Agent Hampsch testified, because, around the time the first interview concluded, the agents executing the search discovered a handgun, two rifles, a silencer, and ammunition in a hallway closet. *Id.* at 110; *see also* GX 7T at 00:36. She testified that she does not recall any communications with Smith while the audio was turned off, but if any occurred, it would have concerned the location of the firearms. Tr. at 111. During the interview, Smith was asked about the firearms, which he said were licensed in South Carolina, but not in New York. *See* GX 7T at 00:25; *see also* Tr. at 32, 129. After the second interview, Smith was arrested on New York state-law charges relating to the possession of the firearms without a New York license. Tr. at 31, 129. As of the start of the second interview, the determination to arrest him had not been made. *Id.* at 127.

9

### III. Discussion

Smith moves to suppress his statements during the interviews, claiming that he was subject to custodial interrogation during each interview, and that his statements thus were elicited in violation of his Fifth Amendment right under *Miranda*, 384 U.S. at 436.

#### A. Applicable Legal Standards

Statements made during a custodial interrogation are generally inadmissible unless a suspect has first been advised of his rights. *Id.* at 444. Under *Miranda*, where a suspect is under custodial interrogation, "police officers must warn [the] suspect prior to questioning that he has a right to remain silent, and a right to the presence of an attorney." *Maryland v. Shatzer*, 559 U.S. 98, 103–04 (2010).

An "interrogation" refers to "any words or actions on the part of the police" that "the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980).

"'Custody' for *Miranda* purposes is not coterminous with the colloquial understanding of custody." *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016) (cleaned up). To determine whether a suspect was "in custody" under *Miranda*, a court conducts a two-part inquiry, considering (1) "the circumstances surrounding the interrogation," and, given those, whether (2) "a reasonable person [would] have felt he or she was at liberty to terminate the interrogation and leave." *Vado*, 87 F. Supp. 3d at 478 (citing *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011). The Second Circuit has described the "ultimate inquiry" for determining whether a suspect is "in custody" for *Miranda* purposes as "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Newton*, 369 F.3d 659, 670 (2d Cir. 2004) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)

10

(per curiam)). Under this "narrow[]" view of the custody requirement, *Faux*, 828 F.3d at 132, "[i]n the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave, or that he is completely at the mercy of the police," *United States v. Familetti*, 878 F.3d 53, 60 (2d Cir. 2017) (citing *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992) and *Newton*, 369 F.3d at 675).

Factors relevant to the custody inquiry include (1) "the interrogation's duration"; (2) "its location (e.g., at the suspect's home, in public, in a police station, or at the border)"; (3) "whether the suspect volunteered for the interview"; (4) "whether the officers used restraints"; (5) "whether weapons were present and especially whether they were drawn"; and (6) "whether officers told the suspect he was free to leave or under suspicion." *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011). Where, under the totality of circumstances, a defendant is found not to have been "in custody" at the time of the interrogation, his rights under *Miranda* are not implicated. *See id.*

**B.    Analysis**

It is undisputed that the agents' questioning of Smith on June 26, 2024, about areas of suspected illegal activity constituted an interrogation and that Smith was never advised of his *Miranda* rights before or during that questioning. *See* Gov't Br. at 5 & n.4; *see also Innis*, 446 U.S. at 300–02. Thus, the decisive question is whether Smith was "in custody" during the questioning. For the reasons that follow, the answer is no.

Crucially, the agents explicitly told Smith at the outset of the interview, and later repeated, that he was "not under arrest," that he was "free to leave" at any point, and that he was free to decline to answer any and all questions. GX 6T 2:14–2:30. These admonitions were clear and emphatic. Smith does not claim otherwise. And after being so advised, Smith

11

continued to answer the agents' questions. Under Second Circuit law, this fact weighs heavily in the Court's analysis. An interrogation, the Circuit has stated, "is not 'custodial' unless the authorities *affirmatively convey the message that defendant is not free to leave*, or that he is completely at mercy of the police." *Familetti*, 878 F.3d at 60 (emphasis added) (citations omitted). Here, the agents' words to Smith were exactly the contrary. *See, e.g., Vado*, 87 F. Supp. 3d at 479 (child pornography suspect interviewed in his apartment not in custody where "agents explicitly informed [him] that he was not under arrest and was free to leave" (citing *United States v. Badmus*, 325 F.3d 133, 139 (2d Cir. 2003)); *United States v. Belitz*, No. 21 Cr. 693, 2022 WL 205585, at *4 (S.D.N.Y. Jan. 24, 2022) (defendant not in custody where he "was explicitly told by the agents that he was free to leave"); *Hernandez v. McIntosh*, No. 22 Civ. 2266, 2023 WL 6566817, at *17 (S.D.N.Y. Oct. 10, 2023) (same), *report and recommendation adopted*, No. 22 Civ. 2266, 2024 WL 2959688 (S.D.N.Y. June 11, 2024).

The agents' conduct also did not convey that Smith was not free to leave. Smith was not handcuffed or otherwise restrained during the interview. The agents drew weapons briefly upon encountering Smith at the threshold of his apartment but holstered these upon completion of the security sweep. The agents neither threatened nor used force. The agents' tone, though probing, was conversational, not confrontational, throughout the interview, which lasted less than an hour. There were no references to arrest. Smith—though naked at the time of agents' entry due to his having been in the shower when they arrived—was clothed during the interviews and thus was not vulnerable in that respect. And the questioning took place on Smith's home turf, in the kitchen of his apartment. Questioning in a suspect's home is "generally not deemed custodial." *Newton*, 369 F.3d at 675; *see, e.g., Faux*, 828 F.3d at 138 (defendant "questioned in the familiar surroundings of her home" was non-custodial); *Belitz*, 2022 WL 205585, at *4 (same).

12

These circumstances lack any traditional indicia of a "custodial" interrogation. Courts resolving the "ultimate inquiry" whether there is "a formal arrest or restraint on freedom of movement of the degree associated with formal arrest," *J.D.B.*, 564 U.S. at 270, have centrally inquired whether handcuffs or other physical restraints were used, *see Newton*, 339 F.3d at 674, or whether "physical force was used, or threatened," *Faux*, 828 F.3d at 138. *See, e.g., Newton*, 339 F.3d at 676 ("Handcuffs are generally recognized as a hallmark of a formal arrest."); *New York v. Quarles*, 467 U.S. 649, 655 (1984) (suspect handcuffed during interview was in custody for *Miranda* purposes); *Dunaway v. New York*, 442 U.S. 200, 215 & n.17 (1979) (circumstances had "trappings of a technical formal arrest" where "officers drew their guns, informed [defendant] that he was under arrest, and handcuffed him"); *United States v. Slaight*, 620 F.3d 816, 820 (7th Cir. 2010) (defendant suspected of child pornography offenses "in custody" where officers "broke in [to defendant's] apartment with a battering arm, strode in with pistols and assault rifles at the ready," "found him naked in his bed [and] ordered him, in an 'authoritative tone' and guns pointed at him, to put his hands up," and interrogated him at a police station). Such badges of custody were absent here.

This case is a far cry from presenting the "extreme or unusual" circumstances in which courts have occasionally held that suspects interrogated in the "familiar surroundings" of their homes were restricted to a degree comparable to that of formal arrest. *Vado*, 87 F. Supp. 3d at 479. In *Orozco v. Texas*, for example, a defendant was held to be in custody where several officers entered his bedroom at 4 a.m., questioned him without warnings, and explicitly told him that he was "under arrest and *not* free to leave." 394 U.S. 324, 327 (1969) (emphasis added). In *United States v. Newton*, the defendant was held to be in custody in his own home where he was handcuffed during the interview, and as such, "his interrogation was being conducted pursuant to

13

arrest-like restraints." 369 F.3d at 676–77. And in *United States v. Romaszko*, a defendant interviewed in her home was held to be in custody where she "asked to leave or attempted to stand up" at least five times and "was told that she could not." 253 F.3d 757, 759 (2d Cir. 2001).

This case is, instead, on par with the many cases in which suspects—largely on the strength of verbal admonitions from officers that they were not under arrest—have been held not to have been in custody. *See, e.g., Familetti*, 878 F.3d at 60–61 (suspect not in custody where "officers advised [defendant] several times that he was not under arrest and was free to leave," the officers "engaged him in a tone that was . . . non-confrontational," the defendant "was not restrained," and "the agents' weapons were never drawn"); *Faux*, 808 F.3d at 139 (suspect not in custody where "she was told 20 minutes into the interview that she was not under arrest; she was never told that she was not free to leave; she did not seek to end the encounter, or to leave the house, . . . the tone of the questioning was largely conversational; there [wa]s no indication that the agents raised their voices, showed firearms, or made threats"); *FNU LNU*, 653 F.3d at 155 (similar); *United States v. Akapo*, 420 F. App'x. 42, 44 (2d Cir. 2011) (suspect not in custody where he was not handcuffed, did not indicate that he wanted to leave, and was not told that he could not leave); *United States v. Cerreta*, 63 F. App'x. 585, 587 (2d Cir. 2003) (suspect not in custody where he "was informed that he did not have to answer questions, that he was not under arrest, and that he could leave if he wanted to"; "there was no evidence that defendant sought and was unable to leave prior to the end of the interrogation"; and "the amount of time involved was not excessive").

Particularly apposite is the Second Circuit's decision in *United States v. Familetti, supra*. There, nine law enforcements questioned a former financial executive about child pornography offenses during the search of his apartment pursuant to a search warrant. 878 F.3d at 56. When

14

the agents entered, Familetti was "temporarily handcuff[ed]" and placed in a chair in his living room. *Id.* The handcuffs were removed before questioning began, and Familetti was advised "several times that he was not under arrest and free to leave." *Id.* at 60. In the interview, Familetti made incriminating statements about child pornography. *See id.* at 57. Despite his claim that "he lacked any real option to leave," the district court denied his suppression motion, and the Second Circuit affirmed, finding the totality of the circumstances to "cut against finding a restraint comparable to formal arrest" and against a finding of custodial interrogation. *Id.* at 60, 62. Decisive to the Circuit were that Familetti had been told several times he was not under arrest and was free to leave, that the questioning occurred in his home, that he was unrestrained when questioned, and that the agents used a conversational tone. *See id.* at 60–62.

Also closely on point is *United States v. Faux, supra*. A health care-fraud defendant there sought to suppress non-*Mirandized* statements during an interview conducted in her home during the execution of a search warrant. 826 F.3d at 131–32. Faux argued that her interrogation had been custodial because agents "swarmed about her home" and accompanied her "to her bedroom when she wanted to get a sweater," she "did not think she was free to leave," and the two-hour interview occurred at her dining room table. *Id.* at 133–34, 139. Upholding denial of her suppression motion, the Second Circuit observed that a suspect's "subjective belief about his or her status generally does not bear on the custody analysis," and concluded on the objective facts that Faux was not subject to custodial interrogation. *Id.* at 135, 139. These included that Faux was never told she was not free to leave, the agents "did not display their weapons or otherwise threaten or use any physical force," they did not use handcuffs, the tone of the questioning was conversational, and the interview occurred in the "familiar surroundings" of Faux's home. *Id.* at 138–39.

15

This case is not meaningfully distinguishable from *Familetti* or *Faux*. And the case law inters each of Smith's arguments.

Smith claims he did not subjectively feel "free to leave or that he could refuse to answer the agents' questions." Def. Mem. at 9; *see also* Smith Aff. ¶ 9. But as *Familetti* underscores, "the inquiry into custodial status is objective," and does not turn on a defendant's subjective perceptions. 878 F.3d at 60–61 (citing *Stansburg v. California*, 511 U.S. 318, 323 (1994) and *Mitchell*, 966 F.2d at 98 (custody status is determined by the "presence or absence of affirmative indications that the defendant was not free to leave")); *Faux*, 828 F.3d at 135 ("An individual's subjective belief about his or her status generally does not bear on the custody analysis.").

Smith also emphasizes that the agents drew weapons at the start of the encounter. But numerous cases have held that an initial display of guns to assure officer safety, where the guns are promptly reholstered, does not result in "custody" requiring *Miranda* warnings. *See, e.g., Cruz v. Miller*, 255 F.3d 77, 86 (2d Cir. 2001) (momentary display of guns "reflect[ed] the officers' initial concern for their safety," but "[o]nce the officers ascertained that [the defendant] was not armed, they put their guns away"); *see also, e.g., United States v. Cota*, 953 F.2d 753, 759 (2d Cir. 1992) (defendant not in custody where "initial use of guns . . . [was] necessitated by the officer's safety"); *United States v. Simmonds*, 641 F. App'x 99, 102 (2d Cir. 2016) ("[T]he fact that the officers initially used firearms and briefly searched [the defendant] does not compel a conclusion that the ensuing interrogation was custodial, especially where the use of firearms was necessitated by the officers' safety concerns and ended as soon as the perceived security threat abated." (cleaned up)).[5]

---

[5] In light of Smith's focus on the agents having drawn their guns and manually moved him to the side to enter the apartment, the Court invited the defense to submit a post-hearing letter for the limited purpose of identifying cases holding that agents' conduct at the start of the execution of a

16

Smith also notes that he was not wearing clothing when he answered the door. But the Court has found that the agents, within one minute, secured a towel for Smith to cover himself, and that, promptly upon completing the security sweep, they obtained for him clothing (underwear, a shirt, and pants) which he wore during the interview. Given these facts, the happenstance that Smith was in the shower when the agents arrived to execute the search warrant is insignificant. *Compare Newton*, 369 F.3d at 675 (finding insignificant, in determining custodial status, that defendant "was in his underwear while detained," because "[t]his was simply how [he] had presented himself when he answered the officers' knock at the apartment door"), *with Parsad v. Greiner*, 337 F.3d 175, 182 (2d Cir. 2003) (assuming without deciding that a person voluntarily at a police station is placed in custody if law enforcement there then seize defendant's clothing). And it is of no moment that the agents, rather than Smith, retrieved his clothes. *See* Def. Mem. at 9. The protective sweep of the apartment was still underway at the time and the officers therefore had good reason to prioritize their control of the premises, to "ensure there were no weapons or other individuals present, which could have posed a safety risk to the agents." Gov't Br. at 2.

Smith also accuses the agents of "surround[ing]" him "on both sides" during the questioning. Def. Mem. at 8. That is inaccurate. The Court has found that Special Agents Hampsch and Buscemi—one seated and one standing—were situated several feet away from

---

search warrant can overcome later actions indicative of a lack of custodial interrogation. *See* Tr. at 153. On April 9, 2025, the defense submitted a letter-brief that did not include any such cases, but largely addressed other issues. *See* Dkt. 62. On the point at issue, the defense's letter states only that the Court should consider the totality of law enforcement's conduct, including at the start of the encounter, in determining whether a suspect was in custody for *Miranda* purposes. *Id.* at 1. That proposition in not in dispute.

17

Smith during the interview, "facing," not surrounding, him. Tr. at 24–25. The officers did not touch Smith during the interview, *see id.* at 25–26, and an open doorway separated the kitchen and the studio apartment's living areas. There was nothing intimidating about this setting. And given the tight quarters, it is difficult to envision to imagine an alternative place in Smith's home where an interview could have occurred without distraction.

In the end, even if the interview (inherently or due to tight quarters) had some coercive quality, that would not make the interrogation custodial. *See Vado*, 87 F. Supp. at 480 ("'*Miranda* does not reach so broadly' as to attach any time an interview has some coercive quality." (quoting *Newton*, 369 F.3d at 671)). As the Supreme Court has recognized, "*any* interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Beheler*, 463 U.S. at 1124 (emphasis added) (cleaned up).

Finally, *United States v. Bullins*, 880 F. Supp. 76 (D.N.H. 1995), the central case on which Smith relies, is inapposite. Smith depicts *Bullins* as supporting that a suspect cannot feel free to leave when confined to a particular area of his residence during the execution of a search warrant. In *Bullins*, the district court held that "[a]lthough [the defendant] was neither handcuffed nor formally placed under arrest at any time, defendant was not free as a practical matter to either leave or move about his home while the search was under way," because he was "directed to remain seated at his kitchen table." *Id.* at 77–78. An agent in that case testified that the defendant, had he attempted to "leave or move about, . . . would have been restrained or taken outside and placed under guard." *Id.* at 78. But that is not the case here. Unlike *Bullins*, Smith was never told that he could not leave the kitchen. *See United States v. Melo*, 954 F.3d

334, 343 (1st Cir. 2020) (distinguishing *Bullins* in part on such grounds). On the contrary, as the audiotape dispositively establishes, the agents repeatedly told Smith the opposite: that he was not in custody and free to leave at any time.

For the above reasons, based on the totality of the circumstances, Smith was not "in custody" for *Miranda* purposes.

## CONCLUSION

For the foregoing reasons, the Court denies Smith's motion to suppress. The Clerk of Court is respectfully directed to terminate the motion pending at Docket 47.

*Paul A. Engelmayer*
PAUL A. ENGELMAYER
United States District Judge

Date: April 16, 2025
New York, New York