P7O8SMIC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          25 CR 004 (PAE)

5    EDWARD GENE SMITH,

6              Defendant.

7    ------------------------------x        Conference

8                                           New York, N.Y.
                                            July 24, 2025
9                                           11:10 a.m.

10

11   Before:

12                   HON. PAUL A. ENGELMAYER,

13                                          District Judge

14                          APPEARANCES

15   JAY CLAYTON
          United States Attorney for the
16        Southern District of New York
     REMY K. GROSBARD
17        Assistant United States Attorney

18   ANDERSON KILL P.C.
          Attorneys for Defendant
19   SAMUEL BRAVERMAN
          -and-
20   ROBERT HERZ
     ELIZABETH KELLEY

21

22

23

24

25

```
1                    (In open court; case called)

2                    THE DEPUTY CLERK:  Counsel, starting with the front

3       table, please state your appearance.

4                    MS. GROSBARD:  Good morning, your Honor.  Remy

5       Grosbard for the government.  And with me at counsel's table is

6       a summer intern in our office, Marley Jacobson.

7                    THE COURT:  Good morning, Ms. Grosbard.

8                    Good morning, Ms. Jacobson.

9                    For the defense.

10                   MR. HERZ:  Good morning, your Honor.  Robert Herz for

11      Edward Smith.

12                   MS. KELLEY:  Good morning, your Honor.  Elizabeth

13      Kelley.

14                   MR. BRAVERMAN:  Good morning, your Honor.  Sam

15      Braverman.  And also with us is Jeff Fischbach.

16                   THE COURT:  Mr. Fischbach, are you an attorney?

17                   MR. BRAVERMAN:  He's not an attorney, but he is the

18      computer expert that we were talking about on the last date.  I

19      thought it would be helpful to have him close by if the Court

20      had any questions.

21                   THE COURT:  Very good.

22                   Good morning to all of you, Mr. Braverman, Ms. Kelley,

23      Mr. Herz, Mr. Fischbach, and of course you, Mr. Smith.

24                   We last met just a few weeks ago on July 7th and had

25      an extensive extension conference on a number of matters.
```

1    Since then, I have received two helpful letters.  One from the

2    defense, dated July 18, informs the Court that the defense will

3    not be filing a motion for a bond at this time because new

4    information has come to the defense's attention which requires

5    further investigation before any such motion can be made; and

6    second, I received a letter from the government on both behalf

7    of both parties setting out a proposed schedule of deadlines

8    leading up to a final pretrial conference a week before the

9    trial date.

10            Thank you for all that.  Very helpful.

11            Let me just take a quick moment on the bond issue, Ms.

12   Kelley, and if you would move the microphone closer.

13            Is there any elaboration you can give?

14            MS. KELLEY:  Not at this point, your Honor.

15            THE COURT:  Should I be expecting a bond motion or not

16   eventually?

17            MS. KELLEY:  You're trying to pin me down, your Honor.

18   At this point we do not know.

19            THE COURT:  Fair enough.  In the event that there is

20   such a motion anticipated, speak with the government and then

21   reach out to my chambers, but I will want to set an orderly

22   process that anticipates an exchange of letters in advance of

23   an in-person conference.

24            MS. KELLEY:  Certainly so.

25            THE COURT:  Putting that aside, we have the schedule

1    that the parties have set.  On the face of it, it certainly

2    seems fine, but there are certain matters I need to probe into

3    to make sure that it is fine.

4         Let me begin by taking up an issue with the defense,

5    and I think this again falls to you, Ms. Kelley, that we

6    briefly touched upon at the last conference, involving mental

7    health.  And you were all but declarative that there was not

8    going to be any notice of a mental disease or defect or any

9    defense in that space.  You hadn't given such notice, you were

10   all but certain it was not going to be part of the case, but

11   you left the door open enough of a crack that I need to ask

12   you.

13        MS. KELLEY:  I did, your Honor.  And I reread the

14   transcript of the hearing last night from that proceeding, and

15   I wanted to clarify a number of points for the Court.

16        Mr. Smith does indeed have autism spectrum disorder.

17   That is a lifelong condition.  The relevance for this matter,

18   and for any criminal proceeding, is the nexus between that

19   disability and the conduct charged.  We are certainly not

20   putting forward an argument that Mr. Smith is not competent to

21   proceed.  We are certainly not putting forward an argument that

22   he was insane at the time of these alleged acts.  The questions

23   in this case, the issues in this case, would likely be the

24   bearing, if any, that his autism spectrum disorder did have on

25   his conduct during the investigation, including the questioning

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    that he submitted to, as well as to how he became involved in

2    this particular matter.

3         THE COURT:  So this is a complete U-turn from what you

4    represented to me with the door open a bit last time around.

5    Last time around, where you were at was that this was a

6    sentencing issue if there was either a plea or a guilty

7    verdict.  Now you're saying to me that his mental health,

8    presumably an area for expertise, is germane both as to the

9    primary conduct involving the alleged child pornography and

10   involving the adult victim, but it's also germane to decoding

11   or understanding the answers he gave when interviewed during

12   the execution of the search of his apartment.

13        MS. KELLEY:  As I say, I reread the transcript, and I

14   realized I was incomplete.

15        THE COURT:  You weren't incomplete.  You left the door

16   open a crack so there is no impropriety.  It wasn't that you

17   were incomplete, you were wrong, in that in the transcript you

18   basically said, this is a sentencing matter, not a trial

19   matter, but you left the door open.  But I don't think it can

20   be dressed up as incomplete.  You basically said, with virtual

21   certainty, this doesn't have a place at the trial.

22        MS. KELLEY:  And the reason why I did that, your

23   Honor, quite frankly, is that in 99 percent of the cases

24   involving mental disability, it is a sentencing issue.  But if

25   in fact this case does go to trial——and indeed we are

```
 1    proceeding in that direction——then we may very well call our

 2    two mental health experts, whom I identified for the Court a

 3    couple of hearings ago.

 4              THE COURT:  And they would be testifying, the sum and

 5    substance, give me the bottom line takeaway that you anticipate

 6    they are testifying to.

 7              MS. KELLEY:  That -- and again, as we emphasized in

 8    the last hearing, because of the forensics issue in this case,

 9    as is continually developing, that may be the complete focus of

10    a trial.

11              THE COURT:  Sorry.

12              MS. KELLEY:  These are tactical questions, your Honor,

13    which we have not yet resolved.

14              THE COURT:  But that wasn't my question.  You told me

15    a moment ago that the trial may involve your calling two mental

16    health experts.  I asked you what the bottom line would be of

17    their testimony, as anticipated, and you started to talk to me

18    about the computer issue.  Answer my question.

19              MS. KELLEY:  All right.  They would generally testify

20    that people on the autism spectrum uniquely——like many of

21    us——spend a good deal of time online, indeed a disproportionate

22    amount online, and that people on the spectrum are sometimes

23    uniquely vulnerable to being victimized by online behavior or

24    unwittingly participate in online behavior.

25              THE COURT:  You said two experts.  Would they both be
```

1    saying the same thing?  What's the difference between them?

2           MS. KELLEY:  Dr. Laurie Sperry is a forensic

3    psychologist, and traditionally forensic psychologists are

4    tasked with administering a variety of different, if you will,

5    gold standard tests in order to measure not only the person's

6    autism spectrum disorder, but the particular permutations of

7    that autism spectrum disorder.

8           Dr. Charles Samenow, he is a forensic

9    psychiatrist——that is to say an M.D.——and he is typically

10   tasked with addressing the issue of pedophilia, if there in

11   fact is any, and future dangerousness, if there is any.

12          THE COURT:  What possible role does future

13   dangerousness have at the trial?

14          MS. KELLEY:  I mentioned that, your Honor, in an

15   abundance of caution because Dr. Samenow, if this case did not

16   go to trial, would probably be called at sentencing.

17          THE COURT:  Just because I am trying to keep us

18   focused.  You kept talking about sentencing at the last

19   conference.  You're not waiving anything about sentencing by

20   not talking about it now.  We are just talking about trial.

21   Future dangerousness is not an element of any defense, and

22   future dangerousness is not a defense.  So what is it that Dr.

23   Samenow would be testifying about at a trial?

24          MS. KELLEY:  At this point in time, I can't commit to

25   anything because the computer forensic evidence is still

1    evolving.  But in an abundance of caution, we want to retain

2    the right to call him if indeed his testimony would be relevant

3    and helpful.

4            THE COURT:  I am still trying to get an answer to what

5    he might say.  In other words, I am trying to understand what

6    the proposition is that's germane to a trial that he might

7    testify to.

8            MS. KELLEY:  We have not made a strategic decision

9    yet, your Honor.

10           THE COURT:  But surely there is some universe of

11   propositions that you have in mind that might be trial

12   relevant.  Whether you decide to call him or not, what is he

13   qualified to testify to that goes to guilt or innocence?

14           MS. KELLEY:  Again, depending upon the evolution of

15   the forensic evidence, he could discuss the circumstances of

16   Mr. Smith accessing that material, or not accessing that

17   material, and what it might mean.

18           THE COURT:  Do you envision either of these

19   individuals examining Mr. Smith?

20           MS. KELLEY:  They have already.  They met with him a

21   number of months ago.

22           THE COURT:  Okay.  So when did Sperry meet with

23   Mr. Smith?

24           MS. KELLEY:  She met with him in March.

25           THE COURT:  When did Samenow meet with Mr. Smith?

1          MS. KELLEY:  Shortly thereafter.  I notified the Court

2    of this two hearings ago.

3          THE COURT:  So, each of them would be giving, as you

4    envision it, not merely abstract testimony about the world at

5    large, but as-applied testimony based on examinations of the

6    defendant.

7          MS. KELLEY:  Indeed.

8          THE COURT:  Have you given the government notice that

9    you would be defending in part on the basis of a mental disease

10   or defect?  There is a rule here that requires that sort of

11   notice.  Have you done that?

12         It looks like no.

13         MS. KELLEY:  I appreciate the terminology, but I am

14   uncomfortable with that in this setting.

15         THE COURT:  Uncomfortable or not, we are in a rules

16   world here.

17         MS. KELLEY:  I understand.

18         THE COURT:  I have set a schedule a long time ago.

19   You have told me now that your client was evaluated.  You have

20   been on the case the whole way through.  Your client was

21   evaluated four months ago.  I am trying to figure out if the

22   right notice has been given.

23         Ms. Grosbard, help me out, what is the rule and the

24   deadline?

25         MS. GROSBARD:  I don't have it.  I believe it's about

1    two months, but I don't have it in front of me.

2            THE COURT:  I am looking at Rule 12.2, but I haven't

3    had this arise.

4            All right.  I will let the government raise any issues

5    pertaining to that.  It's under Rule 12.2.

6            Has there been notice given to the government of the

7    defense intention to elicit expert evidence on this point

8    before today?

9            MS. KELLEY:  We have mentioned in conversations,

10    indeed, in open court, that we have retained two mental health

11    experts, so this should not come as a surprise to the

12    government.

13            THE COURT:  Look, your hesitance in articulating this

14    to me is a problem, if only because the government needs to be

15    able to meet that expertise, and if the target is moving or

16    undefined, it becomes a problem.  Mental health is a vast area.

17            So, let's go back to the schedule then.  With respect

18    to the mental health related issues, under the schedule, you

19    would be disclosing on August 28th the identity and substance

20    of your expert's testimony, correct?

21            MS. KELLEY:  Yes.

22            THE COURT:  As to mental health, that means that

23    potentially both Dr. Sperry and Samenow would be noticed as

24    expert witnesses on this point.

25            MS. KELLEY:  That is correct, your Honor.

1          THE COURT:  Let's stick with the mental health issue.

2     We will get to the computer stuff in a moment.  Anything

3     further you want to share on that?

4          MS. KELLEY:  Not at this point.

5          THE COURT:  Ms. Grosbard, over to you.

6          MS. GROSBARD:  On the mental health issue?

7          THE COURT:  Yes.

8          First of all, is there any notice requirement that is

9     germane here or is it sufficient, as you understand it under

10    the rules, where there isn't an insanity defense, but rather

11    notice of the type that Ms. Kelley is somewhat generally

12    speaking about, is it sufficient to proceed in the manner

13    identified, which is to say it won't be until August 28, where

14    you get pinned down with the contact of the proposed testimony

15    and it's at that point you can move against it, or whatnot.

16         MS. GROSBARD:  Your Honor, I had no understanding that

17    this was an intended or contemplated potential area of expert

18    notice.

19         THE COURT:  Certainly there is no reason you would

20    from the last conference, where it was identified as, barring a

21    change in circumstances, which we have had, a sentencing issue

22    only.

23         MS. GROSBARD:  Thank you, your Honor.

24         I had understood there had been mental health experts

25    involved in this case, but I have been under the impression

1    that it was for mitigation and sentencing purposes.

2            THE COURT:  Let me ask you this.  When you agreed to

3    the proposed case management plan, did you understand the

4    expertise in the case to potentially include mental health

5    expertise?

6            MS. GROSBARD:  I did not.  That was not raised.

7            THE COURT:  The problem here, Ms. Kelley, is that if

8    you didn't share with the government that your expertise

9    included mental health expertise, the case management plan is

10   garbage in, garbage out.  I am not going to likely approve a

11   plan that sets that late a deadline, in addition to whatever

12   expertise you may get on the forensic front, for two mental

13   health experts.  There may be a need to front-load that issue

14   so that I can meaningfully get briefs on it.  This has *Daubert*

15   or 403 or something else written all over it as potential areas

16   of pretrial litigation.  In this district, not sharing the

17   content of the expertise, or leaving the government to believe

18   based on the last conference that the expertise was only about

19   computers, is a bit of sharp practice.

20           MS. KELLEY:  I would like to clarify a couple of

21   points, your Honor.  At the suppression hearing, Mr. Gottlieb

22   made a couple of references, I wouldn't necessarily offhand

23   say that --

24           THE COURT:  Ms. Kelley, no.  The last statement on

25   this point was by you on July 7, and you basically said that

all this mental health stuff was about sentencing.  You did

reserve the right, but that was the last statement.  It was

declarative.  Yes or no, before today, did you tell Ms.

Grosbard that your defense expert disclosure might involve

mental health issues?  Yes or no?

        MS. KELLEY:  No, your Honor.

        THE COURT:  Do you practice in this district?

        MS. KELLEY:  I do, your Honor.

        THE COURT:  This is not acceptable.  You can't

negotiate a schedule and hide the ball like that.  Having told

all of us that this is just a sentencing issue, it was on you

to clarify that the expert disclosure involved something much

different and more complicated.  I am going to hear from the

government, but you should assume that the schedule will be

moved up a few weeks because this will not stand.

        Ms. Grosbard, go ahead.  I realize you have been

blindsided by defense's sharp tactics here.

        MS. GROSBARD:  Your Honor, I would request some time

to speak internally about how much notice we would need.  I

truly was not prepared for this, and I have not had this issue

come up in a case before.

        THE COURT:  When you identified the government's

expert disclosure, I take it that was not on mental health

issues.

        MS. GROSBARD:  No, your Honor.

```
 1              THE COURT:  What was that on?

 2              MS. GROSBARD:  The government expects to have expert

 3    disclosure regarding the forensic review of the devices, and

 4    potentially on Bitcoin transactions.  The government also would

 5    potentially call an expert on sexual abuse issues.  Those are

 6    the intended areas.

 7              THE COURT:  So the schedule you have set for your

 8    expert disclosures, there is no reason to change that.

 9              MS. GROSBARD:  No, your Honor.

10              THE COURT:  Clearly, this schedule was negotiated for

11    a purpose other than what is now being identified; and so,

12    while the schedule may well stand for the purposes that the

13    parties were negotiating about, it certainly isn't going to

14    stand for the newly disclosed topic today.  It's by no means

15    clear to me, had I not raised the issue with Ms. Kelley,

16    whether the defense would even volunteer the mental health

17    change of course.

18              Let me go to the forensic point.  I will circle back

19    and talk about the schedule and reformulate this once I

20    understand what is going on there.  So let's take up the

21    forensic issue.

22              Ms. Grosbard, can you update me, first of all,

23    factually on the state of play and then where things stand here

24    in the case?

25              MS. GROSBARD:  Yes, your Honor.
```

1          So, Mr. Herz sent the government a proposed protective

2     order, that would permit the defense to review the device

3     extractions in this case, on July 14.  And we had previously

4     discussed potentially, right before the conference, the review

5     taking place in an RCFL in New Jersey.  The protective order

6     had instead California, an RCFL in California.

7          It is not the practice in our district to use RCFLs.

8     I understand that may be the practice in other districts in

9     which Mr. Herz has practiced, but there was no familiarity with

10    this within our U.S. attorney's office.  And so it's taken some

11    time for me to do some diligence to understand what that

12    process would entail.  And Mr. Herz kindly put me in touch with

13    AUSAs in other districts where he has used an RCFL, and based

14    on those conversations, I don't really believe it's practicable

15    here.

16          THE COURT:  It's?

17          MS. GROSBARD:  Practicable here.

18          THE COURT:  To use an RCFL?

19          MS. GROSBARD:  To use an RCFL.  And certainly not an

20    RCFL in California.

21          And to say very quickly, I informed Mr. Herz of this

22    yesterday, and he agreed that the defense would not continue to

23    request that the materials be shipped to California.  But where

24    the state of play is now is that we anticipate that the

25    devices -- or I should say copies of the devices should be made

1    available for Mr. Fischbach, who I think is planning to come

2    into FBI offices or the U.S. attorney's office either tomorrow

3    or Monday, or potentially both days, to begin his review.

4            THE COURT:  Let me make sure.  I am not here to

5    resolve a dispute that doesn't exist.  Do you understand that

6    you have an agreement with the defense, putting aside the date

7    of the review, as to where the review will take place?

8            MS. GROSBARD:  I think we do.  I think there may still

9    be some outstanding issues as to the contours of -- so there

10   are potentially two outstanding issues.

11           The first is that—and this might be an issue that we

12   will resolve, but just to give your Honor all of the

13   information—Mr. Herz asked that if the government doesn't make

14   the devices available at the RCFL in New Jersey or in

15   Philadelphia, to provide copies of the devices that have been

16   redacted or wiped of CSAM to, I believe, be in Mr. Fischbach's

17   possession.  I have informed Mr. Herz that the government would

18   not do that under any circumstances because there is no way for

19   the government to be certain that the materials actually had

20   been wiped of all CSAM.  And there is case law suggesting that

21   the government -- not in this district, but stating that the

22   government does not have an obligation to do that.

23           I hope we will be able to work that issue out, and the

24   government is still discussing internally whether we could

25   potentially make available some of the materials in the RCFL in

1    New Jersey, but this is just a very complicated issue because

2    it's not a practice that's done in our district.

3         THE COURT:  Let me see if I can step back and

4    understand a little more about the facts, which were somewhat

5    hazy as put to me in early July.

6         Do you now have a grasp on what happened here?

7         MS. GROSBARD:  It's no different than I had explained

8    in --

9         THE COURT:  But it was not explained to me in a way

10   that it left it clear.  In simple terms, what happened here?

11        MS. GROSBARD:  In simple terms, what happened is that

12   the government seized ten devices from Mr. Smith's apartment in

13   June of 2024.  When the FBI did its review of those devices, it

14   identified that eight of those devices had CSAM on them.  In

15   May of this year, it came to the FBI's attention that one of

16   those devices, which was a laptop, had never actually been

17   copied over and reviewed, and what the case agent believed he

18   had been reviewing was in fact his own hard drive which had a

19   Cellebrite report that had five CSAM images from a different

20   case.

21        THE COURT:  So it's not that items were inserted into

22   something of the defendant's.  It's that the FBI agent confused

23   an item taken from Mr. Smith with a different item unrelated to

24   the case.

25        MS. GROSBARD:  That's correct, your Honor.

1          THE COURT:  So what's the issue?  What is the

2     expertise here?  Isn't the issue then to clarify and say that's

3     off the table, it relates to a different case?

4          MS. GROSBARD:  That's what the government has done,

5     and informed the defense it would do.  And if I may?

6          THE COURT:  Continue.

7          MS. GROSBARD:  In addition to the one laptop, there

8     was a phone.  That phone was copied and extracted.  It did not

9     have CSAM on it.  It was reported that that device also had the

10     same five images of CSAM that the laptop had.

11          THE COURT:  In other words, from your perspective,

12     there is no evidence that any material was added to any device

13     taken from Mr. Smith's residence.  However, the FBI blundered

14     in two respects.  One is that it confused some extrinsic laptop

15     with Mr. Smith's, and on the basis of that, an errant

16     disclosure was made to the defense, number one.  And number

17     two, there was a misrepresentation about a phone that lacked

18     CSAM, so as to suggest inaccurately that it had five CSAM items

19     on it.  Do I have that about right?

20          MS. GROSBARD:  Yes, your Honor.  For the record, there

21     are six devices remaining, where there are CSAM images in

22     varying amounts, and I can go through that if that would be

23     helpful to your Honor.

24          THE COURT:  Let me just try it this way.  You

25     mentioned there were eight devices that had CSAM that were

1    seized.  Six of them are unaffected by this -- sorry.  There

2    were eight devices that were seized that were believed to have

3    CSAM.

4            MS. GROSBARD:  That's correct.

5            THE COURT:  Six of them are not affected by this

6    controversy.

7            MS. GROSBARD:  Yes, your Honor.

8            THE COURT:  A seventh was a phone which proves not to

9    have CSAM.

10            MS. GROSBARD:  Yes, your Honor.

11            THE COURT:  And, therefore, one of the eight devices,

12    in fact, as the government sees it now, never had CSAM, and

13    therefore it is, quote-unquote, only seven that have CSAM.

14            MS. GROSBARD:  Your Honor, the government doesn't know

15    what is on the laptop, which would make it -- that could be the

16    seventh device.

17            THE COURT:  Six are not in dispute.

18            As to the phone, that does not have CSAM.

19            MS. GROSBARD:  That's correct.

20            THE COURT:  As to the laptop, as originally reported,

21    it had CSAM, but that was because of a blunder by the FBI in

22    confusing Mr. Smith's laptop with somebody else's.

23            MS. GROSBARD:  Yes, your Honor.

24            THE COURT:  That leaves the question of, do you have

25    Mr. Smith's laptop and has it been searched for CSAM?

1          MS. GROSBARD:  The government is in possession of Mr.

2    Smith's laptop, but it has not been searched for CSAM.

3          THE COURT:  So, there are either six devices that,

4    from your perspective, have CSAM, or depending on the review of

5    Smith's laptop, seven.

6          MS. GROSBARD:  Yes.  But at this point the government

7    doesn't intend to review this seventh device because we have

8    enough evidence to proceed to trial.

9          THE COURT:  In other words, you're going to confine

10   your proof at trial, relating to the CSAM charge in the case,

11   to the six items that are unaffected by either of these

12   tempests.

13         MS. GROSBARD:  Yes, your Honor.

14         THE COURT:  And have you notified the defense of that?

15         MS. GROSBARD:  It was in the letter that we provided

16   on May 15, I believe.

17         THE COURT:  All right.

18         So, from your perspective, going back to expert

19   disclosures as to forensics, insofar as you're not going to be

20   offering Mr. Smith's laptop at trial --

21         MS. GROSBARD:  Not that laptop.

22         THE COURT:  Not that laptop.

23         -- there is no forensic evidence you would be seeking

24   to offer with respect to that laptop.

25         MS. GROSBARD:  No, your Honor.

1          THE COURT:  With respect to the six items that you are

2    basing your CSAM-related case on, would there be computer

3    expertise as opposed to other expertise that you would be

4    intending to offer at trial?

5          MS. GROSBARD:  I think the government typically at

6    least notices an expert that would sort of explain the

7    mechanics of the extraction process.

8          THE COURT:  All right.  Obviously, there are revisions

9    to the rules of evidence with respect to downloading phones and

10   the like, but I think what you're saying to me is, in cases of

11   this nature, the authentication process that can be done in an

12   abbreviated way through certifications is not the way you

13   usually intend to proceed.

14         MS. GROSBARD:  I think, at least in an abundance of

15   caution, we would notice an expert in this area.

16         THE COURT:  Because the testimony about the extraction

17   process might go beyond the simple matters covered in a

18   certification to explain things more technologically in a way

19   that calls upon special expertise.

20         MS. GROSBARD:  Yes, your Honor.

21         THE COURT:  In any event, you're not anticipating any

22   expertise relating to the, quote-unquote, Smith laptop that has

23   been the source of discussion?

24         MS. GROSBARD:  No, your Honor.

25         THE COURT:  What about the phone that you say in fact

1  doesn't have any CSAM on it, will any evidence from that phone

2  of any sort be offered at trial?

3          MS. GROSBARD:  I don't believe so, your Honor.

4          THE COURT:  Therefore, I take it, you're not

5  anticipating any expertise as to that phone.

6          MS. GROSBARD:  Not as to that phone.

7          THE COURT:  Let me go back then to the defense now

8  with respect to expertise and computers.

9          Who is the lawyer that is going to speak to that

10 point?

11         So that's you, Mr. Herz.

12         Mr. Herz, obviously you don't have to take the

13 government's word for what is on any particular device; you're

14 entitled to search it on your own.  But with the government

15 having taken the, quote-unquote, Smith laptop off the table,

16 the government has basically said this is no part of our case

17 at trial, is there any room for expert evidence or any evidence

18 as to what was resident on that laptop?

19         MR. HERZ:  Potentially.

20         So, first allow me to say it's not my understanding

21 that the FBI blunder, as the Court described it a moment ago,

22 only pertains to mistakenly believing there were images only on

23 an FBI laptop that were not transferred to Mr. Smith's devices.

24 My understanding, and I will defer to Mr. Fischbach since he

25 was the one who discovered this, my understanding, at least at

1    this point, is the images were actually transferred onto two

2    devices, and it was Mr. Fischbach's examination that discovered

3    that.

4            THE COURT:  Here's the question, though.  Are you

5    saying that any -- if I refer to the six devices, by which I

6    mean the ones that Ms. Grosbard said CSAM was found on, that do

7    not involve the laptop in question or the phone, will you know

8    what I am referring to?

9            MR. HERZ:  Yes.

10            THE COURT:  Is it your contention that there is

11    evidence that any of the content on those devices was added to

12    them by the government or by somebody other than Mr. Smith

13    after their seizure?

14            MR. HERZ:  As to one device, the issue is not about

15    whether material definitively was added, but we believe that

16    the device that the government has referred to as containing

17    thousands of images was a defective drive.  And the government,

18    as far as we understand, was unable to apply typical forensic

19    tools to develop what would be called a hash value for that

20    device, which would be essentially a fingerprint or a

21    definitive identification of all the data on that drive.  And

22    normally you hash a drive, and then you're able to compare hash

23    values to make sure no changes have occurred to the drive.  Our

24    understanding is that was not done in this case, and yet all of

25    the data was, at least for a moment when the drive was

accessible, was transferred in a simple copy-and-paste

maneuver, and all of the metadata related to the files on that

drive is not original metadata that would be available on the

source drive; all the dates have changed.

So, what we want to do, at least initially, is

determine whether that drive is in fact accessible or not, and

whether the metadata is available for analysis or not.  And if

it's not, then we are going to have to apply to the Court for a

number of potential measures of relief.  But we are not there

yet.  We need to definitively understand that.

THE COURT:  Let me see if I can unpack that.  The

drive, from your perspective, is defective.

MR. HERZ:  As far as we know.

THE COURT:  Or appears to you to be defective.  And is

what follows from that that something was added, or that

something is unrecoverable, or that the dates associated with

the material on it may be inaccurate?  Which is it?

MR. HERZ:  All of those things are still potential

things.  We don't know, at this point not being able to examine

the drive, where the images may have come from.  We don't know

if any of the data is recoverable at this point, where we can

analyze the data from the source drive and compare it to what

the FBI claims it was able to download.  And we do know, at

least we believe we know at this point, that the MacData, the

modified access create dates are no longer the dates associated

1    with the original source material.  And not knowing what the

2    original MacData is, we don't know if those files ever even got

3    opened by anyone.

4            THE COURT:  So there is a range of stuff that you're

5    exploring as to one of the six items.

6            MR. HERZ:  Correct.

7            THE COURT:  Is there expertise as to the other five of

8    the six?

9            MR. HERZ:  At this point—again, this is a process,

10    it's not complete—we don't definitively know but we believe

11    that the images, the remaining images, which would number under

12    400 images, may only have come from link files, and the links

13    are broken.  And the only way the government believes there are

14    images of CSAM associated with the links is because they

15    accessed links from a different case and said, we believe these

16    links led to CSAM in this other case, therefore we think the

17    links link up to CSAM in this case.  But as far as we know at

18    this point those links were broken, and we don't know when the

19    links were broken and if the links changed in terms of what

20    they were pointing to.  So we don't yet know if any individual

21    images were ever downloaded onto any of Mr. Smith's devices.

22            THE COURT:  So the review process that you're

23    proposing to undertake would incorporate, at a minimum, all six

24    items, as referred to by Ms. Grosbard, and potentially the

25    phone, though she at this point indicates that doesn't have

CSAM and she is not likely to offer anything from it.  Is that
accurate?

MR. HERZ:  At least.  And then we may want to dive
into the -- if, in fact, it is true that images were
transferred from Agent Buscemi's device onto Mr. Smith's
devices, we are going to want to explore that a little bit more
because it may help inform our analysis of the drive, that we
believe is broken at this point, and whether the images there
are recoverable and where they came from.

THE COURT:  Let me ask you a separate question.  You
heard from Ms. Grosbard her preview of potential areas of
government expertise.  Putting aside the affirmative work that
is being done by you, would it be your anticipation to have a
defense expert countering, in effect, the government's expert
on the points that Ms. Grosbard covered?

MR. HERZ:  Well, it's not entirely clear to me the
points that Ms. Grosbard intends to offer as far as computer
forensics.

THE COURT:  I think what she indicated is the computer
forensics was, in effect, describing the retrieval process.
But she had separate points that were more substantive, which
included sexual abuse issues, Bitcoin transactions.

I am trying to think through the schedule here, and
one of the questions is:  Is either of you apt to have a
responsive expert on the points noted by the others?  So with

1    Ms. Grosbard having, be it at a high level, indicated those

2    topics, might the defense have a counter expert on those

3    points?

4            MR. HERZ:  As to cryptocurrency, to the extent the

5    government raises it, Mr. Fischbach has been qualified as a

6    cryptocurrency expert in other cases; and so, yes, we would

7    offer him to rebut anything the government presents on that

8    issue.  I haven't yet had any discussions with Ms. Grosbard

9    about any kind of expert the government might intend to call

10   regarding sexual offenses, and we need to have that discussion.

11   And my anticipation is, based on that, we may want to call an

12   expert to respond to that, but we have not had any notice from

13   the government regarding that intention.

14           THE COURT:  Fair enough.

15           Look, I am obviously not holding you to that, but I am

16   also trying to think about a rational schedule, on the

17   assumption that it's not merely that each side has an

18   affirmative proposition on which they would like to call an

19   expert, but that each side may want to have competing expert

20   testimony.

21           So, you're telling me that you may have an expert on

22   potentially any of the issues that Ms. Grosbard has identified.

23           Ms. Grosbard, over to you then.  You know now that the

24   defense is talking about a potentially mental health expert, or

25   two, based on the examination of the defendant.  Putting aside

1    any motions you may or may not have as to the content of that

2    testimony, and whether all or some of it is properly offered,

3    is there a world in which you would be seeking examination of

4    the defendant or otherwise to have competing mental health

5    evidence?

6             MS. GROSBARD:  Your Honor, I really haven't had the

7    opportunity to think through these issues.  I would like to

8    reserve the right for the government to do any of the above,

9    but I don't know at this point.

10            If I may quickly, with respect to the representations

11   about the other devices in the case.  Just in the interest of

12   disclosing, I believe I understand what Mr. Herz is talking

13   about with respect to this hard drive that contains the bulk of

14   CSAM material.

15            THE COURT:  Sorry.  The one that contains the bulk of

16   CSAM material, are we talking now about the -- is that one of

17   the six?

18            MS. GROSBARD:  It's one of the six.

19            THE COURT:  So it's unaffected by the dustup about the

20   confusion of the laptop?

21            MS. GROSBARD:  It's not related to that.  There were

22   issues with the hard drive and it was damaged in some ways, and

23   there were initially difficulties in getting a forensic copy,

24   but that has been done.

25            THE COURT:  Look, the defense is obviously at liberty

1    to put the government to its proof with respect to these

2    retrieval issues and is at liberty to, by qualified expert or

3    experts, attempt to show the various propositions that Mr. Herz

4    is identifying, including the reliability of the material

5    downloaded, including metadata and the like.

6         MS. GROSBARD:  Absolutely, your Honor.  My only point

7    is, I didn't want to sit here and not clarify that a forensic

8    copy had in fact been created and correct Mr. Herz's

9    understanding on that.

10         THE COURT:  One of the things that's helpful here is

11    that you are durably taking off the table the laptop that was

12    the source of the confusion or the error by the agent in terms

13    of the five.  And you're also indicating to me that the phone

14    is not going to be part of your case.  That is hopefully

15    helpful in -- I haven't heard from the defense a theory under

16    which evidence that you're not proposing to offer would be part

17    of the case.

18         Let me just put that to you, Mr. Herz, so we can move

19    on.  Fully understanding your intention to explore whether

20    expertise can assist the defense's case as to the devices the

21    government intends to offer, is there some theory under which

22    the agent's——my word here——error, snafu, with respect to a

23    laptop that the government is not proposing to offer has any

24    role in this trial?

25         The case is not a report card on the FBI.  It is a

1    judgment about whether the evidence proves or not Mr. Smith's

2    guilt or innocence beyond a reasonable doubt.  The government

3    is restricting its case to other items.  Is there a theory

4    under which the content of a laptop that the government isn't

5    offering, or the FBI's misstep with regard to that, has any

6    role in the trial?

7         MR. HERZ:  So, until we are able to do a forensic

8    evaluation, I certainly can't commit one way or the other.  I

9    want to allow for the possibility we could articulate a reason

10    that may address the relevancy of that.  But if the agent

11    inadvertently transferred data onto Mr. Smith's devices, two of

12    his devices, there may be a reason that we want to not only

13    analyze those devices, it may inform the analysis of the device

14    that may or may not have been recoverable at some point.

15         THE COURT:  Your analysis, I am not restricting it at

16    all.  I am trying to get a realistic sense of the range of

17    expertise and issues at this trial.  I am trying to figure out

18    whether -- look, the government represents that the agent never

19    added CSAM or anything else to Mr. Smith's drive, so much as

20    the agent confused his drive with another one.  Operating on

21    that factual premise for a moment, is there any way in which

22    that has any role in the trial with the government saying it's

23    not going to use that drive?

24         MR. HERZ:  If the premise is he never transferred

25    material from his drives onto Mr. Smith's drives, and he just

1    simply reported that he saw material --

2          THE COURT:  If there is no evidence that he added

3    material to Mr. Smith's drive, is there any reason why his

4    error, in the way Ms. Grosbard described, has any relevance in

5    this case?

6          MR. HERZ:  Standing here at this moment, I wouldn't be

7    able to articulate one.  I am not saying there might not be an

8    articulable reason later.

9          THE COURT:  Now, supposing you come up with evidence,

10    contrary to what Ms. Grosbard has proffered, that with respect

11    to an item of evidence that's not being offered, the agent did

12    transport evidence onto Mr. Smith's drive, but there is no

13    evidence that he did so with respect to drives that are being

14    offered, that would present a somewhat different question.

15    Would you have a responsible argument that the agent's error

16    with respect to a drive that's not being offered has any role

17    at the trial if there is no forensic evidence supporting that

18    any such thing happened with the evidence that is being offered

19    at trial?

20          MR. HERZ:  Potentially, in the sense that -- again, I

21    am hearing for the first time from the government that they

22    have now actually done a forensic analysis of that drive that

23    we thought was maybe not operable.  And I can't speak

24    definitively, but I am not sure we have received a forensic

25    report from Agent Buscemi that indicates that that analysis

actually got done, so I am not sure that has come across in

discovery yet.  But my understanding, at least of the evidence

at this point, is that it wasn't hashed, and he simply did a

copy/paste in order for a moment make the drive operable and

download images.  We don't yet know, but maybe that was done

erroneously as well.

        So the blunder that occurred with the other two

devices, which is fairly unprecedented——Mr. Fischbach would say

he has never seen anything like that done by the FBI in over 30

years——if that kind of mistake got made for those two devices,

it is fair I think to argue that the problem with this

questionable drive with the bulk of the CSAM images, there may

have been mistakes made with that.  So I think as a whole it

would be fair to criticize the government's examination process

generally, not just specifically.

        THE COURT:  Look, I will state the obvious, which is

this is obvious fodder for a motion in limine if you're

intending to go there.

        MR. HERZ:  Absolutely.

        THE COURT:  But to be clear, the admissibility or not

of evidence along these lines, or arguments related to it, is

going to be litigated pretrial.  The one thing that is not

going to happen is that we are going to stumble into this space

without notice to the Court about it.

        So, interesting issues.  Obviously, a lot of things

1    are going to turn on the facts, or the admissible evidence from

2    each side on the facts.  But just to be clear, I expect this to

3    be fully ventilated *in limine*.

4                MR. HERZ:  Absolutely.

5                THE COURT:  Look --

6                MR. HERZ:  I'm sorry, your Honor.  I just want to

7    clarify a couple of things Ms. Grosbard addressed, just so the

8    record is a little bit more clear.

9                We did, on July 13, propose a protective order that

10    addressed the parameters of a forensic exam in this case.  And

11    while on the 7th I had suggested to the Court that the RCFL in

12    New Jersey could work, we pivoted to California, simply because

13    it's closer to where Mr. Fischbach is, and our feeling was, if

14    you're going to move the devices anywhere, whether you move it

15    from New York to New Jersey, you move it from New York to

16    California, it's a one-day process, and it would facilitate a

17    faster forensic review, which is why we suggested that.  At

18    this point, the government has said they don't want to send it

19    to California.  According to Ms. Grosbard's email this morning

20    to me is, apparently, whether it moves to the RCFL in New

21    Jersey or not is under discussion internally with the U.S.

22    Attorney's Office.

23                THE COURT:  There is no live dispute for me to

24    resolve.  I just want you to get to yes on this promptly,

25    because it's clear to me there is a lot of computer work that

1    is going to be done on the case.  How much, if anything, is

2    ultimately going to be admissible at trial remains to be seen,

3    but I can't cross that bridge until the work is done.

4          Ms. Grosbard, it's clear to me that the defense has

5    legitimate areas to explore, and it's clear to me that some of

6    that is different than the usual case.  The defense, therefore,

7    needs to be given a fair opportunity to undertake its

8    investigation in a way that it can be confident is not being

9    leaked back to the government team.  At the same time, you have

10   a legitimate interest in making sure that the original evidence

11   in this case is not monkeyed with by the defense.  There are

12   means to do that, but for a variety of reasons you all are

13   familiar with, CSAM can't ordinarily be copied, it's an

14   additional offense to the victim.  So when the defense is

15   reviewing original, primary source evidence containing CSAM,

16   it's the only copy, right?

17          MS. GROSBARD:  Your Honor, the government doesn't

18   typically make the original evidence available to the defense.

19   And it's my understanding that's not the request here.  It is

20   that the government would make forensic copies available to the

21   defense.

22          THE COURT:  If that is the case, is there a need for

23   anybody from the government to be, quote, supervising the

24   defense's review of the forensic copy?  I understand it can't

25   be given to the defense for the CSAM type reasons, but if a

1    forensic copy is being made for the defense's review, as long

2    as it's being reviewed in a government facility, and you have

3    got a way to ensure that it's not being removed or copied while

4    the defense reviews it, does somebody need to be in the room?

5            MS. GROSBARD:  That is one of the last issues that I

6    am trying to work out internally, but I believe that we will

7    make the material available to the defense without someone from

8    the government in the room.

9            THE COURT:  Okay.  Again, I can't micromanage the

10   issue.  All I have done is set out the operable principles.

11   Let's get that solved.  I appreciate that the terms of

12   discussion have moved some, but this was a subject that was

13   covered in early July.  It's now July 24.  We have got to solve

14   this this week.

15           MS. GROSBARD:  Understood.

16           THE COURT:  One way or the other this needs to get

17   resolved because I am going to be having potentially a bunch of

18   issues coming at me of an evidentiary nature, maybe a *Daubert*

19   nature, and a predicate for all of that is the defense's

20   review.

21           MS. GROSBARD:  Yes, your Honor.

22           THE COURT:  Where this leads us then is what changes

23   need to be made to the schedule here.

24           Looking at the back end, I think I'm fine with the

25   motion *in limine* schedule, which anticipates opening motions

1    being filed on September 9, oppositions on September 16, and

2    replies on September 23.  The problem is what comes beforehand.

3            The defense, in what I regard as a stunning breach of

4    professional ethics, did not disclose to the government its

5    change of course with respect to mental health expertise.  It

6    seems to me clear that the defense expert disclosure on

7    August 28th of that is a joke.  The government would be

8    entitled to consider competing expertise, including potentially

9    competing examination.  The defense's schedule here does not

10   allow for the government to have its own expertise, but would

11   instead have a motion *in limine* due 12 days later.  That's not

12   going to fly.  The issue is whether it's sufficient to simply

13   say that on August 14, in addition to the government's expert

14   disclosure, the defense's mental health disclosure is due.  I

15   want to workshop this process to see how it works.

16           Let's focus first on the mental health issue and then

17   we will talk about other expertise.  With respect to the mental

18   health, if the defense's disclosure is made on August 14, Ms.

19   Grosbard, I take it that would give you time then by August the

20   28th to have a competing government expert, would it not?

21           MS. GROSBARD:  I believe so, your Honor.

22           THE COURT:  So, what that means is that you need to

23   move pronto to figure out if you're going to want the defendant

24   to be examined by somebody so that that person is lined up and

25   retained and can be examined by your expert soon after the

1    defense's expert disclosure on August 14 is made.  If you're

2    comfortable with that schedule on the mental health piece, I

3    think all we need to do is add to the things due on August 14th

4    the defense's mental health disclosure, and that way any

5    government expertise on the same point will be due two weeks

6    later.  That's a tight turnaround, but it gives you time now to

7    line up your proposed expert or examiner.

8           And defense, you, in turn, would need to make

9    Mr. Smith available, essentially, at the government's

10   convenience or its expert's convenience, during that window of

11   time.  It also means that, with the defense's expert disclosure

12   as to mental health, the full range of material considered by

13   the expert, whether that includes other mental health history,

14   diagnostics, examination notes from the expert, all of that

15   needs to be provided on or before August 14 so that Ms.

16   Grosbard has all of the raw material that the expert uses and

17   can furnish it to her potential expert.

18          Do you understand that?

19          MS. KELLEY:  That's well understood, your Honor.  But

20   I also would point out that, insofar as the information

21   contained on the various devices is evolving and might be

22   relevant to our experts, it also might be relevant to their

23   experts.

24          THE COURT:  Great.  That's fine.  You have had the

25   devices for a long time.  The forensic examiner is going to be

1    looking at considerations, if you will, that are under the

2    hood, metadata and the like, and I don't rule out the scenario

3    under which some of that might turn out to speak to Mr. Smith's

4    mental health.  If it turned out these materials were dated in

5    Mr. Smith's teens as opposed to in his 50s, I can well

6    understand why it would matter.  If it's the same content and

7    it differs by a matter of weeks or months, it would be somewhat

8    harder to understand why any of that has anything to do with

9    the mental health analysis, but I don't preclude that there is

10   something I don't know under which some subtlety like that

11   would matter.

12        So, yes, the continued information you get for the

13   forensic review is fair game.  But what matters is, presumably,

14   the contents here, as opposed to the dating of them, as it

15   relates to his mental health.  I understand why the dating of

16   something could matter if the defense is going to mount a

17   theory that all this stuff was planted and that Mr. Smith's

18   admissions in his interview were unreliable, even though there

19   is the same effect.  That's your defense.  But at the end of

20   the day, you're at liberty to factor into your expert's

21   analysis the forensic review, but I wasn't born yesterday and

22   the idea that the forensic analysis, which is getting at FBI

23   and tech issues, is going to realistically hold up your expert

24   in drawing conclusions about your client's mental health is not

25   very persuasive.

1          MS. KELLEY:  It will not hold up our experts, your

2     Honor.

3          THE COURT:  Very good.

4          So with that, as to the mental health piece, I am

5     going to add that the defense's mental health expert

6     disclosure, including embedded primary source material,

7     examination notes and the like, is due August 14.

8          Now, as it relates to the government's expert

9     disclosure, defense, I take it you're fine then with your

10    counter-experts, if you choose to go there, being due two weeks

11    later, as you had negotiated, right?

12         Somebody needs to answer my question.

13         Ms. Grosbard identified the government's areas of

14    potential expertise.  You had set a schedule under which those

15    disclosures will made on August 14th and your disclosures will

16    be due on August 28.  I am assuming you're sticking to that

17    schedule, such that in the event that, for example, Ms.

18    Grosbard has a crypto or—what was it you said—a Bitcoin

19    expert, the schedule gives you the two weeks to have your

20    competing person.  That stands, correct?

21         MR. HERZ:  Yes.  I'm sorry.  I didn't understand the

22    Court was addressing the defense table when it asked the

23    question.

24         THE COURT:  I was.  I am just making sure everybody

25    has got fairness here.  And this, I think, was negotiated so I

am really just confirming. But now that you have a little bit
of flavor or color, as you have gotten from Ms. Grosbard, you
understand that if you're going to have an expert countering
the government's expert, your expert disclosure on those points
is due on August 28.

MR. HERZ: Yes.

THE COURT: Now, the remaining piece is the defense's
other affirmative experts.

Ms. Grosbard, you have heard today about some defense
experts with respect to what I gather amounts to, my words
here, but computer irregularities; I will put that wrapper on
it. Under the current schedule, there is no room for you to
have a competing expert on that point. The other way to do
this would be to have everybody's affirmative expert
disclosures due on August 14. And that way, to the extent the
government has in mind a counter-expert on that point, your
counter-expert on that would be due August 28.

You tell me.

MS. GROSBARD: The government would prefer that
schedule.

THE COURT: Defense, given the nature of things, the
problem here is that what you are proposing to do gives the
government no opportunity to respond. To a large degree your
experts are speaking past each other. The ones you have
announced so far are, for the most part, on different topics.

To be sure, you each envision something in the computer space, but they really are on somewhat different points.  Ms. Grosbard is talking about an expert to explain the retrieval process in a way that calls upon technical knowledge.  The defense has something much more ambitious, which is to, in effect, challenge the reliability and dating of what is found on the computers.  And that's all fair game.  But it seems to me that, under those circumstances, it's a different topic.  It's not that the defense is responding to the government; the defense is introducing a whole other topic.

Under those circumstances, I think I need to give everybody an opportunity to respond to everybody else.  And that means opening expert disclosures are due August 14 and responsive expert disclosures are due on August 28.

Mr. Herz, that seems right.  Otherwise you have built in no time for the government's response.  I want all this wrapped up so that in your motions *in limine* you are all litigating the point.

MR. HERZ:  I understand the Court's concern.  Here is my concern, your Honor.  I think it is an extraordinarily ambitious proposal that the defense expert, Mr. Fischbach, somehow complete a computer forensic examination in the next three weeks.

THE COURT:  Sorry.  This has been out here for a while.

```
 1              MR. HERZ:  The government had over six months to do
 2    its analysis, and from our position at this point it looks like
 3    their analysis was deficient, even though they had six months
 4    to do it.  It's a little bit like asking a doctor to cure
 5    cancer in a year, and if you simply apply enough time and money
 6    to the problem, you should be able to find a cure, and if you
 7    haven't found a cure after a year, you didn't spend enough time
 8    and money to do it.  I just think that the expectation of the
 9    Court that somehow we can get a forensic examination done in
10    three weeks, it's not even fair to call it ambitious; it's just
11    not realistic.
12              We are doing everything we can to meet the Court's
13    schedule to be prepared and ready to go to trial in October.
14    But in order to have an expert report done by the 14th, all I
15    can say is we can produce a report, but the exam won't be done.
16    And to the extent that we continue to do the exam and make
17    additional findings, we will be happy to disclose any new and
18    additional findings to the government, but I can't say that the
19    exam will be a complete exam on the 14th.  It's beyond
20    ambitious.  It's just not realistic.
21              THE COURT:  Ms. Grosbard.
22              MS. GROSBARD:  Your Honor, I have not been able to
23    understand what requires so much time with these devices.  I
24    understand that the devices were in the FBI's possession for
25    some time before the case was charged, even six months is quite
```

1    an exaggeration, but it is not clear to me what would take

2    quite so long to do a forensic exam of these devices.  And I

3    would add that the devices have been made available to the

4    defense since September, and I believe Mr. Smith's first

5    counsel viewed the devices as early as December 2nd of 2024,

6    and that his counsel after that again reviewed the devices, I

7    don't have a date but I believe maybe sometime in February, and

8    that Mr. Fischbach reviewed the devices in May.  So they have

9    been available to the defense for quite some time.

10            THE COURT:  One moment.

11            I am with the government on this.  The case has been

12    charged for a long time.  The defense has blown its credibility

13    with me on the whole mental health stunt.  And I have to tell

14    you I am just going to hold you all to the August 14 date.

15            Ms. Grosbard, you need to make sure that the defense

16    has the opportunity to review those devices pronto.  I don't

17    want any delay.  So that's got to happen early next week.  You

18    need to be able to make it available.  But on that premise, I

19    am going to require all expert disclosures, affirmative expert

20    disclosures, due on August 14, and all responsive disclosures

21    due on August 28.  What that means is I don't want a new expert

22    report dressed up as a response coming in on August 28.  If you

23    have got expertise to bear in this case, it has got to be in

24    the expert disclosure on the 14th.  The responses are due on

25    the 28th.

1          I have complete respect and admiration for the

2    defense's game plan here, which is to see to what degree, if

3    any, a defense can be mounted based on either irregularities

4    with Mr. Smith's computer or alleged improprieties, mal and

5    misfeasance by the FBI.  You're welcome to do that, but I don't

6    understand, and it hasn't been explained to me well, why that

7    exercise would be inconsistent with an expert disclosure on

8    August the 14th.

9          So I am going to adopt the schedule here, except that

10   on the first bullet——and my staff will prepare an order to this

11   effect——the first bullet will now say, opening expert

12   disclosures by both sides due August 14, and then responsive

13   expert disclosures will be due on August the 28th.  So you're

14   both on the same expert schedule.  And that affords everybody

15   an opportunity, which your original schedule didn't permit, to

16   respond to one another.

17         With that, I am going to schedule a conference in this

18   case for next Thursday.  And I am going to do so because it has

19   become clear to me that some adult supervision is needed here.

20   And so, Mr. Smallman, can I have a time next Thursday?  At 11

21   a.m.  We are going to meet next Thursday, just because I want

22   to make sure that we are on track here.  Maybe the conference

23   will be very brief, but I just want to make sure that

24   everything is on track.  I don't want to meet again and learn

25   that there was some lack of meeting of the minds or a snafu.

1           So, is there an application to exclude time until

2    Thursday, July 31, at 11 a.m.?

3           MS. GROSBARD:  Yes, your Honor.  The government wishes

4    to exclude time until the next conference date, which is, as

5    your Honor just said, July 31, in the interests of justice, so

6    that the parties may begin preparing for trial and potentially

7    discuss any pretrial resolutions.

8           THE COURT:  Any objection?

9           MR. HERZ:  Not to the issue of exclusion.  But I do

10   have to at least inform the Court that I am due to be in

11   federal court in Alaska on the 31st.

12          THE COURT:  You have got two other lawyers at the

13   table.  I appreciate it, but at the end of the day you have got

14   a deep defense team here.  I need to make sure this is moving

15   forward productively.

16          MR. HERZ:  Okay.

17          THE COURT:  I will exclude time between today and

18   July 31, pursuant to Title 18, United States Code, Section

19   3161(h)(7)(A).  I find that the interests of justice outweigh

20   the interest of the defense and the public in a speedy trial.

21   In this case, both sides have a lot of work to do in the

22   ramp-up to trial, in particular, both sides have described

23   what, at least on the face of things, are ambitious goals with

24   respect to potential expertise.  I am mindful that that takes a

25   lot of time and work.  The time as well will help facilitate

1    the defense's review via expert of certain electronic

2    materials, and as Ms. Grosbard said, in the ordinary course,

3    the excluded time will also permit the parties to discuss, at

4    least potentially, a disposition.

5            Is there anything further from the government?

6            MS. GROSBARD:  No, your Honor.

7            THE COURT:  Mr. Braverman, anything further from the

8    defense?

9            MR. BRAVERMAN:  I only have one request.  I understand

10   my counsel is out of town.  I was expected to be out of town on

11   the 31st.  I would only ask the Court if we could do it on the

12   30th, if the Court had availability the day before, just

13   because I am scheduled to travel out of the state.

14           THE COURT:  Will that make any difference to your

15   availability, Mr. Herz?

16           MR. HERZ:  I appreciate the offer, but it would make

17   it impossible to get from New York back to Alaska on the 31st.

18           THE COURT:  Essentially, I will be adding Mr.

19   Braverman to Ms. Kelley by moving the conference a day earlier.

20           MR. BRAVERMAN:  I would like to be here, but if we

21   could do it on the 30th.

22           THE COURT:  Ms. Kelley.

23           MS. KELLEY:  As a practical matter, I can't be here on

24   Thursday either, but I could do Wednesday.

25           THE COURT:  Ms. Grosbard, can you be here Wednesday?

 1          MS. GROSBARD:  Yes, your Honor.

 2          THE COURT:  Mr. Smallman, can we have a time on

 3    Wednesday the 30th.  11 a.m. on the 30th.

 4          MR. HERZ:  What I am going to try and do, your Honor,

 5    is get permission from the Alaska court to appear

 6    telephonically on the 31st so that I can be here on the 30th.

 7          THE COURT:  At the end of the day, it may be one of

 8    the world's shortest conferences.  I am just checking in

 9    because we have a trial date and we have got a lot that has

10    percolated recently, and I want to make sure I am keeping close

11    eye on things.  Please keep the line of communications with

12    each of you open.  I will be touching base with you at 11 a.m.

13    on Wednesday.

14          The exclusion of time, I will adjust it one day

15    earlier to the 30th, for the same reasons given.

16          I will see you on the 30th at 11 a.m.

17          Ms. Grosbard, I will expect an oral report at that

18    time as to the state of play with respect to making the devices

19    available.  I hope the answer is they have been reviewed.

20          MS. GROSBARD:  Understood, your Honor.

21          THE COURT:  Please, let's solve that problem.

22          Mr. Herz.

23          MR. HERZ:  The Court mentioned you haven't heard yet

24    anything about why the review could potentially be lengthy.  I

25    simply want to say Mr. Fischbach is available here today.  He

will be available here next week.  If the Court wants to hear
from him about why forensic exams are not simply plug and play,
like unloading information from a cell phone, we are happy to
present that information to the Court.

THE COURT:  Look, he should be available to meet every
day beginning the day that he has the device available until he
completes his review.  Unless you're telling me it's going to
take him weeks to do this, it seems to me——I have had forensic
reviews in other cases——if he is working steadily full days
beginning the day the review begins, I don't see any problem
with the schedule I have set.  So you're welcome to bring Mr.
Fischbach.  We will see where it goes.  But I set a schedule
and I am sticking to it.

MR. HERZ:  I understand.  We will see where we are at
by next Wednesday, and if we want to present more information
to the Court, we will be prepared to do that.

THE COURT:  Very good.

Before we adjourn, Ms. Grosbard, is there somebody
else on the government's trial team?  There is a lot going on
here.  I want to make sure you have got an equal bench here.

MS. GROSBARD:  Thank you, your Honor.  There will be
additional people.

THE COURT:  Very good.

We stand adjourned.  See you next Wednesday.

(Adjourned)