UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-v-                                                           25 Cr. 4 (PAE)

EDWARD GENE SMITH,

OPINION & ORDER

Defendant.

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion by the Government to preclude expert mental-health testimony in this case, which involves charges of receiving and possessing child pornography and giving narcotics to an adult woman without her knowledge, with the intent to engage in nonconsensual sexual acts.

On August 14, 2025, defendant Edward Gene Smith filed a notice reporting his intent to call Dr. Laurie Sperry at trial. Dr. Sperry, Smith states, would testify as a rebuttal witness in the event the Government offered Smith's statements from his interviews by federal agents during the execution of a search warrant in his apartment. Although Dr. Sperry's testimony as previewed would cover numerous points, she would centrally testify that Smith has Autism Spectrum Disorder (ASD), and that this condition may have affected his interview responses.

On August 28, 2025, the Government moved to preclude Dr. Sperry's testimony, on multiple grounds. For the reasons that follow, the Court grants the motion to preclude in full.

I.    Facts

### A.    The FBI's Interviews of Smith

On June 26, 2024, at approximately 6 a.m., seven agents from the Federal Bureau of Investigation ("FBI"), assisted by one FBI intern and one local police officer, executed a court-authorized search warrant at Smith's apartment on Central Park South in Manhattan.  The affidavit in support of the warrant set out probable cause that Smith had purchased and possessed child pornography.

During the search, two FBI agents conducted two interviews of Smith.  The first, which focused on child pornography, lasted approximately 45 minutes.  Dkt. 66 ("Suppression Op."), at 7.  Smith told the two agents, *inter alia*, that he had used Bitcoin to make "some" purchases of "adult material" on an "adult site"; that he had purchased material from a pornography producer known as "Snapgod"; that, before he did so, he "figured" some of the girls in the videos "were teens," who "certainly could have been under 18, like 16 or 17"; that his sexual preference is girls who are "teens"; and that he had been "looking for the teen content."  *Id.* at 7–8; GX 6T[1] at 20:02.  The second interview, conducted by the same two agents, was prompted by the searching agents' discovery of firearms and ammunition in Smith's apartment, and lasted approximately seven minutes.  *Id.* at 9.  Both interviews are memorialized on audio recordings.

### B.    Smith's Arrest and Indictment

On September 10, 2024, Smith was arrested on a complaint.  Dkts. 1–2.  On January 6, 2025, a grand jury returned an indictment.  Dkt. 22 ("Indictment").  It charges Smith in three counts.  Count One charges receipt and distribution of child pornography, on or about June 3 to June 6, 2023, in violation of 18 U.S.C. § 2252A(a)(2)(B) and (b)(l).  Count Two charges

---

[1] GX 6T refers to the transcript of Smith's first interview with the FBI, which was received as an exhibit at the April 7, 2024 evidentiary hearing on his motion to suppress.

possession of child pornography, on or about June 3, 2023 to June 26, 2024, in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2). Count Three charges, on or about April 23, 2023, the knowing and intentional distribution, and possession with intent to distribute, of a controlled substance (clonazepam) in violation of 21 U.S.C. §§ 812, 841(a)(l), and (b)(2). In court filings, the Government has stated that Count Three relates to Smith allegedly having drugged an adult woman with whom he had a sexual relationship. *See, e.g.*, Dkt. 23. The Government has elaborated that Smith sent videos of that adult woman to a Telegram group "dedicated to sharing photographs and videos of naked and unconscious women in sexual positions." *Id.* One such video captured Smith having sexual contact with her as she lay naked and unconscious. *Id.*

### C.    Smith's Suppression Motion

On March 6, 2025, Smith moved to suppress his statements during the FBI interviews on the grounds that the agents had not given him the warnings that *Miranda v. Arizona*, 384 U.S. 436 (1966), requires for a custodial interrogation. Dkt. 47. On April 16, 2025, after an evidentiary hearing, the Court denied the motion, finding that Smith was not in custody within the meaning of the Fifth Amendment during either interview. *See* Dkt. 66.

### D.    Dr. Sperry's Disclosure and Report

At a July 24, 2025 conference, the Court set a schedule for expert disclosures, keyed to the October 14, 2025 trial date then in place. Dkts. 81, 88.[2]

On August 14, 2025, consistent with that schedule, Smith emailed the Government an expert disclosure for Dr. Sperry, pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C), Dkt. 100, Ex. A ("Disclosure"), and an accompanying report, with various attachments, Dkt.

---

[2] The Court has since adjourned the trial date to November 18, 2025.

100, Ex. B, at 1–43 ("Report"); Dkt. 100, Ex. B, at 44–166 ("Att.").[3]  The Disclosure is two-and-a-half pages long, including the case caption and a half-page listing Dr. Sperry's prior deposition or trial testimony.  It identifies Dr. Sperry as a board-certified behavioral analyst with a master's degree in forensic psychology and criminal investigations.  Disclosure at 2.  It states that Smith would call her as a rebuttal witness, should the Government elicit testimony about Smith's statements and behavior when interviewed by the FBI.  *Id.* at 1.  It states that her testimony would "aid the trier of fact in comprehending how Mr. Smith's diagnosis of [ASD] might have influenced his suggestibility, comprehension, and responsiveness during the interrogation on June 26."  *Id.*  It states that her testimony would address "how individuals with ASD may react to similar situations, particularly in moments of stress," and would "encompass both general insights and specific evaluations derived from her assessment of Mr. Smith."  *Id*. at 1–2.  It incorporates by reference Dr. Sperry's 38-page report.  *Id.* at 1.  The Report, it states, "includes a complete statement of all opinions that Mr. Smith will elicit from Dr. Sperry in the defense's case-in-chief; the bases and reasons for them; and Dr. Sperry's qualifications."  *Id.* at 2.

The Report first sets out Dr. Sperry's credentials, which are elaborated upon in her *curriculum vitae* ("CV"), provided as an attachment to the Report.  It states that she holds a Ph.D. (in child development and family studies from the University of North Carolina Chapel Hill, Att. 108) and a degree in forensic psychology and criminal investigations (from the University of Liverpool, *id.*); that she has been an assistant clinical faculty member in Yale University's psychology department "as part of the Yale Autism Forensics Team" and a clinical faculty member at Stanford University's psychiatry and behavioral health department; that she is

---

[3] The disclosure and expert report, as later publicly filed, contain redactions agreed upon by the parties.  The Court has reviewed the unredacted versions of these.

a board-certified behavioral analyst; that she is in private practice; that she has published peer-reviewed articles and served as a panelist at psychiatry and law conferences; and that she has been qualified as an expert "[i]n more than 70 cases." Report at 3.

The Report states that its conclusions are based on sources that include interviews of Smith's father, aunt, wife, and brother-in-law (who was also his high school classmate); eight ASD tests that Dr. Sperry, or Dr. Tyler Whitney (a clinical psychologist), administered to Smith in and around early 2025; Smith's notes on the criminal charges against him (among other topics); research related to ASD and the criminal justice system; and audio and legal records relevant to this case, including the recordings of the FBI interviews. Report at 3–4.

The Report then sets out facts and opinions covering a range of topics. These include:

- **Smith's family and personal history**: The Report recounts Smith's educational history, ASD-related challenges—including his "formal" communication style and struggle with socializing—and family history related to ASD (a sister has been diagnosed with ASD). *Id.* at 5–7.

- **Results of ASD tests on Smith**: The Report summarizes results from eight ASD-related tests, some administered to Smith and some to his family members. These describe difficulties Smith has had in maintaining interpersonal relationships, engaging in reciprocal conversations, and empathizing with others' emotional experiences. *See, e.g., id.* at 8–10, 14–27.

- **Interviews with Smith's family**: The Report recounts interviews with Smith's family members—all of whom described Smith's differences in communication style, socialization, and behaviors (*e.g.*, his need for routine and his hoarding tendencies). *Id.* at 6–8, 10–13.

- **Possible reasons for Smith's middle-age ASD diagnosis**: The Report offers opinions as to reasons why Smith was not diagnosed with ASD until adulthood. These include his "race," Smith's mother's efforts to help him fit in as a child, and Smith's "camouflaging or masking behaviors," which he employed to "'pass' as neurotypical in front of others." *Id.* at 27–28.

- **Facts and opinions regarding Smith's tendency to hoard**: The Report summarizes studies showing the "correlation between hoarding and autism," and notes that Smith has a "long history of collecting, compulsively buying and hoarding." *Id.* at 29. It suggests that Smith's hoarding is relevant to this case

because agents found "trunks full of adult toys," but no "items that suggested a sexual interest in children," during the search of his apartment.  *Id.*

- ***Studies of custodial interviews***:  The Report summarizes studies showing that people with ASD are more likely to comply with a request to be interviewed, and are particularly vulnerable "to having their rights compromised during [a] custodial interview," due to factors such as a propensity to "take the words they hear at face value," difficulty in lying and recognizing deception in others, and a tendency to project, even while being truthful, as "deceptive in the context of an investigative interview." *Id*. at 29–31.

- ***Summary of the FBI interviews of Smith***:  The Report provides a narrative account and selective summary of the FBI interviews.  It states, among other things, that Smith was "physically removed from his shower, naked," that the agents "impeded his ability to move or leave," that he was "not allowed to get up," that an agent made a "non sequitur" about the FBI interview of Martha Stewart, and that this "confused" Smith, who "wasn't sure what information the police wanted from him." *Id.* at 32.

- ***Opinions about the FBI interviews of Smith***:  The Report opines that the agents' statements to Smith, "combined with the shock of the situation, being pulled from the shower naked, being unclear about the information provided to him about his situation, led Mr. Smith to continue talking, without seeking any of the legal safeguards to ensure his rights and fair treatment." *Id.* at 32.  It opines that Smith did "not appreciate the optics" of his using the term "young girls" during the interview; that Smith believed "he was being questioned to *help* law enforcement"; and that he "seem[ed] to believe the narrative proposed by the male agent who suggest[ed] that they don't think [Smith] is the 'big bad guy.'" *Id*. at 32–33 (emphasis in original).  It opines that Smith "stated that he thought he was being helpful and cooperative so that the 'big bad guy' would be held accountable. It was not his understanding that he had done anything wrong, he was repeatedly told he was not in custody and therefore, he continued to answer calmly, candidly, and did not request an attorney to protect his rights." *Id*. at 34.

- ***Opinions about aptitude of autistic people to lie when interviewed***:  The Report opines: "When compared to people without autism, autistic individuals have a substantially more difficult time lying. Again, this has to do with their diminished ability to understand the mental state of others, their difficulties with working memory and processing speed.  As a result, lying is extremely effortful for people with autism.  Compared to neurotypical people they are significantly poorer liars, recognize and rate themselves as poorer liars and as such are less likely to lie than people without autism." *Id*. at 33.

- ***Dr. Sperry's interview with Smith***:  The Report summarizes Dr. Sperry's interview with Smith, including Smith's statements that he came to seek out

6

extreme videos online because he "wanted to understand the extreme nature of human beings and the world we live in to determine if he could deal with the darker side of human nature," that he had believed "that anything on the internet was 'fair to look at,'" and that he would "never . . . touch a child." *Id.* at 34–35.

- **Treatment of people with ASD in the criminal justice system**: The Report summarizes Department of Justice policy and the remarks of former Attorney General Merrick B. Garland regarding the treatment of disabled people within the criminal justice system; research related to recidivism among people with ASD; and research related to "the detrimental impact incarceration has on people with autism." *Id.* at 35–37. The Report opines that "[w]hen considering the next steps" in Smith's case, it is important to "consider diversion and avoid unnecessary prison." *Id.* at 35.

Smith provided the Government copies of the materials underlying the Report, including the tests given to Smith and his family and Dr. Sperry's CV, while stating that Dr. Sperry reserved the right to supplement the Report. Disclosure at 2. Smith later provided additional underlying materials, including Smith's performance record as a Citibank manager, and handwritten notes regarding the charges against him. *See* Dkt. 100, Ex. D ("Citibank Performance Record"), Ex. G ("Smith Notes on Indictment").

### E.    The Government's Motion to Preclude Dr. Sperry's Testimony

On August 28, 2024, the Government moved to preclude Dr. Sperry's testimony. Dkt. 96 ("Gov't Br."). On September 4, 2025, Smith opposed the motion. Dkt. 97 ("Smith Opp."). On September 10, 2025, the Government replied. Dkt. 103 ("Gov't Reply").

## II.    Discussion

The Government moves to preclude Dr. Sperry's testimony on five grounds. First, it argues, Dr. Sperry is not qualified to conclude that Smith has ASD or that this condition may have affected him when interviewed by the FBI. Second, it argues, Dr. Sperry relied on a flawed methodology in reaching both conclusions, such that her testimony is inadmissible under Federal Rule of Evidence 702, as explicated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.

579 (1993).  Third, it argues, Dr. Sperry's testimony about Smith's ASD is barred by the Insanity Defense Reform Act of 1984 ("IDRA"), 18 U.S.C. § 17, which limits defenses based on a defendant's mental health.  Fourth, it argues, Dr. Sperry's testimony as described in the Report—which touches on a range of subjects, some far afield from the FBI interviews—is improper under the Federal Rules of Evidence, including because it is irrelevant, unfairly prejudicial relative to its probative value, and embeds self-serving hearsay (some by Smith himself).  Fifth, it argues, Smith's expert disclosure does not comply with Rule 16(b)(1)(C), which governs the content and timing of disclosures related to expert witnesses.

The Court's analysis proceeds as follows.

The Court first evaluates Dr. Sperry's qualifications and methodology with respect to the subjects identified in the Disclosure: that Smith has ASD and that this condition may have affected him during his FBI interviews.  The Court finds that, although Dr. Sperry has relevant experience, largely involving treating children with ASD, and although a fuller explication of her background might have fortified her qualifications, Smith has not reliably established on the current record that Dr. Sperry is qualified to diagnose 50-year-old Smith with ASD.  The Court further finds that Smith has not met his burden to establish that Dr. Sperry is qualified to opine on whether Smith's statements to the FBI were affected by his ASD, let alone that his statements to the FBI were less likely to be truthful on account of his ASD—the one point on which competent testimony about Smith's ASD could be properly received at trial.  Assuming *arguendo* the sufficiency of her qualifications, however, the Court finds that Dr. Sperry's methodology is reliable as to the conclusion that Smith has ASD, but not as to the conclusion that it affected him during the interview or compromised the truthfulness of his statements there.

The Court next considers whether testimony related to Smith's ASD is admissible under the IDRA.  General testimony about Smith's ASD, the Court holds, is inadmissible under the IDRA, because it would not tend to establish that Smith was unable to appreciate the nature and quality of his actions, the sole mental-health-based defense the IDRA permits.  The IDRA would not, however, bar testimony by a qualified expert, using reliable methodology consistent with Rule 702 and *Daubert*, on a discrete point: that Smith's ASD made his statements in the FBI interviews less likely to be factually accurate.  But Dr. Sperry is unqualified to so testify, and a review of her Report reflects that she has not drawn that conclusion, let alone by reliable methodology.  Rather, the Report concludes only that Smith's responses may have been, in an unspecified manner, affected by his ASD.  Thus, because testimony about Smith's ASD is not drawn to a proper purpose and could instead be treated by the jury as supporting a legally unavailable mitigation or diminished capacity defense, it is barred in its entirety by the IDRA.

The Court next analyzes the host of topics addressed in the Report that go beyond the narrow issues identified in the Disclosure.  These include Smith's hoarding tendencies, the criminal justice system's treatment of people with autism, and Smith's reflections on the charges against him.  The Court finds that each topic is barred by various Federal Rules of Evidence, including Rules 401 (relevance), 403 (prejudice), and 801 (hearsay).

Finally, the Court considers whether the Disclosure, which incorporates the Report, satisfies the disclosure requirements imposed on defendants by Rule 16(b)(1)(C).  The Court finds that it does not, because it is inconsistent and unclear as to the scope of Dr. Sperry's testimony, does not clearly state her proposed opinions, and fails to articulate the bases and reasons for many opinions it does state.

On multiple independent grounds, the Court therefore finds Dr. Sperry's testimony inadmissible.  The Court grants the Government's motion to preclude in full.

A.    **Analysis Under Rule 702 and *Daubert***

1.    **Applicable Law**

Federal Rule of Evidence 702 governs the admissibility of expert testimony in federal court.  Courts have distilled Rule 702 to require the proponent to show, by a preponderance, that "(1) the expert is qualified; (2) the proposed opinion is based on reliable data and methodology; and (3) the proposed testimony would be helpful to the trier of fact."  *Nike, Inc. v. StockX LLC*, No. 22 Civ. 0983, 2024 WL 3361411, at *2 (S.D.N.Y. July 10, 2024); *see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14-MD-2542, 2025 WL 354671, at *2 (S.D.N.Y. Jan. 30, 2025).  In deciding whether the proponent has made that showing, the district court serves a "gatekeeping role," which involves "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 597.

Because the Government challenges Dr. Sperry's testimony based on the first two requirements—the sufficiency of her qualifications and the reliability of her methodology—the Court focuses its analysis on those.

*Qualifications*: "Whether a witness is qualified as an expert is a threshold question that precedes the court's relevance and reliability inquiries."  *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 636 (S.D.N.Y. 2016) (quoting *Loyd v. United States*, No. 8 Civ. 9016, 2011 WL 1327043, at *4 (S.D.N.Y. Mar. 31, 2011)), *aff'd*, 720 F. App'x 24 (2d Cir. 2017) (summary order).  In evaluating a proposed expert's qualifications, "courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."  *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir.

2004).  "Any one of the qualities listed in Rule 702—knowledge, skill, experience, training, or education—may be sufficient to qualify a witness as an expert."  *Crown Cork & Seal Co. Master Ret. Tr. v. Credit Suisse First Bos. Corp.*, No. 12 Civ. 5803, 2013 WL 978980, at *2 (S.D.N.Y. Mar. 12, 2013).  But merely "because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields."  *Nimely v. City of N.Y.*, 414 F.3d 381, 339 n.13 (2d Cir. 2005)

*Methodology*: "To warrant admissibility, . . . it is critical that an expert's analysis be reliable at every step."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).  A district court "has broad discretion" in assessing reliability, *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016), and "the types of factors that are appropriate to consider will 'depend[] upon the particular circumstances of the particular case at issue,'" *id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)).  At a minimum, "the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."  *Amorgianos*, 303 F.3d at 267.  Ultimately, "[t]he Court's task 'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"  *Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 369, 371 (S.D.N.Y. 2014) (quoting *Kumho Tire Co.*, 526 U.S. at 152).

## 2.    Analysis

### a.    *Dr. Sperry's Qualifications*

The Government contends that Dr. Sperry's qualifications are deficient in three respects. First, it disputes that she has the requisite education and experience, noting that she does not hold

a PhD in forensic psychology, is not a psychologist, and is not board-certified in psychology. Gov't Br. at 22. Second, it argues that Dr. Sperry has limited relevant diagnostic experience, as "it does not appear that either appointment [at Stanford or Yale Universities] required Dr. Sperry to diagnose individuals with autism or teach students how to make such diagnoses." *Id.* at 23. Third, the Government discounts the list of cases in which Dr. Sperry claims to have testified, noting that it has been able to identify only "one case in which Dr. Sperry appears to have provided expert testimony at trial," and there, it was undisputed that the defendant had ASD. *Id.*

To determine whether Dr. Sperry is qualified, the Court must compare her purported expertise "with the subject matter of the proffered testimony." *Tin Yat Chin*, 371 F.3d at 40. In her expert disclosure, Dr. Sperry frames her anticipated testimony as concerning "how Mr. Smith's diagnosis of [ASD] might have influenced his suggestibility, comprehension, and responsiveness during the interrogation on June 26." Disclosure at 1. The Court therefore must determine whether Dr. Sperry's education, research, certifications, work experience, and prior testimony qualify her to render an ASD diagnosis as to Smith and opine on the impact of ASD on Smith's interview responses.

Dr. Sperry has extensive experience studying and researching ASD. According to her CV, she holds a master of science (MSc) in forensic psychology and criminal investigation from the University of Liverpool, where her dissertation related to video games and ASD. Att. 108. She has a series of ASD-related certifications. She is a research reliable assessor in the "Autism Diagnostic Observation Schedule," a board-certified behavior analyst, and a licensed behavior analyst. *Id.* As detailed below, much of her work experience has entailed teaching about ASD, consulting on issues related to ASD, and working directly with young people who have ASD. *See id.* 110–15. She has held editorial roles for publications such as the *Journal of Autism and*

*Developmental Disorders*, *Research in Autism Spectrum Disorder*s, and the *International Society for Autism Research*. *Id.* 109.  In this capacity, she assesses ASD-related articles, films, and study submissions "to determine [their] scientific merit and accuracy." *Id.*  She has authored numerous articles on ASD, including "Autism and Sexual Offending Against Minors," "Sexuality and Problem Behaviors," and "Autism, the Internet, and Images of Child Exploitation." *Id.* 116.

Dr. Sperry thus is steeped in issues related to ASD.  Less clear, however, is her relevant experience to opine on the issues here: (1) whether Smith, a 50-year-old adult who before his arrest in this case had never been diagnosed with ASD, has ASD; and (2) whether Smith's ASD adversely affected the accuracy of his responses to official interrogation.  Dr. Sperry's work and research has centered on supporting children and students, not adults, with ASD.  *See, e.g.*, *id.* 110 (as an adjunct clinical faculty member at Stanford University, she supported neurodiverse students); *id.* (as an associate professor at Regis University, she taught a course on methods for students with ASD and was an early childhood special education program coordinator); *id.* 111 (as a visiting scholar at Griffith University, she taught courses on how to engage students with ASD and transitions for such students); *id.* (as a visiting scholar at Griffith University, she worked to develop early autism intervention centers and provided "direct services to children with ASD and their families"); *id.* 113 (as a parent trainer for a social skills development/play group, she coordinated research efforts related to newly-diagnosed children with ASD); *id.* 117– 18 (her published works explore treatment models for young children, early intervention, and classroom practices for children with ASD).  Dr. Sperry also has teaching, consulting, and writing experience related to ASD in the workplace, including training organizations to support employees with ASD and providing such supportive services herself.  *See, e.g.*, *id.* 112 (as state

13

director at the Hawaii Department of Education, she provided ASD training to staff); *id.* 114 (as

a consultant, she worked with human resources at multiple companies to train staff and support

neurodivergent employees); *id.* 117 (published works include "Perceptions of Social Challenges

of Adults with Autism Spectrum Disorder"). The issues in this case, however—which do not

involve either a minor subject or an employment setting—fall outside those areas.

     The Court therefore focuses on Dr. Sperry's remaining credentials to determine whether

she has demonstrated qualifications to testify on the two distinct points at issue: that Smith has

ASD and that this condition may have affected the accuracy of his statements to the FBI.

     ***Qualifications to diagnose ASD in an adult.*** The materials supplied by Dr. Sperry do

not reveal meaningful experience diagnosing ASD in adult subjects. Dr. Sperry's most relevant

credential is her certification as a research reliable assessor for the Autism Diagnostic

Observation Schedule. *Id.* 108. That certification, Dr. Sperry states, "means that through

extensive training on this instrument as well as decades of diagnostic experience, my diagnostic

evaluations meet the standard to be included in research studies." Report at 3. In addition,

between 1994 and 1997, she worked as a consultant for the Autism Division of South Carolina,

where her responsibilities included diagnosing children and adults with developmental

disabilities. Att. 113. It is possible that one or both of these activities entailed extensive work

diagnosing ASD among adults. But the shorthand summaries furnished to the Court do not

reveal the extent, if any, to which Dr. Sperry did so.

     Dr. Sperry's CV lists other potentially relevant experiences, but again, because these are

described sparsely, the extent of her diagnostic experience with adults is elusive. For example, it

states that between 2015 and 2019, as an assistant clinical faculty member in the Yale University

department of psychiatry, Dr. Sperry provided "[d]irect or indirect patient care or evaluations

within clinical services or research projects." *Id.* 110. But Dr. Sperry does not state what this work entailed and whether it involved diagnosing adult patients with ASD. Similarly, her CV states that, between 2000 and 2001, Dr. Sperry was a postdoctoral fellow in the department of psychiatry at the University of North Carolina School of Medicine, and that, as part of this job, she was "a member of two national and international diagnostic teams." *Id.* 113. But it does not reveal the types of persons diagnosed (including whether they were adults), or whether and to what extent she participated in the diagnoses.

Dr. Sperry's account of her prior testimony regarding ASD is especially unrevealing. The Report states that she has been qualified as an expert in "more than 70 cases." Report at 3. It does not, however, specify the propositions to which she testified in these cases, or whether she provided in-court testimony. The Government asserts that it "has only been able to identify one case in which Dr. Sperry appears to have provided expert testimony at trial." Gov't Br. at 23. In that case, as the Government notes, Dr. Sperry's conclusion that the defendant had autism was undisputed. Transcript at 181, *United States v. Isaacs*, No. 21-28 (D.D.C. Feb. 13, 2021), Dkt. 1145. Smith responds with the conclusory statement that Dr. Sperry "has previously been qualified as an expert on ASD in federal court," but does not cite cases in which her court testimony consisted of diagnosing an adult with ASD. Smith Opp. at 23. This lapse is particularly striking because Smith was on notice of that specific challenge to Dr. Sperry's qualifications, but did not respond with a concrete showing that—save in the one case in which the point was uncontested—she has ever given expert testimony that an adult has ASD.

Based on Dr. Sperry's record as developed in this case, the Court cannot affirmatively find that she is qualified to diagnose Smith, an adult, with ASD. *See, e.g.*, *United States v. Dzionara-Norsen*, 2024 WL 191803, at *4 (2d Cir. Jan. 18, 2024) (summary order) (affirming

preclusion of proposed autism expert based on "limited educational or practical experience").  At the same time, it is possible that a more developed record would have supported that Dr. Sperry is qualified to do so.[4]  Had Dr. Sperry's testimony not been otherwise inadmissible, the Court would have held an evidentiary hearing to flesh out her diagnostic qualifications.  *See Colon ex rel. Molina v. BIC U.S.A., Inc.*, 199 F. Supp. 2d 53, 70 (S.D.N.Y. 2001) ("Courts often hold pretrial evidentiary hearings pursuant to Rule 104(a) to determine whether expert scientific (or other specialized) testimony is reliable under *Daubert* . . . .").  But because Dr. Sperry's proposed testimony is improper for multiple other reasons, as explained below, there is no occasion to convene such a hearing.

*Qualifications to assess ASD's impact on interrogation responses.*  Dr. Sperry's qualifications to opine on the second point at issue—the effect of ASD on a subject's responses to interrogation—are threadbare at best.  Dr. Sperry cites one potentially germane experience: she served as a consultant to the FBI during an unspecified period, which involved "[t]raining task force response teams on risk assessment and interview techniques" for "offenders on the autism spectrum."  Att. 114.  Dr. Sperry does not, however, develop concretely how, if at all, that assignment supplied her with the knowledge to opine on the proposition at hand.

Otherwise, Dr. Sperry lists a smattering of publications and presentations that relate to the criminal justice system, but she does not connect any to the issue of how answers to official

---

[4] The Government argues that—independent of the lack of a demonstrated record of adult ASD diagnoses—Dr. Sperry is unqualified to opine on this point because her PhD is not in forensic psychology, and she is not a psychologist.  *See* Gov't Br. at 22.  That argument is not persuasive. The Government has not shown that either credential is a prerequisite to being qualified to diagnose ASD.  And "a proposed expert may lack academic training in an area" yet "still have 'practical experience' or 'specialized knowledge' that qualifies him to render opinion testimony."  *Loyd*, 2011 WL 1327043, at *4 (citing *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1043 (2d Cir. 1995)).

interrogation are affected by the subject's autism.  For instance, in 2006, Dr. Sperry co-authored

an article titled, "Vulnerabilities within the Criminal Justice System," which appeared in

*Representing People with Autism Spectrum Disorders: A Practical Guide for Criminal Defense*

*Lawyers*. *Id.* 116.  Dr. Sperry has also given presentations to law enforcement and psychiatrist

audiences on the topics of "Improving Outcomes for Agents, the Community and People with

Autism," "Cross Systems Approaches to Improve Outcomes for People with Disabilities in

Crisis Response Situations," and "Criminality and ASD: Vulnerabilities within the Criminal

Justice System." *Id.* 118–20.  But her CV and the Report do not delve beneath these titles.  And

the titles of her article and presentations do not imply concerted study of the context of official

interrogations.  On the contrary, these titles are so broadly worded as to embrace a wide array of

topics involving the interplay between ASD and the criminal justice system, including, among

many examples, the propensity of neurodivergent people to commit particular crimes, optimal

ways to arrest and engage with such individuals to minimize safety risks, and considerations at

sentencing for offenders with ASD.

On the basis of Dr. Sperry's background as developed, she lacks any training, research, or

experience on which to knowledgably opine about whether—and under what circumstances—an

adult's ASD might affect his "suggestibility, comprehension, and responsiveness" during an

official interrogation, as Dr. Sperry proposes to testify with respect to Smith's FBI questioning.

Disclosure at 1.  Her lack of qualifications is all the more glaring in that, as explained below, the

only potentially proper topic for an ASD expert's testimony at Smith's trial is the narrower one

of whether his ASD made his responses less likely to be accurate.  Nothing in Dr. Sperry's CV or

Report suggests any basis—scholarly, experiential, or clinical—on which to opine on that

subject.  (And indeed, the Report nowhere squarely so opines.)  The Court thus finds that Smith

17

has not come close to meeting his burden to demonstrate that Dr. Sperry has the relevant

qualifications. *See, e.g.*, *LVL XIII Brands, Inc.*, 209 F. Supp. 3d at 638 (although expert's

"experience and education may qualify him as an expert in certain areas," he "has not shown

how such expertise qualifies him to testify as to the central . . . issue addressed in his report");

*Serrano v. City of N.Y.*, No. 15 Civ. 6885, 2022 WL 2529547, at *3–4 (S.D.N.Y. July 7, 2022)

(finding expert "qualified to testify as to portions of his proffered testimony but not others"

because he does not have "specialized training . . . in support of his conclusions"); *Loyd*, 2011

WL 1327043, at *4–5 (same).

    In the interest of completeness, the Court will evaluate the ensuing issues presented by

Dr. Sperry's proposed testimony, assuming—contrary to the above—that she is qualified both to

diagnose Smith with ASD and to opine that that condition affected his interview responses. *See,*

*e.g.*, *Hamrit v. Citigroup Glob. Mkts., Inc.*, No. 22 Civ. 10443, 2024 WL 4891889, at *4–5

(S.D.N.Y. Nov. 26, 2024) (where expert's opinions were improper on other grounds, assuming

*arguendo* that expert is qualified to give them).

### b.    *Dr. Sperry's Methodology*

    The Government argues that, on both points at issue, Dr. Sperry's conclusions are based

on a flawed methodology. In diagnosing Smith with ASD, it argues, Dr. Sperry relied on biased

sources, used tests intended to assess children, and overlooked key materials such as Smith's

medical, academic, and professional records. In opining that Smith's ASD affected his

statements to the FBI, it argues, Dr. Sperry distorted the circumstances of the interviews and

ignored contradictory evidence. The Court finds Dr. Sperry's methodology reliable to support

her ASD diagnosis of Smith, but not reliable to support her opinions as to that condition's impact

on Smith's statements to the FBI.

18

***Smith's ASD diagnosis.***  In diagnosing Smith with ASD, Dr. Sperry relied on the following sources: (1) the Autism Diagnostic Interview-Revised (ADI-R), which involved interviews with Smith's father and maternal aunt; (2) collateral interviews with Heather Rodgers, Smith's wife, and Geoff Beach, Smith's brother-in-law and high school classmate; (3) records from two assessments performed by Dr. Tyler Whitney, the Social Responsiveness Scale-2 (SRS-2) Self Report and Informant Report, and Dr. Whitney's interview with Smith's wife; (4) "the relevant literature"; (5) audio and legal records, including from the FBI's interviews of Smith; and (6) six direct assessments of Smith: the Vineland Adaptive Behavior Scales Comprehensive Form-3 ("VABS-3"); Behavior Rating Inventory of Executive Functioning-Adult Version Informant and Self Report ("BRIEF2A"); Autism Diagnostic Observation Schedule-2 Module 4 ("ADOS-2"); Autism Spectrum Quotient ("AQ"); Camouflaging Autistic Traits Questionnaire ("CAT-Q"); and Empathy Quotient ("EQ").  Report at 3–4.

The diverse methodology deployed by Dr. Sperry to diagnose Smith is reliable.  Her approach conforms with the recommendations of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition Text Revision ("DSM-5-TR"), which is "one of the basic texts used by psychiatrists and other experts."  *Hall v. Florida*, 572 U.S. 701, 704 (2014).  The DSM-5-TR states that "[d]iagnoses are most valid and reliable when based on multiple sources of information, including clinician's observations, caregiver history, and, when possible, self-report."  *Id.* at 60.  It also states that a proper diagnosis may require "inquiring about any tolls of social interaction," particularly when diagnosing adults.  *Id.* at 60–61.  The DSM-5-TR notes that the ASD "diagnosis remains a clinical one, taking all available information into account, and is not solely dictated by the score on a particular questionnaire or observation measure."  *Id.* at 62.  Here, Dr. Sperry used the multi-faceted

approach that the DSM-5-TR recommends.  She observed and interviewed Smith directly (the ADOS–2), obtained a caregiver history by interviewing Smith's family (the ADI-R), and utilized self-report tools (such as the SRS-2, AQ, and BRIEF 2A).  Additionally, Dr. Sperry inquired about the "tolls of social interaction" for Smith.  *See, e.g.*, Report at 20 ("When asked about social difficulties he experienced, [Smith] shared that he will do what it takes to get along with others however, he does not actively pursue relationships at work or socially beyond what is required.").  Dr. Sperry's methods thus comport with established practice in the medical field.[5]

Dr. Sperry's approach is also consistent with methods approved by courts in other reported cases, which cite sources akin to those above as sound bases on which to diagnose diverse mental-health conditions.  *See, e.g.*, *Qube Films Ltd. v. Padell*, No. 13 Civ. 8405, 2016 WL 888791, at *2–3 (S.D.N.Y. Mar. 1, 2016) (upholding as reliable methods to assess mental acuity, where these included interviews with defendant, assessment of his performances on "standard psychological tests," and an evaluation of his medical records); *Discepolo v. Gorgone*, 399 F. Supp. 2d 123, 125–27 (D. Conn. 2005) (upholding as reliable methods to diagnose post-traumatic stress disorder (PTSD), where these included "psychological testing, record review, and other interviewing" of plaintiff and plaintiff's boyfriend and childhood friends); *United States v. Finley*, 301 F.3d 1000, 1006, 1009 (9th Cir. 2002) (upholding as reliable methods of expert who opined that defendant had an "atypical belief system," where expert's "proper psychological methodology and reasoning" included "accepted psychological tests" and "a

---

[5] Although open to the critique that it consists of selective bolstering, the Report cites research supporting Dr. Sperry's chosen methodology.  *See, e.g.*, Report at 15 (citing study showing that the AQ has a false positive rate of only one percent); *id.* at 21 (citing study that "shows robust psychometric support for" the CAT-Q).

thorough patient history, including meeting with [defendant's] wife and observing [defendant's] behavior").[6]

As Dr. Sperry credibly explains, these methods yielded substantial evidence supporting a diagnosis of ASD. She points to several indicators of Smith's ASD, including his struggles with socialization, his robotic communication style, his rigidity and adherence to routine, and his lack of empathy. Each is supported by test results.[7] Smith's score on the VABS–3 in the social domain placed him at a percentile rank of < 1, which, according to Dr. Sperry, suggest that "he has significant difficulty with interpersonal relationships which includes how he relates to others, his demonstrations of caring and his ability to make friends." Report at 10. The SRS-2, administered by Dr. Whitney, produced similar results, revealing "deficiencies in reciprocal social behavior that are clinically significant and lead to substantial interference with everyday social interactions." *Id.* at 14. And the AQ found that Smith has "particular difficulty reading nonverbal cues such as body language, tone of voice and facial expressions." *Id.* at 16. It also showed that Smith has a "strong preference for routine and predictability," *id.*, a finding supported by the BRIEF 2A, which found that Smith has "difficulty switching thought channels and tolerating changes to his routine," *id.* at 27.

---

[6] Unlike in some of these cases, Dr. Sperry did not examine Smith's medical records. But it is unclear what records would be relevant, in that there is no evidence that Smith received psychiatric attention before this case. *Cf. Schoolcraft v. City of N.Y.*, No. 10 Civ. 6005, 2015 WL 6444620, at *2 (S.D.N.Y. Oct. 23, 2015) (evaluating medical records where, years before case, plaintiff had been evaluated by a psychologist). Dr. Sperry did consult the records created by Dr. Whitney, who had evaluated Smith before Dr. Sperry was retained and had found the results to be "highly suggestive" of ASD. Report at 3.

[7] These indicators closely track the ASD diagnostic criteria stated in the DSM-5-TR. Salient here, those criteria include "[p]ersistent deficits in social communication and social interaction," "[d]eficits in developing, maintaining, and understanding relationships," and "inflexible adherence to routines." DSM-5-TR at 56–57.

As to Smith's mode of communication, the ADOS-2 found that Smith's speech was "overly formal, monotone and robotic," and that he demonstrated limited ability to "initiate or maintain a conversation with examiner"—all of which, Dr. Sperry writes, are "[s]peech abnormalities associated with autism." *Id.* at 17.  She observed that Smith's "facial expressions maintained a fairly bemused look and did not match the seriousness of the situation of his incarceration." *Id.* at 18.  The same test also supports a lack of empathy.  As Dr. Sperry noted in her summary of the ADOS-2 results, Smith "had limited insight into what he does that upsets others" or "how other people feel about things." *Id.* at 20.  This was consistent with the EQ, on which Smith "received a total score of 7 out of a possible 80[,] placing him in the extremely low range." *Id.* at 23.  Dr. Sperry stated that Smith's "difficulty understanding and recognizing the thoughts, ideas, beliefs and emotions of others are consistent with his diagnosis of Autism." *Id.* at 25.

These tests are mutually reinforcing, and accord with interviews conducted by Dr. Sperry.  For instance, Smith's aunt and father described how, as a child, Smith "didn't chat with people or engage in small talk," did "not engage in pretend play alone or with peers," "struggled with changes in his routine and environment," and became "more formal in his speech and mannerisms" as he aged. *Id.* at 6–7.  And Beach described Smith's "overly formal and monotone" communication style, inability to "distinguish between other people joking or being serious," and "particular[ity] about his items being moved or things in his room being changed." *Id.* at 10–11.  Dr. Sperry notes that these characteristics are "indicative of a diagnosis of Autism." *Id.* at 11.  Because Dr. Sperry reached supported conclusions based on "reliable principles and methods," her ASD diagnosis satisfies Rule 702 and *Daubert*.  Fed. R. Evid. 702(c).

The Government makes several arguments to the contrary. It argues that Dr. Sperry obtained evidence from "highly biased sources," which she did not "attempt to independently verify." Gov't Br. at 26. The Government likens this case to *United States v. Ray*, in which Judge Liman precluded the proposed expert's testimony as to the defendant's delusional beliefs in part because the expert had reached his conclusion by interviewing the defendant and reviewing records selected by defense counsel. *See* 583 F. Supp. 3d 518, 541–42 (S.D.N.Y. 2022). But the proposed expert there "did not administer any tests that would be used to diagnose delusion disorders." *Id.* at 541. Here, in contrast, Dr. Sperry conducted six common ASD tests and reviewed the results of two others administered by Dr. Whitney. Report at 3–4. And, contrary to the Government's premise, experts commonly consult with a subject's close associates in rendering an ASD diagnosis. *See* DSM-5-TR at 64 (suggesting that, because a "history of poor social and communication skills in childhood" supports an ASD diagnosis in adults, reports "by parents or another relative" are relevant to adult diagnoses); *Hlavac-Maass v. Kijakazi*, No. 23 Civ. 1586, 2024 WL 989846, at *3 (E.D.N.Y. Mar. 6, 2024) (psychologist diagnosed plaintiff with autism based in part on "questioning the plaintiff's close friend and neighbor"). Experts also often interview the defendants themselves. *See Tchatat v. City of N.Y.*, 315 F.R.D. 441, 445 (S.D.N.Y. 2016) (collecting cases showing that "court decisions involving psychological or psychiatric expert testimony typically recite that the testifying expert has personally interacted with the patient"). The Government's argument that it was unsound methodology for Dr. Sperry to consider factual input from the defendant and his family is wrong. *See id.* at 446 (finding expert's methodology unreliable to produce "an accurate psychiatric diagnosis" where expert chose to "forgo a patient interview" and only reviewed written records).

The Government next discounts one of the eight tests that Dr. Sperry used to evaluate Smith with ASD, on the ground that it is "aimed at diagnosing children with autism."[8]  Gov't Br. at 26.  The Government is correct that the Vineland Adaptive Behavior Scales test appears targeted to children.  *See, e.g.*, Att. 15–16 (asking if respondent "[p]lays 'baby' games like peek-a-boo, patty cake" or "[s]eparates easily from parent/caregiver"); *id.* 32 (goal of test is to "determine the level of a child's adaptive behavior," which requires "someone who knows that child well . . . to describe his daily activities").  Even if that test were set aside, the other seven tests, which are tailored to adults, support Dr. Sperry's diagnosis.  *See, e.g.*, *id.* 35 (describing BRIEF2A as a standardized rating scale for "adults ages 18 years and older"); Report at 21 (stating that the CATQ "was developed for individuals 16+ suspected of having autism who are of average to above average intelligence"); *id.* at 23 (describing the EQ as "a tool to assess empathy in adults (18 years of age and older)").

Finally, the Government contends that Dr. Sperry erred because she did not consider Smith's academic record (he is a Harvard College graduate), *id.* at 6, or professional accomplishments (he was a group manager at Citibank), Citibank Performance Record at 1.  These, it argues, reveal capabilities not easily squared with ASD.  Gov't Br. at 27.  That argument is fair, but it "raise[s] a question of weight and not admissibility."  Fed. R. Evid. 702 advisory committee's note to 2023 amendment.[9]  Had Dr. Sperry's testimony otherwise been

---

[8] The Government suggests that Dr. Sperry relies on multiple tests meant for children, but the two tests that the Government discusses are both titled, "Vineland Adaptive Behavior Scales, Third Edition," and were simply administered by different examiners (one by Dr. Sperry and the other by Dr. Whitney).  In her Report, Dr. Sperry only discusses the results of the test that she administered and neither mentions nor attaches the separate test performed by Dr. Whitney.

[9] The Advisory Committee noted that courts have sometimes erred in treating "critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology" as "questions of weight and not admissibility."  Fed. R. Evid. 702 advisory committee's note to

proper to receive, the Government would have been within bounds to challenge her conclusion on these grounds, via "[v]igorous cross-examination" and the "presentation of contrary evidence." *Daubert,* 509 U.S. at 596.[10]   It is not, however, a basis to preclude Dr. Sperry's testimony. *See, e.g.*, *Israel v. Spring Indus*., Inc., No. 98 Civ. 5106, 2006 WL 3196956, at *11 (E.D.N.Y. Nov. 3, 2006), *aff'd*, 2007 WL 9724896 (E.D.N.Y. July 30, 2007) (to extent expert failed to review relevant medical and school records and "relied on the subjective views of others," "those issues go to the weight and credibility of the evidence, to be determined by the trier of fact"); *see also R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 252 (S.D.N.Y. 2010) ("Minor flaws in an expert's analysis . . . can be probed through cross-examination . . . .").

Dr. Sperry "based [her] diagnosis on multiple facts and data points from a variety of sources," including ones commonly utilized in diagnosing ASD. *Schoolcraft v. City of N.Y.*, No. 10 Civ. 6005, 2015 WL 6444620, at *2 (S.D.N.Y. Oct. 23, 2015).  Her methodology in arriving at that diagnosis is thus sufficiently reliable. *See, e.g.*, *Qube Films Ltd.*, 2016 WL 888791, at *3 (admitting expert's mental acuity analysis, which relied on "extensive data"); *Tardif v. City of N.Y.*, 344 F. Supp. 3d 579, 600, 602 (S.D.N.Y. 2018) (admitting PTSD and anxiety diagnoses by

---

2023 amendment.  But, the Committee stated, "once the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence."  *Id.*  Such is the case here.

[10] The Government suggests that Smith's Citibank performance records are inconsistent with the statement of Smith's wife—cited by Dr. Sperry—that Smith "has a limited ability to engage in chit chat, small talk or reciprocal conversations."  Gov't Br. at 27 (quoting Ex. B at 13).  The records, for their part, state that Smith "quickly 'buil[t] credibility' in his 'interactions with senior management' 'through his clear thought processes and communications style.'"  *Id.* (quoting Citibank Performance Record at 2).  It is by no means clear, however, whether a clear communication style is inconsistent with an inability to engage in small talk.  And Smith's work records describe his interpersonal skills consistent with Dr. Sperry's ASD diagnosis.  His manager, for example, stated that "skills, such as influencing" are "outside [Smith's] comfort zone," despite being necessary for an effective senior leader at Citibank.  Citibank Performance Record at 36.

expert who relied on a "variety of data points" and used "field-standard diagnostic tools"); *Weiss v. Macy's Retail Holdings Inc*., No. 16 Civ. 7660, 2019 WL 6174350, at *2 (S.D.N.Y. Nov. 19, 2019) (admitting learning disability diagnosis of expert who "gathered a variety of data points" and used "an accepted method of psychological diagnosis"); *Lane v. Am. Airlines, Inc*., No. 18 Civ. 6110, 2024 WL 1200074, at *8 (E.D.N.Y. Mar. 20, 2024) (admitting PTSD diagnosis of expert whose opinions were "based on conventional methods for rendering a psychological diagnosis").

***Effect of Smith's ASD on his statements to the FBI.*** In contrast, the Report's conclusion that Smith's statements when interviewed by the FBI were in some manner affected by his ASD is not based on reliable methodology. The Report is unclear as to the empirical basis for that conclusion. Dr. Sperry appears to have so concluded based on: (1) the transcripts and recordings of the FBI interviews; (2) general studies regarding the waiver of *Miranda* rights by people with ASD and their vulnerability to capitulating to authorities, including in custodial interrogations; and (3) her interview with Smith, in which he recounted his perspective on the FBI interviews.

For at least three reasons, Dr. Sperry's methodology in reaching this conclusion—if any can be discerned—is unreliable.

First, Dr. Sperry's account of the FBI interviews is rife with factual inaccuracies about the circumstances under which Smith was interviewed. On multiple points, her assertions of fact are squarely contradicted by the Court's findings of fact in its decision denying Smith's suppression motion.[11] That decision, in turn, was based on testimony from a percipient witness,

---

[11] The Court issued its suppression decision on April 16, 2025. *See generally* Suppression Op. The Report is dated May 30, 2025. *See* Report at 1.

the audiotape of the interviews, body camera footage from police officers, and still photographs. *See* Suppression Op. at 2–3.

For example, Dr. Sperry states that "[w]hen law enforcement entered his home, Mr. Smith was physically removed from his shower, naked." Report at 32. That is wrong. As the Court found and as the body camera footage reflected, Smith was not seen or touched in the shower. Instead, in response to the officers' knocks on his front door, Smith left the shower, naked, and came to the front door. *See* Suppression Op. at 5 ("Smith appeared to be walking towards [the front] door when the agents opened it," having "just emerged from a shower"). Dr. Sperry also suggests that Smith was given only a "pair of underwear" to wear during the interviews. Report at 32; *see also id.* at 33 ("[Smith] sat initially wrapped in a towel and later boxer shorts . . . ."). That too is wrong. As the Court found—and as was demonstrated by a photograph of the interview in progress—Smith "wore a shirt and pants throughout the interview." Suppression Op. at 6. Dr. Sperry also repeatedly implies that Smith was in custody and unlawfully subjected to a non-*Mirandized* custodial interrogation. *See* Report at 30 (explaining "how much of the meaning of communication people on the autism spectrum may miss during a *custodial* interview" (emphasis added)); *id.* at 32 ("The proximity of both agents and furniture impeded his ability to move or leave."); *id.* (stating that the circumstances "led Mr. Smith to continue talking, without seeking any of the legal safeguards to ensure his rights and fair treatment"). That is also wrong. As the Court held, Smith was not in custody and his Fifth Amendment rights were not violated. *See* Suppression Op. at 1. And the audio recording of the interview reflects that Smith was expressly notified at the start of the interview that he was "free to leave" and not answer questions. *See id.* at 7–8. He participated in the interview freely.

Dr. Sperry's taking liberties with central facts—facts recited in a published, evidence-based decision in the case at hand—is the hallmark of an improper, and motivated, expert opinion. *See, e.g.*, *Houser v. Norfolk S. Ry. Co.*, 264 F. Supp. 3d 470, 476–77 (W.D.N.Y. 2017) (finding expert opinion unreliable where it is "based upon an unsupported and inaccurate interpretation of the record evidence" and "completely ignores the undisputed fact[s]"); *Barrett v. Black & Decker (U.S.) Inc.*, No. 6 Civ. 1970, 2008 WL 5170200, at *8 (S.D.N.Y. Dec. 9, 2008) (finding expert opinions unreliable because "they are without factual foundation and inconsistent with Plaintiff's own deposition testimony"); *Macaluso v. Herman Miller, Inc.*, No. 1 Civ. 11496, 2005 WL 563169, at *8 (S.D.N.Y. Mar. 10, 2005) (finding expert opinion unreliable where "it is based on incorrect factual assumptions that render all of his subsequent conclusions purely speculative"). Dr. Sperry's factual errors are particularly problematic because they enable her to paint a portrait of a lawless, exploitative, and coercive questioning environment, which is a central basis for her conclusions that Smith's ASD may have affected him during the interview. As the Report itself acknowledges, in evaluating the impact of Smith's ASD on his interview, "it is essential to come back to the circumstances under which [Smith] was interviewed by law enforcement." Report at 31. But the circumstances that Dr. Sperry describes—that Smith had been "pulled from the shower naked" immediately before the interview, that he was physically impeded from leaving during the interview, and that his rights were violated—are, in significant part, fictitious. *Id.* at 32. That foundational error alone disqualifies her ensuing opinion as unreliable. *See Amorgianos*, 303 F.3d at 267 (stating that "it is critical that an expert's analysis be reliable at every step," that courts are to "rigorous[ly] examin[e] . . . the facts on which the expert relies," and that "any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible" (citation omitted)).

Second, Dr. Sperry's methodology is virtually non-existent with respect to the only issue on which her testimony can properly be received: to show that Smith's ASD undermines the truthfulness of his admissions in the interviews. She cites studies that speak to the behavior and vulnerabilities of autistic people in interrogations, including that they are "more compliant" (North *et al.*), less likely to report "details that would support their innocence" (Bagnall), less likely to produce "coherent and causally connected narrative versions of events" (Barnes and Baron-Cohen; Baixauli *et al.*), and more likely to "display verbal cues associated with deception" (Vredeveldt *et al.*). Report at 30–31. None of these studies, however, support that people with ASD are more likely to make false admissions. On that issue, Dr. Sperry provides only one citation, to a 2021 article titled, "The science-based pathways to understanding false confessions and wrongful convictions." *Id.* at 31, 40. But that article discusses the causes of false confessions generally and reviews the history of scientific research in the field. *See generally* Gisli H. Gudjonsson, *The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions*, Frontiers in Psych., Feb. 2021. It mentions ASD only once, as one developmental disorder that increases the risk of false confessions (along with intellectual disability and literacy problems), but it does not elaborate as to how or why ASD is a risk factor. *Id.* at 7. A method that consists of one unexplained reference does not bespeak the "intellectual rigor" that Rule 702 and *Daubert* demand.

Third, even assuming *arguendo* that the Report had accurately described the circumstances of Smith's voluntary interview, and even assuming that Dr. Sperry had thoroughly examined how ASD might have affected the accuracy of Smith's interview responses, her methodology in so concluding would still be deficient. That is because the Report does not consider evidence contradicting the premise that Smith's statements to the FBI were inaccurate.

*See In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005) (an expert theory "that fails to explain information that otherwise would tend to cast doubt on that theory is inherently suspect").  Dr. Sperry states that tense interrogation environments can exacerbate communications challenges for people with ASD and may lead to "false confessions," suggesting that a similar dynamic might have been at play in Smith's interrogation.  Report at 31. However, Dr. Sperry ignores the fact that Smith's damaging admissions—that he purchased pornography files from "Snapgod," which contained pictures and videos of "teens," *see* Suppression Op. at 8—are largely corroborated by (apart from physical evidence) Smith's own handwritten notes on the charges against him, which Dr. Sperry disclosed as a basis in the Report, *see* Report at 4.  In those notes, Smith stated that after his "Snapgod" purchase, he "could see hundreds of subfolders, labeled with girls' names and a number in parenthesis which seemed to indicate age."  Smith Notes on Indictment at 1–2.  Critically, too, Dr. Sperry fails to reconcile her opinion as to the ostensible untrustworthiness of Smith's interrogation statements with her findings that people with ASD are more apt than others to tell the truth.  *See, e.g.*, Report at 33 ("[A]utistic individuals have a substantially more difficult time lying."); *id.* ("[L]ying is extremely effortful for people with autism."); *id.* ("Compared to neurotypical people they are significantly poorer liars, recognize themselves as poorer liars and as such are less likely to lie than people without autism.").

Although Rule 702 does not require an expert to "exclude each and every possible" piece of contradictory evidence, an expert "should address evidence that contradicts [her] conclusions."  *Trombetta v. Novocin*, No. 18 Civ. 993, 2024 WL 689144, at *4 (S.D.N.Y. Feb. 20, 2024), *reconsideration denied*, No. 18 Civ. 993, 2025 WL 1066210 (S.D.N.Y. Mar. 7, 2025)

(cleaned up). Dr. Sperry failed to do so here. On this basis, too, her opinion testimony as to Smith's interrogation statements is inadmissible.

## B.    Analysis Under the IDRA

The holdings above—that Dr. Sperry is not qualified to opine on the effects of ASD on Smith's FBI interviews and that her proposed testimony on that subject is not based on a reliable methodology—require the exclusion of Dr. Sperry's testimony under Rule 702 and *Daubert*. For completeness, the Court considers the Government's other arguments—based on the IDRA, other Federal Rules of Evidence, and Rule 16(b)(1)(C). The Court first addresses the IDRA.

### 1.    Applicable Law

The IDRA limits the mental-health evidence a defendant can offer in a federal criminal trial. It provides, in relevant part:

> It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

18 U.S.C. § 17(a).

In enacting the IDRA, Congress (1) "eliminat[ed] . . . any form of legal excuse based on a defendant's lack of volitional control," (2) "eliminat[ed] . . . affirmative defenses such as 'diminished capacity,' 'diminished responsibility,' 'mitigation,' and 'justification,'" (3) "limit[ed] . . . the use of expert psychological testimony on ultimate legal issues," (4) "alter[ed] . . . the burden of proof to require the defendant to prove the affirmative defense of insanity by clear and convincing evidence," and (5) "creat[ed] . . . a special verdict of 'not guilty by reason of insanity,' which triggers federal civil commitment proceedings." *United States v. Jones*, No. 16 Cr. 553, 2018 WL 1115778, at *4 (S.D.N.Y. Feb. 27, 2018) (citation omitted).

31

The IDRA permits defendants to offer mental-health evidence for limited purposes. They may pursue the affirmative defense of insanity—although they must establish such by "clear and convincing evidence." 18 U.S.C. § 17(a)–(b). The Second Circuit has also held that the IDRA does not "preclude a defendant from submitting mental health evidence for the purpose of rebutting the prosecution's proof of the *mens rea* element of a specific intent crime." *United States v. Dupre*, 462 F.3d 131, 137 (2d Cir. 2006).

### 2.    Analysis

The Government argues that Dr. Sperry's testimony about Smith's ASD does not serve a permissible purpose under the IDRA. It notes that Smith neither raises an insanity defense nor argues that his ASD prevented him from forming the intent required by any charged offense. Gov't Br. at 17–18. It argues that, under the IDRA, there is no other "proper purpose" for mental-health evidence at a federal criminal trial. Gov't Reply at 4. It also suggests that the IDRA bars such evidence when offered—as Smith purports to here—to impeach a defendant's admissions during an interrogation. Gov't Br. at 18–20.

The Court, although excluding Dr. Sperry's testimony on separate grounds, rejects the Government's construction of the IDRA. The IDRA's text does not bar competent evidence about a mental-health condition's impact on a defendant's interrogation responses. It bars evidence of a mental disease or defect when offered as "a defense" other than the defense of insanity. 18 U.S.C. § 17(a). But the statute's text does not address the admissibility of mental-health evidence when offered for purposes other than to make out "a defense."

For this reason, the Second Circuit, in *Dupre*, held that the IDRA does not block the admission of mental-health evidence tending to negate the intent element of a charged offense. 462 F.3d at 137. The Circuit adopted the insightful statutory construction of the district judge,

the Honorable Denise L. Cote. *Id.* at 137 n.8. The IDRA's text, Judge Cote found, narrows the available affirmative defenses to one—insanity—but it "[n]owhere . . . prevent[s] defendants from using indicators of mental disease as *evidence* to address the question of whether the Government has met its burden of proving intent." *United States v. Dupre*, 339 F. Supp. 2d 534, 537–38 (S.D.N.Y. 2004), *aff'd*, 462 F.3d 131 (2d Cir. 2006). And the IDRA's structure, Judge Cote noted, reinforces the point, in that Congress left in place Federal Rule of Criminal Procedure 12.2, which, at that time, required disclosures related to expert mental-health evidence "bearing upon the issue of guilt," including evidence offered to negate intent. *Id.* at 538 (quoting Fed. R. Crim. P. 12.2(b) (1975)). The IDRA's history likewise showed that Congress "appreciated the distinction between an affirmative defense meant to excuse a crime, and evidence offered to rebut Government attempts to meet their burden of proof on intent," and solely was concerned with eliminating the latter. *Id.* at 539. Decisions following *Dupre* have applied its holding, inquiring whether defendants' mental-health evidence is properly being offered for the limited purpose of negating a statutory *mens rea*. *See, e.g.*, *United States v. Elmaani*, No. 20 Cr. 661, 2023 WL 2770742, at *5 (S.D.N.Y. Apr. 4, 2023); *Cromitie v. United States*, No. 9 Cr. 558–01, 2017 WL 1383982, at *6 (S.D.N.Y. Apr. 7, 2017).

By the same logic as *Dupre*, the IDRA does not preclude the defense from offering competent mental-health evidence to help a jury assess the veracity of a defendant's admissions during official questioning. Indeed, evidence offered for that purpose stands on firmer ground under the IDRA than evidence rebutting a *mens rea*, as it runs a lesser risk of tacitly resurrecting the defenses the IDRA eliminated. And a district court can readily instruct juries as to the limited purpose for which they may consider testimony bearing on a specific item of evidence. That task is far easier than the one required by *Dupre*. *See Dupre*, 339 F. Supp 2d. at 544 (noting

the "ethereal line" between "impermissible mental disease evidence addressing a defendant's inability to engage in normal reflection, and permissible mental disease evidence advancing a 'legitimate' *mens rea* theory").[12]

Consistent with this holding, evidence that casts doubt on the truthfulness of a defendant's confession, including in the form of testimony by mental-health experts, has long been held proper, provided, of course, that it is admissible under the Federal Rules of Evidence. *See, e.g., Crane v. Kentucky*, 476 U.S. 683, 687 (1986) (exclusion of testimony about circumstances of defendant's confession violated "constitutional right to a fair opportunity to present a defense"); *United States v. Shay*, 57 F.3d 126, 129, 133 (1st Cir. 1995) (expert testimony admissible that defendant's "pseudologia fantasia" "caused him to make false statements"); *United States v. Hall*, 93 F.3d 1337, 1345 (7th Cir. 1996) (expert testimony admissible that defendant's personality disorder can "cause individuals to make false confessions").

The limited case law in this Circuit applying the IDRA has not addressed the use of mental-health evidence to impeach a defendant's admissions during an interrogation. One district court in another circuit has, however, considered evidence of this sort.

In *United States v. Lawson*, the defendant sought to offer expert testimony about the defendant's mental disability as a means to "challenge the weight the jury should accord the inculpatory statements she made to the police." 459 F. Supp. 2d 1200, 1203 (M.D. Ala. 2006).

---

[12] As in *Dupre*, the legislative history is in accord. It supports that Congress enacted the IDRA with the limited aim of "narrow[ing] the definition of insanity that had evolved from the caselaw." *United States v. Garcia*, 94 F.3d 57, 61 (2d Cir. 1996) (citing S. Rep. No. 98–225, 98th Cong., 1st Sess., at 225–26 (1983)); *see also* S. Rep. No. 98–225, at 229 (statute aimed to eliminate broader definition of insanity under the Model Penal Code and to "insur[e] that the insanity defense is not improperly resurrected in the guise of showing some other affirmative defense").

The district court assumed that the IDRA did not, by its terms, preclude such testimony. It instead excluded the testimony for the narrower reason that, under the IDRA, evidence offered for a statutorily permitted purpose must be "adequately keyed" to that end. *Id.* at 1205 (quoting *United States v. Childress*, 58 F.3d 693, 729 (D.C. Cir. 1995)). The evidence proffered there was insufficiently linked to the issue of "whether the jury should believe [the defendant's] confession," and therefore ran the risk of being treated as a defense, which the IDRA forbade. *Id.* at 1203. In particular, the court in *Lawson* noted that the expert's report did not contain any "testimony on why her specific level of mental retardation and its attendant difficulties made her, in particular, more susceptible to giving a false confession under the circumstances." *Id.* Without an explanation of "why, because of her specific mental disability, the defendant said or did something, or failed to say or do something," the court held, there was no way to ensure that the testimony "kept within the confines Congress so carefully crafted in the [IDRA]." *Id.* at 1204.

The same analysis—and outcome—applies here. Like the district court in *Lawson*, the Court holds that mental-health evidence offered to demonstrate the falsity of an admission or confession is, conceptually, compatible with the IDRA. However, again as in *Lawson*, the particular expert mental-health testimony that Smith envisions offering is not adequately keyed to that end.

Smith here proposes to offer Dr. Sperry's expert testimony as rebuttal evidence in the event Smith's admissions to the FBI are received during the Government's case. *See* Disclosure at 1. Specifically, Smith states that Dr. Sperry will testify as to how Smith's ASD "might have influenced his suggestibility, comprehension, and responsiveness during the interrogation." *Id.*

According to the Report, Dr. Sperry would testify as to the following topics germane to the issue of how Smith's ASD affected his interrogation:

- **Vulnerability**: People with ASD are "more vulnerable to interrogation techniques," "may not understand what the purpose of the interrogation is," "may not understand their right to leave," "may not understand that they have the right to ask for an attorney," and may accede to an interview "just to fit in or be compliant." Report at 30, 33.

- **Perception**: People with ASD are "often perceived as deceptive in the context of an investigative interview," even when they are being truthful. Investigators' follow-up can yield a "breakdown in communication and even false confessions." *Id.* at 31. The circumstances surrounding Smith's interrogation may have "exacerbated" these risks. *Id.* at 31–32.

- **Inability to lie**: People with ASD have a "substantially more difficult time lying" than neurotypical people and are "less likely to lie" in a custodial interview. *Id.* at 33. They also have trouble recognizing deception in others. *Id.* at 32.

- **Misunderstandings**: People with ASD understand language in a "literal manner" and, in a custodial interview, can miss "much of the meaning of communication." *Id.* at 30. When Smith stated that he was "interested in young girls," he did not appreciate that a listener might understand him to refer to minors, when he actually meant to refer to women ages 18–20. *Id.* at 33.

- **Coherence**: People with ASD "may produce less coherent and causally connected narrative versions of events with fewer key contextualizing details," and "more often fail to recognize and report extricating details that would help demonstrate their innocence of criminal offenses." *Id.* at 31.

The problem with Dr. Sperry's testimony is that, like the expert testimony rejected in *Lawson*, it is not directly linked to the one purpose for which evidence about Smith's ASD could properly be received: to undermine the veracity of Smith's admissions to the FBI. The Report does not address why Smith's mental-health condition "made h[im], in particular, more susceptible to giving a false confession under the circumstances." *Lawson*, 459 F. Supp. 2d at 1203. It may help explain why Smith agreed to be interviewed, and it illuminates communicative issues characteristic of persons with autism. But, on the relevant point, it does

not explain "why, because of [Smith's] specific mental disability, [he] said . . . something" falsely incriminating. *Id.* at 1204. As the Government aptly synopsizes the point, the Report nowhere opines as to how Smith's ASD "should cause the jury to doubt his statements to the FBI." Gov't Reply at 3.

Dr. Sperry's ostensible rebuttal testimony thus does nothing to rebut the admissions that the Government would elicit. It does not undermine the veracity of Smith's admissions that he purchased "adult material" containing images of girls who he "figured" "were teens." Suppression Op. at 8. To the contrary, the Report suggests that Smith's ASD made him *more* likely to tell the truth in his statements to the FBI. *See, e.g.,* Report at 33 ("[A]utistic individuals have a substantially more difficult time lying."); *id.* ("[L]ying is extremely effortful for people with autism."); *id.* ("Compared to neurotypical people they are significantly poorer liars, recognize themselves as poorer liars and as such are less likely to lie than people without autism."). The Report also states that Smith's ASD caused him to answer questions "candidly," *id.* at 34, and to understand questions literally and give literal answers to them, *id.* at 30. These traits, if anything, tend to bolster, not undercut, Smith's admissions.

The rest of the Report covers a broad array of topics relating to ASD that do not relate to Smith's interrogation.[13] Based on the Report, she envisions testifying about Smith's background, family, education, and early-life challenges, including challenges resulting from his undiagnosed ASD; her conjecture as to why Smith was not earlier diagnosed with ASD, including because of his race; Smith's tendency to hoard and how that shows that he does not

---

[13] Other sections of the Report—which cover topics such as Smith as a stepfather and grandfather, *id.* at 13, 35, or Smith's statements about his offense conduct, *id.* at 34–35—have no relation to ASD. Their admissibility is therefore unaffected by the IDRA. These aspects of the Report are, however, inadmissible under the Federal Rules of Evidence, as explained in the ensuing section.

have a sexual interest in children; and the manner in which the criminal justice system treats people with ASD. This testimony about Smith's ASD is clearly barred by the IDRA, as it has no bearing on the circumstances of his interrogation, let alone the veracity of his statements. As reviewed below, such testimony is also inadmissible under the Federal Rules of Evidence.

Dr. Sperry's ostensible rebuttal testimony is thus not keyed—or close—to its purported purpose, and the defense does not identify any other proper purpose for such testimony. *See United States v. Pelletiere*, 101 F.3d 685, 1996 WL 282142, at *1 (2d Cir. May 29, 1996) (unpublished disposition) (excluding testimony about mental abnormality that "purport[ed] to relate to the issue of intent," but did not in fact do so (citation omitted)); *United States v. Towns*, 19 F. Supp. 2d 67, 71 (W.D.N.Y. 1998) (partially excluding testimony about defendant's psychological difficulties as not relevant to the "actual issue" on which such testimony could properly be received). It would therefore serve as a backdoor means to put before the jury inadmissible evidence about a defendant's mental health evocative of the "justification and excuse" defenses that the IDRA was enacted to eliminate, and thus exceed "the confines Congress so carefully crafted in the [IDRA]." *Lawson*, 459 F. Supp. 2d at 1204; *see also United States v. Sabir*, No. 5 Cr. 673, 2007 WL 1373184, at *9 (S.D.N.Y. May 10, 2007) (excluding mental-health evidence that would "implicitly encourage [jurors] to nullify by acquitting [the defendant] based on something other than the question of whether the Government has proved each element of the crimes charged beyond a reasonable doubt," which is "exactly what the IDRA was enacted to prevent").

Because Dr. Sperry's proposed testimony about Smith's ASD lacks a direct link to a permitted purpose, it is barred by the IDRA. *See, e.g.*, *Ray*, 583 F. Supp. 3d. at 539 (precluding mental-health evidence because the "mismatch between [the expert's] proffered testimony" and

its purpose—rebutting the *mens rea*—"ma[de] exclusion appropriate"); *Sabir*, 2007 WL 1373184, at *9 (same, where expert testimony did not support that defendant "has some type of mental disease or defect which affected his ability to form the requisite intent"); *Jones*, 2018 WL 1115778, at *6 (same, where defendant "has not presented a direct link between his alleged delusional disorder and a lack of intent"); *United States v. Agnello*, 158 F. Supp. 2d 285, 287 (E.D.N.Y. 2001) (same, where defendant "failed to establish the necessary link or fit between his alleged mental defect or disease and the intent required of any of the crimes charged against him"); *United States v. Griffin*, No. 94 Cr. 631, 1996 WL 140073, at *11 (S.D.N.Y. Mar. 27, 1996) (same, and noting that "other courts have precluded the admission of evidence as to a defendant's mental defect when a defendant has failed to proffer a proper relationship between the alleged mental abnormality and a legally acceptable theory" of its admissibility).

### C.    Analysis Under the Federal Rules of Evidence

In addition to being improper under Rule 702 and *Daubert* and barred by the IDRA, Dr. Sperry's wide-ranging proposed testimony is prohibited by other Federal Rules of Evidence. Depending on the topic, the proposed testimony fails (1) Rule 401, which requires evidence to be relevant to an issue being tried; (2) Rule 403, which requires that the probative value of evidence not be substantially outweighed by the risks of confusion, delay, or unfair prejudice; and/or (3) Rule 801, which excludes hearsay, subject to exceptions in Rules 803 and 703. Various matters covered by the Report are also ill-suited to expert testimony under Rule 702.

### 1.    Applicable Law

***Relevance***: Rule 401 states that "[e]vidence is relevant when 'it has any tendency to make a [material] fact more or less probable than it would be without the evidence.'" *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012) (quoting Fed. R. Evid. 401). "A material fact is

39

one that would 'affect the outcome of the suit under the governing law.'" *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 579 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

      ***Prejudice***: Rule 403 allows a court to exclude relevant evidence where its probative value is substantially outweighed by the risk of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *United States v. Gupta*, 747 F.3d 111, 131 (2d Cir. 2014) (quoting Fed. R. Evid. 403). Evidence is prejudicial if it "involves some adverse effect beyond tending to prove a fact or issue that justifies [its] admission." *Costantino v. David M. Herzog, M.D., P.C.*, 203 F.3d 164, 174–75 (2d Cir. 2000).

      ***Hearsay***: Hearsay is "evidence of a declarant's out-of-court statement to prove the truth of what is asserted in the statement." *United States v. Reyes*, 18 F.3d 65, 69 (2d Cir. 1994) (citing Fed. R. Evid. 801). A hearsay statement is generally "not admissible," Fed. R. Evid. 802, unless it falls under an exception stated in Rule 803. However, expert opinion testimony, governed by Rule 703, may be "based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions." *United States v. Locascio*, 6 F.3d 924, 938 (2d Cir. 1993). But an expert may not "simply transmit that hearsay to the jury." *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008). "Instead, the expert must form [her] own opinions by 'applying [her] extensive experience and a reliable methodology' to the inadmissible materials." *Id.* (quoting *United States v. Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2003)).

      **2.**      **Analysis**

Dr. Sperry seeks to testify about an extensive list of topics, a number of which are outside her purported area of expertise and the scope of her proposed testimony, as defined in the Disclosure. For the sake of brevity, the Court groups these topics into categories for analysis.

**Smith's ASD diagnosis**: Smith's ASD diagnosis, as explained above, is irrelevant to any fact at issue. It is not a defense to the child pornography or narcotics charges; it does not bear on a statutorily required *mens rea*; and it does not impeach Smith's admissions to the FBI. It thus is excluded under Rule 401. And, because evidence of Smith's autism is irrelevant and has obvious potential to stoke sympathy, its capacity to confuse and unfairly prejudice the Government substantially outweighs its (nonexistent) probative value, requiring exclusion under Rule 403.

**Smith's personal and educational background**: The Report covers Smith's younger sister's diagnosis of ASD, Report at 5, Smith's educational history dating back to his "Mommy and Me" class as a toddler, *id.* at 6, and statements of Smith's family members, who shared that he was "very reserved," "didn't seem to feel comfortable playing with other children," was "bull[ied] and exclude[d]" as a child, "struggled with changes in his routine and environment," and possessed "exceptional skills in memory for dates," "musical ability," "early reading skills at the age of 2," and "computational abilities which earned him scholarships to Harvard and MIT," *id.* at 6–7. Smith's personal and educational background is only relevant insofar as Dr. Sperry finds it to support his autism diagnosis. But because that diagnosis is irrelevant, for the reasons reviewed above, this biographical information is as well. And its admission at trial would require exclusion not only under Rule 401 but also under Rule 403, because it does not have any probative value, but could improperly evoke sympathy for Smith, unfairly prejudicing the Government. *See, e.g.*, *Sabir*, 2007 WL 1373184, at *9 (excluding evidence under Rule 403

because it "would suggest that the jurors should have sympathy" for the defendant because of his "troubled childhood," and thereby "distract the jury's attention from considering the evidence as it applies to the elements of the crimes charged"); *Agnello*, 158 F. Supp. 2d at 289 (precluding psychiatric testimony that "could easily mislead the jury into thinking that such evidence ameliorates or excuses the offense").

***Smith's role as a stepfather and grandfather***:  Dr. Sperry describes Smith as a "doting grandfather" who provides support for his step-grandchild, who "has severe cerebral palsy and requires a feeding tube," Report at 13, and as a "caring, solicitous stepfather who has never engaged in any inappropriate sexual conduct towards his stepdaughters," *id.* at 35.  This information is not relevant to the charges against Smith.  It, too, would run the risk of inspiring sympathy in the jurors based on irrelevant personal biographical details.  For the same reasons as Smith's personal and educational background, this testimony is prohibited by Rules 401 and 403.

***The absence of an earlier ASD diagnosis***:  Dr. Sperry ventures a series of explanations as to why Smith was "not diagnosed with ASD until adulthood."  Report at 27.  She attributes the mid-life diagnosis largely to Smith's race, stating that "people of color are diagnosed later or not at all relative to Caucasian children," *id.*, and "[c]ultural influences have been found to delay families receiving and seeking appropriate health care for their black child with ASD," *id.* at 28.  Dr. Sperry also notes that the diagnosis may have been delayed by "his brilliance and the camouflaging or masking behaviors he utilizes to mask his autism."  *Id.*  These factors, she opines, explain how Smith "flourished in a school environment with other brilliant, Ivy League bound students."  *Id.*  Because this testimony is only germane—at most—to Smith's ASD diagnosis, it is irrelevant.  It is also highly prejudicial, as it would serve—and transparently

would be put forward—to engender sympathy for Smith based on his race, upbringing, and academic record. This testimony is barred by Rules 401 and 403.

**Smith's hoarding tendencies**: Dr. Sperry states that Smith "has been described as a hoarder," Report at 7, that hoarding is prevalent among people with ASD, *id.* at 29, and that Smith "has a long history of collecting, compulsively buying and hoarding," *id.* Dr. Sperry also opines that Smith's hoarding "has relevance to the charges against him" because the FBI discovered "trunks full of adult toys," including "boxes of temporary tattoos with a picture of a young woman on the box," but "*[w]hat was not evident* in any of the pictures were any items that suggested a sexual interest in children." *Id.* (emphasis in original). But testimony related to hoarding is irrelevant because Smith's "cluttering behaviors," *id.*, let alone the source of these tendencies, do not have any bearing on his guilt or innocence of any charge against him.

Smith's counter-arguments fail. Dr. Sperry suggests that because Smith is a hoarder, and because the FBI recovered an array of sex-related objects from Smith's apartment but did not recover any evidence specifically indicating "sexual interest in children," Smith must not have a sexual interest in children. *See id.* at 29. Smith's notes on the charges against him similarly argue that he does not have pedophilic tendencies: "[T]he search warrant authorized agents to seize communications of any type . . . related to child pornography or a sexual interest in children. They found nothing of this sort because I have no pedophilic interests or tendencies whatsoever." Smith Notes on Indictment at 8. But that fact is irrelevant. Smith is not charged with having sex with minors. His lack of an interest in sexual contact with minors does not rebut any element of any charged offense. Whether Smith knowingly received and possessed child pornography, as alleged, does not turn on whether he was interested in hands-on contact with children. And even assuming *arguendo* that such testimony were relevant, Dr. Sperry, whose

credentials relate to ASD, does not have any qualifications to so testify. *See Davis v. Carroll*, 937 F. Supp. 2d 390, 413 (S.D.N.Y. 2013) ("[T]he admission of an expert does not provide that individual with *carte blanche* to opine on every issue in the case."). Finally, if the absence of certain physical evidence in Smith's apartment were germane, that fact could be established by lay evidence. *See Andrews v. Metro N. Commuter R.R. Co*., 882 F.2d 705, 708 (2d Cir. 1989) (stating that, "[f]or an expert's testimony to be admissible," it must not be directed "to lay matters which a jury is capable of understanding and deciding without the expert's help"). This testimony is therefore prohibited by Rule 401 because it is not relevant; by Rule 403, because it would confuse the jury as to the pertinent issues; and by Rule 702, because it will not "help the trier of fact."

**The circumstances surrounding Smith's FBI interview and related research**: Dr. Sperry offers a host of opinions and summaries of research about interviews of people with ASD generally and Smith's interrogation specifically. She describes the Department of Justice's report on techniques for interviewing victims with disabilities and research on how ASD causes "substantial communication deficits." Report at 29–30. She summarizes studies showing that people with ASD have unique "vulnerabilities" in interrogations, such as an inability to understand their rights, read the social intent of the questioners, and provide fulsome accounts, including facts supportive of their innocence. *Id.* at 30–31. As reviewed above, she provides a version, albeit one riddled with inaccuracies, of the circumstances of Smith's interrogation. And she notes research that people with ASD are less able "to lie and detect lying in others," opining that Smith was ill-equipped to detect inaccurate premises in questions put to him by the interviewing agents. *Id.* at 32.

This testimony is irrelevant. As reviewed above, the circumstances of a confession can be "of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence" when such evidence "casts doubt" on the credibility of a confession. *See, e.g., Crane*, 476 U.S. at 689; *see also Hall*, 93 F.3d at 1345; *Shay*, 57 F.3d at 133. But, as explained, Dr. Sperry's testimony would not undermine Smith's admissions; if anything, it would bolster his veracity. *See, e.g.*, Report at 33 ("[A]utistic individuals have a substantially more difficult time lying."). Evidence as to the circumstances of Smith's interrogation has no other relevance. And Dr. Sperry's opinions, insofar as they imply that Smith's interrogators engaged in misconduct or exploited his ASD, have obvious capacity to confuse the jury that the agents' conduct was germane to Smith's guilt or innocence, and to unfairly prejudice the Government. This evidence fails to satisfy Rules 401 and 403.

Dr. Sperry's testimony recounting the circumstances of Smith's interrogation separately violates Rule 801, prohibiting hearsay, to the extent that it would serve as a vehicle to put before the jury Smith's out-of-court statements to Dr. Sperry reflecting on the FBI interviews. *See, e.g.*, Report at 32 (representing that, because Smith had had "limited interactions with law enforcement," he "initially thought something was wrong in the apartment or in NYC"); *id.* at 33 (representing that, "[i]n [Smith's] mind," he meant to refer to girls ages 18–20); *id.* at 34 (representing, based on Dr. Sperry's questioning of Smith, that Smith "thought he was being helpful and cooperative" with the FBI agents). Although a proper expert report may embed hearsay, no "reliable methodology" undergirds Dr. Sperry's bid to recite Smith's out-of-court statements to the jury. *Dukagjini*, 326 F.3d at 58. This backdoor means of putting Smith's view of events before the jury without subjecting him to cross examination is therefore separately improper under Rule 801. *See Ray*, 583 F. Supp. 3d at 540 (testimony about what the defendant

"'believes' is not expert testimony at all," but rather "a regurgitation of the defense uttered through the mouth of an expert").

   ***The criminal justice system's treatment of people with ASD***:  The Report includes several pages summarizing research related to people with ASD in the criminal justice system.  It details a speech by former Attorney General Garland on the Department of Justice's "efforts to combat disability discrimination that leads to needless criminal justice involvement," Report at 36, the link "between ASD and sexually offending behaviors," *id.*, the "detrimental impact incarceration has on people with autism," *id.* at 37, and the "alternatives that would provide the treatment and rehabilitation [Smith] requires," *id.*  Whatever relevance such information might have in support of an argument "for sentence mitigation," it is irrelevant to the elements of any charge, and would not "give[] the jury a reason in law not to convict," *United States v. Litzky*, 18 F. 4th 1296, 1306 (11th Cir. 2021) (cleaned up); *see also Dzionara-Norsen*, 2024 WL 191803, at *4 (precluding testimony that "[i]ndividuals with Asperger's syndrome . . . [are] especially vulnerable to committing this sort of offense" because such testimony "has no tendency to make the existence of any element of the relevant offenses less likely").  It also fails Rule 403, given its capacity to stoke unfair prejudice by calling to mind the challenges incarceration presents for people with ASD.

   ***Smith's oral and written statements about his offense conduct***:  The Report recounts Smith's statements to Dr. Sperry about his offense-related conduct, including that as Smith "became older and his job became more stressful, he began looking at 'edgier' content that was being pushed towards him through algorithms," that he believed "anything on the internet was 'fair to look at,'" that he "was aware of statutory rape laws" and that he would "never . . . touch a child.'"  Report at 34–35.  Like Dr. Sperry's proposed testimony recounting Smith's out-of-court

statements about the FBI interviews, her testimony relating the above statements about his underlying conduct breach the hearsay rules, as they are not a proper basis for any expert testimony. *See, e.g.*, *United States v. Rodriguez*, 651 F. App'x 44, 47 (2d Cir. 2016) (summary order) (affirming preclusion of expert testimony recounting defendant's statements about circumstances of assault because "[i]t is not clear what if anything the proffered hearsay statements . . . would add to the jury's understanding of [the] expert opinion" and "the jury would rely on the hearsay testimony for its truth"); *Mejia*, 545 F.3d at 197–98 (precluding expert testimony that "involved merely repeating information [expert] had read or heard . . . from witnesses" because expert "did not analyze his source materials so much as repeat their contents"); *United States v. Rubi-Gonzalez*, 411 Fed. App'x 483, 487 (2d Cir. 2009) (summary order) (same). Smith's statements about his understanding of the child pornography laws are separately inadmissible under Rule 401 because they are irrelevant. *See Bryan v. United States*, 524 U.S. 184, 192 (1998) ("[T]he knowledge requisite to knowing violation of a statute is factual knowledge as distinguished from knowledge of the law." (quoting *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 345 (1952) (Jackson, J., dissenting))).

### D.    Analysis Under Rule 16(b)(1)(C)

Finally, the Government argues that Smith's expert disclosure is deficient because it does not identify "the statements or opinions that she will actually provide at trial, leaving the Government to guess." Gov't Br. at 14. That critique is correct: Dr. Sperry's Disclosure and Report do not satisfy Rule 16(b)(1)(C).

#### 1.    Applicable Law

Rule 16(b)(1)(C) requires parties to provide, *inter alia*, a "complete statement of all opinions that the defendant will elicit from the witness in the defendant's case-in-chief" and "the

bases and reasons for them." Fed. R. Crim. P. 16(b)(1)(C)(iii). Rule 16(b)(1)(C)(iv) allows a defendant, in making that disclosure, to "refer[] to, rather than repeat[]" information already provided in an expert report, so long as such a reference clearly delineates the testimony to be offered. *See* Fed. R. Crim. P. 16 advisory committee's note to 2022 amendment ("Information previously provided need not be repeated in the expert disclosure, if the expert disclosure clearly identifies the information and the prior report in which it was provided."). Rule 16 was amended in 2022 to "require more specificity" in expert disclosures, *United States v. Kwok*, No. 23 Cr. 118, 2024 WL 1773143, at *1 (S.D.N.Y. Apr. 24, 2024), to "facilitate trial preparation, allowing the parties a fair opportunity to prepare to cross-examine expert witnesses and secure opposing expert testimony if needed," Fed. R. Crim. P. 16 advisory committee's note to 2022 amendment.

### 2.    Analysis

Because the Disclosure expressly incorporates the Report by reference, *see* Disclosure at 1, the Court considers the two together in assessing Smith's compliance with Rule 16(b)(1)(C). For several reasons, these materials do not supply the requisite notice.

First, and most fundamentally, the Disclosure and Report leave unclear the scope of Dr. Sperry's intended testimony. The Disclosure states that this testimony will be limited to "how Mr. Smith's diagnosis of [ASD] might have influenced his suggestibility, comprehension, and responsiveness during the interrogation on June 26." *Id.* at 1. But the Report, which runs 38 pages and contains 122 pages of attachments, sets out views and information on a wide of range of topics, far exceeding the boundaries indicated by the Disclosure. And Smith's brief does not back away from the Report's intention to use Dr. Sperry as a catch-all expert witness, who would offer opinions about hoarding, federal law enforcement policies regarding autistic people, and Smith's subjective perspective about his offense conduct and interrogation. *See, e.g.*, Smith

Opp. at 6–10.  Putting aside the independent deficiencies in the proposed testimony as reviewed above, Smith's scattershot approach to disclosure leaves the Government with a wide array of eclectic topics to prepare to meet on cross-examination or with a reply expert, and hamstrings the Court in its proper gatekeeping role. [14]  *See, e.g.*, *United States v. Kaufman*, No. 19 Cr. 504, 2021 WL 4084523, at *19 (S.D.N.Y. Sept. 8, 2021), *aff'd*, No. 21-2589, 2023 WL 1871669 (2d Cir. Feb. 10, 2023) (finding Rule 16 deficiencies where expert's "proposed testimony remains something of a mystery" and the disclosures were "inconsistent both with each other and with varying arguments made by defense counsel"); *Kwok*, 2024 WL 1773143, at *3 (finding that insufficient detail as to content of proposed expert testimony "dooms [defendant's] notices under Rule 16" and "fails to provide the Court with enough information" to perform "its gatekeeping function under *Daubert*"); *United States v. Ferguson*, No. 6 Cr. 137 CFD, 2007 WL 4539646, at *2 (D. Conn. Dec. 14, 2007) (finding that defendant's vague disclosures failed to supply the government with "the type of information envisioned by Rule 16(b)(1)(C) with which to prepare for cross-examining the experts").

Second, the Disclosure and Report do not clearly state Dr. Sperry's proposed opinions. *See Kaufman*, 2021 WL 4084523, at *19 (finding disclosures insufficient where "it is unclear exactly what [expert's] proposed opinions would have been"); *United States v. Valle*, No. 12 Cr. 847, 2013 WL 440687, at *5 (S.D.N.Y. Feb. 2, 2013) ("Merely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's actual opinions.").  The Report recounts at length Smith's familial, educational, and personal history, research on topics ranging from late-in-life ASD diagnoses of people with color to

---

[14] The Disclosure's statement that Dr. Sperry will be called as a "rebuttal witness" does not relieve Smith of his duty to comply with Rule 16.  *See, e.g.*, *United States v. Amirov*, No. 22 Cr. 438, 2025 WL 636088, at *3 (S.D.N.Y. Feb. 27, 2025).

recidivism rates among people with ASD, and the content of her interview with Smith. These sections largely do not contain opinions but instead transmit factual matter disconnected from any opinion. It is unclear whether and on what basis Dr. Sperry proposed to testify to such content.

Third, to the extent the Disclosure and Report do state opinions, many are without "the bases and reasons for those opinions as required under Rule 16(b)(1)(C)(iii)." *United States v. Gentile*, No. 21 Cr. 54, 2024 WL 3251702, at *3 (E.D.N.Y. June 20, 2024) (finding deficient disclosures that "preview [expert's] opinions on certain topics," but failed to explain how the expert "came to his conclusion and what methodologies or evidence substantiate that conclusion" (quoting *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006), *aff'd*, 552 U.S. 312 (2008))). Most centrally, as reviewed above, the Report loosely states that Smith's FBI interviews were affected by his ASD, but it stops short of opining on the one relevant point—that these answers were more likely false on account of that condition—and does not provide any support for that proposition. *See* Report at 31.

District courts have "broad discretion" to determine the remedy, if any, for a breach of Rule 16. *Kwok*, 2024 WL 1773143, at *1 (cleaned up). Where a disclosure merely contains insufficient information, courts often allow defendants to supplement their disclosures. *See, e.g.*, *Valle*, 2013 WL 440687, at *6; *Kaufman*, 2021 WL 4084523, at *18. But here, as reviewed above, Dr. Sperry's testimony is inadmissible *in toto* for numerous reasons. There is no well-founded opinion in the Report that would be admissible. Because the testimony set out in the Report is barred on numerous grounds, no purpose would be served by inviting Dr. Sperry to supplement her Report.

## CONCLUSION

For the foregoing reasons, the Court grants the Government's motion to preclude the testimony of Dr. Sperry.  The Clerk of Court is respectfully directed to terminate the motion pending at Docket 96.


SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge


Dated: October 2, 2025
       New York, New York