UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-

EDWARD GENE SMITH,

Defendant.

S1 25 Cr. 4 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

Defendant Edward Gene Smith is charged with receiving and possessing child pornography, distributing a controlled substance (clonazepam) to an adult woman without her knowledge and with the intent to engage in nonconsensual sexual acts, and falsifying a document with the intent to obstruct a federal investigation. His trial is scheduled to begin on February 23, 2026. This decision resolves the Government's motion to preclude the testimony of Jeffrey Fischbach, an expert in computer forensics whom the defense proposes to testify on a wide array of subjects.

As developed below, Fischbach has set out the topics of his anticipated testimony in an iterative series of disclosures, the last one filed substantially after the operative deadline. These topics include: computer files, thumbnails, and metadata; the ostensible "tainting" by the Federal Bureau of Investigation ("FBI") of certain electronic evidence; cryptocurrency and Telegram communications; and whether use of cryptocurrency and Telegram are "indicative of crime." As to Smith, Fischbach proposes to testify about the modified, accessed, and created ("MAC") data on Smith's devices, as well as Smith's search history, sexual interests, relationship with the

1

person to whom he is alleged to have distributed narcotics, participation in Telegram group chats, purchases from the website SexyVids.com, and lack of a Klonopin[1] prescription.

On October 16, 2025, the Government moved to preclude Fischbach's testimony in its entirety, on multiple grounds. For the following reasons, the Court grants the motion to preclude with respect to the overwhelming majority of Fischbach's proposed testimony, while denying the motion with respect to a subset of the proposed testimony regarding computer forensics.

## I.    Relevant Background

### A.    The Search, Arrest, and Indictment

On June 26, 2024, at approximately 6 a.m., the FBI and local police executed a court-authorized search warrant at Smith's apartment on Central Park South in Manhattan. The affidavit in support of the warrant set out probable cause that Smith had purchased and possessed child pornography. During the search, FBI agents conducted two interviews of Smith, both memorialized on audio recordings. Smith told the agents that he had used Bitcoin to make "some" purchases of "adult material" on an "adult site"; that he had purchased material from a pornography producer known as "Snapgod"; that, before he did so, he "figured" some of the girls in the videos "were teens," who "certainly could have been under 18, like 16 or 17"; and that his sexual preference is girls who are "teens." Dkt. 66 at 8.

On September 10, 2024, Smith was arrested on a complaint. Dkts. 1–2.

On January 6, 2025, a grand jury returned an initial Indictment. Dkt. 22 ("Indictment"). It charged Smith in three counts. Count One charges receipt and distribution of child pornography, on or about June 3 to June 6, 2023, in violation of 18 U.S.C. § 2252A(a)(2)(B) and (b)(1). Count Two charges possession of child pornography, on or about June 3, 2023 to June 26,

---

[1] Klonopin is a brand name for clonazepam. *See* Dkt. 23.

2024, in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2). Count Three charges, on or about April 23, 2023, the knowing and intentional distribution of, and possession with intent to distribute, a controlled substance (clonazepam, or "Klonopin"), in violation of 21 U.S.C. §§ 812, 841(a)(l), and (b)(2). In filings, the Government has stated that Count Three arises from Smith's allegedly having drugged an adult woman ("Victim-1") with whom he had a sexual relationship. *See, e.g.*, Dkt. 23 ("Bail Revocation Ltr.") at 1.

On September 30, 2025, a grand jury returned Superseding Indictment S1 25 Cr. 4 (PAE), the operative indictment today. Dkt. 106 ("Superseding Indictment"). It modifies the Indictment in three ways. First, it broadens the time frame in Count Two, charging Smith with possessing child pornography "[f]rom at least in or about 2019, through on or about June 26, 2024." *Id.* Second, it modifies Count Three, to allege that, in providing Klonopin to Victim-1, Smith intended to commit rape, in violation of 21 U.S.C. § 841(b)(7). *Id.* Third, it adds Count Four, which charges Smith with falsifying a document with the intent to obstruct a federal investigation, in violation of 18 U.S.C. §§ 1519 and 2. *Id.* That count alleges that Smith created, and paid Victim-1 to sign, a document containing false claims regarding her access to his residence and computer. *Id.*

### B.    The FBI's Ongoing Review of Smith's Devices

Pursuant to the court-authorized search warrant, the FBI reviewed the devices seized at Smith's apartment. Its analysis of these revealed thousands of images and videos containing child sexual abuse material ("CSAM"), many with explicit names connoting CSAM contents,

such as "Pthc 2010 5yo Kathie Making Poop and Pee" and "(pthc) 2007 Tara 8Yr – Ass Fuck."[2] Dkt. 124 ("Gov't Mot.") at 5 (cleaned up).

The FBI's review also revealed evidence of other crimes. Agents found messages from approximately April 2023 between Smith and the administrator of a Telegram group titled, "Sleepy Wives,"[3] id., which is "dedicated to sharing photographs and videos of naked and unconscious women in sexual positions," Bail Revocation Ltr. at 7. In those messages, Smith allegedly "discussed drugging women with Klonopin and alcohol to render them unconscious for sexual purposes." Gov't Mot. at 5–6. Smith is also alleged to have sent the Telegram group administrator a video of Smith having sexual contact with Victim-1 as she lay naked and unconscious. Bail Revocation Ltr. at 3.

### C.    Ongoing Issues Related to Electronic Evidence

In a series of status conferences, the parties have raised issues related to three of the 10 devices seized from Smith's apartment. The Government has labeled these 1B2, 1B8, and 1B9. Because these issues feature prominently in Fischbach's disclosures, the Court reviews them here.

Device 1B2 is alleged to contain the bulk of the CSAM recovered in this case (approximately 6,000–7,000 files). 10/6/25 Tr. at 61. On September 10, 2025, the Government notified the Court that it had been unable to recover all the files on that device, or make a complete forensic copy of that device, due to its damaged hard drive. 9/10/25 Tr. at 15–16. Accordingly, the Government created a "partial clone," 10/6/25 Tr. at 55, or "derivative of

---

[2] According to the Government, "PTHC" stands for "pre-teen hardcore," "a common genre of CSAM." Gov't Mot. at 5 n.1.

[3] Filings also refer to this group by the name, "Sleeping Wives." See, e.g., Gov't Mot. at 8.

1B2"—known as "1B15"—along with a spreadsheet containing the metadata from the original 1B2 hard drive, 9/10/25 Tr. at 43–44. In July 2025, the Government provided the defense with a copy of 1B15 and the 1B2 spreadsheet. *Id.* That copy of 1B15, however, was found to contain a "metadata error," 10/6/25 Tr. at 56, insofar as it contained metadata that did not correspond to the metadata on the 1B2 spreadsheet, *id.* at 67. On October 6, 2025, the Government stated that it would re-copy 1B15 for the defense, in an attempt to remedy this error. *Id.* at 56–57. The defense responded that a new copy of 1B15 would be inadequate and requested access to the original device or a forensic copy of it. *Id.* at 69. On October 20, 2025, the Government informed the Court that, on October 14, it had provided a "better copy" of 1B15 to the defense, and that it was also in the process of getting approval to send 1B2 back to the FBI's Digital Forensic Analysis Unit in Alabama to attempt another partial clone of that device. 10/20/25 Tr. at 4. On October 28, 2025, the Government filed a letter stating that it had shipped 1B2 to that Unit, which was "actively working on re-processing it as of [that] date." Dkt. 131. On November 24, 2025, the Government informed the Court that the reprocessing of 1B2 was complete, that a new derivative of the device had been sent to the FBI's headquarters in New York, and that the derivative would be made available to the defense in early December.

Devices 1B8 and 1B9 were initially identified to contain CSAM. The Government informed defense counsel in May, and the Court in early July, that the FBI had made "an inadvertent error" with respect to both devices. 7/7/25 Tr. at 24–25. Specifically, an FBI agent wrongly reported that 1B8 (a computer) and 1B9 (a phone) contained CSAM, when in fact the agent drew these conclusions from reviewing a hard drive which "had five CSAM images from a different case." 7/24/25 Tr. at 17. The Government thereafter confirmed that 1B9 does not contain CSAM, but did not conduct a search of 1B8. *Id.* at 19–20. As a result of the FBI error,

the Government initially stated that it did not intend to introduce any evidence from 1B8 at trial, then scheduled for this fall, and the defense had not expressed interest in reviewing 1B8. *Id.* at 20. On September 10, 2025, however, the Government stated that it intended to review 1B8 and "remains ready to provide access to 1B8 upon request." Dkt. 104–1. On October 6, 2025, the Government confirmed that its review of 1B8 was ongoing, and that the defense had not requested a copy of that device. 10/6/25 Tr. at 78–79. On November 24, 2025, the defense informed the Court that it planned to review 1B8, along with the new derivative of 1B2, in early December.

### D.    Procedural History Related to Fischbach's Disclosures

At a July 24, 2025 conference, the Court set a schedule for expert disclosures, keyed to the October 14, 2025 trial date then in place. Dkts. 81, 88.

On August 14, 2025, consistent with that schedule, the defense provided the Government with an expert disclosure for Fischbach (the "initial disclosure"). On August 22, 2025, the Government asked the Court to set a schedule for motions to preclude the defense's proffered expert testimony. Dkt. 92. On August 25, 2025, the Court did so. Dkt. 93.

On September 10, 2025, on a defense motion and after a conference, the Court adjourned the trial date to November 18, 2025.[4] Dkt. 102. A basis for the adjournment was Fischbach's ongoing review of electronic evidence. *See* Dkt. 98. At that conference, the defense stated that Fischbach might seek to supplement his initial disclosure based on his ongoing evidentiary review. 9/10/25 Tr. at 11. The Court observed that Fischbach's initial expert disclosure had

---

[4] The trial date has since been adjourned to February 23, 2026 due to the withdrawal of Smith's former lead counsel because of surgery and prolonged recovery, and the possibility of a second superseding indictment. *See* Dkt. 125. That adjournment did not alter the briefing schedule for the present motion. *Id.*

6

covered a wide array of topics, some of which appeared outside the scope of the expertise of a computer expert, and encouraged the defense to closely evaluate—with "a gimlet eye"— Fischbach's proposed testimony and limit it to "plausibl[e] expert testimony" by someone with his qualifications. *Id.* at 84–85. The Court set a revised briefing schedule keyed to the new trial date and directed the defense to "complete its disclosure" as to Fischbach by September 29, 2025. Dkt. 102.

On September 29, 2025, the defense provided the Government with a supplemental disclosure, titled "Jeffrey M. Fischbach Rule 16b Supplemental." *See* Dkt. 124, Ex. C ("supplemental disclosure" or "SD").

On October 3, 2025, the Government asked the Court to order the defense to provide additional information related to Fischbach's disclosures. Dkt. 109. It asked that the defense (1) clarify whether the supplemental disclosure "was intended to supersede and replace" the initial disclosure, or "merely to supplement it"; (2) state whether any of Fischbach's credentials have been updated to support his opinions on "multiple new subjects"; and (3) give the Government all materials to which Fischbach's disclosures referred. *Id.* at 3–4. The Government also sought an adjournment of the deadline for its motion to preclude. *Id.* at 4. The Court ordered the defense to provide the requested material by the next day. Dkt. 110.

On October 4, 2025, the defense filed a response. Dkt. 111. It stated that the supplemental disclosure was intended to supplement, not supersede, the initial disclosure; that Fischbach's opinions in it are supported by his credentials stated in the initial disclosure; and that the defense had, that day, furnished the Government with all materials Fischbach referenced. *Id.* at 1, 4. It also attached an amended version of the initial disclosure, *see* Dkt. 124, Ex. A ("amended disclosure" or "AD"), representing that "potential proffered opinions, statements,

observations have been deleted due to lack of relevancy" based on Fischbach's work between August 14 and September 29. Dkt. 111 at 1.

On October 5, 2025, the Government asked the Court to direct the defense to provide it with a redlined comparison of the initial and amended disclosures, and to confirm whether the amended disclosure added or modified—or just deleted—certain opinions stated in the initial disclosure. Dkt. 112 at 1.

At a conference on October 6, 2025, the Court admonished the defense for filing the amended disclosure well after the September 29 deadline and stated that "[t]here are no more supplements to be done" by Fischbach. 10/6/25 Tr. at 36. After an extended back-and-forth in which defense counsel appeared not to know the status of Fischbach's ongoing review of electronic devices, the defense stated that it had provided the Government its final version of the Fischbach disclosures and would modify them only if it were to receive new electronic evidence from the Government. *Id.* at 37. The defense also agreed to supply a redlined comparison of the initial and amended disclosures to the Government, *id.* at 33–34, and did so that day, Dkt. 114.

On October 16, 2025, the Government moved to preclude Fischbach's testimony in its entirety. Gov't Mot. On October 23, 2025, the defense opposed. Dkt. 126 ("Def. Opp'n"). In its opposition, the defense withdrew and modified numerous proffered opinions in Fischbach's amended and supplemental disclosures, to "focus the defense evidence" and "give the Court a pared down list of opinions to rule on for this motion." *Id.* at 2. On October 30, 2025, the Government replied. Dkt. 135 ("Gov't Reply").

### E.    Fischbach's CV and Disclosures

Fischbach's *curriculum vitae* is 21 pages.  Dkt. 124, Ex. B ("CV").  As originally filed, his amended disclosure is 13 pages and has 176 numbered paragraphs, and his supplemental disclosure is six pages and has 84 numbered paragraphs.[5]  The Court summarizes these in turn.

***Curriculum vitae***:  Fischbach's CV recites his employment history, board positions, membership affiliations, trainings and presentations, mainstream media citations, consulting references, and prior testimony.  It reports that, since 1994, he has run a consulting firm—for corporate clients and parties in litigation—specializing in "forensic technology, evidence preservation, analysis and authentication."  CV at 1.  He has consulted for numerous lawyers and law firms.  *Id.* at 9–14.  He has served on boards in the education and business sectors, advising on issues such as "the viability of nascent technologies" and "market trends."  *Id.* at 2.  He is a member of trade associations including the Association for Information and Image Management Evidentiary Support Committee, the American College of Forensic Examiners, and the Information Systems Security Association.  *Id.* at 2–3.  He has trained or spoken to police departments, public defenders, and courts on technology-related topics, including "Challenging Digital Evidence," "Sex, Lies & Cyberspace," and "Social Networking & Wireless Location."  *Id.* at 4–5.  He has been quoted or cited in, among other outlets, the *Washington Post* and *NPR*.  *Id.* at 6–8.  He has testified in dozens of cases in state and federal court.  *Id.* at 15–21.

---

[5] As to both disclosures, the Court has stricken, and hence does not list or consider, the areas of proposed testimony that the defense later withdrew in its opposition to the motion to preclude.  *See* Def. Opp'n at 2–3.  The Court also does not consider the modifications to the amended and supplemental disclosures that the defense proposes in that opposition.  *See id.*  These would alter the substance of Fischbach's proposed testimony.  They thus flagrantly breach the September 29, 2025 deadline for completion of Fischbach's disclosures, Dkt. 102, and disregard the Court's unambiguous statement at the October 6, 2025 conference that it would not allow Fischbach to make further revisions to his disclosures except where based on newly-produced electronic evidence from the Government.

Fischbach's CV does not set out his education or list his publications. His amended disclosure states that he "has not published in the last 10 years, but he has provided publicly-recorded training, interviews, and seminars which can be found on the Internet." AD ¶ 35.

*Amended disclosure*: Fischbach's amended disclosure recites his qualifications, AD ¶¶ 1–36, identifies 62 defined terms about which he may testify, *id.* ¶ 37, and sets out the bases for his opinions—primarily, his review of electronic discovery in Smith's case, *id.* ¶¶ 38–42. It then identifies the topics on which Fischbach proposes to opine:

- *Cryptocurrency*: "[A]lthough Mr. Fischbach will not testify as an expert in banking," he will testify, based on his training and experience, that using cryptocurrency "is not an implicit sign of criminal activity"; that Coinbase is one of the "best known" cryptocurrency exchanges and "complies with U.S. Banking and money changing rules"; and that, based on his experience in prior cases, individuals use cryptocurrency "as a means of hiding perfectly legal purchases from significant others." *Id.* ¶¶ 44–47, 50, 52.

- *Electronic communications and group chats*: To join the Sleeping Wives group, Smith "provided publicly available content he found on the Internet," and "may have paid to produce 'original content.'" *Id.* ¶¶ 54–55.

- *The FBI's electronic evidence handling and preservation*: He visited the FBI's review room in this case and "observed electronic evidence connected to the FBI workstation without a forensic write blocking device." *Id.* ¶¶ 57–58. Based on these observations, the "thousands of dates post-dating device seizures," and the fact that "the FBI copied contraband from an agent's own hard drive," the electronic evidence was "altered, tainted, [and] spoiled by the government multiple times, involving multiple evidence items." *Id.* ¶¶ 59–62.

- *Devices 1B2 and 1B15*: 1B2 was accessed without a proper write-blocking device and contains "thousands of files that post-dated its seizure," and 1B15 cannot be a partial clone of that device because "a 'clone' cannot, by definition, be 'partial.'" *Id.* ¶¶ 63–66. 1B15 "is, in fact, new evidence," and "neither 1B2, nor 1B15 provide proof" that Smith knowingly possessed CSAM. *Id.* ¶¶ 69–72.

- *Forensic examination protocol*: He is experienced in "forensic examinations, including FBI digital forensic protocols," and "personally witnessed poor evidence handling" by the FBI in this case. *Id.* ¶¶ 76, 78.

10

- ***Smith's sexual interests***: Fischbach "has examined evidence of [Smith's] interest in, and collection of material related to adult females." *Id.* ¶ 81.

- ***Link files***: Link files "are not CSAM in and of themselves," are "automatically created, without user intervention," and "can be received . . . without a user ever having had the file to which it links." *Id.* ¶¶ 82–84. The link files found on Smith's devices "were broken," which could be the result of deletion or disconnection from the device to which they were previously connected, and the Government has not produced evidence as to "when [those] link files became broken" or that they "resolv[ed] to CSAM." *Id.* ¶¶ 87–93. There is also "no evidence" that Smith clicked on the link files, that the files to which the link files resolve ever existed on Smith's devices, or that Smith made "any attempt to hide CSAM" by "[w]iping" or using wiping utilities. *Id.* ¶¶ 96–99.

- ***MAC data***: MAC data is stored on electronic devices, and "essential to understanding when a file arrived on a device, in a particular folder, when it was originally written, and when it was last accessed." *Id.* ¶¶ 102, 104; *see also id.* ¶¶ 101–14. The fact that an accessed date and time matches the created or modified date and time "is evidence that a user has never interacted with that file," and "any missing MAC data negates any evidence that a user has ever interacted with that file." *Id.* ¶¶ 112, 115. As to Smith's devices, "there are many instances where the MAC data for CSAM images is static and therefore the evidence is clear that [Smith] never interacted with that file and thus never knowingly possessed that image." *Id.* ¶ 117.

- ***Metadata***: Timestamps "are critical to understanding if, when, how, and by whom or what, a file was accessed," and "without metadata, it is nearly impossible to attribute a particular file to a particular user's knowledge of the file or whether it was knowingly possessed." *Id.* ¶¶ 122–23

- ***Evidence obfuscation***: There are "free encryption utilities that allow users to easily add or remove files and folders," but Fischbach has not "found any evidence" of such utilities on Smith's devices. *Id.* ¶¶ 124–25. There is no evidence that Smith "ever wiped any files or drives or took any action to encrypt any files." *Id.* ¶ 126.

- ***Search records***: "[S]earch records are an important piece of evidence when assessing an individual's knowledge and intent," and Fischbach has found "no search records relevant to the CSAM charges" on Smith's devices. *Id.* ¶ 128, 130. Fischbach "may testify to the timing" of Smith's searches about Klonopin. *Id.* ¶ 129.

- ***Snapgod***: There is "no evidence" that Smith intended to purchase, purchased, downloaded, or searched for CSAM from Snapgod. *Id.* ¶¶ 138, 140–42. "[T]here is evidence" that Smith downloaded non-CSAM from Snapgod and other sites. *Id.* ¶ 143.

- *Telegram*:    Telegram is a widely-used social media and instant messaging platform that is "in no way indicative of crime or criminal activity." *Id.* ¶¶ 144–47, 152.  Fischbach "is a long-time Telegram user himself" and knows that it "has become a required application for communicating with event coordinators." *Id.* ¶¶ 148–49.

- *Thumbnails*:  Thumbcache and Thumbs.db files are automatically created, and their existence "is not evidence that an individual viewed a particular file" because an "average user has no way of knowing" that such files exist or viewing such files, given they are low quality, "about the size of a person's thumbnail," and require special software. *Id.* ¶¶ 154–61.  In this case, "none of the images" preserved in Thumbcache or Thumb.db form was found "as a full-size file" on any of Smith's devices, and there is no "forensic proof that any of the images . . . ever existed on any device as a full-size image." *Id.* ¶¶ 167–68.

- *Smith's relationship with the victim*:  Smith had a "transactional relationship with the victim" in this case, based on "online communications," "business records," and "chronological records," and the interaction between Smith and the victim "may have been a transactional event." *Id.* ¶¶ 169–73.

- *Devices 1B8 and 1B9*:  Fischbach "received a copy of a letter" from the Government acknowledging that an FBI agent "had copied CSAM from his own hard drive to items 1B8 and 1B9." *Id.* ¶ 176.

*Supplemental disclosure*: Fischbach's supplemental disclosure describes his ongoing review of files identified by the Government as CSAM and represents that Fischbach "has developed a forensically-sound chart and timeline" of certain such files.  SD ¶¶ 20–24.  It then identifies these additional topics on which he proposes to opine:

- *Analysis of CSAM files*:  He has examined files identified by the FBI agent in this case as CSAM and "found numerous incongruities," in that many files are duplicates, were "never viewed or otherwise accessed" or have dates that "were incongruent with Mr. Smith's case." *Id.* ¶¶ 25–26.  For example, some files appear to have been "accessed at a date and time for which Fischbach found evidence in Smith's Google Calendar and email demonstrating that Mr. Smith was at a public event." *Id.* ¶ 26(b).

- *1B2 and 1B15*:  He has examined 1B15 and concluded that it is not a forensic copy of 1B2. *Id.* ¶ 27.  The serial number provided for 1B2 is "not a valid Toshiba hard drive serial number, and thus [Fischbach] can provide only a limited opinion as to the physical hardware" of 1B2. *Id.* ¶ 28.

12

- *SexyVids.com*:  He "has retrieved an email receipt" on Smith's phone from SexyVids.com, which contains a USPS tracking number. *Id.* ¶¶ 29–30. 1B2 "could be the hard drive purchased from SexyVids.com," but it is "impossible to know" due to "some combination of poor evidence handling and/or mechanical failure." *Id.* ¶¶ 35–36. If 1B2 "was sold with CSAM on it . . . it would be impossible for a user to know that prior to making a purchase." *Id.* ¶ 37. 1B2 also "may have been damaged in transport," and "Smith may never ha[ve] had access to any files on it." *Id.* ¶ 38.

- *FBI forensic review techniques*:  He witnessed an FBI agent review the evidence without using a write-blocking device, which "is an essential practice to protect evidence from being tainted or manipulated." *Id.* ¶¶ 39–45. "1B2 evidence has been tainted simply by the manner in which" it was handled by the Government, *id.* ¶ 47, and "1B6 was manipulated or tainted, negligently or otherwise, post-seizure," *id.* ¶¶ 48–49.

- *1B2 spreadsheet*:  The 1B2 spreadsheet provides a list of "incongruous dates the government purports to represent files saved on item 1B2," and is missing information. *Id.* ¶¶ 50–51. A spreadsheet "is not a forensically-sound" method of evidence preservation because it "can be easily modified" and must be "compared to a forensic image" of the original device for its accuracy to be verified. *Id.* ¶¶ 52–54. Based on these issues, and Fischbach's observations of "improper evidence handling of the original 1B2, it is his opinion that 1B2 is no longer a reliable source of evidence." *Id.* ¶ 58.

- *The night of April 23, 2023*:  Based on photographic evidence, electronic photo-stores, cloud-based electronic communications, ride share records, and financial transactions between Smith and Victim-1, Fischbach "has developed a timeline and sequence of events" for the night of April 23, 2023, and concluded that Victim-1 "was aware that she was being photographed," had solicited Smith to buy her photographs, and "arrived at her destination" (which is "believed to be her home") that night. *Id.* ¶¶ 59–67, 69–70. Transactions between Smith and Victim-1 totaled "at least $18,509.98 over roughly four years." *Id.* ¶ 68.

- *Klonopin*:  There are "no receipts or evidence" establishing that Smith ever purchased Klonopin or was prescribed Klonopin. *Id.* ¶¶ 72–73, 75. Smith instead "was offered but declined to purchase Klonopin." *Id.* ¶ 74.

- *Adult photography*:  Smith curated "both explicit and non-explicit adult photography," but Fischbach has "not identified any inbound or outbound solicitations or general communications related to child models, or any other child-related searches or solicitations" on Smith's devices. *Id.* ¶¶ 78–79, 81–82.

13

## II.    Governing Legal Principles

*Expert disclosures*:  Federal Rule of Criminal Procedure 16(b)(1)(C), which governs expert witnesses, requires the defense to provide a "complete statement of all opinions that the defendant will elicit from the witness in the defendant's case-in-chief" and "the bases and reasons for them." Fed. R. Crim. P. 16(b)(1)(C)(iii).  Rule 16 was amended in 2022 to "require more specificity" in expert disclosures, *United States v. Kwok*, No. 23 Cr. 118, 2024 WL 1773143, at *1 (S.D.N.Y. Apr. 24, 2024), in order to "facilitate trial preparation, allowing the parties a fair opportunity to prepare to cross-examine expert witnesses and secure opposing expert testimony if needed," Fed. R. Crim. P. 16 advisory committee's note to 2022 amendment. Where a defendant's disclosure is vague or contains insufficient detail, the district court is unable to perform "its gatekeeping function under *Daubert*." *Kwok*, 2024 WL 1773143, at *3.

*Admissibility standards*:  Federal Rule of Evidence 702 governs the admissibility of expert testimony in federal court.  Courts have distilled Rule 702 to require the proponent to show, by a preponderance, that "(1) the expert is qualified; (2) the proposed opinion is based on reliable data and methodology; and (3) the proposed testimony would be helpful to the trier of fact." *Nike, Inc. v. StockX LLC*, No. 22 Civ. 983, 2024 WL 3361411, at *2 (S.D.N.Y. July 10, 2024); *see In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14 Md. 2542, 2025 WL 354671, at *2 (S.D.N.Y. Jan. 30, 2025).  In deciding whether the proponent has made that showing, the district court serves a "gatekeeping role," which involves "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

14

## III.    Discussion

The Government moves to exclude Fischbach's testimony in its entirety, making three arguments.  First, it argues that Fischbach is unqualified to opine on the wide-ranging topics he proposes to cover, and that even in his purported area of expertise—computer forensics—his credentials are insufficient to qualify him as an expert.  Second, it argues that Fischbach's proposed testimony is inadmissible, because his opinions as to computer forensics lack discernible methodology, and his opinions outside of computer forensics are irrelevant, improper expert testimony, or unduly prejudicial.  Third, it argues that Fischbach's disclosures violate Rule 16(b)(1)(C) because they cover an "extraordinary range of topics," do not reveal the bases for the opinions he would give, and opaquely "leave the Government (and the Court) guessing" as to the opinions to which he will actually testify at trial.  Gov't Mot. at 21–23.

The Court's analysis proceeds as follows.

The Court first evaluates Fischbach's qualifications.  The Court next considers the admissibility of each topic of proposed testimony under other Federal Rules of Evidence.  On topics relating to computer forensics, the one area in which the Court finds him qualified to opine, the Court also considers the adequacy of Fischbach's disclosures.

The Court's review yields the following outcome.  The Court excludes, in its entirety, Fischbach's testimony as to all topics other than computer forensics.  Fischbach is unqualified to opine in these areas, and the opinions he proposes to give are irrelevant, unduly prejudicial, not a proper basis for expert testimony, and/or intrude on the function of the jury.  Within the topic of computer forensics, Fischbach's proposed testimony as to foundational concepts is proper.  His testimony about the data on Smith's devices, however, is not admissible on the present record because it lacks a discernible methodology.  The Court grants the defense leave to file a

15

supplemental disclosure for the sole purpose of setting out the methods Fischbach used to arrive at those opinions.

### A.  Fischbach's Qualifications

Fischbach terms himself a "computer forensics expert," AD ¶ 1, but proposes to opine on topics including CSAM, cryptocurrency, Telegram group chats, and FBI investigation techniques—plus, as to Smith, his mental state, sexual interests, and relationship with Victim-1. Of these, the Court finds Fischbach qualified to testify only about computer forensics.

### 1.  Relevant Law

"Whether a witness is qualified as an expert is a threshold question that precedes the court's relevance and reliability inquiries." *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 636 (S.D.N.Y. 2016) (quoting *Loyd v. United States*, No. 8 Civ. 9016, 2011 WL 1327043, at *4 (S.D.N.Y. Mar. 31, 2011)), *aff'd*, 720 F. App'x 24 (2d Cir. 2017) (summary order).  In evaluating a proposed expert's qualifications, "courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).  "Any one of the qualities listed in Rule 702—knowledge, skill, experience, training, or education—may be sufficient to qualify a witness as an expert." *Crown Cork & Seal Co. Master Ret. Tr. v. Credit Suisse First Bos. Corp.*, No. 12 Civ. 5803, 2013 WL 978980, at *2 (S.D.N.Y. Mar. 12, 2013).

### 2.  Computer Forensics

The Government argues that Fischbach lacks qualifications in computer forensics because he does not have "formal education, peer-reviewed research, or industry certification." Gov't Mot. at 52–53.  The defense counters by noting Fischbach's three decades of experience in

16

the field, certifications by industry groups, and qualification as an expert in prior federal cases. Def. Opp'n at 3.

The Court finds Fischbach's qualifications in computer forensics sufficient to satisfy Rule 702. Fischbach has worked in this field since at least 1994, as a technology consultant to public and private corporations through his firm, SecondWave Inc. CV at 1. Through this work, he represents, he has developed "[e]xpert-level knowledge" of computer operating systems and is "[p]roficient in . . . multiple Forensic tools." *Id.* He has served on the boards of two companies as a technology advisor, belonged to professional associations such as the American College of Forensic Examiners, and presented, trained, or spoken on topics such as "Challenging Digital Evidence," "Sex, Lies & Cyberspace," and "Social Networking & Wireless Location." *Id.* at 2–5. Fischbach also represents that he has testified as an expert on computer forensics in dozens of cases in both state and federal court. *Id.* at 15–21. In one jury trial, the district court permitted Fischbach to testify about topics such as deletion and wiping of computer files, encryption, and computer hard drives. *See United States v. Sterlingov*, No. 21 Cr. 399 (D.D.C. Mar. 16, 2024), Dkt. 289 at 31–34, 89. In another, the district court heard his testimony on topics including deleted computer files, file wiping software, MAC data and its significance, and device encryption technology. *See United States v. Schwier*, No. 17 Cr. 95 (D. Ala. July 14, 2023), Dkt. 533 at 18, 24–27.

To be sure, by important measures, Fischbach lacks qualifications commonly associated with qualified experts. His CV does not state his educational background. He admits that he "has not published in the last 10 years." AD ¶ 35. And his recent work appears concentrated on testifying in court rather than developing his expertise. The Court, however, is mindful that the Second Circuit takes a "liberal view of the qualification requirements of Rule 702," *In re Rezulin*

17

*Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004), that computer forensics by its nature is a discipline in which longstanding hands-on experience is apt to enhance expertise, and that Fischbach's qualifications are akin to those of forensic technologists whose testimony has been admitted by other courts. The Court accordingly finds Fischbach qualified to testify as to the limited topics in his disclosures related to computer forensics. *See, e.g.*, *Zhen v. Safety-Kleen Sys., Inc.*, No. 18 Civ. 6015, 2021 WL 4937888, at *1 (E.D.N.Y. May 27, 2021) (permitting forensic testimony of expert who "has spent about 15 years working in computer forensics"); *Sec. & Exch. Comm'n v. McGinnis*, No. 14 Civ. 6, 2019 WL 13172404, at *1, 10 (D. Vt. Feb. 1, 2019) (permitting forensic testimony of expert who was chief executive officer of "a firm that provides expert witness and consulting services regarding electronic technology to legal and business communities," had provided "trainings and conference presentations," and had testified "on the issue of computer forensics in numerous civil and criminal cases"); *Indiaweekly.com, LLC v. Nehaflix.com, Inc.*, No. 7 Civ. 194, 2011 WL 13228299, at *1–2 (D. Conn. Jan. 21, 2011) (permitting forensic testimony of expert who "has conducted over 500 forensic examinations of data storage devices and has managed a computer forensic consulting firm for the past eight years").

Opposing this conclusion, the Government cites cases in which courts have excluded or seriously criticized Fischbach's testimony. Gov't Mot. at 52–53 (citing *id.* at 26–28 (collecting cases)). The cited decisions bespeak Fischbach's undeniable pattern of submitting deficient disclosures and attempting to opine on matters audaciously beyond his expertise. This decision will now be added to that list. But those excesses do not impeach Fischbach's qualifications to opine on computer forensics. In some of the cited decisions, courts excluded or limited Fischbach's testimony based on his failure to make necessary or timely disclosures. *See United*

18

*States v. Grupe*, No. 17 Cr. 90 (D. Minn. Oct. 31, 2017), Dkt. 76 at 90 (excluding Fischbach's testimony for failure to "make the disclosures required by Rule 16"); *United States v. Flocker*, No. 5 Cr. 360 (E.D. Cal. Apr. 15, 2011), Dkt. 255 at 19–21 (limiting Fischbach's testimony to that disclosed in his initial letter and noting Rule 16 violations); *United States v. Young*, No. 4 Cr. 351 (D. Colo. July 8, 2009), Dkt. 328 at 14–16 (excluding Fischbach's testimony under Rule 16 and *Daubert* where his disclosure failed to "explain[] how [his] experience leads to the conclusion that is reached, why that experience is sufficient basis for the opinion, and how that experience reliably applied the facts"). In others, courts have found Fischbach unqualified to testify on issues far afield of his computer forensics expertise, such as the "legal question of adequacy of counsel," *United States v. Hawthorne*, No. 16 Civ. 4037, 2018 WL 6011538, at *4 (C.D. Cal. Apr. 5, 2018), or "cell tower triangulation," as to the latter of which he supplied "no *curriculum vitae* establishing [his] expertise in this area," *Booth v. Jackson*, No. 20 Civ. 6264, 2022 WL 4124949, at *25 (W.D. Wash. Sept. 9, 2022) (cleaned up). Courts have also excluded Fischbach's testimony where his declarations purported, but failed, to support a finding of prejudice to the defendant from asserted constitutional violations. *See, e.g.*, *United States v. Mitrovich*, 95 F.4th 1064, 1072 (7th Cir 2024); *Simpson v. Montgomery*, No. 15 Civ. 8965, 2017 WL 5592997, at *6–7 (C.D. Cal. Sept. 5, 2017). Fischbach's track record is disquieting, but these derelictions do not bear on his qualifications as to computer forensics. Accordingly, the Court finds him qualified to opine in that one area. As in prior cases, however, Fischbach will not be permitted to testify as to opinions that he belatedly attempted to add to his disclosures or topics that are outside his area of expertise.

### 3.    Other Topics

Fischbach is not qualified to testify as to the myriad other topics in his disclosures.  He is not an expert in adult pornography, adult psychology, SexyVids.com, Telegram, prescription medication, regulatory compliance of cryptocurrency exchanges, or how to read a calendar.  Nor is his training in forensic technology "closely related" to these areas of proposed testimony. *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013) (citation omitted).  It is no answer that some of these topics involve technology or are implicated by records on Smith's electronic devices.  Expertise in forensic technology does not qualify a person to discuss any topic that appears in a file on a computer or phone. *See Nimely v. City of N.Y.*, 414 F.3d 381, 339 n.13 (2d Cir. 2005) ("[B]ecause a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields.").

Fischbach's qualifications to opine on FBI forensic examination techniques also fail Rule 702.  He states that "he routinely lectures and provides training in his areas of expertise to . . . law enforcement," AD ¶ 10; that "his services have been utilized by courts for the purposes of assisting in investigations of alleged misconduct by government agencies," *id.* ¶ 17; that "he frequently consults with law enforcement agencies, and has provided training to law enforcement whenever requested," *id.* ¶ 18; that he "has extensive familiarity with proper FBI electronic evidence handling protocols" based on "decades of examining FBI evidence," *id.* ¶ 24; and that he "uses [FBI] protocols in his own work," *id.* ¶ 76.  But these claims are broad, hazy, and conclusory.  They are also unsubstantiated: Fischbach's CV does not support his claim of

such expertise.  He may have addressed police departments[6] on topics such as "Social

Networking & Wireless Location" and "Cell Tower Technology," CV at 4, but he does not

substantiate that he has trained federal law enforcement officials, let alone on the topics on which

he proposes to opine, such as protocols for handling electronic evidence, reviewing MAC data,

or making forensic copies of electronic devices.  The defense thus has not met its burden to show

that Fischbach is qualified to testify about FBI forensic examination techniques.  *See, e.g., Loyd

v. United States*, No. 8 Civ. 9016, 2011 WL 1327043, at *4–5 (S.D.N.Y. Mar. 31, 2011)

(proponent "failed to demonstrate [expert's] qualification" where there was no evidence of

expert's "academic training, practical experience, or special knowledge").

Because Fischbach is unqualified to testify on any subject other than computer forensics,

the Court excludes his testimony under Rule 702.  *See, e.g., McCullock v. H.B. Fuller Co.*, 981

F.2d 656, 657–58 (2d Cir. 1992) (affirming exclusion of testimony about subject on which expert

"lacks training or experience"); *Serrano v. City of N.Y.*, No. 15 Civ. 6885, 2022 WL 2529547,

at *4 (S.D.N.Y. July 7, 2022) (similar); *LVL XIII Brands, Inc.*, 209 F. Supp. 3d at 638 (similar).

## B.    Proposed Testimony on Computer Forensics

The Court next considers whether Fischbach's proposed computer forensics testimony is

proper.  Fischbach proposes to opine about general computer forensic concepts, and to give

specific opinions about the files and metadata on Smith's devices.

For the reasons below, the Court finds Fischbach's testimony about general concepts—

such as link files, MAC data, and thumbnails—proper expert testimony.  That testimony is based

on substantial relevant experience, will educate jurors about technical concepts not widely

---

[6] Fischbach's CV unhelpfully supplies only the acronyms of groups he claims to have addressed, *e.g.*, "WSOPD," "KCPD," and "CCPD."  CV at 4.  The Court infers that these refer to police departments, although it is possible they refer to public defender offices—or something else.

21

understood by lay persons, and is disclosed in sufficient detail to satisfy Rule 16. The other opinions Fischbach proposes to offer in this area, however, lack a discernible methodological foundation. On the present record, they are inadmissible under both Rules 16 and 702.

### 1.    Relevant Law

Under Rule 702, "it is critical that an expert's analysis be reliable at every step." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). A district court "has broad discretion" in assessing reliability, *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016), and "the types of factors that are appropriate to consider will 'depend[] upon the particular circumstances of the particular case at issue,'" *id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). At a minimum, "the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267. Ultimately, "[t]he Court's task 'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 369, 371 (S.D.N.Y. 2014) (quoting *Kumho Tire Co.*, 526 U.S. at 152).

### 2.    General Computer Forensics Concepts

Fischbach proposes to educate the jury about general concepts in computer forensics, such as link files and thumbnails, how they are created and viewed, and what that implies about user interaction with such files; encryption technology; and MAC data and the significance of modified, created, and accessed dates when assessing user interaction. Specifically, he proposes to testify as follows:

- ***Basics about link files and how they are created***:  Link files "do not contain content, and thus are not CSAM in and of themselves"; "they are automatically created, without user intervention"; and "they can be received as independent files, without a user ever having had the file to which it links." AD ¶¶ 82–84.

- ***Names of link files***:  "[A]lthough the name of a Link File may be suggestive, or match the name of another file, there is no way to know the content to which it linked if that content does not exist." *Id.* ¶ 95.

- ***Basics about MAC data***:  "MAC is an acronym for Modified, Accessed, and Created"; "all electronic storage devices store MAC data"; "MAC data is extremely volatile and easily modified"; and "MAC data is essential to understanding when a file arrived on a device, in a particular folder, when it was originally written, and when it was last accessed." *Id.* ¶¶ 101–04.  Also: "MAC data is a form of metadata," and "'metadata' is typically defined as 'Data that describes other data, as in describing the origin, structure, or characteristics of computer files, webpages, databases, or other digital resources.'" *Id.* ¶ 118–19.

- ***Significance of modified date***:  "[T]he Modified date and time generally applies to the last time the file itself was changed"; and "a word processing file or an image will reflect a Modified date and time from when the document was last changed, or the image was last edited." *Id.* ¶¶ 105–06.

- ***Significance of accessed date***:  "[T]he Accessed date and time generally applies to the last time a file was 'read' in any way"; it is the "most volatile, and easily changed"; and it "can apply to the last time [the file] was Modified or Created, the last time it was moved, the last time it was opened or viewed, the last time it was scanned by a piece of software, such as a virus scanner, or for any other action that causes the file to be interacted with." *Id.* ¶¶ 107–09.

- ***Significance of created date***:  "[T]he Created date and time generally applies to the moment a file was saved on a storage device, or a particular folder in a storage device"; "depending on how [the file] is moved, the Created date and time can change simply by moving it to a different place on a storage device." *Id.* ¶¶ 110–11.

- ***Significance of MAC dates relative to each other***:  An access date and time that matches or predates "either the created date and time, and/or the Modified date and time, is evidence that a user has never interacted with that file." *Id.* ¶¶ 112–13.  An access date and time "subsequent to the Modified and/or Created date and time is not, in and of itself, evidence that a user interacted with a file, but could be evidence that a user interacted with a file." *Id.* ¶ 114.

- ***Basics about encryption***: "[F]ree encryption utilities allow users to easily add or remove files and folders from a password-protected encrypted 'container', similar to a Zip file." *Id.* ¶ 124.

- ***Basics about thumbnails***: "Thumbcache and Thumns.db is a file created automatically by an operating system," the existence of which "is not evidence that an individual viewed a particular file." *Id.* ¶¶ 154–55. "[A]n average user has no way of knowing that Thumbcache or Thumbs.db exists" and "no way to view the images" within those files because they "are not intended for a user to view, and are not easily viewed," as they "are of significantly lower quality and resolution than a full-size image." *Id.* ¶¶ 156–59. They "are so named because they represent images about the size of a person's thumbnail" and "require[] specialized software and knowledge" to view. *Id.* ¶¶ 160–61.

- ***Creation and deletion of thumbnails***: "[D]ownloading or otherwise possessing a file is only one way to create a thumbnail image of that file"; "thumbnails can be included in folders when they are downloaded, unzipped, etc."; "a thumbnail can even come without the original image." *Id.* ¶¶ 163–64. Because of its size, such a file "is more likely to have been fully-downloaded or copied within a folder[] than a full-size image." *Id.* ¶ 165. "[D]eleting a file, a file folder or extracted compressed folder does not delete its Thumbcache or Thumbs.db file." *Id.* ¶ 166.

The Government, other than disputing Fischbach's qualifications, does not challenge the admissibility of this testimony.

The Court finds that such testimony clears the three requirements of Rule 702. First, Fischbach's experience in the field qualifies him to explain these basic concepts, which are "not subject to serious dispute in the forensic community." *McGinnis*, 2019 WL 13172404, at *10 (citing *Unites States v. Vosburgh*, 602 F.3d 512, 520–21 (3d Cir. 2010)). Second, because this foundational testimony derives from sustained experience, it is reliable. *See, e.g., In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 413 (S.D.N.Y. 2016) (expert testimony "may be based on 'experience alone—or experience in conjunction with other knowledge, skill, training, or education'" (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment)). Third, depending on the direction the defense takes at trial, such testimony has the capacity to assist the jury in grasping technical concepts, whose meaning might "not be apparent without the

24

benefit of experience or specialized knowledge." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009); *see also United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (expert testimony "may help a jury understand unfamiliar terms and concepts"); *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("Expert witnesses are often uniquely qualified in guiding the trier of fact through a complicated morass of obscure terms and concepts.").

This testimony was also disclosed in compliance with Rule 16. Fischbach's disclosures regarding the above concepts "reveal[] more than the general topics about which the expert will testify." *United States v. Ray*, No. 20 Cr. 110, 2022 WL 101911, at *5 (S.D.N.Y. Jan. 11, 2022) (citation omitted). They preview the terms that Fischbach will define (*e.g.*, "MAC data," "link files," "Thumbcache and Thumns.db"), how he will define them, and what they signify.

Because Rule 16 and Rule 702 are satisfied, the Court denies the motion to preclude this evidence. *See, e.g., Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 691 F. Supp. 2d 448, 462 (S.D.N.Y. 2010) (admitting expert testimony to help jury understand documents "studded with complex terminology"); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 5 Md. 1720, 2022 WL 15044626, at *49 (E.D.N.Y. Oct. 26, 2022) (admitting testimony about industry dynamics that "are sufficiently complex and sufficiently related to technical concepts . . . to warrant expert testimony"); *Baker v. Saint-Gobain Performance Plastics Corp.*, No. 16 Civ. 917, 2024 WL 4189385, at *3 (N.D.N.Y. Sept. 12, 2024) (admitting testimony about scientific data that is "dense, complex, and difficult to understand without specialized knowledge").

### 3.    Files and MAC Data on Smith's Devices

Fischbach also proposes to testify about what the files and metadata on Smith's devices indicate about Smith's viewing, accessing, or attempted wiping of CSAM. He would opine that:

- ***Link files on Smith's devices were broken.*** "Link Files found on [Smith's] devices were broken," which could be because "the file to which it resolves has been deleted, or moved," the link file was "included with downloaded folders" without "the file to which it once resolved," or the link file "once connected to a file on a network or device that is no longer connected." AD ¶¶ 87–91. "[T]he Link Files appear to have been broken at least at the time the FBI seized the devices on which the link files were found." *Id.* ¶ 100.

- ***There is a lack of evidence related to the broken link files on Smith's devices.*** "[T]he government has produced no evidence of when its link files became broken" or "of its link files resolving to CSAM," *id.* ¶¶ 92–93, nor any evidence "that [Smith], or anyone else ever clicked on any of the Link Files," or that "the files to which the Link Files resolve ever existed on any of the seized devices," *id.* ¶¶ 96–97. "[T]ypically, if a file existed, additional evidence would be recoverable." *Id.* ¶ 98.

- ***There is no evidence that Smith attempted to wipe the files on his devices.*** "[T]here is no evidence of Wiping, the use of, or existence of Wiping utilities, or any attempt to hide CSAM" on Smith's devices. *Id.* ¶ 99. Fischbach has not "found any evidence of VPN, TOR ('Onion'), or other forms of encrypted or obfuscated routing," or "evidence that [Smith] ever wiped any files or drives or took any action to encrypt any files." *Id.* ¶¶ 125–26.

- ***There is no evidence that Smith viewed or accessed certain CSAM files.*** Fischbach "has found numerous incongruities" in the FBI's "identification of CSAM files alleged to have been knowingly possessed by Edward Smith," including that "approximately 89% or 421 files contain MAC data that proves they were never viewed or otherwise accessed"; "1B1 contains 413 files which can be determined *not* to have been viewed by anyone due to matching MAC dates/times," 1B6 contains five such files, and 1B7 contains one; numerous devices contain duplicate files; and devices 1B1 and 1B6 contain files "that are within databases that contain identical dates only indicating the last time that database was accessed not a particular time a file or item was saved inside the database." SD ¶¶ 25–26 (emphasis in original); *see also* AD ¶ 117 ("[T]here are many instances where the MAC data for CSAM images is static . . . .").

- ***MAC data on several of Smith's devices post-date Smith's seizure and arrest.*** "[T]here are thousands of instances where the MAC data for CSAM images is of a date after the device was seized by the FBI." AD ¶ 116; *see also* SD ¶ 26.

In particular, "Item 1B2 contained thousands of files that post-dated its seizure and [Smith's] arrest." AD ¶ 64.

- ***Smith could not have viewed certain files on his devices without specialized software.*** Items on 1B1 and 1B6 contain files that "cannot be accessed individually, or at all, by a user without advanced technical skills and advanced software," and "1B1 contains 8 files that were either damaged, or in a format which required advanced skills and/or specialized software to view." SD ¶ 26(b), (e). "[I]t is unlikely that Mr. Smith would have been able to" use 1B2 because the FBI was unable to do so "even with the assistance of specialized software, equipment, and expert personnel." *Id.* ¶ 46.

- ***There is no evidence that Smith viewed his thumbnail files.*** "[T]here is no evidence that any software existed on the devices seized by the government to facilitate the reviewing or recovery of a Thumbcache or Thumbs.db." AD ¶ 162. "[N]one of the images automatically preserved in Thumbcache or Thumbs.db were found, or recovered, as a full-size file on any of the devices seized by the government," and "there is no forensic proof that any of the images recovered from Thumbcache or Thumbs.db ever existed on any device as a full-size image." *Id.* ¶¶ 167–68.

The Government states that Fischbach's disclosure does not explain the methodology by which he reached his determinations with respect to Smith's devices, including "what forensic tools he used, and whether those tools have been validated." Gov't Mot. at 50. To the extent that Fischbach's methodology is "simply counting files with static timestamps," the Government argues, he fails to account for the fact that "many system processes can alter access times." *Id.* at 51. The Government thus argues that his testimony breaches Rule 702's requirement of reliable methodology and disobeys Rule 16(b)(1)(C)'s requirement that experts disclose "the bases and reasons" for their opinions. The defense does not defend Fischbach's methodology. It does defend his disclosure, arguing that the Government's proposed rebuttal testimony shows that it understands the scope of Fischbach's proffered testimony. Def. Opp'n at 4.

Fischbach's testimony, as disclosed, is indeed inadmissible for the two interrelated reasons that the Government identifies.

27

To determine whether an expert's methodology is reliable, "the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that the 'witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos*, 303 F.3d at 265 (quoting Fed. R. Evid. 702).  Because Fischbach does not disclose his methodology, his testimony fails this test.  Fischbach states only that he has "reviewed and/or examined discovery materials produced to the defendant in this matter," and that he "conducted an independent forensic examination of the government's evidence, using an FBI workstation at the FBI in the SDNY, including examinations of forensic copies of items 1B1, 1B4, 1B6, 1B7, and 1B10." AD ¶¶ 38–39.  He also represents, in a conclusory fashion, that he "has developed a forensically-sound chart and timeline of the files identified as CSAM," but he does not elaborate on what this chart contains or what makes it "forensically sound." SD ¶ 24.  Fischbach does not "cite any standard in the forensic field" that guided his analysis.  Gov't Mot. at 50.  Nor does he describe the technology he used in conducting his forensic examination of Smith's devices. *Cf. United States v. Gardner*, No. 10 Cr. 551, 2012 WL 6680395, at *1 (D. Utah Dec. 21, 2012) ("Understandably, the Government does not challenge the soundness" of computer forensics expert's methodology, where he "used the AccessData software called Forensic Toolkit").  Fischbach therefore fails to explain how he came to his conclusions: that link files on Smith's devices were broken, that they appear to have been broken "at least at the time the FBI seized the devices," that a large number of the files found on Smith's devices (specifically, 89%) were never viewed or accessed, that Smith's devices contain duplicate files, that some MAC data post-date the FBI's seizure, or that Smith's devices do not contain software to facilitate the review of thumbnails or encryption utilities.

28

Denied such information, the Court cannot perform its required gatekeeping role and ensure that the expert's analysis is "reliable at every step." *Amorgianos*, 303 F.3d at 267. Accordingly, on the present record, Fischbach's testimony is inadmissible under both Rule 16 and Rule 702. *See, e.g., Kwok*, 2024 WL 1773143, at *3 (failure to disclose methodology "dooms [expert's] notices under Rule 16" and "under *Daubert*"); *United States v. Mrabet*, 703 F. Supp. 3d 442, 444–45 (S.D.N.Y. 2023) (noting "shoddy noncompliance" with Rule 16 where expert disclosure "contain[ed] just a single sentence" as to the bases and reasons for his opinions). The defense's counterargument—that the Government's preparation of a responsive disclosure proves that the defense disclosure was compliant—is wrong. Rule 16 aims to "facilitate trial preparation" and "ensure that parties receive adequate information" in advance of trial. *Mrabet*, 703 F. Supp. 3d at 443 (quoting Fed. R. Crim. P. 16 advisory committee's note to 2022 amendment). That the Government has made its best surmise as to the content of Fischbach's testimony does not mean that the testimony was adequately disclosed. Rule 16 aims to avoid such a guessing game.

Where a party's expert disclosure is inadequate to enable the district court to determine admissibility under the Federal Rules of Evidence, the court has "broad discretion in fashioning a remedy." *United States v. Weiner*, No. 22 Cr. 19, 2024 WL 82729, at *6 (S.D.N.Y. Jan. 8, 2024) (citation omitted). The Court is loath to afford the defense another opportunity to supplement its disclosures for Fischbach, both because he has revised his disclosures four times, some without leave of court and in defiance of deadlines, and because some aspects of the seven bullet-point topics listed above appear facially problematic under Rule 702. At the same time, the Court is mindful that trial is still some three months away, such that the Government will have time to respond to any supplemental disclosure, provided that it is circumscribed as prescribed here.

29

Accordingly, the Court finds the "extreme remedy of preclusion" not required, *United States v. Gentile*, No. 21 Cr. 54, 2024 WL 3251702, at \*4 (E.D.N.Y. June 20, 2024) (citation omitted), and grants the defense leave to file a supplemental disclosure, *see, e.g.*, *id.* (allowing supplemental disclosure where "defendants at least previewed their disclosures before the start of trial, and several weeks remain before defendants will begin their cases-in-chief"); *Kwok*, 2024 WL 1773143, at \*3 (same where there were "more than three weeks until trial," making "exclusion too harsh a remedy"); *see also Mrabet*, 703 F. Supp. 3d at 444 (noting that, if defense "had lodged a pretrial objection" to Government's disclosure, "the Court would likely have required the Government to amend the disclosure to comply with Rule 16 by providing far greater specificity and analysis").

The supplemental disclosure is ***solely*** to state the methodology Fischbach has used in reaching the opinions listed in the seven bullet points above (drawn, as noted, from AD ¶¶ 64, 87–93, 96–100, 116–17, 125–26, 162, 167–68; and SD ¶¶ 25–26, 46).  The Court forbids Fischbach from supplementing his disclosure on any other points.  The Court sets the following deadlines, which presuppose that Fischbach has done the work on which he bases his heretofore unexplained findings: (1) the defense's supplemental disclosure is due December 5, 2025, (2) any opposition by the Government is due December 12, 2025, (3) any response by the defense is due December 16, 2025, and (4) any reply from the Government is due December 19, 2025.

### C.    Proposed Testimony Related to the FBI Investigation

Fischbach proposes to pontificate about various aspects of the FBI's conduct.  He proposes to opine about: (1) limits on his pretrial access to devices 1B2 and 1B15, and the problems with those devices; (2) the alleged spoliation of devices 1B8 and 1B9; and (3) the

FBI's investigative methodology.  The Court reviews each area of testimony in turn—and precludes each.

### 1.    Relevant Law

Unless otherwise provided, "[r]elevant evidence is admissible." Fed. R. Evid. 402. Under Rule 401, "[e]vidence is relevant when 'it has any tendency to make a [material] fact more or less probable than it would be without the evidence.'" *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012) (quoting Fed. R. Evid. 401).  "A material fact is one that would 'affect the outcome of the suit under the governing law.'" *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 579 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Rule 403 allows a court to exclude relevant evidence where its probative value is substantially outweighed by the risk of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *United States v. Gupta*, 747 F.3d 111, 131 (2d Cir. 2014) (quoting Fed. R. Evid. 403).  Evidence is unfairly prejudicial if it "involves some adverse effect beyond tending to prove a fact or issue that justifies [its] admission." *Costantino v. David M. Herzog, M.D., P.C.*, 203 F.3d 164, 174–75 (2d Cir. 2000).

### 2.    Fischbach's Access to Devices 1B2 and 1B15

Fischbach seeks to testify about his lack of access to 1B2—the device with a damaged hard drive—and about issues with respect to 1B15, which the Government has described as a "partial clone," or a "derivative," of 1B2, but which contains files with metadata that do not match the metadata on 1B2.  Specifically, Fischbach proposes to opine that:

- ***Fischbach has not been provided access to 1B2 or its forensic copy.*** "[D]espite requests, he was not provided access to examine forensic copies of

items 1B2, and 1B15, or an original copy of 1B2." AD ¶ 40; *see also* SD ¶ 26(c). "[S]ubsequent to being provided newly added item 1B15 he received a spreadsheet detailing over 80,000 files allegedly attributed to 1B2, but he has not been provided access to forensically-matching evidence." AD ¶ 73.

- ***1B15 is not a forensic copy of 1B2.*** "[I]n a 302 document he analyzed, Item 1B15 was represented to be a 'partial clone' and 'derivative evidence,'" but "a 'clone' cannot, by definition, be 'partial,'" and "he has never heard this term used within the forensic community." *Id.* ¶¶ 65–66. "[F]orensically, 1B15 is, in fact, new evidence" because it "contains thousands of files post-dating the search and seizure of [Smith's] home, but not matching dates on 1B2." *Id.* ¶¶ 69, 71; *see also* SD ¶ 27 (stating that Fischbach "has examined 1B15" and "it is *not* a 'forensic copy'" because the "files in the 1B15 folder supplied to him by the FBI *do not* match files previously shown to him . . . allegedly originating from Item 1B2" (emphasis in original)).

- ***The 1B2 serial number is not valid.*** Because the serial number for 1B2 provided by the FBI is "not a valid Toshiba hard drive serial number," Fischbach "can provide only a limited opinion . . . unless or until he is provided physical access to the device." SD ¶ 28.

The Government argues that these opinions—insofar as they even constitute expert testimony—are inadmissible. To the extent that Fischbach seeks to "attack the FBI and Government," it argues, his opinions improperly impugn agencies and their personnel rather than commenting on admissible evidence. Gov't Mot. at 35 n.10. To the extent Fischbach seeks to testify about metadata discrepancies between 1B2 and 1B15, it argues, that testimony is moot or concerns undisputed matters. *Id.* The defense does not respond.

The Government is correct. Fischbach's opinions about 1B2 and 1B15 are inadmissible.

As to Fischbach's claim of inhibited access to the original 1B2 device, such arguments are properly directed to the Court. And, the Court, at conferences, has engaged extensively with the parties about the defense's access to 1B2, whether 1B15 is a "forensic copy" of that device, and the mechanics by which the defense is to obtain access to these materials, which, because they allegedly contain CSAM, may not be copied for external distribution. At those conferences, the defense expressed concerns along the lines that Fischbach proposes to testify, and the Court

32

followed up and took appropriate responsive action.[7]  But "the Government is not on trial in this case." *United States v. Chang*, No. 18 Cr. 681, 2024 WL 3567006, at *3 (E.D.N.Y. July 29, 2024).  And the issues relating to discovery compliance and mechanics on which Fischbach wishes to opine have no bearing on the findings of guilt or innocence the jury will be called upon to make.  Fischbach's opining as to these irrelevancies would only serve to confuse the jury and/or give rise to unfair prejudice.   Rules 402 and 403 require exclusion.

As to the accuracy of 1B15's metadata, Fischbach's proposed testimony is moot. The Government has informed the Court that, to rectify the metadata error, it has provided the defense with a "better copy" of 1B15, 10/20/25 Tr. at 4, and sent the original 1B2 hard drive back to the FBI's Digital Forensic Analysis Unit in Alabama, Dkt. 131, to "attempt another partial clone," 10/6/25 Tr. at 61.  At a conference this week, the Government confirmed that these efforts have resulted in a new partial clone of 1B2 that is available for Fischbach's review. The metadata issues affecting earlier copies of that device, such as 1B15, are thus irrelevant.

---

[7] The defense raised issues regarding its access to 1B2, the accuracy of 1B15, and the discrepancies between 1B15 and the 1B2 spreadsheet. *See, e.g.*, 9/10/25 Tr. at 15 (1B2 "is the device that may have been compromised in its duplication in some form" and "there was a question about whether or not . . . it [has] only and exclusively files from Mr. Smith"), 70–71 (it is "hard for" the defense to assess the accuracy of 1B2 copies "without seeing the original device"); 10/6/25 Tr. at 35 ("[W]hat we believe is missing . . . is a current copy of the original source provided for 1B2."), 65 ("1B2 is a copy. It's not a mirror image, and it's incomplete."), 67 ("They're calling that a partial clone, but in forensics, there is no such thing as a partial clone."), 68 ("[Because] we don't have a complete forensic image of the source, we have no way of verifying the accuracy of the spreadsheet.").  In response, the Court repeatedly directed the Government to address each bona fide issue raised and accommodated various defense requests. *See, e.g.*, 9/10/25 Tr. at 76 (granting defense continuance request based partly on Fischbach's asserted ongoing need to "check[] the fidelity of the [G]overnment's copying efforts" and "confirm[] the accuracy of the metadata"); 10/6/25 Tr. at 58–59 (permitting defense to supplement Fischbach's disclosure based on its review of the newly provided copy of 1B15), 63– 64 (noting that "the defense has every right to go back to the 'primary source'"—1B2—"as much as its accessible"); 10/20/25 Tr. at 7 (directing Government to file a letter on the docket stating that 1B2 "is in Alabama, and that the [G]overnment has conveyed the urgency of getting this job done" to the FBI).

There is no probative value to testimony—expert or otherwise—on this point. The Court thus excludes Fischbach's remaining testimony related to 1B2 and 1B15.

### 3.    Alleged Spoliation of Devices 1B8 and 1B9

Fischbach next proposes to opine that the FBI tainted or spoiled evidence because, in an early production, the FBI errantly attributed files on an agent's hard drive (derived from a different case) to two of Smith's devices. Fischbach proposes to testify that:

- ***The FBI wrongly copied files onto 1B8 and 1B9.*** "CSAM allegedly found on 1B8 and 1B9 that the government relied upon to support charges of knowing possession of CSAM, was discovered by Mr. Fischbach to be files copied onto these devices after the devices had already been seized," AD ¶ 42; such files were copied "from an agent's own hard drive," *id.* ¶ 61.

- ***Those devices are therefore spoiled.*** "[I]t is his opinion, that evidence charged against [Smith] was altered, tainted, spoiled by the government based on . . . the government's subsequent written acknowledgement," *id.* ¶ 59, in which it stated that an FBI agent "had copied CSAM from his own hard drive to items 1B8 and 1B9," *id.* ¶ 176; *see also id.* ¶¶ 60, 62.

The Government argues that Fischbach's opinions are inadmissible because it has caught and corrected the FBI's errant file-copying and will not offer at trial the CSAM inadvertently attributed to Smith's devices. That is clearly correct. In pretrial conferences, the Government repeatedly acknowledged the FBI's misstep. *See, e.g.*, 7/7/25 Tr. at 24; 7/24/25 Tr. at 17; 9/10/25 Tr. at 16. With its having committed not to offer at trial the CSAM inadvertently attributed to Smith, there is no basis for expert testimony about the FBI's miscue. That testimony does not have any probative value because it does not bear on Smith's guilt or innocence. And it would be unfairly prejudicial to the Government, because it could cause the jury to "discredit the government's case" due to the irrelevant "misdeeds of one government

agent." *United States v. Malpeso*, 115 F.3d 155, 163 (2d Cir. 1997). The Court excludes this testimony under Rule 403.[8]

### 4.    The FBI's Investigative Techniques

Fischbach next proposes to testify that the FBI used improper investigative techniques in not using a write-blocking device when examining Smith's electronic devices and in using a spreadsheet as a means of preserving evidence. He would further opine that these techniques contaminated the evidence against Smith. Specifically, he would testify that:

- *The FBI failed to use a write-blocking device when examining Smith's devices.* "[I]n his multiple visits to the FBI's 'review' room in this case, [Fischbach] observed electronic evidence connected to the FBI workstation without a forensic write blocking device." AD ¶ 57. This was "based on his knowledge of the device provided" and "confirmed by another Agent's verbal observation." *Id.* ¶ 58; *see also* SD ¶ 40. In particular, Fischbach witnessed the FBI agent "connect Item 1B2 to the 'review' workstation, without a proper write blocking device." AD ¶ 63. "When that happened, he asked [the agent] if that adapter was 'write blocked' to which [the agent] answered in the affirmative." SD ¶ 39. Fischbach "would not have advised [the agent] to insert original evidence into an un-write blocked non-forensic work station, which he later learned was also a computer containing evidence from other criminal cases, due to the possibility of cross-contamination." *Id.* ¶ 44.

- *It is essential to use a forensic write-blocking device.* "Write blocking is an essential practice to protect evidence from being tainted or manipulated" because "[f]ailing to write-block original evidence causes permanent, unrecoverable changes, and thus renders that evidence unreliable." *Id.* ¶¶ 41–42.

- *A spreadsheet is not a "forensically-sound" method of preserving or producing evidence.* "[A] spreadsheet is not a forensically-sound or scientifically accepted means of preserving or producing evidence for testing or scrutiny" because it "can be easily modified." *Id.* ¶¶ 52–53.

- *The evidence has been tainted as a result of the FBI's improper techniques.* In part because of these alleged deficiencies in the FBI's investigative techniques, "1B2 evidence has been tainted simply by the manner in which the government has used it as personally observed by Mr. Fischbach" and "1B6

---

[8] The Court does not have occasion to consider here whether, were the Government at trial to call the agent responsible for this error, this episode could be a proper subject of cross-examination.

was manipulated or tainted, negligently or otherwise, post-seizure." *Id.* ¶¶ 47–48.

The Government argues that this testimony is inadmissible because it is aimed at establishing Government misconduct, as opposed to Smith's guilt or innocence, and claims of misconduct are properly directed to the Court, not the jury. Gov't Mot. at 32 (citing *United States v. Regan*, 103 F.3d 1072, 1082 (2d Cir. 1997)). The defense denies that this testimony implicates the lawfulness of the Government's conduct. Def. Opp'n at 6.

The Government is correct. The proposed testimony, as formulated, is transparently aimed at putting a claim of official misconduct before the jury. But the Government's conduct is not an element of any offense, and defense claims of misconduct are the province of the Court, whether seeking suppression or other relief. For these reasons, a defendant "may not argue before the jury issues relating to the overall propriety of the Government's investigation in this case." *United States v. Demosthene*, 334 F. Supp. 2d. 378, 380 (S.D.N.Y. 2004) (citing *Regan*, 103 F.3d at 1082); *see also United States v. Preldakaj*, 456 Fed. Appx. 56, 60 (2d Cir. 2012) (summary order) (district court did not err by instructing jury that "the government is not on trial, and law enforcement techniques are not your concern" (cleaned up)). Because Fischbach's opinions about alleged Government missteps are irrelevant and would have significant capacity to confuse the jury and/or unfairly prejudice the Government, such testimony is barred by Rule 403.

To be sure, a qualified expert using reliable methodology may properly testify that an item of trial evidence has been altered or errantly copied from the original. Fischbach's disclosures gesture at certain such opinions. For example, he states that files on Smith's devices contain metadata that post-dates Smith's seizure and arrest. *See, e.g.*, AD ¶¶ 64, 116; SD ¶ 26. But Fischbach has not set out the methodology, if any, that he utilized in reaching conclusions of

this nature about Smith's electronic devices.  For this reason, to the extent that Fischbach has drawn such conclusions about items of electronic evidence, the Court, as explained above, is giving the defense a final opportunity to supplement Fischbach's disclosures to explain the methodology he used to reach these conclusions.  *See supra* pp. 26–30.  For avoidance of doubt, Fischbach's supplemental disclosure must not only set out in sufficient detail his methodology but must also identify the specific item of evidence and the specific data on it that Fischbach would opine is deviant and why.  Because issues as to 1B2 have been mooted by later events, Fischbach may not offer further opinions as to the metadata issues he identified with respect to earlier copies of that device.

### D.    Proposed Testimony About Miscellaneous Topics

Fischbach proposes to testify about a motley array of other topics far afield of computer forensics.  These include Smith's sexual interests, Fischbach's theory about a hard drive purchased from SexyVids.com, the nature of Smith's relationship with Victim-1, cryptocurrency, Telegram, and Smith's lack of a prescription for Klonopin.  This testimony is inadmissible on multiple grounds.

#### 1.    Relevant Law

"For an expert's testimony to be admissible under [Rule 702] . . . it must be directed to matters within the witness' scientific, technical, or specialized knowledge and not to lay matters which a jury is capable of understanding and deciding without the expert's help." *Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989).  A court may not "admit[] expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror." *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994).  Expert testimony "cannot be presented to

the jury solely for the purpose of constructing a factual narrative based upon record evidence."

*Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005).

Expert testimony is further limited by Federal Rule of Evidence 704(b), which states that "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Such expert testimony is prohibited because it "poses a uniquely heightened danger of intruding on the jury's function." *United States v. DiDomenico*, 985 F.2d 1159, 1164 (2d Cir. 1993).

### 2. Factual Narratives about Smith's Sexual Interests, Relationship to Victim-1, and CSAM and Klonopin Purchases

Fischbach seeks to present to the jury factual narratives that he has developed on a host of topics. He bases these on Smith's business records, internet search history, calendar, and electronic communications, and other discovery. He proposes to testify that:

- ***Smith did not seek out CSAM, but did download adult pornography, demonstrating interest in "adult females."*** Smith had "no search records relevant to the CSAM charges," AD ¶ 130, and there is "no evidence that [Smith] purchased [CSAM] from the Snapgod site," or that Smith "searched for or intended to purchase CSAM from Snapgod," *id.* ¶¶ 138, 141–42. However, "there is evidence that [Smith] downloaded non-CSAM from Snapgod, and elsewhere." *Id.* ¶ 143. Based on Smith's "cloud-based photography sites," Smith curated "both explicit and non-explicit adult photography," but there were no "inbound or outbound solicitations or general communications related to child models, or any other child-related searches or solicitations on any of Edward Smith's devices." SD ¶¶ 78–79, 81–82; *see also* AD ¶ 81.

- ***Any CSAM on device 1B2 was unknown to Smith, who possibly purchased the device from SexyVids.com.*** Based on Smith's "cloud-based email," Smith made a purchase from SexyVids.com on May 15, 2023, and device 1B15 "could be the hard drive purchased from SexyVids.com" on that date. SD ¶¶ 29–30, 35. It is "impossible to know if the device was purchased from SexyVids.com," but if the device did originate from that website, and if it was sold with CSAM on it, "it would be impossible for a user to know that prior to making a purchase." *Id.* ¶¶ 36–37.

- ***Some of the files on Smith's devices were accessed when he was "at a public event."*** "1B1 contains 3 files that were accessed at a date and time for which Fischbach found evidence in Smith's Google Calendar and email demonstrating that Mr. Smith was at a public event." *Id.* ¶ 26(b).

- ***Smith had a "transactional relationship" with Victim-1 and did not take nonconsensual photos of her for the Sleepy Wives Group on April 23, 2023.*** Based on "recent discovery provided by the government and information provided to him by the FBI," as well as "business records," Smith had a "transactional relationship" with "the victim"; his interaction with her "may have been a transactional event"; Smith "provided publicly available content he found on the Internet in order to join the 'Sleeping Wives' group, and was denied entry"; and Smith "may have paid to produce 'original content.'" AD ¶¶ 53–54, 170–73. Based on Smith's "cloud-based electronic photo-stores" and "photographic evidence," Fischbach has "developed a timeline and sequence of events" of April 23, 2023, and "has seen visual evidence that [Victim-1] was aware that she was being photographed." SD ¶¶ 59–62. Based on "electronic communications" and "financial transactions," Victim-1 "solicited to Edward Smith opportunities to buy photography"; Smith paid Victim-1 "at least $18,509.98 over roughly four years"; and Fischbach "has developed a forensically-sound timeline that proves the time at which [Victim-1] left Edward Smith's home on April 23, 2023, and arrived at her destination." *Id.* ¶¶ 63–70.

- ***Smith never purchased Klonopin.*** Based on "email receipts for purchases by Edward Smith from online pharmacies," "[t]here are no receipts or other evidence found that establishes that Mr. Smith ever purchased Klonopin or Clonazepam, the generic form of Klonopin," nor was "ever prescribed" those drugs. *Id.* ¶¶ 72–73. Based on "cloud-based messaging from online pharmacies" and "[t]he government's own discovery," Smith "was offered but declined to purchase Klonopin." *Id.* ¶¶ 71, 74.

The Government argues that this testimony is inadmissible both because it "is not expert analysis but a factual argument the defendant can make from primary evidence," and because it is "entirely speculative." Gov't Mot. at 43, 46. The defense does not respond.

For three reasons, Fischbach's proposed expert testimony is blatantly inadmissible.

First, to the extent that Fischbach proposes to construct factual narratives based on trial evidence, that is not proper expert testimony. A lay person can equally develop a chronology based on documentary evidence. No expertise is required to review or synthesize search

histories, financial records, photographs, and electronic communications. And Fischbach does not purport to have applied any expertise in developing these narratives. *See, e.g., United States v. Mejia*, 545 F.3d 179, 195 (2d Cir. 2008) (finding expert testimony erroneously admitted where it was based on records that could have been introduced through "lay witness testimony" and "intelligently interpreted and understood" by the jury without expert explanation (cleaned up)); *Taylor v. Evans*, No. 94 Civ. 8425, 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997) (excluding testimony where expert report "present[s] a narrative of the case which a lay juror is equally capable of constructing"). Trial in this case may or may not prove to include voluminous records as to which neutral summaries, authenticated by a fact witness, may be admitted, pursuant to Federal Rule of Evidence 1006. But there is zero charter for expert testimony on these points.

Second, to the extent that Fischbach proposes to opine about factual matters, his opinions are wildly outside the scope of permissible expert testimony. Fischbach proposes to opine about such topics as whether Smith had sexual interest in children, whether Smith appreciated or not that there was CSAM on his devices, and whether his relationship with Victim-1 was "transactional." These subjects do not call upon expertise. They certainly do not call upon the expertise of a computer forensics expert. The jury is capable of drawing its own conclusions on these quintessentially lay subjects based on the lay testimony and evidence that will be received. *See, e.g., LinkCo, Inc. v. Fujitsu Ltd.*, No. 00 Civ. 7242, 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002) (excluding testimony where expert report "does not address technical questions that may be difficult for a juror to comprehend," but rather "contains arguments and conclusory statements about questions of fact masquerading behind a veneer of technical language"); *Lane v. Am. Airlines, Inc.*, No. 18 Civ. 6110, 2024 WL 1200074, at *14 (E.D.N.Y. Mar. 20, 2024) (excluding testimony where expert "has no personal knowledge of the underlying facts, such

40

recitation is not based on his expert knowledge or experience, and [d]efendant has not shown that . . . [the] records cannot be understood by a lay person").

Third, Fischbach's opinions, far from having a reliable basis, are highly speculative. Thus, even if these topics were somehow suitable for an expert, his testimony would fail Rule 702. To choose just two examples, he proposes to opine that device 1B15 "*could be* the hard drive purchased from SexyVids.com," while also acknowledging that it is "impossible to know." SD ¶¶ 35–36 (emphasis added). He also proposes to testify that Smith "*may have* paid to produce 'original content'" for the "Sleeping Wives" group, but he does not cite support. AD ¶ 54 (emphasis added). Opinions such as these—based on nothing more than "subjective belief or unsupported speculation," *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 543 (citation omitted)—are inadmissible. *See, e.g.*, *Northway Med. Ctr. Condo v. Hartford Fin. Servs. Grp., Inc.*, 745 F. Supp. 3d 170, 181–82 (S.D.N.Y. 2024) (excluding testimony where expert "provides no basis for his conclusion" except "a single conclusory statement" without any "technical or factual explanation"), *aff'd sub nom. Northway Med. Ctr. Condo v. Sentinel Ins. Co., Ltd.*, No. 24 Civ. 2468, 2025 WL 1703194 (2d Cir. June 18, 2025) (summary order); *Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13 Civ. 8645, 2018 WL 1889763, at *6 (S.D.N.Y. Apr. 18, 2018) (excluding testimony where "the analytical gap between known facts and [expert]'s assertions is enormous"), *aff'd sub nom. ScentSational Techs. LLC v. PepsiCo, Inc.*, 773 F. App'x 607 (Fed. Cir. 2019).

### 3.    Cryptocurrency and Telegram

Fischbach also proposes to testify about Coinbase, a cryptocurrency exchange, and Telegram, a social media platform. He would opine that:

- ***Neither cryptocurrency nor Telegram is indicative of criminal activity.*** "[T]he use of cryptocurrency, including Bitcoin, Etherium [*sic*], and others is not an

implicit sign of criminal activity." AD ¶ 45. Rather, "in his experience in other cases, individuals have used Cryptocurrency as a means of hiding perfectly legal purchases from significant others." *Id.* ¶ 50. Similarly, the "use of Telegram, Telegram Groups or Channels are in no way indicative of crime or criminal activity." *Id.* ¶ 152.

- ***Coinbase and Telegram are widely known and used.*** "Coinbase is one of the largest and best known Cryptocurrency Exchanges," *id.* ¶ 46, and "Telegram is a cloud-based, cross-platform social media and instant messaging (IM) service," with "over 1 Billion monthly active users"—more than Snapchat and Twitter, *id.* ¶¶ 144–47. And "within [Fischbach's] professional speaking capacity, specifically in Cryptocurrency, Telegram has become a required application for communicating with event coordinators." *Id.* ¶ 149.

- ***Coinbase is legal.*** "Coinbase complies with U.S. Banking and money changing rules." *Id.* ¶ 47.

The Government argues that this testimony is inadmissible for reasons including that these matters do not require specialized knowledge, let alone that of a computer forensics expert. Gov't Mot. at 42–43. The defense defends this testimony because it "relat[es] to computer forensics" and would "explain[] what isn't commonly known by typical jurors without computer backgrounds." Def. Opp'n at 7.

The Government is again correct. Fischbach has not demonstrated his expertise with respect to Telegram or Coinbase. He lacks expertise as to the legality of either (a subject which, in any event, would be the province of the Court). And the conclusions he would draw—for example, about whether using certain cryptocurrencies implicitly signals illegality, or about Telegram's ubiquity—are "lay matters that the jury [is] capable of understanding and deciding without the expert's help." *United States v. Finazzo*, 682 Fed. App'x. 6, 10 (2d Cir. 2017) (summary order). This is not a complex case in which the jury will be required, for example, "to analyze the market capitalization for cryptocurrencies or their level of ownership concentration," *United States v. Guo*, No. 23 Cr. 118, 2024 WL 2262706, at *3 (S.D.N.Y. May 17, 2024), *on reconsideration in part*, No. 23 Cr. 118, 2024 WL 3104538 (S.D.N.Y. June 24, 2024), or to

understand emergent practices "such as the use of multiple cryptocurrency 'wallets' and 'wallet addresses,'" *United States v. Chastain*, No. 22 Cr. 305, 2023 WL 2966643, at *9 (S.D.N.Y. Apr. 17, 2023). Cryptocurrency appears relevant only insofar as Smith is alleged to have used it to purchase child pornography. *See* Dkt. 1 (complaint). And Telegram appears relevant only insofar as Smith is alleged to have participated in a group chat on that platform. *See* Bail Revocation Ltr. Further, Fischbach does not even claim to have relied on expertise in opining on these matters. He states obliquely that these views are based on "research," experience as an expert, and experience as a "professional speak[er]." *See, e.g.*, AD ¶¶ 50, 149, 153.

To be sure, there may be a proper basis for lay evidence about the extent of public usage of cryptocurrency for transactions and Telegram for communications. Evidence to the effect that these are widely used could be a basis on which a jury could draw the inference pursued by the defense that paying with cryptocurrency or communicating via Telegram group is not a badge of criminal intent. Expert testimony on these subjects, however, is out of bounds. *See, e.g.*, *Wells Fargo Bank, N.A. v. U.S. Life Ins. Co.*, No. 22 Civ. 8606, 2025 WL 2220948, at *22 (S.D.N.Y. Aug. 4, 2025) (excluding expert testimony where it would not "provide[] background to jurors on unfamiliar topics," and the evidence was "straightforward and understandable by a layperson"); *Scott v. Chipotle Mexican Grill*, 315 F.R.D. 33, 56 (S.D.N.Y 2016) (excluding testimony where there is no evidence that expert "utilized his specialized knowledge"); *United States v. Brooks*, No. 8 Cr. 35, 2008 WL 2332371, at *2 (S.D.N.Y. June 4, 2008) (excluding testimony where defendant "has not shown that [experts] would offer any specialized knowledge to assist the jury" and "[t]he subjects of the proposed expert testimony are solely lay matters that the jury is capable of understanding").

### 4.    Smith's State of Mind

Fischbach next seeks to opine about what the forensic evidence shows as to Smith's mental state—his opinion being that Smith did not knowingly purchase or possess CSAM. He relatedly would opine about when forensic evidence, in general, is probative of intent and knowledge. Specifically, he would testify that:

- ***The evidence shows that Smith did not knowingly possess CSAM.***  Across Smith's devices, "there is no evidence that [Smith] ever interacted or knowingly possessed those CSAM images, or that they came from devices seized from his home" because "there are many instances where the MAC data for CSAM images is static." AD ¶¶ 116–17. As to 1B2 and 1B15, neither "provide[s] proof of [Smith's] knowing possession of any items therein." *Id.* ¶ 72.

- ***The evidence shows that Smith did not knowingly purchase CSAM from Snapgod.*** "[T]here is no proof that [Smith] specifically purchased, or intended to purchase CSAM from Snapgod." *Id.* ¶ 142. Fischbach "has seen in the government's discovery no means by which an individual would know that Snapgod provided CSAM material to customers." *Id.* ¶ 140.

- ***Certain types of evidence prove that an individual did or did not intend to possess files.*** "[T]he presence of a Link File is not proof that an individual ever viewed the file to which it resolves," *id.* ¶ 85, and "a broken Link File is more indicative of a file that a user intended to dispossess than to possess," *id.* ¶ 94. "[A]ny missing MAC data negates any evidence that a user has ever interacted with that file," *id.* ¶ 115, and "without metadata, it is nearly impossible to attribute a particular file to a particular user's knowledge of the file or whether it was knowingly possessed," *id.* ¶ 123. Also: "search records are an important piece of evidence when assessing an individual's knowledge and intent." *Id.* ¶ 128.

The Government argues that these opinions are improper expert testimony, including because they violate Rule 704(b). Gov't Mot. at 39–40. The defense responds that these objections have been "mooted by the defense's withdrawal of those proffered opinions." Def. Opp'n at 7. The defense had not, however, previously withdrawn such opinions. *See id.* at 2–3.

In any event, had the defense continued to offer such, Fischbach's opinions about the inferences to be drawn about Smith's intent or knowledge are not the province of experts. They

44

are squarely prohibited by Rule 704(b). Smith is charged, among other offenses, with the receipt and possession of child pornography under 18 U.S.C. § 2252A. Intent is an element of both offenses, which require that the defendant "knowingly" engaged in the prohibited conduct. *See id.* § 2252A(a)(2)(B), (a)(5)(B). Where a state of mind is an element of the charged offense, Rule 704(b) bars experts from "expressly stating the final conclusion or inference as to a defendant's actual mental state." *DiDomenico*, 985 F. Supp. 2d at 1164 (citation omitted). Fischbach's testimony to the effect that the evidence suggests that Smith was unaware that he possessed or had purchased CSAM is out of bounds. It also violates the broader precept that an expert may not "tell the jury what result to reach," or "substitute [his] judgment for the jury's." *Duncan*, 42 F.3d at 101.

The same analysis applies to Fischbach's opinions as to the inferences about knowledge and intent that may be drawn, in general, from species of forensic evidence. Although Fischbach packages these opinions as not specific to Smith—*e.g.*, that "[t]hat a broken Link File is more indicative of a file that a user intended to dispossess than to possess," AD ¶ 94—such testimony, if offered at Smith's trial, would be tantamount to opining on his intent or knowledge. That is all the more so because Fischbach would testify as to the factual predicates of these opinions (*e.g.*, that "[t]he link files found on [Smith's] devices were broken," *id.* ¶ 87). *See Diaz v. United States*, 602 U.S. 526, 535–36 (2024) (expert who "never spoke the defendant's name" would violate Rule 704(b) if she testified to the effect that "all people in the defendant's shoes" have a particular mental state). The Court accordingly precludes all of Fischbach's proposed testimony as to Smith's mental state. *See, e.g., United States v. Haynes*, 729 F.3d 178, 196 (2d Cir. 2013) (excluding expert testimony about defendant's knowledge, which was "a critical element of the

charges against the defendant"); *DiDomenico*, 985 F. Supp. 2d at 1165 (similar); *United States v. Chang*, No. 18 Cr. 501, 2020 WL 364157, at *1 (E.D.N.Y. Jan. 21, 2020) (similar).

## CONCLUSION

For the foregoing reasons, as to the vast majority of Fischbach's proposed testimony, the Court grants the Government's motion to preclude. The Court denies that motion only as to general concepts in computer forensics, as detailed above.

To the limited extent the Court herein has authorized the defense to file a supplemental disclosure from Fischbach detailing the methodology he used to reach certain conclusions about Smith's devices, *see* pp. 26–30, *supra*, that submission is due December 5, 2025; any opposition by the Government is due December 12, 2025; any response from the defense is due December 16, 2025; and any reply from the Government is due December 19, 2025. These deadlines will not be extended.

The Clerk of Court is respectfully directed to terminate the motion pending at docket 124.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: November 26, 2025
      New York, New York

46