UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                            :
UNITED STATES OF AMERICA
                                                            :
           - v. -                                               S2 25 Cr. 4 (PAE)
                                                            :
EDWARD GENE SMITH,
                                                            :
              Defendant.
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**THE GOVERNMENT'S SENTENCING MEMORANDUM**



                                          JAY CLAYTON
                                          United States Attorney
                                          Southern District of New York
                                          26 Federal Plaza, 37th Floor
                                          New York, New York 10278


Remy Grosbard
Rita Maxwell
Daniel C. Richenthal
Joseph Zabel
Assistant United States Attorneys
– Of Counsel –

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 3

I.      The Charges and Guilty Plea ........................................................................... 3

II.     Offense Conduct ............................................................................................... 5

      A.  Child Pornography ..................................................................................... 5

      B.  Drugging and Sexual Assaults ................................................................... 9

          1.     Victim-1 ......................................................................................... 10

          2.     Victim-2 ......................................................................................... 13

          3.     Victim-3 ......................................................................................... 20

          4.     Victim-4 ......................................................................................... 23

          5.     Victim-5 ......................................................................................... 26

          6.     Victim-6 ......................................................................................... 27

          7.     Other Victims or Planned Victims ............................................... 27

      C.  Obstruction of Justice ............................................................................... 30

      D.  Additional Relevant Conduct .................................................................... 32

III.    The Defendant's Purported Expert Report ................................................... 36

IV.    Dr. Rosenberg's Report ................................................................................. 45

V.     The Defendant's Objections to the PSR ........................................................ 48

VI.    Applicable Law ............................................................................................... 50

VII.   Discussion ....................................................................................................... 51

      A.  The Defendant's Egregious, Abusive, Dangerous, and Repeated Conduct
          Warrants a Term of 360 Months' Imprisonment ..................................... 51

          1.     The Nature and Circumstances of the Offenses ......................... 51

          2.     The Need for Specific Deterrence and to Promote Respect for the Law ... 61

          3.     The Need to Protect the Public .................................................... 67

      B.  The Defendant's Additional Arguments in Favor of a Lenient Sentence Should Be
          Rejected ..................................................................................................... 70

          1.     The Defendant's Term of Imprisonment Will Be No Harder than that of
              Other Prisoners ............................................................................ 70

2.    The Child Pornography Guidelines Have Almost No Impact on the Defendant's Guidelines Range ................................................... 73

3.    The Defendant's Comparable Cases Are Inapposite.................................. 74

C.  The Court Should Impose the Recommended Sex Offender Treatment Condition.................................................................................................. 76

D.  The Court Should Impose a Lifetime Term of Supervised Release .................... 77

E.  Probation's Recommendation........................................................................... 78

F.  JVTA and AVAA Assessments........................................................................ 80

G.  Restitution...................................................................................................... 81

CONCLUSION.................................................................................................... 82

**PRELIMINARY STATEMENT**

The defendant is a sexual predator.  He used promises of financial security to lure his victims—young women from foreign countries or far-away states, who were vulnerable and needed a source of income.  He used drugs to incapacitate them, making sure they were incapable of defending themselves.  He then raped and sexually abused them.  The proof of the defendant's crimes is as horrific as it is incontrovertible, memorialized in extensive notes detailing what he did to incapacitate, abuse, humiliate, degrade, and violate his victims, as well as in photographs he took to document his sexual abuse—images of his victims nude, unconscious, and in sexually explicit positions.  But the defendant's criminal acts extend beyond adults.  The defendant also obtained and maintained a trove of tens of thousands of files of child sexual abuse material ("CSAM"), horrifying material depicting prepubescent children, toddlers, and even infants being penetrated by adults and suffering humiliating, degrading, and sadistic acts.  The defendant took steps to hide his crimes, and, when he was caught, obstructed the investigation by compelling a victim he had drugged, raped, and disseminated videos of, to sign a false letter intended to inculpate her and exculpate the defendant.  The defendant committed these heinous crimes hiding behind the façade of a well-educated bank executive, using his outward appearance to draw in victims and evade detection.  And now, even after pleading guilty to his crimes, the defendant continues to disclaim responsibility for his actions.

The defendant's sentencing submission asks the Court to believe what is demonstrably and obviously not true:  That most (if not all) of the defendant's crimes were an unfortunate product of his purported autism.  That the defendant repeatedly drugged and raped women because he "did not know – since he had not been explicitly taught – about legal consent or bodily autonomy" and that he just "did not perceive the women's emotional distress."  (Dkt. 231 (Def. Sub.) at 15).  That

the defendant—a fifty-year old, Harvard-educated, former financial executive—amassed a collection of tens of thousands of files of CSAM because he was "academically" interested in such material, and only learned it was illegal upon questioning from federal agents in this very case. (*Id.* at 15, 16). He asks this Court, in short, to find that all of his criminal conduct, while technically illegal, was not really his fault, if viewed in the context of the life of a man who supposedly ate burritos for dinner for two years, refused to let a child win at chess, kept a storage unit for books, and read before he liked to talk. Despite his deliberative and egregious sexual abuse of multiple women, he is not antisocial or psychopathic. (*Id.* at 37). Despite his organized collection of violent imagery of the sexual abuse of children, he is not interested in sexually abusing children. (*Id.*). Despite committing obstruction of justice, he respects the law. (*Id.* at 39). He is just autistic, he promises.

This is inflammatory nonsense. It is an offensive smear to those in the autistic community. And it is utterly irreconcilable with what the defendant did, and how he did it. It is inconsistent with his solemn admissions before this Court, under oath, to committing the crimes for which he stands to be sentenced, including admitting that he knew, at the time he acted, that what he was doing was wrong. It is inconsistent with not just his words of a few months ago, but also with his words at the time he acted, including what he said to his victims and what he said in his plans for his victims. And it is inconsistent with words he wrote long before he chose to commit his crimes. Contrary to his current claim that he could not understand the harms he inflicted on his victims, in the *Harvard Crimson* in 1998, just a year after his college graduation, the defendant wrote:

> All rape is horribly traumatic. But there is something particularly traumatic about being raped by someone a victim knows and had even liked or trusted. The right to say no to sex is a human right, a basic right of control over one's body. But for too many men, it's a right mitigated by circumstances, by how well the two know each

other, by how much they've had to drink, by just how much "fooling around" has already occurred.

(*See* Ex. A at 1-2).   There can be no mistake.  The defendant knew *exactly* what he was doing when he drugged and sexually abused his victims.  He knew *exactly* what he was doing when he sought out, downloaded, collected, and organized horrific images of the sexual abuse of children.  And he knew *exactly* what he was doing when he paid a woman he raped to try to cover up his crimes.

The defendant is not a victim, as he repeatedly suggests.  He is a sexual predator, a serial rapist, an avid CSAM collector, and someone who has demonstrated no respect for the humanity of anyone else.  The defendant left his victims permanently scarred with emotional and psychological injuries, trying to piece together what happened to them:  What drugs the defendant used, what exactly he did to them, and whether he kept or distributed photographs or videos of the abuse.  He amassed and consumed tens of thousands of images of horrific CSAM.  He tried to avoid detection of his crimes, and, to this day, responsibility for them.  The defendant deserves condemnation, not sympathy.  Society needs protection from him.  His victims deserve justice.

Accordingly, and as further detailed below, the Government submits that the Court should impose a sentence of 360 months' imprisonment.

## BACKGROUND

### I.     The Charges and Guilty Plea

On December 23, 2025, a grand jury in this district returned a six-count superseding indictment (the "S2 Indictment") charging the defendant with (1) distributing a controlled substance to Victim-1 with the intent to rape Victim-1, in violation of 21 U.S.C. §§ 841(a)(1), (b)(2), and (b)(7) (Count One); (2) sex trafficking Victim-2 by force, fraud, or coercion, in violation of 18 U.S.C. § 1591(a) and (b)(1) (Count Two); (3) enticement or inducement of Victim-

2 for unlawful sexual purposes, in violation of 18 U.S.C. § 2422(a) (Count Three); (4) receiving child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(B) and (b)(1) (Count Four); (5) possessing child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2) (Count Five); and (6) obstructing justice, in violation of 18 U.S.C. §§ 1519 and 2 (Count 6).  (Dkt. 170).[1]

On January 27, 2026, the defendant pleaded guilty, pursuant to a written plea agreement (the "Plea Agreement"), to Counts One, Three, Four, and Six.  Pursuant to the Plea Agreement, the defendant also admitted additional facts, including, among other things, that the defendant repeatedly drugged and raped Victim-2, that the defendant caused another victim, Victim-3, who was then a minor, to send naked photographs of herself to the defendant, and that the defendant drugged and raped Victim-3.  (*See* Plea Agreement (attached as Exhibit B), Exhibit A thereto).[2] The defendant further agreed that all of this conduct constitutes relevant conduct, pursuant to U.S.S.G. § 1B1.3, or other conduct of the defendant, pursuant to U.S.S.G. § 1B1.4, that the Court may consider at the time of sentencing. The defendant also agreed to make restitution to Victim-1, Victim-2, and all victims of Count Four (the child pornography count) in an amount ordered by the Court in accordance with 18 U.S.C. §§ 2259, 2264, 3663(a)(3), and 3663A.  The defendant further agreed to make restitution to identified victims other than victims of the offenses of conviction, including but not limited to Victim-3, to the extent they seek restitution, pursuant to 18 U.S.C. § 3663A(a)(3).

While the Plea Agreement set forth a stipulated Guidelines range of 324 to 405 months' imprisonment based on an offense level of 41 and a criminal history category of I, the parties

---

[1] The S2 Indictment was returned on December 23, 2025.  As reflected on the docket, the S2 Indictment was docketed on December 24, 2025.

[2] The public version of the Plea Agreement has been redacted to protect the privacy of the victims. The unredacted version of the Plea Agreement is attached as Exhibit B and is submitted under seal.

4

agreed that neither party would request a sentence lower than 240 months' imprisonment or higher than 360 months' imprisonment.  (*See* Plea Agreement at 7).

## II.    Offense Conduct

### A.  Child Pornography

The defendant first came to the attention of federal law enforcement in connection with an investigation by the Federal Bureau of Investigation ("FBI") into an online moniker or persona ("Snapgod"), which produces and sells child pornography (also known as child sexual abuse material or "CSAM").  (Presentence Investigation Report ("PSR") ¶¶ 11-13).  In particular, records from Coinbase, a cryptocurrency exchange, indicated that in June 2023, the defendant paid approximately $1,347.72 of Bitcoin to obtain material from Snapgod.  (*Id.* ¶ 12).

On June 26, 2024, federal agents executed a judicially authorized search warrant of the defendant's rental apartment on Central Park South of Manhattan, seizing ten electronic devices from the defendant's residence.  (*Id.* ¶¶ 12, 13).  During the search, law enforcement officers also located the following: (1) a 9mm semi-automatic Springfield Armory pistol, (2) a 9mm semi-automatic Palmetto State Armory assault rifle, (3) a 5.56X45 semi-automatic Colt assault rifle, (4) a firearm silencer, (5) photographs of women in bondage with their breasts and genital areas marked as targets, (6) ropes tied to the defendant's bedframe, (7) bags and chests containing bondage, duct tape, and sex toys, and (8) a child or toddler's t-shirt. (*Id.* ¶ 13).  The defendant did not have a license for any of the firearms or the silencer.  (*Id.*).

While law enforcement officers were searching the defendant's apartment, two federal agents conducted a voluntary interview of the defendant, who was neither arrested nor detained. (*Id.* ¶ 14).  During that interview, which was recorded, the defendant stated that (1) he had made "some" purchases of "adult material" using Bitcoin on an "adult site," (2) he purchased material from a pornography producer known as Snapgod, (3) before he purchased the material, he

"figured" the girls in the videos "were teens," who "certainly could've been under 18, like 16 or 17," and (4) his sexual preference is girls who are "teens." (*Id.*)

As noted above, during the search of the defendant's residence, federal agents seized ten electronic devices. Law enforcement officers subsequently searched these devices, pursuant to a judicially authorized search warrant, for child pornography and identified more than 9,000 unique images and videos of child pornography, including 8,000 unique images, and approximately 1,000 unique videos of child pornography, across six devices. (*Id.* ¶ 15). Some of these images and videos depicted toddlers and prepubescent children. Metadata recovered from the child pornography files identified on the defendant's electronic devices indicate that the defendant possessed and organized such files from at least 2012 to approximately June 2024 (the month of the search). (*Id.*).

On one of the defendant's hard drives, 347 files depicting child pornography were identified. (*Id.* ¶ 16). On another hard drive (the "1B2 Hard Drive"), approximately 9,000 files depicting child pornography were identified. (*Id.*). The 1B2 Hard Drive contained a folder labeled "CP Central," which contained subfolders filled with files depicting child pornography. (*Id.*). These subfolders were also labeled with folder names such as, "My Nieces August 2004," "hussy," "11-yrpinkpuss," "Emma 6yo,1" and "daughter." (*Id.*). The files depicting child pornography in these subfolders contained graphic file names, consistent with their content, such as:

(a) "PTHC2 - New 2007 ███ anal no condom cum on pussy (resized).mpg"—a nine second video of an approximately 12- to 15-year-old female lying naked on the floor being anally penetrated by an erect penis.[3]

---

[3] "PTHC" is a known acronym within the CSAM community, standing for pre-teen hardcore. *See, e.g.*, United States Sentencing Commission, Report to Congress: Child Pornography Offenses, Appendix A, https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Appendix_A.pdf.

(b) "Pthc) !!! New 0708 !!! 11 yo G fucks 10 yo Gand man(excellent)"—an approximately 11-minute video involving two approximately ten-year-old females, in which one of the minor females penetrates the other with a strap-on dildo while another minor films, before an adult male then vaginally and orally penetrates the minors.

(c) "! NEW ! (pthc) 2006 █████ 7yr masturbates and dad fingers ass.mpg"—an approximately three-minute video of an approximately seven-to-ten-year-old female who is masturbating on a bed before she is then observed on her hands and knees with her anus facing the camera and an adult male digitally penetrating her vagina.

(d) "!!!!!!!!!! PTHC 8yo █████, Masturbation, real ass fuck and rape with orgasms.wmv"— a 31-second video of an approximately eight-year-old female who is naked on her hands and knees with her anus facing the camera while she masturbates her vagina.

(e) "Pthc 2010 5yo █████ Making Poop And Pee (((Very Rare))).wmv"—an approximately four-minute video of an approximately five-year-old female being vaginally penetrated by an erect male penis. The penis then ejaculates on the minor. The minor is later filmed making feces which an erect male penis ejaculates on.

(f) "pthc - Underage Russian Lolita █████ 15yo Incest With 3 Yg Boys.avi"—an approximately 12-minute video of three approximately 15-year-old males and one approximately 15-year-old female. Each minor male is observed in multiple simultaneous sex acts with the female, including vaginal and oral penetration.

(g) "(Pthc) █████ Boil Young Girl abused with Dildo and by Dad Pt 2.avi"—an approximately 17-minute video in which an approximately eight-year-old female is vaginally and anally penetrated by a dildo being held by what appears to be an adult hand.

(h) "Pthc 2010 5yo █████ Fucked Pencil And Daddy Masturbating 5m53s (((Very Good))).wmv"—a one-minute-and-thirty-one-second video of an approximately five-year-old naked female masturbating her vagina with a marker, before an adult male penis ejaculates on the minor.

(i) "(PTHC) 9Yo Niece - Horse.mpg"—a 52-second video of an approximately nine-year-old female sitting on an adult male who is anally penetrating the minor while digitally manipulating her vagina.

(j) "(Pthc) 10Yo █████ Holiday - Sleep Assault-Blond Blanket (Farm A).avi"—an approximately four-minute video of an approximately ten-year-old minor female who is being digitally penetrated in her vagina by an adult male.

(k) "Little 6 Yr Girl Old Raped And Waxed By Two Boys.mpg"—an approximately four-minute video of an approximately six-year-old female who is naked on a bed with her hands and feet bound to bed posts. The female is being penetrated with a sex toy by what appears to be two minor males, each wearing a mask.

(l) !!!!!baby fuck dad fucks 142.jpg—photos of a female infant from the stomach down with her vagina exposed and the tip of an erect penis inserted into the vagina.

7

(m) 1085998814881.jpg—a photo of an infant in a car seat with an erect penis in its mouth.

(n) Cbaby_mummy.mpg— a 23 second video of a minor female approximately two to three years old performing oral sex on an adult erect penis.

(o) Cbaby2.mpg— a 1 minute and 6 second video of a minor female approximately two to three years old with her vagina being digitally penetrated. An adult penis then penetrates the vagina and ejaculates onto it.

(*Id.* ¶ 16).

Law enforcement officers also identified an image of child pornography on one of the defendant's laptops that depicts a minor female with the word "Snapgod" written on her breasts, and the image contains two watermarks with the word "Snapgod." (*Id.* ¶ 17).

Law enforcement further identified searches on the defendant's devices for and/or using eMule, a peer-to-peer file sharing program that can be used by individuals to download and share child pornography; those searches included "pthc de rosa" and "secret city pthc." (*Id.* ¶ 18). There was also evidence of the devices that the defendant viewed child pornography on eMule in 2020, including files such as:

(a) (Pthc Center)(Opva) (2013) Polish Peasant Girls 06 - 10Yo.avi

(b) Hard And Painful Anal Sex With 14Yo Girl Hurtcore Preteen Bdsm (Pthc).avi

(c) (Pthc) Secret city (Тайный город) studio - Russian Pedomom - In the shower ███ Nastya 4yo.wmv

(d) color climax GREAT Mom-daughters incest - stimulates 9yo and 13yo girls - Dad fucks ( Pedo pthc) 59m04s.avi

(e) julyjailbait 2018 - Lada 8Yo 11Yo - Girl Fondled Showing (Full)_HOT_dad licks fingers daughter, JO & cat licks pussy.avi

(f) 13 14 Brother Forced Very Young Little Sister To Fuck Him - Amateur Real Rape Sex Movie - Tiny Little Virgin Defloration - Girl Fuck Dog - Hussyfan(1).avi

(*Id.* ¶ 18).

Law enforcement officers later located child pornography in the defendant's Google account, including a video of an adult male ejaculating on the face of a sleeping minor. (*Id.* ¶ 19).

8

Law enforcement also found several apparent fantasy writings depicting the gruesome rape, drugging, and sexual abuse of a female camp counselor by boys who attended the camp and counselors who worked at the camp. (*Id.*). The writings also depicted the female camp counselor being drugged and raped, and the female camp counselor watching a videotape of a violent beating of another female camp counselor, followed by her violent anal and vaginal rape by adults, children, and a dog. (*Id.*). An example of the writings is shared below.

> We followed the boy to a log where four of the younger boys were sitting on the ground, leaning back against the log behind them for support. The boy that had the nerve to get up and ask for our services peeled his shorts down and sat down on the end. He wiggled his finger at Joni.
>
> She dropped to her knees between his legs and went right to work.
>
> I watched for a second, along with the other four boys. But only for a second or two before the boy next to him lifted his butt off the ground and pulled his shorts off. He grinned at me and I dropped to my knees and began to suck his hard little cock. Keep in mind that in this instance little is a comparative term. I am pretty certain that all of these boys, even the youngest, had longer cocks than my husband. But compared to the men and the older boys, the younger boys were much easier to handle.
>
> We ended up sucking off eight of the younger boys, one right after the other. I assumed that these were the non-swimmers that hadn't been able to make it out to the raft earlier.
>
> After we sucked off the eight boys we began to get passed around to the other boys. We got an occasional rest period in between blowjobs. But until the story ended and the campfire burned down, Joni and I were both kept busy moving around the group of boys whenever one of them called out to us, usually using some derogatory term such as, "Hey cunt! Get your ass over here!" or "Rest period is over, bitch. Get over here and suck on this hard cock!"
>
> I was sitting on a log recuperating when Rodney waved me over just before Mr. Moore sent the boys to their dorms for the night. He made me suck his cock for a few minutes and then he put me on my hands and knees and fucked me from behind.

(*Id.*).

## B. Drugging and Sexual Assaults

Between at least in or about 2015 through at least in or about June 2024 (the month his residence was searched), the defendant planned, attempted to, and did surreptitiously drug numerous women, with the intent to incapacitate them and/or render them unable to consent to sexual activity. (PSR ¶ 20). The defendant purchased Klonopin in bulk from an online pharmacy based in the pacific nation Vanuatu, and he kept notes and other similar planning documents on

his personal electronic devices and in his Google account in which he described in detail his plans to drug numerous female victims and engage in degrading and sadistic sexual activity with them while they were incapacitated or unconscious. (*Id.*). The defendant did, in fact, sexually assault at least some of these women and surreptitiously took videos or photographs of at least some of that sexual activity, including by filming them with hidden cameras he kept in apartments in which he resided in Boston, MA and New York, NY over the course of at least a decade. (*Id.*). These women include Victim-1, Victim-2, Victim-3, Victim-4, Victim-5, and Victim-6, as described below.

1. Victim-1

On April 23, 2023, the defendant drugged and raped an adult female individual, Victim-1, who the defendant had met through a so-called sugar dating website, Seeking.com, in the summer of 2020. (*Id.* ¶ 21). In July 2020, the defendant met Victim-1 in person for the first time, when Victim-1 traveled to Florida to spend several days with the defendant and engage in sexual activity. (*Id.*). The defendant paid Victim-1 approximately $1,700 for this trip. (*Id.*)

In or about early April 2023, the defendant and Victim-1 reconnected and met in person on April 23, 2023. (*Id.* ¶ 22). The defendant and Victim-1 had lunch at a restaurant near the defendant's Central Park South residence and then went to the defendant's apartment, where the defendant gave Victim-1, unbeknownst to Victim-1, alcoholic beverages that he had laced with Klonopin, a controlled substance. (*Id.*). While Victim-1 was still conscious, the defendant tied up Victim-1 before he started engaging in sexual intercourse with her. (*Id.*). After Victim-1 passed out, the defendant continued having sexual intercourse with Victim-1. (*Id.*).

While Victim-1 was still unconscious, the defendant took videos of Victim-1 nude, without her consent or knowledge. (*Id.*). The defendant then shared these videos with a Telegram group

10

called Sleepy Wives, which is dedicated to sharing images of the group members' drugged and unconscious wives, girlfriends, and partners. (*Id.*). The defendant had attempted to join Sleepy Wives several days prior, on April 18, 2023, and was told by the group's administrator (the "Administrator") that to gain admission, potential members must "share 1 min video from their passed out partners with this special position (spread eagle position) with a paper that this wordls [sic] has been written over that 'for vip group.' [sic]." (*Id.*).

Then, on April 23, 2023, to gain admission to Sleepy Wives, the defendant shared a video, which is approximately one minute and nineteen seconds, depicting Victim-1, naked, unconscious, with her arms and legs spread out, and with a paper sign on her leg that reads, "April 23, 2023, FOR VIP GROUP!! (telegram channel)." (*Id.*). In the video, the defendant zoomed in on different parts of Victim-1's body, including her genitals and face. The defendant wrote to the Administrator that the video was "shot just now," and asked, "how's this." (*Id.*). The Administrator told the defendant to use the "correct position," and sent the defendant a screenshot of the video of Victim-1, with red arrows indicating that the Administrator wanted Victim-1's arms to be more spread out, and also sent the defendant a religious image of a woman crucified on a cross. (*Id.*). The Administrator noted that "another name of the position is crucified girl." (*Id.*). The defendant then sent the Administrator another video, which is approximately one minute and three seconds of Victim-1, naked and unconscious, with the same sign, and with her arms positioned as the Administrator had directed.[4] (*Id.*). In this video, in addition to zooming in on different parts of Victim-1's body, the defendant touched and penetrated Victim-1's genitals with

---

[4] The Government has provided these videos directly to the Court as sealed exhibits (Exhibits C and D). Upon the Court's request, the Government can provide any of the materials quoted, or photographs and videos described, in this submission.

11

his fingers. (*Id.*). The defendant wrote to the Administrator, "I don't get a chance to do this every day lol [*i.e.*, laugh out loud], but will be as active as I can." (*Id.*).

The same day, on April 23, 2023, the defendant used Venmo to send Victim-1 $500 for their encounter. (*Id.* ¶ 23). The following day, on April 24, 2023, the defendant also sent Victim-1 a Venmo message that said, ███████████ (*Id.*). ███████████████████████

███████████████████████████████████████████████

███████████████████████ (*Id.*).

On or about July 8, 2023 (*i.e.*, about one month after the defendant paid $1,347.72 of Bitcoin to purchase child pornography from Snapgod), the defendant messaged the Administrator of Sleepy Wives, "I might try to put her [*i.e.*, Victim-1] out again soon. she's a ███████████ so it takes a lot of liquor and other stuff." (*Id.* ¶ 24). The Administrator responded, "i want to know how many videos do you have from her." (*Id.*). The defendant responded, "no more. but i can make more when the opportunity comes." (*Id.*). The Administrator then asked, "and how many from other girls?" (*Id.*). The defendant responded, "don't know I'll have to look." (*Id.*).

On or about July 15, 2023, the defendant messaged the Administrator of Sleepy Wives, "i don't have more of the ███████ girl, I've got a few passed out pics of this ███████ hottie," sent the Administrator an image of the face of an adult female ("Victim-4"), and offered to "send if you're interested." (*Id.* ¶ 25). The Administrator responded, "its ok." (*Id.*). The defendant then said, "███████ girl comes over every now and then. I'll see what I can do." (*Id.*).

On or about July 20, 2023, the Administrator of Sleepy Wives messaged the defendant, "i am thinking to [sic] that ███████ girl." (*Id.* ¶ 26). The defendant responded, "I'm seeing her again next week. We'll see what happens." (*Id.*). On or about July 31, 2023, the Administrator responded to this message, asking if the defendant was able to meet her. (*Id.*). The defendant

12

responded, "yes. got her tipsy but not enough to pass out. may get another chance later this week or next." (*Id.*). The defendant then sent the Administrator an image of Victim-1's naked backside, bent over, and wrote "I'm getting her into bondage so may be able to tie her up completely next time," adding "if you look closely you can see her first ever butt plug." (*Id.*).

On or about July 31, 2023, the defendant used Venmo to send Victim-1 $800 to help pay for ███████████████. (*Id.* ¶ 27).

On or about October 13, 2023, the defendant messaged the Administrator, "how's the group." (*Id.* ¶ 28). The Administrator responded, "We are doing great," and that the Administrator "hope[s] [SMITH] ha[s] collected more videos from your sessions with passed out girls." (*Id.*). The defendant responded, "I have. And seeing ██████ girl again next week :)" (*Id.*). The Administrator responded, "sounds good," "if you have anything you can share." (*Id.*).

On or about February 29, 2024, the Administrator messaged the defendant saying, "long time no see." (*Id.* ¶ 29). On or about March 15, 2024, the defendant responded, "here's a pic of the ██████ girl you like from a few weeks ago," "not passed out though :( " and sent an image of Victim-1, naked, with her legs spread open, and with her ankles tied by ropes to a bedframe. (*Id.*). The Administrator responded, "OH," "hi there." (*Id.*). The defendant responded, "hard to get enough drinks into her," to which the Administrator responded, "but you are an experienced guy." (*Id.*).

### 2. Victim-2

In or about ██████ 2019 (*i.e.*, approximately one year before the defendant first met Victim-1, approximately two years before the defendant first met Victim-4, and approximately two-and-a-half years before the defendant first met Victim-3, all on Seeking.com), the defendant met Victim-2 on Seeking.com. (*Id.* ¶ 30). At the time, Victim-2 was in her early 20s, living in

██████, and finishing college. (*Id.*). Victim-2 felt alone and was not enjoying her college experience. (*Id.*).

The defendant first met Victim-2 in person in ████████ in or about the ██████ of 2019. (*Id.* ¶ 31). Victim-2 planned to meet him at the hotel bar in the hotel where he was staying. (*Id.*). Instead of going to the bar, the defendant suggested they go to his hotel room, where he provided Victim-2 with a drink. (*Id.*). Victim-2 then blacked out and had no memory of the rest of the night. (*Id.*). That night, the defendant drugged and raped Victim-2, ████████████████████ ██████ (*Id.*). When Victim-2 was unconscious, the defendant took a photo of Victim-2 with his ejaculate on her face and stored it on one of his electronic devices.[5] (*Id.*). ████████████████ ██████████████████████████████████████████████████████████ ████████████████████████ (*Id.*).

In or about ██████ 2019, Victim-2 traveled to New York City to visit the defendant. (*Id.* ¶ 32). On the day Victim-2 returned to ████████ the defendant used Venmo to pay Victim-2 $2,000. (*Id.*).

In or about ████████ 2019, the defendant traveled to ████████ and visited Victim-2 at her apartment. (*Id.* ¶ 33). After that visit, the defendant used Venmo to pay Victim-2 $500. (*Id.*).

In or about December 2019, Victim-2 traveled to New York City again to visit the defendant. (*Id.* ¶ 34). The defendant paid for and booked her travel. (*Id.*). In a note from the defendant's Google account with metadata showing a date of on or about ████████, 2019, the defendant wrote, "Fri early morning phone spy / hide hard drive" and "The TALK – prosecco, xmas music, candle if success, reserve table after reviewing tablelist, pretox d." (*Id.*). On this trip, Victim-2 and the defendant discussed an arrangement where Victim-2 would relocate to New

---

[5] This photograph has been provided directly to the Court as sealed Exhibit E.

14

York, NY for a longer period of time. (*Id.*). The defendant would provide Victim-2 with an apartment and financially support her. (*Id.*). The defendant presented it as a great opportunity for Victim-2, who wanted to be in a big city and had plans to move to ███████ in the fall of 2020. (*Id.*). On or about December 16, 2019, the day Victim-2 returned to ███████, the defendant used Venmo to pay Victim-2 $1,000. (*Id.*).

In or about late ███████ 2019, the defendant and Victim-2 communicated about the terms of their arrangement whereby Victim-2 would relocate to New York, NY. (*Id.* ¶ 35). The defendant proposed a document for her to sign that, in broad terms, stated that the defendant would provide for Victim-2 financially, including providing an apartment, paying for expenses, and providing funds for personal spending. (*Id.*). Victim-2 would have to "provide herself" to the defendant, to "take in any way he wishes" and that she would seek to "please and obey him without reservation." (*Id.*). Victim-2 declined to sign this document. (*Id.*).

One of the terms in the initial draft of the arrangement terms was that Victim-2 would not take illicit drugs without the defendant's permission. (*Id.* ¶ 36). Victim-2 informed the defendant that she did not think he should ever let her take any illegal drug. (*Id.*). The defendant responded, "good point. Better safe than sorry. It would be somewhat awkward explaining to your dad that you died from fentanyl-laced coke." (*Id.*).

Another term that was included in the initial draft of the arrangement terms was that Victim-2 would allow the defendant to review her messages on her phone, monitor her social media accounts, and always share iPhone location. (*Id.* ¶ 37). Again, Victim-2 declined to sign the document that had these terms. (*Id.*).

In addition to proposing an agreement for Victim-2 to sign, the defendant privately planned their time together. (*Id.* ¶ 38). A file recovered from the defendant's Google account is titled

15

"Plan – start" in a folder that included Victim-2's name in the filepath. (*Id.*). The defendant wrote out his plan for Victim-2, which he did not share with Victim-2, and, contrary to his telling her that he would not give her drugs, stated that a "typical weekend" would involve, among other things "drunk night" which involved "drug + cocktails and hard liquor." (*Id.*). The defendant's plan for Victim-2 also described "sex activities" to engage in with Victim-2, reproduced below:

> SEX ACTIVITIES (MAIN FOCUS): facefucking, basic arm behind back ties, ass to mouth (get used to finger, then cock), making her say she's my slut, making her admit to wanting to be raped, photos and video ANYTIME (when's she's not expecting it), keeping tied up and drinking from dog bowl or peeing like that, rimming, plugs, piss and drunk porn.

(*Id.*).

In or about ████ 2020, the defendant moved Victim-2 to New York, NY. (*Id.* ¶ 39). Though he planned for Victim-2 to live in ████████, Victim-2 did not feel comfortable there, and the defendant moved Victim-2 to his apartment. (*Id.*). The defendant subsequently moved Victim-2 to a hotel for a short period of time when his wife (whose existence the defendant had hidden from Victim-2, who did not know the defendant was married) unexpectedly arrived in New York, NY. (*Id.*). The defendant then cosigned a lease for Victim-2's apartment in New York, NY, paid the full rent for the apartment, and provided Victim-2 with a debit card designed for use by children, which allowed him to monitor Victim-2's spending. (*Id.*). The defendant actively discouraged Victim-2 from working; he told her he did not want her to have a job because he wanted all of her time. (*Id.*). As a result, Victim-2 was entirely financially dependent on the defendant with no independent means of support or income. (*Id.*). Additionally, the defendant isolated Vicitm-2 from her social contacts and support systems, making her dependent on the defendant. (*Id.*). The defendant would also frequently tell Victim-2 that she should be grateful for the opportunity he was providing her and that women for whom he had provided in the past had great lives. (*Id.*). Victim-2 stated that she felt she had no choice in engaging in sexual activity

16

with the defendant because he was her sole source of financial support, and he would regularly remind her that she should be grateful for the lifestyle he was providing.  (*Id.*).  Victim-2 did not consent to abusive conduct and the defendant did not reveal his true nature and interests until Vicitm-2 was already dependent on the defendant.  (*Id.*).

Between in or about ███████ 2019 and in or about █████ 2020, the defendant repeatedly drugged and sexually assaulted Victim-2 by, unbeknownst to Victim-2, providing Victim-2 with one or more alcoholic drinks, to which the defendant added Klonopin, which Victim-2 drank, and then engaging in sexual activity with Victim-2 while she was unconscious and/or incapacitated.  (*Id.* ¶ 40).

The defendant generally forbade Victim-2 from speaking to others without his permission.  (*Id.* ¶ 41).  For instance, Victim-2 once asked the defendant permission to see a family friend who was in New York City.  (*Id.*).  The defendant granted Victim-2 permission but later told Victim-2 that he had changed his mind and was unhappy that Victim-2 had seen her family friend.  (*Id.*).  The defendant then punished Victim-2 by physically and sexually harming her, as detailed below.  (*Id.*).

In addition, while Victim-2 was living in New York, NY (*i.e.*, from █████ 2020 to █████ 2020), the defendant surveilled Victim-2's communications and surreptitiously took photographs of pictures, notes and communications on Victim-2's cellphone, which were later recovered from the defendant's electronic devices.  (*Id.* ¶ 42).  The defendant also put or planned to put hidden cameras in Victim-2's apartment and installed keylogger, a type of spyware that secretly records every keystroke a user makes on a device, capturing passwords, private messages, search queries, and any other typed content, on Victim-2's cellphone.  (*Id.*).  In the defendant's personal notes planning for Victim-2's life in New York, NY (reproduced in part above), the defendant wrote:

17

"Put keylogger on, and get passwords to log in to social media on clean windows account (DONE)," and "Obviously set up hidden cams." (*Id.*).

On at least one occasion during Victim-2's time in New York City (*i.e.*, from ██████ 2020 through ██████ 2020), the defendant physically assaulted Victim-2, by slapping or pushing Victim-2. (*Id.* ¶ 43). The defendant also repeatedly used a restraining device on Victim-2 that immobilized Victim-2's hands and feet. (*Id.*). The defendant would undress Victim-2, put her in this contraption, and physically and sexually assault her. (*Id.*). Victim-2 also recalled the defendant taking her into the hallway of his apartment building after she had allegedly misbehaved and sexually abusing her, which included forcing her to be naked in the hallway. (*Id.*). This occurred in the narrow hallway near the defendant's apartment, which had a mirror and elevators down the hall. (*Id.*). Victim-2 felt extremely embarrassed by this public humiliation. (*Id.*).

The defendant told Victim-2 that he had a gun and she recalled seeing the defendant "messing with" a gun in his New York, NY apartment. (*Id.* ¶ 44). Victim-2 also recalled that the defendant told her he once set a church on fire years ago. (*Id.*).

At some point during this time period (*i.e.*, from ██████ 2020 through ██████ 2020), Victim-2 went through the defendant's cellphone, while the defendant appeared sick, drugged, and/or inebriated. (*Id.* ¶ 45). On the defendant's cellphone, Victim-2 located at least one photograph of Victim-2 apparently asleep and/or unconscious and naked and/or in a sexually explicit position. (*Id.*). Victim-2 had not consented to that photograph being taken. Victim-2 also found photos of other women who appeared to be asleep and/or unconscious and naked and/or in sexually explicit positions. (*Id.*). These photos were kept in folders organized by female names. (*Id.*). Victim-2 attempted to delete the photographs of herself. (*Id.*). She later confronted the defendant, who got upset with Victim-2 and told Victim-2 that he had made a backup of such

18

photographs, leading Victim-2 to worry that, despite her attempt to delete photographs, the defendant could still share them with others. (*Id.*).

At another point during this time period (*i.e.*, from ████ 2020 through ████ 2020), Victim-2 was at a restaurant in New York, NY with the defendant when she began to feel ill. (*Id.* ¶ 46). Victim- 2 believed that the defendant had drugged her, and she confronted the defendant, who denied doing so. (*Id.*).

On or about ████████ 2020, Victim-2 called 911, although Victim-2 is unable to recall the contents of the call (and records obtained by the Government corroborate that she indeed called 911). (*Id.* ¶ 47). Victim-2 recalled that when the police called back, the defendant was present, and Victim-2 told the police the call had been accidental. (*Id.*). Victim-2 recalled the defendant physically and sexually punishing Victim-2 after he learned of the call. (*Id.*).

In addition to the defendant's conduct against Victim-2 outlined above, the defendant also required Victim-2 to watch pornography of young-looking females who appeared to be asleep, unconscious, or dead; called her derogatory names such as bitch, slut, and whore; and viewed programs that degraded women in her presence (and materials found in the defendant's Google account indeed corroborate that the defendant subscribed to newsletters and media dedicated to denigrating women and instructing men on how to dominate women). (*Id.* ¶ 48).

As a result of the defendant's repeated actions against Victim-2, Victim-2 was sick nearly constantly during this period, suffering from repeated illnesses and ████████████ that required frequent doctor visits and ████████████████. (*Id.* ¶ 49). Victim-2 felt depressed, isolated, and emotionally numb. (*Id.*). The defendant repeatedly told Victim-2 she needed to be happy and should be grateful for the life he was providing. (*Id.*). Victim-2 did not

feel like she could leave and felt trapped. (*Id.*). Victim-2 believed this was her life for the foreseeable future and did not see any way out of the situation. (*Id.*).

In or about ▮▮▮▮ 2020 (*i.e.*, just a few months before the defendant met Victim-1 and traveled to Florida with her), in connection with the start of the COVID-19 pandemic, the defendant left New York, NY for the South, and Victim-2 left New York, NY to return to her family. (*Id.* ¶ 50).

In addition to the photograph of Victim-2 passed out with ejaculate on her face that the defendant took without Victim-2's permission in ▮▮▮▮▮, the defendant took other photographs of Victim-2 and kept them on his electronic devices, in which Victim-2 appears incapacitated or unconscious with a dildo inserted in her vagina. (*Id.* ¶ 51). These photographs were also taken without Victim-2's consent and appear to have been taken in the defendant's New York City residence. (*Id.*).

### 3. Victim-3

The defendant first met Victim-3 in or about October 2021, via Seeking.com, when Victim-3 was seventeen-years old, estranged from her parents, and facing severe financial hardship and housing instability. (*Id.* ¶ 52). While Victim-3 was still a minor, the defendant solicited Victim-3 to send him nude photographs of herself, which she did, and the defendant sent Victim-3 photographs of his erect penis. (*Id.*). The defendant met Victim-3 in person for the first time at a restaurant in ▮▮▮▮▮ in November 2021, about two weeks after Victim-3 turned 18 years old. (*Id.*). The defendant subsequently used Venmo to pay Victim-3 $500. (*Id.*). The defendant did not have sex with Victim-3 on this particular occasion but told Victim-3 that he was sexually interested in virgins, which Victim-3 was at the time. (*Id.*). In the days following their meeting,

the defendant texted with Victim-3 about Victim-3 visiting him in New York, NY. (*Id.*). The defendant texted Victim-3, "I want you to stay a virgin until you come up." (*Id.*).

In December 2021, the defendant purchased an airline ticket for Victim-3 to travel from ███████ to New York, NY which she did. (*Id.* ¶ 53). When Victim-3 arrived at the defendant's Central Park South apartment, the defendant made her alcoholic drinks in the kitchen out of her view and became angry when she did not finish them. (*Id.*). The defendant thereafter subjected Victim-3 to violent sexual acts, including handcuffing and restraining her on a bench apparatus, gagging and blindfolding her, inserting sex toys that caused her to bleed and cry, and using a shock device on her clitoris. (*Id.*). When Victim-3 asked to be untied, the defendant refused. (*Id.*). During that same trip, in or about December 2021, the defendant solicited Victim-3 to bring her younger sister, who was under 18 years old at the time, and other minor friends to come from the ███████ to New York and encouraged Victim-3 to recruit those minors to engage in sexual conduct with the defendant. (*Id.*).

In December 2021, the defendant used Venmo to pay Victim-3 approximately $1,000. Between Victim-3's December 2021 and October 2023 trips to New York, Victim-3 and the defendant communicated by text message. (*Id.* ¶ 54). In August 2022, the defendant sent Victim-3 a picture of himself so that Victim-3 could share the picture with her friend, who was a minor, to determine whether Victim-3's friend was interested in having a "threesome" with him and Victim-3. (*Id.*). The defendant also told Victim-3 to send him a picture of her friend, which Victim-3 did. (*Id.*). The defendant told Victim-3 that he wanted to have a threesome with Victim-3 and her friend after receiving the picture. (*Id.*).

In or about October 2023 (*i.e.*, while the defendant was still communicating with the Administrator on the Sleepy Wives Telegram chat, including informing the Administrator that he

had collected additional videos from his "encounters with passed out girls"), the defendant purchased an airline ticket for Victim-3 to travel from ███████ to New York, NY. (*Id.* ¶ 55).

During the October 2023 trip, the defendant made Victim-3 a purported Long Island Iced Tea, a beverage generally made by mixing together various types of alcohol, in the kitchen out of her view. (*Id.* ¶ 56). After drinking it, Victim-3 felt that everything was blurry, she was half asleep, and she has no memory of what happened next. Victim-3 woke up at around 1:00 p.m. the next day. (*Id.*). The defendant told Victim-3, that they had sex the night before and she liked it, but Victim-3 had no memory of having sex. (*Id.*). Victim-3 recalled feeling sore and uncomfortable with pain in her anal and vaginal areas, neck, and arms, and having vaginal tearing. (*Id.*). The defendant then provided Victim-3 with Plan B emergency contraception. (*Id.*). Victim-3 felt that she passed out for an unusually long period of time, given that under normal circumstances, she does not sleep so easily. (*Id.*).

During this October trip, the defendant transported Victim-3 to an Italian restaurant in upper Manhattan where she met an approximately 50-year-old male whom the defendant appeared to have arranged for her to meet. (*Id.* ¶ 57). Following dinner, Victim-3 accompanied this individual to what appeared to be a studio apartment upstairs from the restaurant. (*Id.*). Two males were present at the apartment, the approximately 50-year-old male and another similarly-aged male. (*Id.*). One individual directed Victim-3 to perform oral sex and instructed her to remove her clothing. (*Id.*). Victim-3 was extremely impaired and experienced sensations of disorientation and vertigo at that time. (*Id.*). Victim-3 did as she was directed. (*Id.*). After the sexual encounter ended, one individual provided cash to Victim-3 by throwing it at her. (*Id.*). Victim-3 understood that the defendant either remained present at the location or waited in the vicinity, and upon Victim-3's return to the defendant's vehicle, the defendant received the cash from her. (*Id.*). The

22

following day, Victim-3 experienced severe impairment characterized by extreme grogginess and continued cognitive difficulties. (*Id.*).

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ (*Id.* ¶ 58).

4. Victim-4

In the spring of 2021 (*i.e.*, approximately six months before the defendant first met Victim-3 and approximately one year after the defendant first met Victim-1), the defendant met another adult female individual, Victim-4, also over Seeking.com. (*Id.* ¶ 59). At the time they started communicating, Victim-4 was living in ████, where Victim-4 is from. (*Id.*).

In May 2021, the defendant paid for Victim-4 to visit him in New York, NY at his Central Park South apartment. (*Id.* ¶ 60). During this trip, the defendant and Victim-4 engaged in sexual conduct and traveled together to Newport, Rhode Island. Victim-4 returned to ████ after this trip. (*Id.*).

Victim-4 returned to New York, NY in June 2021 and stayed with the defendant for approximately one week. (*Id.* ¶ 61). On or about July ██, 2021, the defendant flew Victim-4 to Miami, FL. (*Id.*). The defendant and Victim-4 stayed in Miami, FL for several days. (*Id.*). On that trip, Victim-4 observed that the defendant was taking videos or photos of her while they were having sex, without Victim-4's permission. (*Id.*). Also on that trip, the defendant checked Victim-4's phone while she was sleeping and saw messages between Victim-4 and another man. (*Id.*). The defendant and Victim-4 had agreed to see each other exclusively, and the defendant was upset when he saw the messages between Victim-4 and the other man. (*Id.*).

On or about July ████, 2021, the defendant took photos of Victim-4 passed out and naked, without her permission. (*Id.* ¶ 62). In a video from on or about July █, 2021, Victim-4 lies on a bed, unconscious, with her underwear pulled down around her legs. (*Id.*). In photos from that date, Victim-4 appears unconscious. (*Id.*). The defendant took close-up photos of Victim-4's vagina and anus. (*Id.*). In some of the photos, the defendant's hands are visible spreading Victim-4's buttocks apart. (*Id.*). In a photo from on or about July 18, 2021, Victim-4 is naked and slumped over while sitting on a toilet. (*Id.*). In a photo taken shortly thereafter, Victim-4 is visible in a slumped position on the toilet consistent with the defendant receiving oral sex (whose arm is visible on Victim-4's back).[6] (*Id.*). The defendant stored at least some of these files in a folder called "[Victim-4 First Name] Sleep." (*Id.*).

On or about August █, 2021, the defendant and Victim-4 planned to meet the next day at the defendant's Central Park South apartment. (*Id.* ¶ 63). Victim-4 wrote to the defendant that her period had started and that "sex tomorrow was not the best idea, tgh [sic]. We can meet for chilling and talking though. Lmk what you think." (*Id.*). The defendant wrote "OK I'm fine to talk and chill." (*Id.*). The two then confirmed plans to meet on or about August █, 2021. On or about August █, 2021, Victim-4 wrote to the defendant, "Edward, yesterday is so blurry. I remember we talked and then we had sex. Or it was a dream?" (*Id.*). The defendant replied, "[i]t was my fruity cocktails. They're sneaky powerful. We definitely had sex since I had to buy new sheets today lol." (*Id.*). Victim-4 wrote, "omg I barely remember that. What I remember is that you didn't finish." (*Id.*). The defendant wrote "That's because you got up in the middle of things

---

[6] This photo, along with another photo and video of Victim-4, have been provided directly to the Court as sealed Exhibit F, G, and H.

and started getting dressed. I'll have to finish twice next time to make up for it." (*Id.*). Victim-4

responded, "coz it was way to [sic] much and much enough to loose [sic] conscience [sic]." (*Id.*).

Victim-4 did not see the defendant again after in or about October 2021. (*Id.* ¶ 64).

However, on one of the defendant's Samsung cellphones, the defendant kept an undated file in the

"Notes" section of the phone titled "[Victim-4's first name] plan." (*Id.*). The body of the notes

discuss the defendant's trip to Miami, FL with Victim-4, including that "miami start[ed] well. until

i act on my suspicions and look through her phone and discover her interactions." (*Id.*). The

defendant then contemplated the parameters of "any relationship moving forward" and his plans

to "employ scrambler technique," including "encourag[ing]" Victim-4 to be with other guys since

he had previously had "work[ed] har[d]" to ensure she was not with other guys. (*Id.*). The

defendant's notes further describe "punishments" he wanted to inflict on Victim-4, depicted below:

> revision to above: half her hooker money, complete
> sex slave to me, describes every sexual encounter, i
> control all bank accounts and anything in apt, tattoo
> with my name, clean and cook, dress as i want / nude
> etc,
>
> make her pure whore!!my revenge: turning her into a
> mindless, sex crazed, prostituted, comoletey
> dependent, sex slave whore.
>
> She's likely depressed or low self esteem or lonely or
> other issues that cause her to seek constant male
> attention, validafion, and sex. Promiscuity is her drug
> of choice.

As noted above, two years after the defendant last saw Victim-4, on or about July 15, 2023,

the defendant wrote to the Administrator of the Sleepy Wives Telegram chat that "although i don't

have more of the ███████ girl, I've got a few passed out pics of this ███████ hottie" and shared a

clothed photo of Victim-4. (*Id.* ¶ 65). The defendant said "can send if you're interested[.]" (*Id.*).

5.  Victim-5

In or about the spring of 2015 (*i.e.*, several years before the defendant met Victims-1, -2, -3, or -4), the defendant contacted an adult female individual, Victim-5, in response to an advertisement for prostitution that Victim-5 posted online. (*Id.* ¶ 66). The defendant offered to fly Victim-5 from ███████, where Victim-5 lived, to Boston, MA, where the defendant principally lived at that time, and pay Victim-5 $2,500 for two nights. (*Id.*). Victim-5 agreed, and the defendant flew Victim-5 to Boston, where the defendant engaged in sexual activity with Victim-5. (*Id.*). The defendant took photographs of Victim-5, while Victim-5 was staying at his apartment in Boston. (*Id.*). Those photographs of Victim-5 depicted Victim-5 drinking what appeared to be alcoholic drinks, as well as photographs of Victim-5 naked in sexual positions. (*Id.*). In some of the photos, Victim-5 had a cut/sore on her face and bruises/marks on her legs. (*Id.*). Victim-5 was addicted to certain drugs at the time but has memory loss regarding the events of that weekend beyond the more typical memory loss that she experienced as a result of her addiction. (*Id.*).

In or about 2017 or 2018, the defendant created a spreadsheet titled "girl retrospective" and indicated that he planned to contact Victim-5 in 2018. (*Id.* ¶ 67). On the sheet "2018 Contact Plan" with respect to Victim-5, he wrote "DONE." (*Id.*). The defendant created a separate document titled [Victim-5 First Name] 2018 Plan" that included a plan for contacting Victim-5 and taking her on a trip. (*Id.*). Under "Prep" he wrote "Alcohol and drink kit: DRUGS!! 4 capsules full of dissolved k [*i.e.*, Klonopin] 2mg." (*Id.*). The document also included plans for certain days on the trip, with notes such as, "I make her drugged cocktails (let's relax and celebrate you getting here)," "AFTER DINNER: I make her drugged cocktails, while we chill", and "When laying in bed, ensuring she's drugged, ask about other porn work she's done." (*Id.*). In his planned email

26

to Victim-5, he wrote "For our get-together, I'll plan to fly you in like last time. To NYC this time. I assume you'll be flying out of ███████ . . . We'll do everything similar to last time[.]" (*Id.*).

### 6. Victim-6

Based on metadata from files found on the defendant's electronic devices, in or about February 2015 (*i.e.*, a few months before the defendant met Victim-5), the defendant took photographs of another adult female individual, Victim-6, nude, drinking what appeared to be alcoholic drinks, and in sexual positions, including bondage positions and hanging from a device. (*Id.* ¶ 68). The defendant also took photos of Victim-6's anus and vagina, as well as photos of Victim-6 with what appeared to be his ejaculate on her face and breasts. (*Id.*).

The defendant created and kept a document called "[Victim-6 Full Name] plan" on his electronic devices. (*Id.* ¶ 69). In that document, which appeared to be plans for a weekend, the defendant wrote that he needed, among other things "drug (2 batches)" and "high proof alcohol." (*Id.*). The document also planned out actions with respect to Victim-6, including "3:30ish – Drugged li iced tea while I set up and put on armor and music, short chat." (*Id.*). Other plans included "give shots and fuck" and "plug ambien before bed." (*Id.*).

### 7. Other Victims or Planned Victims

Between at least in or about 2015 and at least in or about June 2024, the defendant planned to drug, attempted to drug, and/or drugged additional women with the intent to incapacitate them and/or render them unable to consent to sexual activity. He engaged in sexual activity with these

27

women, and, in at least some cases, surreptitiously took videos or photographs of that sexual activity. (*Id.* ¶ 70).

For example, in a note from his electronic device from 2023, the defendant wrote what appears to be a packing list for an upcoming trip that included "canned cocktails, klon [*i.e.*, Klonopin], cutter, case[.]" (*Id.* ¶ 71). A portion of the note is found below.

| Time | Note |
|---|---|
| Created:<br>7/5/2023<br>7:45:33 AM(UTC-4)<br>Modified:<br>11/23/2023<br>3:37:47 PM(UTC-5) | Title:<br>Source: Samsung Notes<br>Labels:<br>Body: bills<br>laundry<br>plan ███<br>ou game<br>caipirina<br>tattoo<br>work<br><br>canada pack<br>caip (cachaca, limes, sugar, teaspoon, muddler, shaker)<br>canned cocktails<br>klon, cutter, case<br>red pills, ruglet<br>toys (plug, remote vibe, gag, pussy lube, anal lube, anal numbing, open plug, spanker, 2 ropes, leather cuffs, blindfold, tattoos)<br>condoms, wipes<br><br>3 dress shirts<br><br>two dress white shirts<br>dress blue shirt<br>three casual long sleeve<br>three sweaters<br>big umbrella<br>fall jacket<br>shorts and tshirt, sweats<br>belt<br>6 underwear<br>6 nice socks, including polo<br>1 sport sock<br>shirt stays<br>shoes: blue casual, black dress, brown dress, tennis<br><br>deodorant<br>toothpaste<br>brush<br>floss<br>razor<br>shaving cream<br>clippers |

In another note, from 2024 and titled "miami with [woman's name]," the defendant made plans for a trip to Miami, FL that included "klon (fri night)." (*Id.* ¶ 72). A portion of the note is below.

| Created:<br>4/21/2024<br>6:09:37 PM(UTC-4)<br>Modified:<br>5/2/2024<br>7:37:21 PM(UTC-4) | Title: miami with ▮▮▮▮▮<br>Source: Samsung Notes<br>Labels:<br>Body: house inspeqctipn<br>work<br>sprinklers<br>full miami plan<br><br>cadillac (mentioned) - beach access and activities<br>the palms - beach access but doesn't look as good as cadillac<br>boulan - close to w, beach access, appear more adult than others<br>nautilus sonesta (highly rated) - looks a little corporatey<br>national hotel (mentioned) - beach access, adults only, super long infiniti pool, looks good<br>betsy (9.2) - very adult and civilized. beach access althouy have to cross ocean drive<br>pelican (9.2) -no<br>victor (mentioned) - not so fancy<br><br>meet at airport, bring work<br>arrive, get bag, get rental, drive to betsy<br>check in, will be around midnight<br>f<br>change g into night outfit 1 (maybe two piece)<br>mini bar crawl (look up. maybe she does two)<br>back and sleep<br><br>virginia key?<br>haulover<br>jetcar<br>liv or eleven or dare<br>hard rock casino<br>scarletts<br>restaurant<br>w south beach<br>fisting lube<br>lush - wear to scarletts<br>carry over shoulders while she blow me upside down<br>sex pillow<br>eroscillao<br>domi clone<br>klon (fri night)<br>pussy pump<br>cocktails for the car rental ride<br>plugs<br>blow up plug<br>rope for tying legs<br>cuffs<br>panties gag |

C. **Obstruction of Justice**

After federal agents executed the June 2024 Warrant at the defendant's Central Park South apartment, making the defendant aware that he was under investigation for child pornography crimes, the defendant searched the internet for phrases related to blaming others for the presence of child pornography on his electronic devices, including "child porn defense others had access to computer," "child porn defense shared access," "how to prove unintentional possession," and "child porn shared devices." (*Id.* ¶ 73).  He also searched "how to subtly imply bribe" and visited a website forum for "[h]ow to offer bribe indirectly." (*Id.*).

Around the time of these searches, the defendant contacted Victim-1 and informed Victim-1 that he was potentially facing child pornography charges. (*Id.* ¶ 74).  The defendant also told Victim-1 that during the time between their trip to Florida in 2020 through the time they reconnected in April 2023, the defendant had met a ▮▮▮▮ woman on Seeking.com who stayed with him for a while. (*Id.*).  The defendant stated that the ▮▮▮▮ woman must have downloaded the child pornography because she had access to his devices. (*Id.*).  The defendant then asked Victim-1 if she would sign a letter on his behalf, for which the defendant would pay her an amount of money greater than he had paid her for their prior sexual encounters. (*Id.*).

On or about August 13, 2024, the defendant emailed Victim-1 a letter that the defendant had written, and Victim-1 then signed it.  Specifically, the defendant emailed "[Victim-1], here's the support statement I show you last night in paragraph form. Let me know you're good with it. Thank you so much for doing this!" (*Id.*).  The letter, which was attached to the email, stated:

> I have known Edward Smith since 2020. I have often stayed at his residence, or traveled together, for short or extended periods. During these times, I have had free access to his residence and specifically his computing devices during these stays. I have also occasionally viewed and/or downloaded adult material on his computer.
>
> I am happy to attest to his trusting character and other positive traits.

30

(*Id.*).

The next day, August 14, 2024, the defendant used Venmo to pay Victim-1 $2,500, with the false note "legal advice."  (*Id.* ¶ 76).  On August 15, 2024, the defendant sent Victim-1 an additional payment of $1,000 for alleged "legal advice." (*Id.*).  On August 18, 2024, the defendant sent Victim-1 another payment of $1,000, and on August 22, 2024, the defendant paid Victim-1 another $500 via Zelle. (*Id.*).

Victim-1 is not a lawyer and did not provide "legal advice" to the defendant. (*Id.* ¶ 77).  In addition, Victim-1 never downloaded pornography to the defendant's devices; did not have free access to the defendant's devices; had no knowledge of the passwords to the defendant's devices; and did not have free access to the defendant's apartment. (*Id.*).  Nor was Victim-1 ever alone in the defendant's apartment. (*Id.*).  The one occasion in which Victim-1 viewed adult pornography with the defendant was in Florida in 2020. (*Id.*).  During this time, Vicitm-1 told the defendant that it made her uncomfortable. (*Id.*).  In short, the letter was replete with falsehoods.

On September 13, 2024, the defendant informed Victim-1 of his arrest on federal charges via text message. (*Id.* ¶ 78).  He also told Victim-1 that his lawyer would call Victim-1 "at some point and explain," but the defendant directed Victim-1, "Don't tell him I told you anything because I'm not supposed to contact any potential defense witnesses for the time being[.] And please delete these messages from your chat! Just wanted you to be aware[.]" (*Id.*).

On December 19, 2024, the defendant messaged Victim-1 from a new number. (*Id.* ¶ 79). The defendant wrote, "[h]i, it's Edward. This is my new number for now. We figured out a way to fight the case without needing your statement so I'm officially free to talk to you again :)" (*Id.*).

On January 8, 2025, after the defendant was first indicted in this case and the Government sought his remand, the defendant messaged Victim-1 again. (*Id.* ¶ 80).  He wrote, "Well they

decided to put me in jail sadly." (*Id.*). He then provided his then-lawyer's contact information and wrote, "Also may be good to delete these messages eventually, just in case. Kisses[.]" (*Id.*).

In addition to soliciting and paying for the false letter from Victim-1, the defendant also solicited false letters from at least two other female individuals with whom the defendant had sexual relations. (*Id.* ¶ 81). The defendant contacted one of these individuals ("Individual-1") while he was in custody at the Metropolitan Detention Center ("MDC"). (*Id.*). The defendant wrote, "[t]rust me that I think things are headed in a good direction..... Will still be very hard though. My lawyers should eventually reach out with ways you can help regarding statements on certain things, character references, etc (let's not discuss here)." (*Id.*).

On August 13, 2024, the defendant contacted another individual ("Individual-2"), writing, "Hi, here's the statement of support we were discussing. Let me know that you're ok with it. Thank you for doing this!" and attaching a similar statement to the one he sent to Individual-1. (*Id.* ¶ 82). A week prior, on August 5, 2024, the defendant paid Individual-2 $1,000 by Zelle with the false note "Legal advice." (*Id.*).

The defendant also asked another individual ("Individual-3") to make similar statements, which Individual-3 has stated to the Government were also false. (*Id.* ¶ 83).

### D. Additional Relevant Conduct

Between at least in or about 2005 and at least in or about 2008, the defendant communicated with minors whom he met online about entering into sexual arrangements with him. (*Id.* ¶ 84). During this time period, the defendant also used a fictious email address in the name of a woman to solicit (a) stories involving the sexual abuse of minors, and (b) experiences with drugging and raping women. (*Id.*).

In May 2005, the defendant used a fictitious email address in the name of a woman, "Cindy," to post on Craigslist, soliciting stories about rape and "family experiences." (*Id.* ¶ 85;

*see also* Exhibit I).    An individual who claimed to be a 32-year-old man responded to the defendant's post and shared stories with the defendant about that individual's sexual abuse of a six-year-old girl. (*Id.*). The defendant, pretending to be "Cindy," responded stating that she had sexual experiences with two cousins when she was 12 years old, as well as her brother who was 10 years older.[7] (*Id.*). The defendant, pretending to be "Cindy," explained in detail her purported sexual experiences with her older brother, stating that it began when "Cindy" was eight-years old and describing having oral, vaginal, and anal sex with "Cindy's" brother, which "Cindy" purportedly enjoyed. (*Id.*).

In May 2005, the defendant used the same fictitious email address in the name of "Cindy" to correspond with another individual, who claimed to be a "white male" named ████, about ████'s sexual abuse of his daughter, when his daughter was thirteen-years old. (*Id.* ¶ 86; *see also* Exhibit J). The defendant, pretending to be "Cindy," responded to ████ with stories about having "sexual relations with [her brother who] was also older, kinda like another parent,"[8] and stating that "Cindy" "never had more comforting, loving, and pleasurable sex" and stating that ████'s stories about his daughter made "Cindy" "turned on" and that "Cindy" "want[ed] to hear mroe [sic]." (*Id.*).

In September 2005, the defendant used the same fictitious email address in the name of "Cindy" to correspond with individuals who answered a post that the defendant, posing as "Cindy," made on Craigslist soliciting experiences with drugging and raping a girl. (*Id.* ¶ 87). The defendant received varying responses. (*Id.*). One person responded that a girl he dated had

---

[7] ████████████████████████████████████████

[8] ████████████████████████████████████████
████████████████████████████████

33

such a fantasy, so he drugged her but was not interested in sexual conduct with her after that, so he arranged her bed as if they had sex and told her that they had sex. (*Id.*). The defendant, as "Cindy" responded, "Thanks for the reply. That's what I would have thought – why would it be exciting to screw an unconscious girl? Funny though, she had that fantasy. I'm not sure how she could enjoy something she couldn't remember. I'm curious – how did you drug her?" The other person informed the defendant, *i.e.*, "Cindy," that he had used Rohypnol, which he obtained from a neighbor. (*Id.*). The defendant, as "Cindy," responded, "yeah I had heard of that drug in college but didn't know if it was real or just hype to scare all the girls! I guess your neighbor has some good connections. thanks for replying to me." (*Id.*).

In another email exchange, the defendant received a response to his Craigslist post from an individual who wrote "I haven't never [sic] done this, just curious is this a fantasy of yours? I could help you out!" (*Id.* ¶ 88). The defendant, still posing as "Cindy," wrote, "Maybe, I'm not entirely sure. I'm more just curious right now. What would you use to drug the girl? And what would you want to do to her?" The individual responded, "I have never. I have some ideas. Nothing more than what she wants. It would be her fantasy what she would say would go." (*Id.*).

In April 2008, the defendant corresponded over email with a seventeen-year-old girl ("Minor-1"), who responded to an online ad that the defendant had posted. (*Id.* ¶ 89). Using the email address, "newyorkfinancier@gmail.com" and describing himself as a "32yo finance professional, fit and good-looking . . ., well-educated," the defendant discussed with Minor-1 an arrangement whereby Minor-1 would live in the defendant's "upscale condo in the heart of Manhattan" and have all of her expenses taken care of, including "food, shopping, clothing, etc." and Minor-1 "wouldn't have to worry about having a job. (*Id.*). "In return," the defendant explained, he would "expect two things . . . 1) for you to use your time in NY to be serious about

34

improving yourself – eg, pursuing studies, or a career field (such as modeling); 2) your complete

obedience, both in and out of the bedroom." (*Id.*). The defendant further explained, "As I

mentioned in the ad, I would want to use the time we had together to expand your sexual horizons,"

including by working on "specific bedroom skills (eg, deep throating)." (*Id.*). After exchanging

a few additional emails and photographs of themselves, the defendant suggested they move their

chat to a different platform and proposed specific flights for Minor-1, so that she could travel from

███████ to New York, NY to spend a few days with the defendant. (*Id.*).

In April 2008, the defendant corresponded over email with a fifteen-year-old girl ("Minor-

2"), who responded to an online ad that the defendant had posted. (*Id.* ¶ 90). Also using the email

address "newyorkfinancier@gmail.com," the defendant sent Minor-2 an email that was nearly

identical to the email he sent Minor-1 about the terms of an arrangement whereby Minor-2 would

live with the defendant in exchange for sex. (*Id.*). The defendant and Minor-2 then exchanged

many detailed emails about the logistical hurdles of obtaining a visa for Minor-2 to come to New

York from her home in the ███████████ and the complications that would be posed because

Minor-2 was "underage." (*Id.*). The defendant wrote to Minor-2,

> I don't relish the thought of your parents and possibly law
> enforcement out there trying to track you down. That was never a
> situation I thought of when I put the ad up. The only way I could
> imagine that would work is if you were truly willing to make a clean
> break from your home life, with minimal (anonymized) contact with
> family and friends.

(Ex. K at 3-4). The two continued to email about the possible arrangement and eventually, the

defendant emailed Minor-2 saying, "I'm afraid I scared you off a bit with some of my direct sex-

related questioning in our last chat, so sorry for that. But we'll have to be comfortable talking about

things and more if we're to make this work down the road. Let's talk again soon. -e" (*Id.* at 1).

35

In and around July 2008, the defendant used his fictitious email address in the name of "Cindy" to contact multiple female individuals who had posted advertisements on Craigslist indicating they were planning to run away from home. (*Id.* ¶ 91). Using the "Cindy" persona, the defendant directed these individuals to contact a separate email account that the defendant also controlled. (*Id.*).

In addition to a large volume of child pornography (in various forms, and with children of various ages, including infants), a number of images and videos depicting graphic violence or degrading conduct were also discovered on the defendant's electronic devices and/or Google account, including: thousands of videos of adult women who appear to be passed out being sexually abused; a photo of a naked woman hanging from a noose; a photo of a woman passed out on a floor covered in feces; videos of women engaging in sexual conduct with animals; a photo of a naked woman with an open head wound surrounded by blood, who appears to be deceased; a photo of a woman with a plastic bag tied around her head; and a video of a woman lying on the floor while her head was being sawed off. (*Id.* ¶ 92).

### III.    The Defendant's Purported Expert Report

The defendant's request for a downward variance in his sentencing submission is, at bottom, grounded in a single argument—that, according to a purported expert retained by the defendant in connection with sentencing, Jonathan DeRight, the defendant has autism and that autism prevented him from understanding that he was inflicting harm on any person at any time. (*See* Def. Sub., Ex. B (Forensic Neuropsychological Evaluation of Jonathan DeRight) ("DeRight Report")). The DeRight Report relies on tests administered by other practitioners, including Laurie Sperry—whom the Court precluded from providing expert testimony in this case on two separate occasions, *see United States v. Smith*, No. 25 Cr. 4 (PAE), 806 F. Supp. 3d 382 (S.D.N.Y. 2025)

36

(*Sperry Op. I*); *United States v. Smith*, No. 25 Cr. 4 (PAE), 2026 WL 122337 (S.D.N.Y. Jan. 16, 2026) (*Sperry Op. II*)—and Tyler Whitney, who administered tests that Dr. Sperry relied on in connection with her precluded reports. (DeRight Report at 2). It also relies on interviews of the defendant, the defendant's wife, father, aunt, and brother-in-law conducted by Dr. Sperry, as well as Dr. DeRight's own clinical interview of the defendant and administration of the Adult Asperger's Assessment interview. (*Id.*). The only condition the defendant was allegedly tested for was autism. And notably, while Dr. DeRight purports to find that the defendant is not a psychopath, he expressly states that the defendant was *not* tested for psychopathy. (*Id.* at 30). The defendant also declined the Probation Office's request to conduct an independent psychosexual evaluation, and no such analysis was performed by Dr. DeRight. (*See* PSR ¶ 161). The defendant, in short, asks this Court to adopt the proffered views of his retained expert, after having prevented the Probation Office from conducting an independent evaluation.

Dr. DeRight's report provides a summary of autism spectrum disorder (*id.* at 4-7), the defendant's background (*id.* at 8-10), descriptions of different tests that may be performed on individuals to test for autism (*id.* at 11-16), a section titled "Defendant's Account of the Instant Offense" (*id.* at 18-19), a purported risk assessment (*id.* at 19-21), an analysis of the defendant's history in the context of autism spectrum disorder (*id.* at 21-25), a section on Dr. DeRight's findings and the psychological testing performed on the defendant (*id.* at 25-29), and a section titled "Formulation," which consists of Dr. DeRight's conclusions regarding how the defendant's purported autism affected the offense conduct, Dr. DeRight's assessment of the defendant's risk of reoffending, and Dr. DeRight's recommendations (*id.* at 29-34).

In describing the defendant's background, Dr. DeRight states that the defendant's "childhood was characterized by isolation and difficulty connecting with peers" and that the

37

defendant suffered from "exclusion and bullying" from neighborhood children and classmates on account of his perceived "difference." (*Id.* at 8). Dr. DeRight further states that the defendant's "close friendships throughout childhood, adolescence, and into adulthood remained few in number," and that the defendant's "time at Harvard was [socially] sparce" because "he maintained only a few friendships grounded in shared intellectual interests and felt no desire for broader institutional life." (*Id.* at 8, 9). Dr. DeRight also states that the defendant self-reported that he has "no desire to socialize beyond what circumstance required," "found casual socializing and 'small talk' pointless and exhausting," and "describes his professional persona as a result of deliberate, fatiguing effort—using social scripts and forced eye contact to meet social expectation." (*Id.* at 8, 9). Dr. DeRight relatedly states that the defendant—a man who has been married for over a decade with many additional long-term intimate and romantic partners—nevertheless "describes having had no capacity to pursue romantic relationships through conventional social means and having been entirely reliant on explicit, written communication and structured arrangements throughout his adult intimate life." (*Id.* at 9).

The part of Dr. DeRight's report that addresses the "Defendant's Account of the Instant Offense," states, without analysis, that the defendant stated that "he did not at the time perceive the administration of [Klonopin] as harmful," but that he "now recognizes this is a profound failure of moral reasoning and human empathy." (*Id.* at 18). In the same section, Dr. DeRight repeats the defendant's claim that "[t]hroughout his adult life he relied almost exclusively on explicit written communication and pre-negotiated structured arrangements to initiate and maintain intimate contact, having never developed the capacity for the social inference and nonverbal reciprocity that conventional relationships require." (*Id.*). While professing that the defendant accepts responsibility for all of his crimes, Dr. DeRight reports that the defendant "states that

38

across much of this conduct"—although apparently not all—"he did not at the time believe he was causing harm." (*Id.* at 19). Dr. DeRight appears to accept this self-report as true, without engaging in any analysis of what the defendant actually did.

In seeking to contextualize the defendant's background in the context of his purported autism diagnosis, Dr. DeRight states (without citing any specific interviews of the defendant's family members that he may be referencing) that the defendant's "family described" the defendant as a child of "extraordinary intellectual gifts who . . . was excluded and bullied by peers who sensed his difference, who preferred solitary rule-governed activities to imaginative or reciprocal play, and who navigated social environments through deliberate effortful performance rather than natural participation," (*id.* at 22), explaining that these alleged family "observations"—which the report does not seek to substantiate—reflect the "early developmental signature of ASD." (*Id.*). Dr. DeRight also states that the defendant's "employer performance evaluations, generated independently across multiple institutions over more than two decades, document" the defendant as someone whose "exceptional technical performance" was "paired with persistent, effortful, and ultimately limited navigation of the relational and organizational dimensions of professional life." (*Id.*). Dr. DeRight further states that the defendant reported that "he has never found reading nonverbal cues or social intent to be natural or reliable, and that he has spent his professional life learning and applying explicit scripts and behavioral rules to compensate for what he cannot perceive intuitively." (*Id.* at 23).

In seeking to explain how the defendant's purported autism diagnosis maps on to the defendant's criminal conduct, Dr. DeRight again references the defendant's self-reporting that the defendant supposedly understood his "interactions in terms of explicit agreements and surface-level consent while remaining unable to perceive the emotional experience of the person in front

of him, what she was actually feeling, whether she was experiencing distress, and what the structural features of the arrangement meant for the authenticity of her participation." (*Id.*). Dr. DeRight does not appear to attempt to reconcile this self-report with what the defendant said when pleading guilty, or what the defendant said and did in planning and committing his crimes for years (including the steps the defendant took to cover up what he was doing).

As for the child pornography offenses, Dr. DeRight states that the defendant's purported "social naivite and literal thinking, while applicable in some ASD-related CSAM cases, cannot be applied in straightforward terms here given the volume, organization, and decade-long span of the material recovered, as well as Mr. Smith's statements to law enforcement."  (*Id.* at 25). Nonetheless, Dr. DeRight professes to observe that "individuals with ASD may engage with and accumulate material in categories that reflect compulsive interest patterns rather than primary sexual motivation." (*Id.*).  Dr. DeRight does not comment on how the extensive evidence in this case demonstrating the defendant's sexual interest in children—including searching for, downloading, and organizing such materials for years—may or may not indicate that the defendant's collection of CSAM derived from a sexual motivation as opposed to the defendant's so-called "collecting behavior." (*See id.*).

In the section of the report labeled "Findings," Dr. DeRight states that the defendant made "poor" eye contact during their virtual interview and that "direct eye contact does not come naturally to him" but that "he has learned to approximate it in professional settings through deliberate effort." (*Id.* at 26).  Dr. DeRight also notes the defendant's "brief, affect-neutral statements." (*Id.*).  Dr. DeRight concludes that the defendant's "presentation throughout the evaluation was consistent across all phases of the interview and did not vary in ways suggestive of impression management or deliberate misrepresentation." (*Id.*).  Dr. DeRight further states that

40

the defendant's "account of his history was largely consistent with collateral sources where those sources were available for comparison, and he did not minimize the offense conduct or attempt to redirect responsibility onto others." As discussed further below, however, Dr. DeRight does not explain how he reached the conclusion that the defendant's self-reporting was consistent with "collateral sources" notwithstanding the many material inconsistencies in the defendant's self-reporting and the notes from Dr. Sperry's interviews of the defendant's family, which it appears were the *only* "collateral sources" that Dr. DeRight apparently relied on or reviewed. (*See id.* at 2). Nor does Dr. DeRight explain why these were the only sources relied upon or reviewed.

In the report's "Findings" section, Dr. DeRight states yet again that the defendant reported finding "small talk" as "difficult and pointless" and "casual conversation" as "a task to be executed rather than an experience to be enjoyed." (*Id.* at 28). Dr. DeRight then asserts that the "most clinically striking findings in" what is termed "the evaluation"—yet appears to be no more than regurgitating what the defendant said—was the defendant's "impairments in imagination," noting that the defendant "reported no interest in generating fictional content across his lifespan and described finding such activities unrewarding and unnatural." (*Id.*). Dr. DeRight apparently made no effort whatsoever to corroborate this "most clinically striking" finding, again relying exclusively on the defendant's self-reporting—and as explained below, there is overwhelming evidence that the defendant's self-reporting is a lie. Dr. DeRight also does not address whether the defendant's claim that he has no interest in imagination or fiction indicates that the defendant genuinely intended to execute all of what he wrote in his computer and Gmail notes regarding how he would torture and punish his victims. (*See* PSR ¶¶ 38, 64, 67, 69).

Finally, in the "Formulation" section of the report, which contains Dr. DeRight's asserted conclusions, Dr. DeRight describes in some detail why he has concluded that the defendant is

42

solely autistic, as opposed to psychopathic (or simply someone who chose his own sexual gratification over the safety, dignity, and humanity of others, for years). (*Id.* at 30). First, he states that a psychopath "sees another person's distress and chooses not to respond," while an autistic person "frequently does not register that distress in the first place." (*Id.*). Then, he opines that the defendant must be autistic, not psychopathic, because the defendant purportedly "does not present with grandiosity, pathological lying, or manipulative interpersonal style," and his "behavior prior to the instant offense"—*i.e.*, offenses that date back more than ten years, includes relevant conduct dating back nearly twenty years, and comprises repeated, serial rapes and the infliction of psychological and emotional abuse on numerous victims—supposedly "reflects no pattern of predatory exploitation across domains of his life outside the specific context documented in these proceedings." (*Id.*). This asserted conclusion does not withstand even the most cursory examination. Perhaps there might be a case in which a single, aberrant, fleeting criminal offense might fit the report's conclusion. This is obviously not such a case.

Dr. DeRight's report also makes no effort to reconcile any inconsistencies between the defendant's self-reporting and the other materials that Dr. DeRight purportedly consulted in preparing his report. For instance, Dr. DeRight notes on several occasions that multiple employers of the defendant over the course of multiple decades (*i.e.*, not just Citibank) described the defendant as excellent at technical work but limited in relationship skills. (*See id.* at 9, 22). Dr. DeRight does not, however, explain how he supposedly knows (other than from the defendant's own self-reporting) that *multiple* employers across *multiple* decades have found this to be true, as Dr. DeRight appears to have only reviewed the defendant's performance evaluations from one institution (Citibank) over a three-year period. (*Id.* at 2). Dr. DeRight also notes that the defendant's family's observations about the defendant were consistent with self-reporting that the

defendant's "childhood was characterized by isolation and difficulty connecting with peers" and that the defendant suffered from "exclusion and bullying" from neighborhood children and classmates on account of his perceived "difference." (*Id.* at 8, 22). But Dr. Sperry's notes from her interview with the defendant's father and aunt (attached as Exhibit L) repeatedly state that they described the defendant as a "reserved" child and "matter of fact" but one who was "outgoing w/ people he felt comfortable w/". (*See id.* at 8, 9, 10, 15). Nowhere in Dr. Sperry's interview notes is it reflected that the defendant's family members described him as a loner who was unable to read human emotion. Moreover, Dr. Sperry's interview with the defendant's brother-in-law (attached as Exhibit M), who knew the defendant during his teens, reflects that the defendant was "slower" in terms of "picking up social cues" but that "people didn't make fun of him" and that ultimately, he was "[e]ndearing." (*Id.* at 1, 2). Dr. DeRight just ignores these statements.

Dr. DeRight's report also does not even attempt to deal with the many inconsistencies between the defendant's self-reporting to Dr. DeRight and what the defendant told the expert retained by the Government, Miranda Rosenberg, who interviewed the defendant in prior proceedings in this case and authored a report rebutting the findings of Dr. Sperry (and, as discussed below, has updated that rebuttal report, attached as Exhibit N, with an addendum, attached as Exhibit O in connection with sentencing and in response to Dr. DeRight's report). Indeed, Dr. DeRight apparently did not even review Dr. Miranda Rosenberg's initial rebuttal report. That report, however, indicates that the defendant (1) "described positive and stable social functioning throughout childhood," (2) "reported that he maintained close relationships with extended family and reported a small but consistent circle of friends across developmental stages, including several with whom he remains in contact," (3) "enjoyed a range of shared activities with peers and participated in organized football through middle school and the early years of high

43

school," (4) "denied any history of bullying, social rejection, or difficulty forming or maintaining friendships," and (5) "reported that neither family members nor teachers ever raised concerns regarding his social skills." (Ex. N at 4-5). Dr. Rosenberg (in contrast to Dr. DeRight) also spoke with the defendant's father and aunt, who both "reported no concerns regarding [the defendant's] developmental, social, or emotional functioning during childhood." (*Id.* at 5).

Notwithstanding Dr. DeRight's repeated references to the purported written and explicit agreements the defendant said he had entered into with victims and that supposedly led him to a misguided understanding of their relationship dynamics and the absence of consent, Dr. DeRight also does not discuss the fact that there is no evidence in any form, from any time, that any such written or explicit agreements ever existed (beyond the one agreement with respect to Victim-2, which Victim-2 notably refused to sign). Dr. DeRight also did not review any of the email correspondence the defendant has exchanged with friends and family since he has been detained at the MDC. In those emails, a sample of which are attached as Exhibit P, the defendant describes his day-to-day interactions with fellow inmates, banters about his commissary scheme with the "Russian crew" (discussed further below), boasts about how he has ascended to the "top tier" of his prison unit, makes frequent inside jokes, uses pet names, and fondly recollects the sports cars he used to own. These emails make a mockery of the defendant's claimed aversion to small talk. These emails are essentially nothing but small talk. But Dr. DeRight did not consider them, or anything else inconsistent with his defendant-favoring conclusion. Instead, he simply regurgitated the defendant's demonstrably false, made-for-sentencing assertion that, for all his life, he found "small talk" "difficult and pointless" and "casual conversation" as "a task to be executed rather than an experience to be enjoyed." (*Id.* at 28). To be sure, even if the defendant found small talk

44

"difficult and pointless," he would not deserve a lower sentence—but it is plain that the defendant is absolutely capable of, and indeed, enjoys, small talk.

What is more, Dr. DeRight does not appear to be aware of the defendant's article in the *Harvard Crimson*, discussed above, in which the defendant described in great detail the harms that he perceives result to women who are victims of acquaintance rape (*see* Ex. A at 1, 2 ("There is something particularly traumatic about being raped by someone a victim knows and had even liked or trusted. The right to say no to sex is a human right, a basic right of control over one's body.")), and laments perpetrators' refusal to take responsibility for their action and instead engage in blame-the-victim excuse making (*see* Ex. A at 2 ("But for too many men, it's a right mitigated by circumstances, by how well the two know each other, by how much they've had to drink, by just how much "fooling around" has already occurred.").  Dr. DeRight therefore offers no explanation of how the defendant's statements regarding his supposed inability to understand emotion or the harm he perpetrated on his victims can be reconciled with the defendant's own words.

In short, Dr. DeRight's report, among other things, relies almost exclusively on the defendant's own post-crimes self-interested self-reporting and fails to address the overwhelming record that seriously undermines, and often outright conflicts, with this self-reporting.  His report, in short, has minimal value, *at best*.

## IV.    Dr. Rosenberg's Report

As noted above, the Government retained its own expert, Miranda Rosenberg, to analyze Dr. DeRight's report, as well as the risk assessment performed by Shauna Keller, who was also retained by the defense and is part of the same practice as Dr. DeRight.  The Government previously retained Dr. Rosenberg to evaluate the defendant and his claimed diagnosis of autism spectrum disorder, in light of Dr. Sperry's purported expert report.  In connection with sentencing,

Dr. Rosenberg has authored a supplemental report, which casts considerable doubt on Dr. DeRight's methodology and the conclusions set forth in his report.  (*See* Ex. O at 1-7).  Dr. Rosenberg also provides context to understanding Dr. Keller's report and the significant limitations of the Static-99R test administered by Dr. Keller.  (*Id.* at 7-8).

To start, Dr. Rosenberg explains that while the tests administered by the defendant's prior experts (Dr. Sperry and Dr. Whitney), upon which Dr. DeRight relies, may be appropriate in certain settings, in particular, routine clinical settings where the primary goal is diagnosis and treatment, such tests are not appropriate in the context of a forensic evaluation, where subjects may have incentives to distort symptom presentation.  (*Id.* at 2).[9]  This problem is compounded, Dr. Rosenberg explains, because Dr. DeRight's developmental history of the defendant "relied heavily upon retrospective self-report and collateral interviews conducted after the initiation of legal proceedings rather than contemporaneous developmental records."  (*Id.*).  Dr. Rosenberg also notes that Dr. DeRight's report is further called into question because he did not reconcile inconsistencies in the results of the independent evaluation that Dr. Rosenberg performed on the defendant, as well as similar inconsistencies across collateral sources, including interviews with the defendant's family members.  (*Id.* at 3).

Dr. Rosenberg also explains that Dr. DeRight's report does not sufficiently explain how the defendant's purported deficits in "theory of mind, cognitive empathy, perspective-taking, and

---

[9] This phenomenon—presenting as impaired for the purposes of a forensic evaluation while functioning with social fluency when an individual believes they are unobserved—is not uncommon.  *Cf. United States v. Gigante*, 982 F. Supp. 140, 152 (E.D.N.Y. 1997) ("Law enforcement witnesses who had watched Mr. Gigante on the street, in his club, and at his home, reported that he changed his behavior depending upon whether or not he was in public, or believed he was being watched . . . . [W]hen defendant thought he was 'behind closed doors' he was observed as savvy, interacting normally with natural family members, friends, and criminal associates . . .[and] exercised meticulous and detailed control of the day-to-day operations of a huge criminal enterprise."), *aff'd*, 166 F.3d 75 (2d Cir. 1999).

cognitive rigidity . . . account for numerous aspects of the offenses that required sustained planning, deception, manipulation, concealment, anticipation of consequences, and adaptation over an extended period." (*Id.* at 4). As Dr. Rosenberg observes, much of the relevant conduct, for example, "purchasing controlled substances, calculating drug dosages, planning to install spyware and hidden cameras, covertly recording victims, maintaining detailed planning documents, obtaining and organizing child sexual abuse material over several years, and engaging in obstruction of a federal investigation[,] involved psychological processes that extend beyond deficits in social reciprocity or perspective-taking." (*Id.*). Moreover, many of these behaviors, including "maintaining detailed planning documents and engaging in efforts to conceal the conduct from victims[,] reflects an awareness of the consequences of discovery and the ability to modify behavior accordingly," which are some of the very capacities that Dr. DeRight's report suggests are significantly impaired on account of the defendant's purported autism. (*Id.*).

Dr. Rosenberg also discusses Dr. DeRight's failure to consider alternative explanations for the defendant's conduct, instead adopting a "singular framework of autism spectrum disorder." (*Id.* at 5-6). In particular, Dr. DeRight gave "comparatively little consideration to other clinically plausible explanations, including compulsive sexual behavior, hypersexuality, paraphilic interests, personality pathology, or psychopathic traits," which Dr. Rosenberg finds a "significant omission" particularly because Dr. DeRight's opinions ultimately concern "the psychological motivation underlying sexual offending." (*Id.* at 6). Dr. Rosenberg also notes that no psychosexual evaluation was performed on the defendant, notwithstanding the fact that the defendant's conduct and history—which Dr. Rosenberg lays out in detail—would be "clinically relevant" to a possible diagnosis of paraphilic disorder. (*Id.* at 6). Moreover, as Dr. Rosenberg explains, even assuming that the defendant does meet diagnostic criteria for autism spectrum disorder, "that diagnosis

47

would not, in itself, establish that autism spectrum disorder was the primary psychological mechanism underlying the offense conduct. Autism spectrum disorder and other psychological conditions or behavioral patterns relevant to sexual offending are not mutually exclusive." (*Id.*).

Finally, Dr. Rosenberg addresses Dr. Keller's risk assessment, which is "limited to a single actuarial estimate derived from static historical factors," *i.e.*, the Static-99R analysis, even though Dr. Keller expressly acknowledges that best practices recommend a more comprehensive analysis in which "actuarial measures" are integrated with "professional judgment approaches." (*Id.* at 7). As Dr. Rosenberg explains, the Static-99R is "intended to provide a baseline actuarial estimate and should be interpreted in conjunction with the individual's unique psychological functioning, developmental history, offense dynamics, strengths, and other clinically relevant factors." (*Id.* at 8). Because the Static-99R results are presented in isolation, Dr. Keller has not provided a comprehensive sexual risk assessment, even by Dr. Keller's own account. (*Id.* at 7; *see also* Def. Sub., Ex. H at 2).

## V.    The Defendant's Objections to the PSR

The defendant submitted extensive objections to the initial PSR, all of which were rejected by the Probation Office (*see* PSR at 47-48; *see also* Def. Sub., Ex. F). The defendant also filed an "Addendum" to his sentencing submission which he described as "a discussion of some of Mr. Smith's objections to the PSR" that is "offer[ed] to provide greater context for [the defendant's] offense conduct." (Addendum at 1). These objections, which are discussed in detail below, *see infra* VII.A.2, demonstrate that the defendant has failed to accept responsibility for his criminal conduct and continues to quibble about immaterial minutiae, hoping to distract from the mountains of evidence of the defendant's crimes that are detailed in the PSR.

In any event, the defendant's objections to the PSR need not be resolved at all. Plea agreements are "interpreted according to principles of contract law," *United States v. Gregory*, 245

48

F.3d 160, 165 (2d Cir. 2001) (quoting *United States v. Rexach*, 896 F.2d 710, 713 (2d Cir. 1990)), and a defendant who knowingly and voluntarily enters into a plea agreement is bound by its terms, *In re Altro*, 180 F.3d 372, 377 (2d Cir. 1999); *United States v. Difeaux*, 163 F.3d 725, 728 (2d Cir. 1998); *United States v. Alexander*, 869 F.2d 91, 94 (2d Cir. 1989).  The defendant is therefore bound by the stipulations he entered into knowingly and voluntarily, under oath, and which the Court accepted at his change of plea.  His sentencing submission and PSR objections cannot be used to unilaterally rewrite the terms of the agreement he negotiated.  Indeed, courts have repeatedly precluded defendants from making sentencing arguments that conflict with the stipulations in their plea agreements.  *See United States v. Loiaza-Devilla*, No. 94 Cr. 73 (CSH), 1995 WL 747796, at *1 (S.D.N.Y. Dec. 18, 1995) ("Neither party may take a position at sentencing which it agreed not to take in the plea agreement."); *United States v. Branston*, 216 F.3d 1073 (2d Cir. 2000) ("[B]oth parties will be foreclosed from making arguments inconsistent with the promises that constitute the agreement.").  Despite the defendant's continued failure to acknowledge facts to which he has admitted, the Government stands by the Plea Agreement and seeks its enforcement.  *See United States v. Cimino*, 381 F.3d 124, 127 (2d Cir. 2004) ("[W]hen the defendant is the party in breach, the Government is at least entitled to specific performance of the plea agreement."); *United States v. Vaval*, 404 F.3d 144, 153 (2d Cir. 2005) (a party's assertion that it did not intend to breach does not insulate it from a finding of breach).  Thus, to the extent the defendant's objections and submission are inconsistent with his stipulated admissions, the Court must hold the defendant to his admissions as a matter of specific performance. [10]

---

[10] To the extent the Court concludes that any objection is both factual and material to the sentence—and, as explained above, most are not—the applicable standard of proof at sentencing is a preponderance of the evidence. *See* U.S.S.G. § 6A1.3, cmt.; *United States v. Cordoba-Murgas*, 233 F.3d 704, 708 (2d Cir. 2000).  Where, as here, the defendant admitted under oath and in a

49

## VI.    Applicable Law

Although *United States v. Booker*, 543 U.S. 220, 264 (2005), held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and district courts must "consult" the Guidelines and "take them into account" when sentencing.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"—that "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).  After that calculation, a sentencing judge must consider the seven factors outlined in 18 U.S.C. § 3553(a), which include the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; the defendant's need for rehabilitation; the kinds of sentences available; the need to avoid unwarranted disparities in the sentences imposed on similarly situated defendants; and the sentencing range under the Guidelines.  If the Court imposes a sentence outside the Guidelines range, it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc).

---

signed, written plea agreement to precisely the conduct he now disputes through counsel, the Court can readily find that conduct based on his own prior sworn admissions alone.  *See Blackledge v. Allison*, 431 U.S. 63, 74 (1977) (statements at plea allocution "carry a strong presumption of verity"); *United States v. Gonzalez*, 970 F.2d 1095, 1101 (2d Cir. 1992) ("No evidentiary hearing was required on the basis of these unsupported allegations, which merely contradicted [defendant's] earlier statements made under oath at his plea allocution.").

## VII.     Discussion

### A.  The Defendant's Egregious, Abusive, Dangerous, and Repeated Conduct Warrants a Term of 360 Months' Imprisonment

#### 1.     The Nature and Circumstances of the Offenses

The seriousness and dangerousness of the defendant's crimes alone justify a Guidelines sentence of 360 months.  The defendant's conduct was long-standing and wide-ranging, but there is one thread that runs through each type of crime the defendant has committed over the past at least 10-15 years:  He targeted and repeatedly preyed upon vulnerable victims, whether they were the infant, toddler, and prepubescent victims of his child pornography crimes, or the adult female victims who the defendant drugged, raped, recorded, and, in some cases, tricked into signing false "statements of support" that tended to inculpate the victims and exculpate the defendant.

***Child Pornography Offenses.***  The defendant has collected child pornography since at least 2012, *i.e.*, for more than a decade, and stored that child pornography on multiple devices and an online account.  Based on the FBI's analysis to date, the defendant possessed more than *9,000* unique files of CSAM at the time of his arrest.  These files were carefully organized on his electronic devices by type and sub-type, including, for example, into folders labeled, "My Nieces August 2004," "hussy," "11-yrpinkpuss," "████ 6yo,1" and "daughter."  The CSAM in the defendant's possession depict adults penetrating and ejaculating on prepubescent children and toddlers, children being tied up, bound, and penetrated, toddlers performing oral sex on adults, and even infants being penetrated by adults.

The National Center for Missing & Exploited Children ("NCMEC") also conducted an analysis of the CSAM possessed by the defendant, and determined that the defendant possessed 4,893 unique files and 210 unique videos containing CSAM from 156 "series," *i.e.*, known collections in which a minor victim has been positively identified.  (PSR ¶ 96).  The disparity

51

between FBI's calculation of unique files (approximately 9,000) and NCMEC's calculation (approximately 5,000) means that the defendant possessed over 4,000 unique files containing CSAM that NCMEC did not have in its (very large) database, that were unknown to law enforcement, and that therefore involve unidentified victims.[11]  But that does not make their harm less real.

Some of the victims known to NCMEC have, in pseudonymous victim impact statements, described the harms they have suffered not only through their sexual abuse itself, but as a result of the public exchange of files depicting that abuse.  One victim explained the never-ending nature of the trauma that comes with being a victim of child pornography crimes:

> Knowing that there may still be images or videos of me somewhere—circulating, stored, or shared without my knowledge—is a never-ending source of anguish. The idea that my abuse could continue in the form of those images is unbearable. It makes it hard to move forward when part of your past may still be out there, used and viewed without your control.

(Ex. Q at 1).  Another victim explained,

> Grief, anger, disgust, nightmares, difficulty trusting people I don't know well, these are all things I feel or experience regularly when I think of the CSAM activity, which is daily.  I feel that I have healed as thoroughly as one can, from the original abuse and I rarely think of it.  What I do think about is who has seen these images of me and what they have done with them.  Are they using them to harm or groom others?

(Ex. R at 1).  This type of long-term trauma is well recognized in the law.  *See, e.g.*, *United States* v. *Gouse*, 468 F. App'x 75, 78 (2d Cir. 2012) ("[C]ontrary to [the defendant's] contention, his crimes are not victimless because they create[] a market for child pornography and thus harm children, scarr[ing] [them] for life"); *United States* v. *Miller*, 594 F.3d 172, 189 (3d Cir. 2010)

---

[11] This arises, for example, where (a) the CSAM is newly produced or (b) where law enforcement has been unable to identify the victim.

("[P]ossession of even a small number of images of child pornography contributes to the victimization of children and creates a market for child abuse."); *see also United States* v. *Williams*, 553 U.S. 285, 307 (2008) ("Child pornography harms and debases the most defenseless of our citizens. Both the State and Federal Governments have sought to suppress it for many years, only to find it proliferating through the new medium of the Internet.").

The defendant's suggestion in his sentencing submission that he collected CSAM not for his own sexual gratification, but merely because he was allegedly "explor[ing] the limits of sexuality: trying to understand, academically, the most extreme actions of which humans were capable" (Def. Sub. at 15) is absurd. It bears no resemblance to what he did and how he did it. The defendant did not collect "academic[]" articles *about* CSAM. *He collected CSAM.* Indeed, he sought out CSAM, downloaded it and organized it—for years. The defendant's justification is also deeply offensive to his victims. The defendant's analogy between his collection of CSAM and his collection of Legos and books (*id.*) negates the dignity and the trauma of the human beings the defendant has victimized through treating the images and videos of their abuse as something to be collected and glorified—not what they are, which is a record of human suffering.

But the defendant's story as to why he did what he did also makes no sense for another and fundamental reason. Plainly, the defendant had a sexual interest in children. The evidence of that interest is overwhelming—from the children's t-shirts he kept for sexual "role-playing" in his apartment; to the rape fantasies he wrote or kept about minor campers and counselors; to the emails he wrote as "Cindy Knobelman" detailing child sex abuse; to the minor girls he sought out on Craigslist, hoping to bring them to the United States to live with him in exchange for sex; to telling Victim-3, via text message, to save her virginity for him to take when she had just turned 18 years-old, requesting nude photographs of Victim-3 while she was still a minor (*and sending her photos*

53

*of his penis*), and expressing sexual interest in her minor friends. That the defendant committed hands on abuse only of adult, not minor, victims is indicative more of his apparent lack of opportunity to do so—or that he had not done so yet—rather than a lack of desire on his part.

Finally, the defendant's related suggestion that he only learned that possessing child pornography was a "criminal offense" from the "agents' questioning" during the June 2024 search of his Central Park South residence (*see id.* at 16), is similarly outlandish, offensive, and disproved by his own words during that recorded interview. It is also contradicted by his admission under oath at his change of plea that "for each of the[] counts" to which the defendant pleaded guilty, he "kn[ew] what [he] did . . . was wrong and illegal at the time [he] did it." (Plea Tr. at 32). The defendant's last-ditch efforts to feign ignorance about the wrongfulness, harm, and illegality of the child pornography he collected for years should be soundly rejected. It is not what happened. It is not a basis for a lower sentence. It is yet another deeply troubling sign of a complete lack of remorse.

***Drugging and Sexual Assaults.*** The defendant was also a serial rapist for nearly a decade. Between at least 2015 and 2024, the defendant repeatedly drugged and sexually assaulted *at least* six women. He preyed on women who were far younger and far less financially stable than he. He sought many of these women out on the "sugar daddy" website Seeking.com. Contrary to the defendant's submission, the defendant did not use this website merely to find women with whom he could play out his "drunk girl fantasy" (Def. Sub. at 13). He used this website to find women he could incapacitate with drugs and then sexually assault. That is what he pled guilty to doing, and what the evidence overwhelmingly shows he did. .

The defendant had a *modus operandi*. He purchased Klonopin in bulk from an online pharmacy based in pacific island nation Vanuatu (notwithstanding that the defendant lived in New

54

York City and had access to numerous local pharmacies).  (PSR ¶ 20).  He kept packing lists and planning notes for upcoming trips that included, for instance, "canned cocktails, klon, cutter case," (PSR ¶ 71), and "klon (fri night)" (PSR ¶ 72).  His crime was deliberate, premeditated, and repeated.  Over the course of approximately 2015 to 2024, the defendant drugged and sexually abused at least six victims.  And the defendant's crimes are well-documented—by himself.  For example:

- More than a decade ago, in 2015, the defendant drugged and sexually assaulted Victim-5 and Victim-6, photographing both women in sexually explicit, compromised positions.  (PSR ¶¶ 66-69).

- In or about the ████ of 2019, the defendant drugged and raped Victim-2 and, when she was unconscious and without her consent, took a photograph of her with his ejaculate on her face.  (PSR ¶ 31).  The defendant eventually convinced Victim-2 to move to New York City, where he repeatedly drugged and raped her for a period of roughly four months.  (PSR ¶ 40).

- In July and August 2021, on two separate occasions, the defendant drugged and raped Victim-4 and kept many photographs and videos of her nude and unconscious.  (PSR ¶¶ 62, 63).

- In or about April 2023, he drugged Victim-1 with Klonopin before raping her and then shared a video of himself sexually assaulting her while she was nude and unconscious with the Telegram group chat, Sleepy Wives.  (PSR ¶ 22).

- In or about October 2023, the defendant drugged and raped Victim-3, then sold Victim-3 for sex, and collected the money that Victim-3 received for the encounter.  (PSR ¶ 57).

The facts speak for themselves.  The defendant's assertion in his sentencing submission that he "believed their [*i.e.*, all of the victims whom he drugged and sexually assaulted] participation . . . was consensual" (Def. Sub. at 14) is so obviously false that it bears little response, other than to say that this lie shows his abject failure to accept responsibility.  So too with the lie that he passed on to Dr. DeRight that he had "written agreements" with each of his victims that rendered all of their interactions consensual.  (*Id.*).  As explained above, there is no evidence whatsoever that any victim signed a written agreement governing her relationship with the defendant—and certainly none that permitted the defendant to drug and rape her.  To the contrary, the evidence shows that the defendant attempted to convince Victim-2 to sign a written agreement governing the terms of the relationship he wanted, which Victim-2 refused to sign.  (PSR ¶¶ 35-39).  Victim-2 also explicitly told the defendant, *in writing*, that she did not want to take any illegal drug.  (PSR ¶36).  The defendant repeatedly drugged her anyway.

But the defendant not only drugged and sexually assaulted his victims.  He also physically and emotionally abused them, in particular, Victim-2 and Victim-3.  The defendant controlled Victim-2's finances, forbade her from speaking to others without his permission, surreptitiously surveilled her communications, and punished her physically and sexually.  (PSR ¶¶ 39-43).  The defendant used restraining devices on her body, undressing her and putting her in a contraption so that he could assault her.  (PSR ¶ 43).  The defendant also punished Victim-2 after he had perceived that she "misbehaved" and sexually abused her, including forcing her to stand naked in the hallway.  (*Id.*).[12]  The defendant cannot reasonably claim now that he did not realize how his

---

[12] That the defendant recognized this conduct (*i.e.*, being forced to stand naked in a public hallway) is humiliating is evidenced from the arguments the defendant's then-counsel made at the suppression hearing in this case and the defendant's own affidavit at that time.  In connection with arguing about the purportedly unduly harsh conditions of the search, defense counsel repeatedly

actions would have impacted Victim-2. They were designed to punish her, to humiliate her, to reduce her humanity. To turn her into an object for the defendant's satisfaction, at any cost. That was the defendant's goal.

And it was a goal in which the defendant invested time and thought. In the leadup to and during the course of Victim-2's time in New York City, the defendant ran many searches on his Google account, including: "how to train girl as slave" and "dog training women" (████, 2019); "slave rules" and "bdsm slave rules" (████ 2020); "how to isolate girl from friends" (████ 2020); "cnet actual keylogger" and "how to monitor iphone location" (████ 2020); "gangrape literotica" and "literotica sugar baby rape" (████, 2020); "wearable child tracking" (████, 2020); "debit card for child" (████ 2020); "gf bad behavior in public red pill" (████ 2020); "how to make gf submissive" (████ 2020); "how to recover deleted iphone pictures" (████ 2020); "klonopin comedown" (████ 2020); "red pill gf not enthusiastic," "signs girlfriend isn't that into you," "how to turn gf into slave," "how to respond when gf disobeys red pill," "how to punish a dog," and "how to punish woman" (████ 2020); "how to respond when girlfriend disrespects," "how to punish girlfriend," and "how to evict roommate not on lease nyc" (████ 2020); "how to give ultimatum 'red pill.'"[13] (████ 2020). (Ex. S, Google Search Excerpts). These searches (and the websites visited after them) are windows into the defendant's methodical

---

referenced the fact that the defendant was kept naked in the hallway of his apartment building for a few seconds while federal agents completed a safety sweep of his residence. (Tr. 6:23; 7:12). In the affidavit the defendant submitted to the Court, in which the defendant complained of feeling "humiliation and embarrassment," he noted, "I was in clear view of at least two of my neighbor's apartments and could be seen by anyone leaving their apartment and walking down the hall." (Dkt. 48-2 ¶ 5).

[13] "Coach Red Pill" was an antifeminist blogger who disseminated misogynistic videos and livestreams.

isolation, domination, and humiliation of Victim-2. And again, they are utterly irreconcilable with the story he now tells the Court.

The defendant likewise tortured Victim-3. Shortly after Victim-3 turned 18 years old, the defendant purchased a plane ticket for Victim-3 to visit him at his apartment in New York City, where he subjected her to violent sexual acts, including handcuffing and restraining her on a bench, gagging and blindfolding her, inserting sex toys that caused her to bleed and cry, and using a shock device on her clitoris. (PSR ¶ 53). He also drugged and raped Victim-3 before selling her for oral sex to someone else. (PSR ¶ 57). None of this was fleeting or done without planning.

The defendant's claim that he nevertheless "did not perceive the women's emotional distress" (Def. Sub. at 15) because of his purported autism makes no sense in light of the deliberate and calculated ways in which the defendant humiliated, degraded, and violated his victims for years—*and enjoyed their suffering*. As Victim-2 explains in her victim impact statement, the very point was to do harm, because the defendant enjoyed his power to do so: "He loved to punish me, hurt me, mock me, and verbally attack me. He loved violence and darkness. He enjoyed people experiencing pain. He was very sadistic. He enjoyed hurting me. He enjoyed hurting others or watching others get hurt." (*See* Ex. T at 3).

Moreover, as noted above, the defendant's feigned inability to understand that his victims were suffering (precisely as he planned and intended them to suffer) is belied not just by the defendant's contemporaneous plans and words, but also by the words the defendant wrote nearly twenty years ago—long before he knew that one day, years later, he would try to sell the Court on a purported late-in-life autism diagnosis and purported inability to understand when others are suffering, in an effort to escape the consequences of his own serial rapes (along with his other crimes). In the article the defendant personally authored regarding the horrors of campus rape, the

defendant wrote about acquaintance rape, the very same type of rape he repeatedly perpetrated over the course of (at least) nearly a decade.  Making clear the defendant understood exactly the types of harms that are inflicted on a rape victim, he wrote, "Whether it happens after a party, on a date or in the middle of the day, each rape is like a little murder, killing off the person who was there before with persistent emotional trauma, grief and hopelessness, as well with a loss of self-respect, hope and pride."  (*See* Ex. A at 1-2).

And just as the defendant knew they would, the defendant's rapes had profoundly detrimental effects on his victims' lives.  He caused lasting psychological and emotional harm, as the victims try to piece together what happened to them, to wonder what he did to them, what he used to drug them, and whether he photographed them in their most vulnerable moments and shared their photographs with like-minded sexual predators.  Victim-2 explains the pain she has suffered because of the defendant's abuse:  "I was frozen.  Unable and afraid to connect with anyone.  I self-isolated.  I stopped living for the next three years.  I lived in a constant state of fear.  Scared that one day he may come after me.  I thought I would have to carry the weight of this fear forever."  (Ex. T at 4).  And years later and with the defendant in custody, Victim-2 is still left to fear the defendant's eventual release:  "How can we feel safe if he is ever released?  It would be completely demoralizing for me and all other victims to have someone do what he did to us and get out."  (*Id.* at 5).[14]  Victim-3 has also expressed the enduring trauma that the defendant has caused her, in the following statements she has provided to the Government to pass on to the Court:

> Edward Smith didn't just commit a crime; he stole my life. When he targeted me as a minor, drugged me, and raped me, he didn't just hurt me, he shattered my sense of reality.

---

[14] The Government understands that Victim-1 does not intend to submit a written statement but plans to address the Court at sentencing.

I have spent years in therapy trying to survive the wreckage he left behind. His behavior was atrocious, predatory, and calculated. I have had to fight for every inch of my recovery, while he has faced no consequences for the trauma that still haunts my daily life.

He is a danger to the vulnerable, and he belongs in jail. I am asking for a sentence that reflects the gravity of his depravity and finally offers me the justice I deserve.

***Obstruction of Justice.***  The defendant not only victimized women by drugging and raping them, he also attempted to use them in another way—to cover up his crimes.  Shortly after the defendant first became aware that he was under federal investigation for his collection of child pornography, he began researching ways to attempt to defeat these types of charges.  He quickly looked to blame others.  On July 29, 2024, about one month after the search warrant was executed on his apartment, the defendant searched: "defendant tried to prove others used computer child porn."  (PSR ¶ 73; *see also* Dkt. 160 (Second Motion *in Limine* to Preclude Expert Testimony of Dr. Laurie Sperry) at 2).  He also contacted Victim-1, telling her that he was facing child pornography charges, which he falsely attributed to a ▮▮▮▮ woman who had stayed with him and who he purportedly believed downloaded the child pornography.  (PSR ¶ 74).  He asked Victim-1 to sign a letter on his behalf that falsely stated that she (*i.e.*, Victim-1) had "free access to his residence and specifically computing devices" and "occasionally viewed and/or downloaded adult material on his computer"—a letter which clearly was meant to inculpate Victim-1 and exculpate the defendant.  (PSR ¶ 75).  The defendant then paid Victim-1 $5,000 in exchange, and told her not to tell his own lawyer about it and to delete any messages between them.  (PSR ¶¶ 78-80).  The defendant also solicited false letters from other female individuals with whom he had sexual relations.  (PSR ¶¶ 81-83).

In the defendant's sentencing submission, he suggests that the fact that he turned to some of his victims to sign his false so-called statements of support is evidence of his "misguided"

60

understanding that their relationships were consensual. (Def. Sub. at 15). That is plainly not the case. It is obvious why he turned to the victims in this case: Because he knew they were young, vulnerable, and needed money. So he sought to use them again, albeit in a different way. The defendant did not just ask these women to be "character references" as his submission suggests. (*Id.*). He did not just use them in an effort try to point the finger away from himself. He deliberately tried to point the finger at the victims, hoping that they, in particular Victim-1, would become the targets of investigation, instead of himself.

In earlier stages of his criminal case, the defendant attributed his obstruction of justice—like all of his other criminal conduct—to his purported autism. In doing so, he relied on the opinion of his initial proffered autism expert, Laurie Sperry, whose proffered testimony the Court later precluded. *See Sperry Op. I*, 806 F. Supp. 3d 382; *Sperry Op. II*, 2026 WL 122337. According to Dr. Sperry, the defendant's alleged autism could have caused his obstructionist conduct because he may not have been able to "consider how other people might view his behavior," as well as because of his purported challenges in understanding how to communicate with others "absent a law degree and without explicit rules." (Dkt. 152 (Second Declaration of Dr. Laurie Sperry) at 3).

Now, the defendant has changed course. His sentencing submission expressly states, "[The defendant] does not dispute that his conduct constituted obstruction of justice. This conduct is not mitigated by his ASD." (Def. Sub. at 16). But the defendant and his retained expert, Dr. DeRight, do not even try to provide the Court with a cohesive and internally consistent theory of how his purported autism caused him to commit, and somehow excuses, his child pornography, drugging and raping, and enticement crimes, but had no impact on his obstruction crime.

### 2. The Need for Specific Deterrence and to Promote Respect for the Law

The need to promote respect for the law and afford adequate specific deterrence cannot be overstated in this case. The defendant has shown a shocking indifference to the law. At every

turn, he has sought to game the system. As discussed above, he tried to falsely implicate his rape victims in his child pornography crimes. Throughout the course of this criminal prosecution, he tried to deceive the Court with misstatements if not outright lies. Even after his guilty plea, the defendant made objections to the PSR that are incompatible with and flatly contradicted by the crimes to which he pled guilty and the extensive evidence in this case. And now, at sentencing, he again asks the Court to excuse his crimes based on a purported autism diagnosis that does not withstand even minimal scrutiny and, in any event, does not explain or justify any of his crimes.

Moreover, the defendant now asks the Court to apply an acceptance-of-responsibility adjustment that is not included in the Guidelines calculation to which he stipulated (and Probation concurred (*see* PSR ¶ 105)) because it is clearly incompatible with the defendant's obstruction of justice. (*See* Def. Sub. at 48-49). And his sentencing submission all but backs away from his commitment in the Plea Agreement not to seek a sentence below 240 months. (*See* Def. Sub. at 3 ("Because of the requirement in the Plea Agreement, which counsel did not negotiate and does not believe adequately addresses the exceptional circumstances of this case, the Defense is compelled to request that the Court impose a sentence no lower than 240 months and no higher than 360 months. But the Court is not so constrained.")).

As the Court is well aware, from the early days of this criminal prosecution, the defendant has had no qualms about making demonstrably false statements. In connection with and during the suppression hearing in this case, the defendant (through counsel and in a sworn affidavit (*see* Dkt. 48-2)) made numerous statements to the Court, sensationalizing and exaggerating the conduct of the agents who executed the search of his apartment and interviewed him—all for the purpose of seeking to suppress the inculpatory statements he made to law enforcement. At a status conference held before the defendant filed his suppression motion, the defendant's then-counsel,

62

including after checking with the defendant, represented to the Court no less than three times that the agents handcuffed the defendant while he was naked in the hallway and gave him only a towel to wear during his interview.  (Dkt. 42 at 11, 12).  After body worn camera revealed that the defendant was, in fact, never handcuffed, the defendant dropped this claim, but continued to assert that the agents interviewed him while he was wearing only a pair of briefs.  (Dkt. 49 at 9).  The Government then found a photograph of the interview, clearly depicting the defendant wearing a t-shirt.  (Dkt. 55).[15]  At that point, the defendant admitted that he was indeed given a t-shirt but, because only his upper body was visible in the photograph, he continued to dispute whether he had been given and was wearing pants.  (Dkt. 62).  This only-admit-what-you-have-to, try-to-get-away-with-it approach has been the defendant's strategy since being charged in this case, even toward the Court.[16]

The extensive objections the defendant submitted to the initial PSR (*see* Def. Sub., Ex. F), all of which were rejected by the Probation Office (*see* PSR at 47-48) based on the Government's responses (attached as Exhibit U), make even more clear that the defendant still seeks to dispute the incontrovertible evidence of his crimes and ignore his express admissions of guilt during his plea allocution.  For example, notwithstanding his admission pursuant to his Plea Agreement, to "possessing and organizing thousands of files of child sexual abuse material on multiple electronic

---

[15] The defendant's sworn affidavit described in detail circumstances of the search that appear to have been fabricated by the defendant.  He claimed federal agents "pulled [him] out of the shower," (Dkt. 48-2 ¶ 9), and that when the interview began, he was "naked but for a small towel covering [his genitals]" and "asked if [he] could at least put on underwear" (*id.* ¶ 8).

[16] Even after the Court issued an opinion and order denying the defendant's motion to suppress, in which the Court made clear factual findings regarding the circumstances of the search and interview, *see United States v. Smith*, No. 25 Cr. 4 (PAE), 2025 WL 1122647 (S.D.N.Y. Apr. 16, 2025), the defendant submitted an expert report that asserted facts "squarely contradicted by the Court's findings of fact in its decision denying Smith's suppression motion" and that was rife with factual inaccuracies." *Sperry Op. I*, 806 F. Supp. 3d at 403.

devices, including images and videos of toddlers and prepubescent children" between at least in or about 2012 and at least in or about June 2024 (Plea Agreement, Ex. A, ¶ xiv), the defendant claimed to the Probation Office that he "did not seek out or knowingly purchase child pornography" from Snapgod; "never opened or viewed" the files depicting CSAM described in the PSR; "did not download or keep any illicit files" from eMule; and "had no knowledge of any child pornography on his Google drive." (*See* Def. Sub., Ex. F as 1-2). The defendant also claimed that he only drugged Victim-1 on one occasion, that no "bondage" or "tying up" occurred on that occasion, and that Victim-1 was "conscious during the intercourse." (*See* PSR Objections at 2). Pursuant to the Plea Agreement, however, the defendant admitted to distributing Klonopin to Victim-1 *with the intent to rape her*, and then physically restraining her after he had drugged her. He also admitted that she lost consciousness after he commenced vaginal sex with her. (Plea Agreement, Ex. A, ¶ i). The defendant also "denied the allegations" that he watched programs degrading to women in the presence of Victim-2 (Def. Sub., Ex. F at 13), but his Google Drive is full of the exact content that Victim-2 recalled—including content from "Coach Red Pill," an antifeminist blogger who disseminated misogynistic videos and livestreams.

In the "Addendum" the defendant submitted to his sentencing submission, he also disputes some of the abuse he inflicted on Victim-3, claiming that, based on his travel records, it is "impossible for Victim-3's recollection about being raped or prostituted on the fourth day of her October trip to be true, since the trip lasted only three days." (Def. Sent. Addendum at 3). But pursuant to his Plea Agreement, the defendant admitted to drugging Victim-3 and transporting her to locations in Manhattan where the defendant "directed Victim-3 to engage in sexual activities with one or more other men and to provide the defendant with the cash that Victim-3 received from those men in exchange for sexual activity, which Victim-3 did." Whether this happened on

64

the second day of a three-day trip or the third day of a four-day trip is immaterial, and the defendant's effort to effectively withdraw that part of his plea should be rejected. *See, e.g., United States v. Juncal*, 245 F.3d 166, 171 (2d Cir. 2001) (explaining that testimony from a plea "carries such a strong presumption of accuracy that a district court does not, absent a substantial reason to find otherwise, abuse its discretion in discrediting later self-serving and contradictory testimony as to whether a plea was knowingly and intelligently made").[17]  While these are just a few of the defendant's meritless objections to the PSR, there are many more.  Each one is just further confirmation that the defendant sees himself as above the law and the binding commitments he made to the Government in resolving this case.

While the defendant's misstatements to the Court and his wide-ranging frivolous objections to the PSR make clear that there is a significant need to promote respect for the law, the defendant's decision to keep pushing his purported autism diagnosis to justify his conduct is, perhaps, the best indication that the defendant has refused to accept responsibility for his crimes and feels little or no remorse.  Putting aside whether or not the defendant has some form of autism (and the Government submits he does not for all the reasons set forth in Dr. Miranda Rosenberg's expert report, attached as Exhibit O), the defendant cannot credibly claim that his purported autism prevented him from understanding the consequences of his actions.  As described above, his assertions (or at least suggestions) that he collected roughly 9,000 unique files of CSAM because he was "academically" interested in it and did not know, until the execution of the search warrant in this case, that possessing CSAM is illegal, are not credible on their face.  (Def. Sub. at 15, 16).

---

[17] The Government also corroborated Victim-3's statements during the course of its investigation of the defendant's trafficking of Victim-3.  With the information provided by Victim-3, the Government located the individual described by Victim-3 as the man who paid for oral sex with her, interviewed him, and found that the information he provided was consistent with Victim-3's account of the trafficking.

His claims that he repeatedly drugged and raped women because he "did not know – since he had not been explicitly taught – about legal consent or bodily autonomy" and that he "did not perceive the women's emotional distress" are equally absurd and incompatible with the record (and common sense). As Judge McMahon recently explained at sentencing in a child pornography case where, unlike this one, the defendant actually had a lifelong history of mental illness that was undisputed, the defendant was "insulting the autistic community to suggest that autism is somehow an excuse for this kind of behavior. There are hundreds of thousands of kids on the spectrum who don't do this. And most of them have some kind of social cues problems, and a lot of them don't have friends, and many of them have lives on the internet, but they're not" engaging in child pornography crimes. *United States v. Kyle White*, No. 25 Cr. 457 (CM) (Sent. Tr. at 34).

One of the many reasons that the defendant's reliance on a so-called autism defense is particularly offensive in this case is that the defendant has already demonstrated, through words he published in the *Harvard Crimson* nearly twenty years ago, that his claims about not perceiving the harms to the victims are fictions. The Court need look no further than the defendant's article, attached as Exhibit A and already quoted in this submission, to assure itself that the defendant knew exactly what he was doing. Based on his own words, he knew that the fact that Victim-3 (or other victims) may have reached out to him after their sexual encounters was not a sign of consent, contrary to what his counsel now says. (*See* Def. Sub. at 14). As he himself lamented in 1998, "Rape victims are often subjected to the subsequent blame of 'friends,' both male and female. Repeating mantras of 'Why were you in his room alone?" or 'You led him on, didn't you?' insidiously implicate [the victim] as the guilty party. It's an error in perception that both feeds and feeds off the silence surrounding rape." (Ex. A at 3).

66

And if all this—the false letters of support, the misstatements to the Court, the fabricated autism defense, and the attempt to dispute that which he admitted under oath and in writing—were not enough to confirm that the defendant is unrepentant for his crimes, the Court can also look at the defendant's own statement to the Court in connection with sentencing. The defendant cannot, even after pleading guilty to his heinous crimes, help but set the record, from his perspective, straight: "I will not insincerely pretend to harbor no grievances against" the "ordeal" of this case. (Def. Sub., Ex. A at 2). The Court should take the defendant at his word when considering the need to promote respect for the law and afford specific deterrence. He is not repentant; he is aggrieved.

### 3. The Need to Protect the Public

The need to protect the public also warrants a sentence of 360 months' imprisonment. The defendant was a collector of child pornography, a sexual predator, and a serial rapist for (at least) about a decade. And now, at sentencing, rather than take responsibility for his crimes, the defendant has told the Court that (1) because of his purported autism, he did not realize what he was doing was wrong, and (2) because now that he knows collecting child pornography and drugging and raping women is wrong and illegal, he is no longer a danger to society. To repeat these claims is to refute them. They are, in a word, preposterous. And because the defendant's rests his request for extraordinary leniency on these claims, and these claims alone, he leaves the Court with no assurance that the defendant would not continue committing the very same crimes.

The defendant also argues that he is at low risk of recidivism based on a Static-99R analysis, coupled with a presumed release date of when he is over 60 (*i.e.*, in ten years). (Def. Sub. at 38-39; *see also* Def. Sub, Ex. H). But the Static-99R analysis does not consider the repeat and widespread nature of the defendant's conduct—drugging and raping many different women for (at least) approximately ten years, collecting child pornography throughout this time, and obstructing

67

justice—or individualized characteristics of the defendant.  (*See* Def. Sub, Ex. H).  Courts have also recognized flaws in the Static 99 analysis, including because "[e]stimates of recidivism are bound to be too low when one is dealing with underreported crimes such as sex offenses." *United States v. McIlrath*, 512 F.3d 421, 425 (7th Cir. 2008) ("Static 99 treats as a recidivist only someone who is *convicted* of a further sex offense, but the recidivism concern is with someone who commits a further offense, whether or not he is caught—yet if he is not caught, his subsequent crime does not affect the data on which the Static 99 calibrations are based.").

The defendant also relies on the opinion of Dr. DeRight, his retained expert, who opines that the defendant's "risk profile . . . is more favorable than the severity of his offense conduct might suggest in isolation."  (Def. Sub., Ex. B at 32).  According to Dr. DeRight, "[t]he primary dynamic risk factors empirically associated with sexual recidivism" include "hostile masculinity, entrenched offense-supportive attitudes, sexual preoccupation as a stable drive, and antisocial peer association," which Dr. DeRight determined to be "largely absent from [the defendant's] clinical presentation."  (*Id.*).  Regardless of how the defendant chose to present himself in his singular virtual interview with Dr. DeRight, the record in this case is replete with evidence that the aforementioned "risk factors"—factors that Dr. DeRight identified as the "primary dynamic risk factors empirically associated with sexual recidivism"—are highly present here.  This evidence includes the copious notes the defendant methodically kept documenting the different ways he would physically, emotionally, and sexually torture women (PSR ¶¶ 38, 64, 67, 69); the reams of photographs and videos he kept of his victims, nude, often unconscious, and in sexually explicit positions (*id.* ¶¶ 20, 22, 31, 45, 51, 52, 61, 62, 66, 68, 70); the defendant's habit of watching programs that degrade women in Victim-2's presence (*id.* ¶ 48); and the newsletters, pamphlets, and PowerPoint presentations, recovered from the defendant's Google drive, that provided

68

instructions to men on how to dominate, coerce, and control women, including the below excerpt

from a document found on the defendant's Google drive, labeled "How to Dominate Women":

> your fantasy), whatever. Okay, how do you ask someone you've just started dating to do something you're afraid will make her uncomfortable?
>
> You don't know her, know how she'll react, oh, what to do, what to do?
>
> What to do is to shut the fuck up and go ahead any finally just give in and go to a prostitute and *finally* find out whatever it is you've been desiring actually feels like. A lot of this need is just in our heads. We want something so bad we can't ask for it without sounding like stammering nitwits. On top of that, since we've never had it done to us, we get this idea in our heads that "no woman would ever do *that.*"
>
> Well, there's nothing like putting a pair of handcuffs on a woman, blind-folding her and then riding her like a colt, using her hair as your reins and any hole you can find as your jizz jar to get you over the notion that "no woman would ever do *that.*"

Rather than engage with *any* of this evidence, Dr. DeRight instead concludes, without any

explanation, "Features of [the defendant's] case that might superficially suggest some of these

factors [(*i.e.*, "hostile masculinity, entrenched offense-supportive attitudes, sexual preoccupation

as a stable drive, and antisocial peer association")] are better understood . . . as manifestations of

his ASD rather than as the criminogenic propensities those factors represent in neurotypical

offenders." (Def. Sub., Ex. B at 32). This is not a reasoned opinion reached after examining

evidence. It is a conclusion, devoid of analysis. It is the argument of an advocate, wrapped in the

language of science. It deserves no more weight than the defendant's own assertions that he is not

a danger.

In addition, Dr. DeRight's purported risk assessment should be disregarded because it is

based on the false premise that all of the defendant's criminal conduct is attributable to his

purported inability to understand the emotions of his victims on account of his alleged autism.

(*See id.*).  For all of the reasons discussed above, that premise is wrong.  It is apparent that the defendant knew exactly what types of harms he was causing.  He just did not care.  The need to incapacitate the defendant to prevent him from hurting others is overwhelming.

**B. The Defendant's Additional Arguments in Favor of a Lenient Sentence Should Be Rejected**

> 1. <u>The Defendant's Term of Imprisonment Will Be No Harder than that of Other Prisoners</u>

The defendant argues, without any factual support, that "his difficulty reading social dynamics, navigating unwritten social hierarchies, and affiliating with peer groups places him at an elevated risk of exploitation, victimization, and social isolation within the general prison population,"  and that as a result, the "harshness of [his] time in custody is a consideration for a sentence variance."  (Def. Sub. at 42-43).  The defendant's argument is belied by his actual time in custody, which has shown that there is no reason to believe that his imprisonment will be harder than the imprisonment of other prisoners, and if anything, the *defendant* is exploiting the prison system and those around him.

As initial matter, there is nothing to suggest that the defendant has struggled more than the average inmate while detained at the MDC.  The defendant himself has informed the Court that he has "reconnected with his love of literature and writing" "tutored several fellow inmates" and "been requested by them to teach a wide variety of subjects, ranging from black history and finance to introductory Latin and quantum mechanics."  (Def. Sub., Ex. A, Defendant Letter).  Defense counsel has raised no concerns regarding the defendant's safety in the year and a half that he has been detained.  The defendant has had regular visitation and email correspondence with his wife and other female companions.  The defendant even directed one such companion to send him

photographs via Shutterfly to the MDC, which she did.  (Ex. P, Defendant's Emails from MDC, at 14 (Dec. 10, 2025 Email); 12 (Jan 7, 2026 Email)).[18]

The defendant not only appears to be coping well with incarceration, but also exploiting the prison rules to his benefit.  Since at least January 2026, the defendant has engaged in a commissary scheme by which other inmates cause individuals outside the MDC to deposit commissary funds into the defendant's account, and the defendant buys those inmates items from the commissary in exchange for a "tip."  As the defendant explained to a female companion ("Partner-S") with whom he exchanges frequent emails:

> I have to tell you that I've become something of a star commissary broker with the Russian crew here. Each inmate is limited on total spend per bi-weekly order, so when someone wants more stuff than they can put on their personal order, they do deals with other people who don't use up their limit. The "broker" will buy the extra stuff, then settle up later and get a tip. ▮▮▮ did a deal with me last night for two chorizo sausages, 3 minute rices, and one "softee" shampoo. But I didn't realize how in-demand my services had become. Half an hour later, ▮▮ came to me and demanded 2 velveetas, 5 chicken pouches, and one "VO5 kiwi lime" shampoo. I had to say sorry, I've already got something going with ▮▮. Well ▮▮ didn't like that. He got very zloy with me. Started cursing in Russian. I promised we would do a deal next time, which calmed him down a bit. If I ever end up in the Russian mob, this will be how it gets started.

(Ex. P at 11 (Feb. 8, 2026 Email)).  Since January 21, 2026, the defendant has received $2,260 in payments from individuals with Russian names located in Northern New Jersey and Staten Island who have no obvious connection to the defendant.  (Ex. V, Inmate Center Report).

---

[18] Far from being incapable of imagination as suggested by Dr. DeRight, the defendant wrote an extensive imaginative backstory for several of his companion's photographs and the MDC mailroom staff.  (Ex. P at 12 (Jan 7, 2026 Email);  13 (Jan. 4, 2026 Email)).

The defendant selected the inmates with whom he would partner in this scheme.  He wrote to Partner-S regarding his dealings among inmates:

> I find myself in the doghouse at the moment with my regular Russian commissary deal partner. A different Russian came to me yesterday and made me a very generous financial deal I couldn't refuse. Then usual Russian guy comes to my cell all excited, asking if I'm good for our usual deal. I had to let him down gently. He just stood there, with a look of heartbreak. His eyes said "How could you do this to me? I thought we had something special?" My eyes said "yeah, but he was really rich, and had a yacht, and wanted to fly me to Dubai, and well.. think how many Insta followers this will bring me!" I promised to resume our normal deal-making next time. He just said "ok, whatever" and slinked away, all sullen and morose.

(Ex. P at 8 (Mar. 17, 2026 Email)).[19]  On the day of this email, the defendant received $300 in his commissary account from an individual named ███████████ " from New Jersey.  (Ex. V, Inmate Center Report).

The defendant also regularly received extra drink packets and meals from other inmates, demonstrating that not only has he connected and colluded with other inmates, but also they are in fact helping him while incarcerated.  He recounted this treatment to Partner-S:

> The instant drink packets contain some Vitamin C, so when I was sick several months back, I started asking people for their extra packets. Now it's become something of a ritual that the Russians will line up and come by where I'm sitting every morning and solemnly give me their drink packets. I don't have the heart, or the foreign language abilities, to tell them I no longer need them because I'm not sick. I just say spaciba, spaciba.. and smile.
>
> For lunch, we had a breaded fish patty. The same as what they used to serve in grade school cafeteria. I don't know if they had something similar in Russian schools, but just think of cheap, off-brand frozen fish sticks, and you'll get the idea. I was lucky and got donated a halal meal, which was a delicious frank and beans. Solid protein.

---

[19] The defendant's report of what his commissary partner's "eyes said" is inconsistent with Dr. DeRight's conclusion that the defendant has difficulty reading nonverbal cues.

(Ex. P at 10 (Feb. 27, 2026 Email)).  In another email, the defendant wrote that had had a "deal" with another inmate where the defendant "grab[s] his meal and bring[s] it to his cell, and in exchange he lets [him] eat it 80% of the time."  (Ex. P at 5 (May 24, 2026 Email)).[20]

There is nothing in the record to support the defendant's argument that his time in prison will be harsher than the average inmate's imprisonment.  The defendant's persistent drive to thwart rules and manipulate others remains strong.  The defendant continues to employ these tactics in detention to his benefit.  The Court should reject any argument that the "harshness" of his time in prison warrants a variance.

## 2. The Child Pornography Guidelines Have Almost No Impact on the Defendant's Guidelines Range

The defendant's assertion that he is deserving of a variance due to the purportedly artificially inflated child pornography Guidelines should be disregarded because, putting aside his incorrect assumption, the defendant's child pornography offenses do not drive the defendant's Guidelines range.  (*See* Def. Sub. at 47-48).  As set forth in the Plea Agreement, the offense level for Count Four, receipt of child pornography, was 35.  The offense level for *both* Count One, distribution of a controlled substance with intent to rape, and Count Three, inducement to travel to engage in unlawful sexual activity, were *higher* than for Count Four—36 and 38 respectively.[21] Because each of Counts One, Three, and Four constituted separate Groups under the Guidelines, the Group associated with Count Three, the highest offense level, 38, was the primary basis of the defendant's applicable Guidelines offense level.  The defendant's child pornography offense only

---

[20] This email contains the defendant's write-up of a "day in the life" of the defendant, which shows his ample connections in the prison community.  The defendant is the opposite of an exploited, victimized, and isolated inmate.

[21] Under U.S.S.G. § 3C1.1, Application Note 8, Count Four groups with Count Six, obstruction of justice, and the Group for those two counts was 37.

contributed to a one level increase in the defendant's offense level.  *See* U.S.S.G. § 3D1.4(a) (providing that one additional Unit (*i.e.*, one offense level) is added for a Group that is equally serious or from 1 to 4 levels less serious).[22]  The Court should therefore disregard any argument that the defendant's Guidelines are artificially inflated based on his child pornography offense.

### 3.  The Defendant's Comparable Cases Are Inapposite

In arguing for a variance, the defendant also cites several cases in which courts have considered a defendant's autism diagnosis in imposing the defendant's sentence.  (*See* Def. Sub. at 43-46).  None of these cases is on point.  None of them involves defendants with a nearly ten-year record of repeatedly drugging and raping women, in addition to child pornography crimes, in addition to obstruction of justice.  And the defendants in the cases cited by the defense appear to have had lives that were crippled by their autism.  They did not have anything close to the type of successful, productive, wealthy, married, independent life of the defendant in this case.  For instance, in *United States v. Maillat*, the defendant, who was not convicted of any hands-on conduct, "never had any emotionally intimate or sexual relationship" and was a short-order cook in a restaurant, in spite of having two master's degrees and a bachelor's degree in biochemistry and mathematics.  13 Cr. 3005, 2013 WL 6196946, at *6 (D. Neb. Nov. 27, 2013); *see also United States v. Castle*, 20 Cr. 223, 2025 WL 2076011, at *1 (M.D. Al. July 23, 2025) (defendant, who was not convicted of any hands-on conduct and whose autism diagnosis was not disputed by the Government, was an "adult who work[ed] at a grocery store and lives with his parents"); *United States v. Huseth*, 18-20027, 2021 WL 4940915, at *1, 6 (D. Kan. Oct. 22, 2021) (defendant, who was not convicted of any hands-on conduct and whose autism diagnosis was not disputed by the Government, had "significant cognitive deficits," dropped out of college, was unable to maintain

---

[22] The PSR is consistent with the Guidelines calculation in the Plea Agreement.  (PSR ¶¶ 105-37).

a job, and for all but two years of his adult life lived with his parents); *United States v. Knott*, 638 F. Supp. 3d 1310 (M.D. Al. 2022) (defendant, who was not convicted of hands-on conduct, lived at home with his parents and did not work). Even if the defendant has autism (and as noted above the Government submits that he does not), the Court should not afford the same leniency that is appropriate for defendants who have severe diagnoses of autism that may genuinely have contributed to their criminal offenses, particularly given this this defendant actually raped people, rather than only collecting CSAM (serious though that conduct is).

The Government has not identified, and the defendant has not cited, a case truly comparable to this one, because the defendant's conduct is not comparable to that of an ordinary offender in any single category of serious crime. It is instead the product of an extraordinary and rare confluence of three distinct categories of predatory conduct: the sustained collection of an almost unfathomable volume of the most extreme child sexual abuse material, spanning more than a decade; the repeated drugging and hands-on rape of multiple vulnerable adult women over a comparable period, using a well-honed, deliberate method each time; and a calculated obstruction scheme in which the defendant paid and coerced one of his own rape victims into signing a false exculpatory statement, then directed her to destroy evidence. Courts have confronted defendants who possessed extraordinary quantities of CSAM. *See United States v. Pattee*, 820 F.3d 496 (2d Cir. 2016) (affirming 47-year sentence for defendant who produced and possessed a large volume of CSAM). Courts have confronted defendants who have engaged in violent sexual abuse of adult women. *See United States v. Bell*, 761 F.3d 900 (8th Cir. 2014) (affirming 360-month sentence for sex trafficking and coercion offenses); *United States v. Hamidullah*, 847 F. App'x 659 (11th Cir. 2021) (affirming 482-month sentence for sex trafficking, coercion, and transportation offenses); *United States v. Ford*, 821 F. App'x 742 (9th Cir. 2020) (affirming 400-month sentence

for sex trafficking and obstruction offenses).  Courts have confronted defendants who tampered with witnesses.  *See United States v. Confredo*, 759 F. Supp. 2d 347 (S.D.N.Y. 2010) (205 months for obstruction, bank fraud, and associated offenses), *aff'd*, 458 F. App'x 69 (2d Cir. 2012).  What this Court has almost certainly never confronted is a defendant who did all three—who spent a decade methodically collecting some of the most horrific CSAM in circulation, while simultaneously and independently running a multi-year campaign of drugging and raping vulnerable young women he lured with promises of financial security, and who then, when finally caught, turned to one of those same victims a second time, paying her to help bury the evidence of his other crimes.

### C.  The Court Should Impose the Recommended Sex Offender Treatment Condition

Even though the defendant has pleaded guilty to multiple different types of sex crimes—those involving the collection of thousands of files of CSAM, as well as those relating to his drugging and raping of adult females—and the record is full of overwhelming evidence of what can only be described as the defendant's obsessive fixation with sexual domination, abuse, and the control of women, the defendant, remarkably, asks the Court not to impose a sex offender treatment condition.  (Def. Sub. at 49-50).  According to the defendant, "[b]ecause of his ASD and his socio-sexual ignorance, [he] requires therapy that is directed to his condition [*i.e.*, ASD]," rather than sex offender treatment.  (*Id.* at 49).  He claims that he merely needs to be "taught how to notice the true feelings of others," in order to be "concerned about the consequences of [his] actions." (*Id.* at 50).  Not so.  For all of the reasons discussed above, the defendant's claimed inability to understand the emotions of others is incompatible with his actual conduct, the contemporaneous steps he took to seek cover up his conduct, the evidence, and logic.  It should be firmly rejected. And it certainly should not be used to excuse the defendant from the treatment that he so obviously

76

needs. Moreover, the fact that he is unwilling to agree even to sex offender treatment makes it all the more clear that the defendant is a danger to society who has no interest in reform.

### D. The Court Should Impose a Lifetime Term of Supervised Release

A term of lifetime supervised release is warranted, and indeed is the Guidelines-recommended term, given the nature of the defendant's offenses. The Guidelines' recommendation reflects the Sentencing Commission's considered judgment that this category of offender—one whose conduct is rooted in a sustained and demonstrated sexual interest in the abuse of others—presents an ongoing risk that warrants indefinite oversight, not a risk that expires on a fixed release date. *See also United States v. Kurzajczyk*, 724 F. App'x 30, 34 (2d Cir. 2018) ("We have consistently affirmed life terms of supervised release for [CSAM] crimes."); H.R. Rep. No. 107-527, at 2 (2002) (citing high rates of recidivism for sex offenders as a reason to recommend lifetime supervised release).

That judgment has particular force here. The defendant compiled and organized 9,000 unique files of child sexual abuse material over more than a decade, and separately drugged and sexually abused at least six adult women over a comparable period, using a consistent and calculated method each time. He has offered this Court no credible explanation for that conduct, and—as detailed above—his own proffered explanation (a purported autism diagnosis he claims prevented him from perceiving harm to others) is squarely contradicted by the extraordinary planning, concealment, and adaptive deception that this conduct required. A term of supervised release measured in years, rather than for life, would assume that the defendant's risk to the public will meaningfully diminish upon a fixed date determined today, notwithstanding that his own experts have offered the Court no reliable basis to make that prediction and did not even administer a psychosexual evaluation. Lifetime supervision, with the sex-offender treatment, computer-monitoring, victim-contact, and other conditions the Probation Office has recommended, is the

only term that permits meaningful, ongoing assessment of whether the defendant continues to pose a danger to women and children as he ages.

### E.  Probation's Recommendation

The Probation Office has recommended a sentence of 240 months' imprisonment, indicating that a downward variance would be appropriate, in its view, because the defendant's "troubled childhood and his reported employment history present mitigating factors." (PSR at 50-51).  Neither factor supports a variance, much less to a material degree.

As to employment, the Second Circuit's decision in *United States v. Rattoballi*, 452 F.3d 127 (2d Cir. 2006), is instructive.  There, the Second Circuit vacated a non-Guidelines sentence, observing that the Sentencing Commission and Congress have deemed factors such as employment record "not ordinarily relevant" to sentencing, and that where a district court relies on such factors it must point to "extraordinary circumstances particular to [the defendant] and not common to other similarly situated defendants." *Id.* at 136 n.4.  Otherwise, such reliance "rests upon a consideration that contradicts one of the § 3553(a) factors that we must consider in reviewing that sentence for reasonableness—namely, the Commission's policy statements." *Id.*; *see* 18 U.S.C. § 3553(a)(5); *see also* 28 U.S.C. § 994(e).  That reasoning applies directly here.  The defendant's employment history is not an extraordinary circumstance positively distinguishing him from other defendants.  To the contrary, the defendant enjoyed every advantage a career like his affords— wealth, stability, and standing in his community—and none of it deterred him.  If anything, the defendant's resources and professional standing gave him the means to commit and conceal his crimes: to purchase Klonopin in bulk from an overseas pharmacy, to maintain multiple residences in which to isolate and drug his victims, and to pay victims thousands of dollars to sign false exculpatory statements. (*See, e.g.*, PSR ¶¶ 20, 39, 75-83).  It would be perverse for those same advantages to be rewarded with leniency.

The defendant's allegedly "troubled childhood" fares no better. The "troubled childhood" the Probation Office identifies is that the defendant, for a period that the Probation Office notes "ended when [the defendant] was approximately 16 years old," *i.e.*, decades ago, witnessed his ███████████████████████████. (*Id.* ¶ 148). The defendant told the Probation Office that his father never abused him or his sister and that he "disclaimed experiencing any emotional or sexual abuse." (*Id.*). By his own account, his childhood was "pretty good," his mother "did her best to provide him with a middle-class upbringing," and he was "afforded the same life as other children," including piano lessons and museum trips with friends. (*Id.* ¶ 149). He went on to attend an elite high school and graduate from Harvard. (*Id.* ¶¶ 163–164). There is no evidence that his ████████████████████████████████—conduct that ended when the defendant was a teenager—bears any relationship to his decision, beginning around 2012, to amass tens of thousands of files of child sexual abuse material, or his decision, beginning around 2015, to drug and rape multiple women. Absent such a connection, this decades-old and comparatively unremarkable history does not justify a lighter sentence for crimes committed by a fully formed adult. *See United States v. Rivera*, 192 F.3d 81, 86 (2d Cir. 1999); *United States v. Ceasar*, 10 F.4th 66 (2d Cir. 2021) (vacating a sentence for over-weighting even undisputed, severe, expert-corroborated trauma).

In sum, neither factor identified by Probation reflects the kind of unusual, defendant-specific circumstance that the Commission's policy statements and the case law applying them require before ordinary personal-history considerations may support such a variance. The Court should therefore reject the Probation Office's recommendation and impose the Guidelines sentence of 360 months requested herein.

### F. JVTA and AVAA Assessments

The Probation Office recommends that the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018 ("AVAA") assessment be waived based on the defendant's current inability to pay. (PSR at 52).[23]   The Government submits that the Court should impose this assessment, notwithstanding the defendant's purported present financial position, because his history and characteristics indicate a substantial capacity to pay over time.

The defendant is a Harvard-educated professional with an essentially unbroken employment history in finance since 1997. (*Id.* ¶¶ 164, 167–175).  Immediately prior to his arrest, he was employed as a managing director at Citigroup earning a base salary of $400,000 with a target bonus of $1 million; before that, he held a comparable managing director role at BlackRock earning a base salary of $330,000 with average annual bonuses of $800,000. (*Id.* ¶¶ 167-68).  Over the prior two decades he held a series of senior positions at major financial institutions, including State Street Bank, Santander Bank, and Oliver Wyman, consistently earning salaries in the high six figures. (*Id.* ¶¶ 170-75).  This employment history reflects a level of education, skill, and professional marketability that may allow the defendant to resume earning income following his release from custody, even accounting for the reputational consequences of this conviction.

The defendant's current negative net worth is largely a function of his pending incarceration and the legal costs attendant to this case, not a reflection of his underlying earning capacity. (*See Id.* ¶¶ 177-80).  He and his wife purchased their marital residence in Bluffton, South

---

[23] The Government does not seek imposition of the separate assessment under the Justice for Victims of Trafficking Act of 2015 ("JVTA"), 18 U.S.C. § 3014, and agrees with the Probation Office's recommendation that it be waived.  Unlike the AVAA assessment, the JVTA assessment applies by its terms only to a "non-indigent person," 18 U.S.C. § 3014(a)—a threshold statutory condition rather than a discretionary factor to be weighed under § 3553(a) or § 3572.  Given the defendant's purported currently negative net worth, absence of income, and lack of liquid assets, (PSR ¶¶ 177–178), the Government does not request that assessment here.

Carolina for $665,000 in March 2024, and it is presently valued at $680,000, reflecting meaningful equity notwithstanding the outstanding mortgage balance. (*Id.* ¶¶ 177, 180).

Given the defendant's potential capacity to earn income and his history of doing so throughout his adult life, the Government requests that the Court impose the maximum assessment authorized by statute—a $35,000 AVAA Assessment, *see* 18 U.S.C. § 2259A(a)(2)—rather than waiving it, and that any funds available for distribution be applied first to restitution owed to victims, consistent with 18 U.S.C. § 2259(b)(2)(B), before being applied to this assessment.

### G. Restitution

Restitution in this case is mandatory. Because Count Four is a "child pornography trafficking offense" as defined in 18 U.S.C. § 2259(c)(3), the Court must order restitution to each identified victim of the child pornography the defendant received and possessed in "an amount that reflects the defendant's relative role in the causal process that underlies the victim's losses," but in no event less than $3,000 per victim. 18 U.S.C. § 2259(b)(2). Restitution to Victim-1 and Victim-2 is likewise mandatory pursuant to 18 U.S.C. §§ 2264 and 3663A, and the defendant has separately agreed, as a condition of his plea, to make restitution to Victim-3 and any other identified victim of his uncharged conduct pursuant to 18 U.S.C. § 3663A(a)(3). (Plea Agreement at 3–4).

Due to the FBI's ongoing efforts to identify victims of the defendant's crimes, particularly the CSAM Series Victims depicted in the thousands of unique images and videos recovered from the defendant's devices, including the material maintained in the "CP Central" folder on the 1B2 Hard Drive, as well as outstanding requests for documentation from certain of the adult victims, the Government accordingly requests that the Court order restitution to the CSAM Series Victims and the Adult Victims, to the extent they should seek it, and in amounts to be determined, within 90 days of sentencing. *See* 18 U.S.C. § 3664(d)(5) ("If the victim's losses are not ascertainable by

81

the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing."); *see also United States v. Milstein,* 481 F.3d 132, 137 (2d Cir. 2007) (A district court has "broad discretion to determine restitution").

## CONCLUSION

For the foregoing reasons, the Court should impose a within-Guidelines sentence of 360 months' imprisonment.

Dated: New York, New York
        July 9, 2026

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:    s/_____
       Remy Grosbard
       Rita Maxwell
       Daniel C. Richenthal
       Joseph Zabel
       Assistant United States Attorneys
       (212) 637-2446/2206/2413/1559

82