Miranda Rosenberg, Psy.D., PLLC
Licensed Clinical Psychologist

**<u>Confidential</u>**
**<u>Addendum to Summary of Forensic Psychological Evaluation</u>**

**<u>Introduction:</u>**

**NAME:** Edward Smith
**DATE OF EVALUATION:** August 21, 2025
**DATE OF PRIOR REPORT:** September 4, 2025
**DATE OF ADDENDUM:** July 9, 2026

Mr. Edward Smith is a 50-year-old man, born on ▮▮▮▮▮▮ 1975. Mr. Smith has pled guilty to charges of distribution of a controlled substance to an individual with the intent to commit a crime of violence, namely, rape, in violation of Title 21, United States Code, Sections 812, 841(a)(1), 841(b)(2), and 841(b)(7); inducing an individual to travel to engage in unlawful sexual activity for which the defendant may be charged with a crime, in violation of Title 18, United States Code, Section 2422(a); receipt of child pornography (also known as "child sexual abuse material"), in violation of Title 18, United States Code, Sections 2252A(a)(2)(B) and (b)(1); and falsification of a document with intent to obstruct a federal investigation, in violation of Title 18, United States Code, Sections 1519 and 2, in the United States District Court for the Southern District of New York.

At the request of Ms. Remy Grosbard, Esq., Assistant United States Attorney for the Southern District of New York, I previously conducted a forensic psychological evaluation of Mr. Smith on August 21, 2025, for the purposes of diagnostic clarification and to provide an expert opinion in response to the Defense's Expert Disclosure dated August 14, 2025. I summarized my findings in a report dated September 4, 2025. Following completion of my evaluation, I was asked by Ms. Grosbard to review the subsequently disclosed expert reports of Shauna Keller, Psy.D., and Jonathan DeRight, Ph.D., ABPP-CN, and to provide an expert opinion regarding the opinions and conclusions contained therein.

**<u>Collateral Sources of Information:</u>**

The collateral sources reviewed as part of the prior evaluation were also considered in the current evaluation, in addition to the supplementary sources of information listed below.

1. Article entitled "Recognizing Your Faults, Rape on College Campuses Is a Problem That Men Have to Solve with Self Reflection", authored by Edward G. Smith, dated February 23, 1998
2. The Government's Motion to Preclude The Defendant's Preferred Expert Testimony of Dr. Laurie Sperry, authored by Jay Clayton, Esq., United States Attorney, Southern District of New York, United States of America v. Edward Gene Smith, United States District Court, Southern District of New York, dated August 28, 2025
3. Opinion and Order, Issued by the Honorable Paul A. Engelmayer, District Judge, United States of America v. Edward Gene Smith, dated October 2, 2025

m@rosenbergpsych.com

4. Opinion and Order, Issued by the Honorable Paul A. Engelmayer, District Judge, United States of America v. Edward Gene Smith, dated January 16, 2026
5. Plea Agreement, United States v. Edward Gene Smith, U.S. Department of Justice, United States Attorney, Southern District of New York, dated January 22, 2026
6. Presentence Investigation Report, United States of America vs. Edward Gene Smith, United States District Court for the Southern District of New York, authored by Crystalyn Meyers, U.S. Probation Officer, dated June 18, 2026
7. Forensic Report of Static-99R Assessment Findings, authored by Shauna Keller, Psy.D., dated June 19, 2026
8. Forensic Neuropsychological Evaluation, authored by Jonathan DeRight, Ph.D., ABPP-CN, dated June 30, 2026

## Review of Forensic Neuropsychological Evaluation, authored by Jonathan DeRight, Ph.D., ABPP-CN, dated June 30, 2026

The following summarizes my opinions regarding the methodology, findings, and conclusions contained in Dr. DeRight's report.

## I. Methodological Limitations

Although Dr. DeRight's report is presented as an independent forensic evaluation, the factual foundation for many of his opinions is derived primarily from information gathered by prior evaluators rather than through independent investigation. He did not conduct independent collateral interviews with family members or other informants, did not independently administer most of the psychological instruments upon which his opinions rely, and based substantial portions of his developmental history on Dr. Sperry's report and collateral interviews. He likewise did not review Mr. Smith's mental health records from the Metropolitan Detention Center. Although reliance on collateral information is appropriate in forensic practice, independent verification of critical historical information is particularly important where that information forms the basis for diagnostic opinions and conclusions regarding criminal behavior.

In addition, the autism-specific assessment measures which Dr. DeRight relied upon consist of self-report and informant-report instruments that do not contain embedded validity indicators designed to evaluate response style, symptom exaggeration, minimization, or other forms of response distortion. These instruments are widely accepted and clinically useful methods for assessing autism spectrum disorder. However, many of them are highly transparent with respect to the traits and behaviors they assess, making it readily apparent to examinees and informants what types of responses are associated with an autism diagnosis. In routine clinical settings, where the primary goal is diagnosis and treatment and there is generally little incentive to distort symptom presentation, this limitation is less problematic. In contrast, forensic evaluations require heightened attention to response validity because examinees may have substantial incentives to present themselves in a manner consistent with a particular diagnostic formulation.

These considerations are particularly relevant in the present case. Mr. Smith had no documented history of an autism spectrum disorder diagnosis or treatment prior to the instant offense, and the autism-specific assessments were administered only after his arrest, indictment, and retention of

autism experts. Moreover, the developmental history supporting the diagnosis relied heavily upon retrospective self-report and collateral interviews conducted after the initiation of legal proceedings rather than contemporaneous developmental records (e.g., pediatric records, educational records, teacher reports). Under these circumstances, a methodology that places greater emphasis on independent corroboration and formal assessment of response validity is warranted. In my opinion, the absence of such measures represents a significant methodological limitation when interpreting the diagnostic conclusions contained in Dr. DeRight's report.

This limitation is underscored by the inconsistent information obtained across evaluations. During my independent evaluation, which included the administration of the Minnesota Multiphasic Personality Inventory – 3 (MMPI-3) – the only psychological measure in this case containing comprehensive validity indicators – Mr. Smith produced a valid response profile and did not report clinically significant psychological symptoms or developmental characteristics consistent with autism spectrum disorder. During both psychological testing and the clinical interview, he denied many of the core developmental features later reported during subsequent autism-focused evaluations. Instead, he described a markedly different developmental history.

Similar inconsistencies were evident across collateral sources. Collateral informants interviewed during my evaluation (i.e., Mr. Smith's father, maternal aunt, and wife) did not describe the pervasive developmental impairments outlined in Dr. DeRight's report, including the degree of childhood social impairment, restricted interests, repetitive behaviors, and profound interpersonal deficits described elsewhere. Thus, both Mr. Smith's own account and collateral informant reports differed meaningfully depending upon the evaluation in which they were obtained.

## II. Interpretation of Assessment Measures

In my opinion, Dr. DeRight places disproportionate weight on assessment measures while giving comparatively little consideration to objective evidence of Mr. Smith's lifelong functioning. For example, Dr. DeRight relies on Vineland-3 scores suggesting adaptive functioning at or below the first percentile, with socialization scores indicating functioning comparable to that of a child between approximately 10 months and 2 years of age. While adaptive behavior measures are valuable components of a comprehensive developmental assessment, they are intended to supplement – not replace – clinical judgment and must be interpreted in the context of collateral information and an individual's demonstrated functioning across multiple domains. As is noted in the Diagnostic and Statistical Manual of Mental Disorders: DSM-5-TR, "the diagnosis [of autism spectrum disorder] remains a clinical one, taking all available information into account, and is not solely dictated by the score on a particular questionnaire or observation measure."

In the present case, the assessment ratings are difficult to reconcile with Mr. Smith's documented history of graduating from Harvard University, maintaining independent living, sustaining longstanding intimate relationships, and functioning successfully for decades in executive leadership positions requiring sophisticated interpersonal communication and collaboration (e.g., Managing Director at Citigroup, Managing Director at Blackrock, Executive Vice President at Santander Bank, Partner at Oliver Wyman). These achievements reflect complex cognitive, adaptive, and social functioning that should be carefully considered when interpreting subjective behavior ratings.

Dr. DeRight additionally characterizes Mr. Smith's employment performance evaluations as reflecting longstanding autism spectrum disorder-related social and interpersonal deficits. My review of these records does not support that interpretation. Rather, performance reviews from Citibank between 2021 and 2024 documented good performance, and noted Mr. Smith's technical expertise, leadership and execution skills, and ability to build credibility and relationships with stakeholders. The performance evaluations identify relatively limited areas for continued professional development and, in my opinion, do not support the conclusion that Mr. Smith exhibited the degree of pervasive interpersonal or adaptive impairment described elsewhere in the report.

More broadly, psychological test results should not be interpreted in isolation. Accepted forensic practice requires integrating standardized assessment findings with objective historical evidence, collateral information, behavioral observations, and documented real-world functioning. When rating scales substantially conflict with decades of objectively documented adaptive functioning, the evaluator should critically examine and reconcile those discrepancies before concluding that the test results accurately reflect the individual's true level of functioning. In my opinion, Dr. DeRight affords substantially greater weight to subjective adaptive behavior ratings than to the extensive objective evidence demonstrating Mr. Smith's longstanding adaptive, occupational, and interpersonal functioning.

## III. Relationship Between Autism Spectrum Disorder and the Instant Offense

Throughout the report, Dr. DeRight attributes the offense primarily to deficits in theory of mind, cognitive empathy, perspective-taking, and cognitive rigidity associated with autism spectrum disorder. However, the report does not sufficiently explain how these characteristics account for numerous aspects of the offense that required sustained planning, deception, manipulation, concealment, anticipation of consequences, and adaptation over an extended period. The offense conduct – including purchasing controlled substances, calculating drug dosages, planning to install spyware and hidden cameras, covertly recording victims, maintaining detailed planning documents, obtaining and organizing child sexual abuse material over several years, and engaging in obstruction of a federal investigation – involved psychological processes that extend beyond deficits in social reciprocity or perspective-taking.

Indeed, many of these behaviors appear to require the very capacities the report suggests were significantly impaired. For example, maintaining detailed planning documents and engaging in efforts to conceal the conduct from victims reflects an awareness of the consequences of discovery and the ability to modify behavior accordingly. Similarly, discovery materials reviewed as part of the Presentence Investigation Report include Mr. Smith's own written observations regarding one victim, in which he hypothesized that she was "likely depressed or low self esteem or lonely or other issues that cause her to seek constant male attention, validation, and sex; promiscuity is her drug of choice." These statements demonstrate that Mr. Smith was actively attempting to formulate hypotheses about another person's internal mental state and to use those perceptions to guide his own behavior. Such observations appear inconsistent with a profound inability to appreciate or consider the thoughts, feelings, or perspectives of others.

Dr. DeRight expressly acknowledges that the obstruction offense was deliberate and goal-directed and therefore unrelated to autism spectrum disorder, yet he provides no clear methodology for distinguishing which components of the broader offense conduct are attributable to autism spectrum disorder and which reflect intact planning and criminal decision-making. In my opinion, the report demonstrates that certain behaviors may be consistent with autism spectrum disorder but does not adequately establish that autism spectrum disorder was the primary psychological mechanism underlying the sophisticated and prolonged offense conduct.

A related concern is that Dr. DeRight attributes Mr. Smith's failure to appreciate the impact of his conduct on his victims primarily to deficits in cognitive empathy, perspective-taking, and theory of mind associated with autism spectrum disorder. However, the report does not adequately reconcile this opinion with the broader evidence regarding Mr. Smith's interpersonal functioning. Multiple collateral informants described Mr. Smith as a caring, supportive, and loving husband, friend, and family member. Similarly, Mr. Smith has a longstanding history of successful interpersonal functioning, including numerous romantic relationships, friendships, and decades of employment in executive leadership positions requiring the ability to establish rapport, maintain collaborative relationships, and effectively manage interpersonal dynamics.

The report does not explain why the profound deficits in cognitive empathy and perspective-taking that are offered as an explanation for the offense conduct were not more broadly evident across the many other domains of Mr. Smith's life. Put differently, the report does not adequately address why these purported impairments appeared to manifest almost exclusively in the context of the charged offenses while Mr. Smith otherwise demonstrated the capacity to establish, maintain, and navigate numerous complex interpersonal relationships over several decades.

This omission is important because psychological characteristics such as deficits in perspective-taking or empathy generally influence behavior across multiple settings and relationships rather than emerging only in a highly circumscribed context. Although the severity and expression of these deficits may vary, the report does not sufficiently explain how interpersonal functioning described as profoundly impaired in relation to the offense is reconciled with the substantial objective evidence of successful social, occupational, and intimate functioning throughout Mr. Smith's adult life.

## IV. Consideration of Alternative Explanations

Although Dr. DeRight repeatedly offers opinions regarding the psychological mechanisms underlying Mr. Smith's offense conduct, he did not conduct a comprehensive psychosexual evaluation, administer a structured measure of dynamic sexual offending risk, or formally assess alternative psychological explanations for the offense. Similarly, while he repeatedly contrasts autism spectrum disorder with psychopathy and concludes that Mr. Smith's presentation is inconsistent with psychopathy, he expressly acknowledges that psychopathy was not formally assessed. Nevertheless, he concludes that Mr. Smith's empathy deficits are attributable to autism spectrum disorder rather than alternative psychological constructs.

Throughout the report, Dr. DeRight consistently interprets Mr. Smith's history and offense conduct through the singular framework of autism spectrum disorder while giving comparatively little

consideration to other clinically plausible explanations, including compulsive sexual behavior, hypersexuality, paraphilic interests, personality pathology, or psychopathic traits. Rather than systematically evaluating these possibilities, the report generally discounts them without formal assessment. In my opinion, this is a significant omission, particularly where the ultimate opinions concern the psychological motivation underlying sexual offending.

This approach is illustrated by Dr. DeRight's interpretation of Mr. Smith's extensive collection and organization of pornography. The report conceptualizes this behavior primarily as an autism-related collecting or hoarding behavior. However, Mr. Smith did not describe his behavior in those terms. Rather, in handwritten document entitled, "Facts, Evidence, and Considerations Relevant to Counts 1 & 2 (Privileged and Confidential)," which was provided to Drs. Sperry, DeRight, Keller, and myself, Mr. Smith stated "my habit was to acquire all possible content at once, so I could browse later at my leisure." This explanation is more reflective of sexual interest in the material itself than of pathological hoarding. Despite this, the report attributes the behavior primarily to autism spectrum disorder without considering whether it may instead reflect sexual preoccupation, paraphilic interests, or other psychosexual factors commonly evaluated in comprehensive sexual risk assessments.

In my opinion, the available information raised sufficient concern to warrant a comprehensive psychosexual evaluation, including assessment for the presence of a paraphilic disorder (e.g., pedophilic disorder, sexual sadism disorder, fetishistic disorder, voyeuristic disorder). Notably, the Presentence Investigation Report indicated that Probation requested that Mr. Smith undergo a psychosexual evaluation as part of the presentence investigation. According to the report, defense counsel declined to participate in the evaluation requested by Probation, indicating instead that a privately retained psychosexual evaluation would be obtained. To date, no psychosexual evaluation has been produced for my review.

Several aspects of Mr. Smith's conduct and history are clinically relevant when considering the possibility of a paraphilic disorder, including: the prolonged and repetitive nature of the offense conduct, occurring over multiple years; repeated sexual victimization involving numerous victims; behavior suggestive of sexual arousal associated with surreptitious observation, recording, and administration of intoxicating substances to victims; engagement in sexual activity with unconscious women; extensive collection of sexually explicit material, including thousands of unique images of child sexual abuse material and images, and videos of depicting graphic violence or degrading conduct against women; statement to law enforcement upon arrest that his sexual preferences include girls who are "teens" and that he had been "looking for the teen content."; fantasy writings depicting rape, drugging, and sexual abuse; attempts to communicate with minors online to enter sexual arrangements; bags and chest containing bondage, duct tape, and sex toys found in his apartment; a child or toddler's t-shirt found in his apartment; substantial financial expenditures on pornography and reports of over one hundred sexual partners and longstanding patterns of high-frequency sexual behavior.

Moreover, even assuming, for purposes of discussion, that Mr. Smith meets diagnostic criteria for autism spectrum disorder, that diagnosis would not, in itself, establish that autism spectrum disorder was the primary psychological mechanism underlying the offense conduct. Autism spectrum disorder and other psychological conditions or behavioral patterns relevant to sexual

offending are not mutually exclusive. An individual may simultaneously meet criteria for autism spectrum disorder and exhibit problematic sexual behavior, paraphilic interests, or other dynamic sexual risk factors. Accordingly, before concluding that the offense conduct is principally explained by autism spectrum disorder, a comprehensive evaluation should systematically assess and rule out these alternative psychological mechanisms.

Similarly, Dr. DeRight repeatedly states that Mr. Smith accepted responsibility for his conduct, did not minimize the seriousness of his actions, and acknowledged the suffering experienced by his victims. However, the report gives comparatively little attention to other documented statements made by Mr. Smith that are inconsistent with this characterization. In his handwritten offense narratives entitled, "Narrative explaining Count 3 (to the best of my recollection)" and "Facts, Evidence, and Considerations Relevant to Counts 1 & 2 (Privileged and Confidential)," Mr. Smith denied significant aspects of the offense conduct, disputed portions of the allegations, externalized responsibility, and provided alternative explanations for his behavior. These statements are directly relevant to evaluating his level of insight, acceptance of responsibility, offense-related attitudes, and the reliability of his post-arrest self-report. In my opinion, these inconsistencies should have been considered and reconciled before concluding that Mr. Smith fully accepted responsibility for his conduct.

For example, in his handwritten document entitled, "Narrative explaining Count 3 (to the best of my recollection)," Mr. Smith wrote that "the notion that I drugged [Victim Name] is completely false and contradicted by several observations." He further asserted that the victim was intoxicated solely from alcohol and stated that, despite having numerous opportunities to drug women in his apartment, he did not do so. These statements reflect denial of significant aspects of the charged conduct. By contrast, Dr. DeRight writes that "regarding the administration of Klonopin, Mr. Smith accepts that this conduct was criminal and caused harm to his victims," acknowledges that "ongoing, conscious, and informed consent was absent," recognizes that his conduct "resulted in the victimization of multiple women over an extended period" and "does not minimize the gravity of this conduct or the suffering it caused."

**Review of Forensic Report of Static-99R Assessment Findings, authored by Shauna Keller, Psy.D., dated June 19, 2026**

The following summarizes my opinions regarding the methodology, findings, and conclusions contained in Dr. Keller's report.

Dr. Keller's report is considerably narrower in scope than a comprehensive sexual risk evaluation. As she expressly acknowledges, her opinions are based exclusively on a review of records and administration of the Static-99R, and the report "does not constitute a comprehensive psychosexual evaluation or sexual risk assessment, nor does it include a clinical interview or the administration of additional actuarial or structured professional judgment instruments."

Dr. Keller also notes that best practices recommend integrating actuarial measures with structured professional judgment approaches when conducting sexual risk assessments. Despite acknowledging this standard, she did not administer any structured professional judgment instruments or evaluate dynamic risk factors, protective factors, treatment responsiveness, or other

individualized psychological variables relevant to sexual offending risk. Instead, her opinions are limited to a single actuarial estimate derived from static historical factors.

The developers of the Static-99R likewise emphasize that the instrument is intended to provide a baseline actuarial estimate and should be interpreted in conjunction with the individual's unique psychological functioning, developmental history, offense dynamics, strengths, and other clinically relevant factors. Consequently, while her report provides a useful estimate of group-based actuarial risk, it offers only a limited individualized formulation regarding Mr. Smith's sexual offending risk and the psychological mechanisms underlying that risk.

Respectfully submitted,

**Miranda Rosenberg, Psy.D., PLLC**
Licensed Clinical Psychologist